1  Dean Gazzo Roistacher LLP
   Lee H. Roistacher, Esq. (SBN 179619)
2  Kimberly A. Sullivan, Esq. (317857)
   440 Stevens Avenue, Suite 100
3  Solana Beach, CA 92075
   Telephone: (858) 380-4683
4  Facsimile: (858) 492-0486
   E-mail: lroistacher@deangazzo.com
5          ksullivan@deangazzo.com

6  Attorneys for Defendant
   Jeffrey McKee

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10 DEVONTE STEPHENSON,                    Case No.: 5:21-cv-00526-JAK-DTBx
   individually and as successor in
11 interest to Decedent LEROY             **DEFENDANT JEFFREY MCKEE'S
   STEPHENSON; LINDEN                     NOTICE OF SUPPLEMENTAL
12 STEPHENSON, individually and as        AUTHORITY IN SUPPORT OF HIS
   successor in interest to Decedent      MOTION FOR SUMMARY
13 LEROY STEPHENSON;                      JUDGMENT [DOC. 64, 79, 92]**
   KEANDRE STEPHENSON,
14 individually and as successor in
   interest to Decedent LEROY             Judge: John A. Kronstadt
15 STEPHENSON,                            Mag. Judge David T. Bristow

16          Plaintiffs,                   Complaint Filed: March 24, 2021
                                          Trial Date: None set
17     v.

18 STATE OF CALIFORNIA;
   COUNTY OF RIVERSIDE; DANE
19 NOREM; JEFFREY MCKEE;
   MATT BORDEN; and DOES 1
20 through 100, inclusive,

21          Defendants.

22

23          Defendant Jeffrey McKee moved for summary judgment on September 25,

24 2023. Doc. 64. Pursuant to this Court's order, Doc. 78, McKee filed supplemental

25 briefing on December 28, 2023. Doc. 79. On August 2, 2024, plaintiffs filed

26 supplemental authority and briefing, and McKee responded on August 6, 2024.

27 ///

28

                                    1

Docs. 91, 92.  McKee now provides additional supplemental authority and briefing.

On September 16, 2024, the Ninth Circuit published its opinion in *Spencer v. Pew*, No. 21-15521, ___ F.4th ____, 2024 U.S. App. LEXIS 23463 (9th Cir. Sep. 16, 2024).  A copy of the decision is attached to this brief.

*Spencer* is dispositive on plaintiffs' "integral participant" claim against McKee, which is based on McKee, at the very end of the incident, holding down the decedent's legs for 15 seconds while he was handcuffed and being held down by another officer.

In *Spencer*, Mesa Police Department officers Aaron Pew and Jacob Rozema used various means of force against Spencer while trying to handcuff him.  2024 U.S. App. LEXIS 23463, at *4-6.  During the on-going struggle, Maricopa County Sheriff's Deputies Kevin Hall and Justin Macklin arrived.  *Id.* at *6-8.

The Court described what occurred after Deputy Macklin arrived, and his conduct is italicized as it is the conduct to which McKee's is later compared:

> As Macklin approached, Spencer was on his back, and one of the officers punched Spencer in the stomach. Spencer then turned to his side. Officer Pew pressed Spencer's face into the dirt as one of them stated, 'Relax your arm, my man.' *Deputy Macklin began to assist Officers Pew and Rozema in subduing Spencer, and the officers managed to turn him onto his stomach.* While pinning Spencer's head to the ground, Officer Pew repeatedly struck Spencer in the face with his knee. [fn] Pew then grabbed Spencer's head and slammed it into the ground twice. *With Macklin lying on top of Spencer to pin him down,* one of the officers instructed another to 'grab his left arm.' Around this time, a third MCSO officer, Sergeant Clark, arrived and approached the officers and Spencer, but he did not intervene. As the officers tried to handcuff Spencer, one of them again told him, 'Put your hand behind your back.'
>
> Pew then placed Spencer's head between his knees, and, while swearing, picked up Spencer's head and slammed it into the ground several times. Pew tasered Spencer in the neck for approximately 12 seconds, before then beginning to apply pressure to Spencer's carotid artery using what he called in his police report the 'carotid control technique.' [Citation].  While he was doing so, an officer again instructed Spencer, 'Put your hand behind your back!' Simultaneously, another officer had handcuffed Spencer's left hand and was attempting to handcuff his other hand. An officer asked,

2

'where's the other hand?' The officers were unable to bring Spencer's hands close enough to secure him in a single set of handcuffs, and so they chained two sets of handcuffs together in order to connect Spencer's left and right hands. Shortly thereafter, an officer said, 'Clasp it, clasp it, clasp it, there you go.' At that point, Spencer's right arm was also handcuffed. Around this point, Pew ceased applying pressure to Spencer's neck.

Once Spencer was handcuffed, *Deputy Macklin, who had been laying on top of Spencer, picked himself up to his knees.* Spencer was face down, and given the slack in his double-handcuffs, he was able to move his hands toward his side. One of the officers said, 'Stop! We're going to f**k you up unless you put your hands behind your back.' Another officer said, 'Hey, next time don't lie to me about your name.' Pew got up and placed a knee on Spencer's upper back, as another officer asked, 'You gonna tell me your name?' As Spencer lay on the ground with Pew's knee on his upper back, Pew said, 'Stop f**king kicking me.' Spencer squirmed on the ground, saying 'please stop!' and 'please help me!' Pew continued to place his knee on Spencer's upper back, as Spencer said, 'I can't breathe. I cannot breathe.' An officer responded by telling him 'Ok, well relax!' while another said, 'If you're screaming and fighting, man, you can breathe. You need to calm down.' The camera revealed that Spencer's face was covered in blood.

Spencer attempted to turn himself so that he would not be on his stomach, but Pew flipped him back over and held him down with his knee. Spencer continued to complain that he could not breathe, and the officers allowed him to turn onto his right side. Pew stood up a few seconds later. *The officers then held him down by pressing on his left arm while Macklin continued to kneel and straddle Spencer's legs. Shall then took Macklin's place.* Spencer asked Shall to get off his legs, and he also asked to be able to move back to lying on his stomach, but the officers said no. About 30 seconds later, however, they did allow him to move back onto his stomach. For the next several minutes, one or more officers held Spencer in place while Shall remained straddled over his legs. At one point, Spencer said, 'Please untighten it,' and an officer responded, 'Hold on, Fire's here and they're going to check you out.' Subsequently, an officer said, 'Hey, Fire's gonna come over here and look at you, you're not gonna act stupid are you?' Spencer was then asked his name, and he responded that it was 'Cole Spencer.' Emergency medical personnel then arrived to attend to Spencer.

*Id.* at *7-11.

The Ninth Circuit first analyzed the Fourth Amendment excessive force claims finding the Pew, Rozema and Macklin immune from liability for pre-handcuffing conduct but declining to find Pew immune for kneeling on Spencer's back for several after he was handcuffed and no longer a threat concluding,

///

3

1    viewing the facts in Spencer's favor, that conduct constituted excessive force

2    under clearly established law.  *Id.* at 14-33.

3        The court then addressed "whether any of the other officers are also liable

4    for Pew's excessive force" (i.e, kneeling on the back for several minutes of a now

5    compliant Spencer) "as so-called 'integral participants' in Pew's constitutional

6    violation."  *Id.* at *33-34.  The court rejecting this theory of liability against

7    Macklin (and other officers):

8        Although 'vicarious liability' is not available under § 1983, *see
     Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d

9    868 (2009), our caselaw has held that an officer may be culpable for a
     constitutional violation committed by another officer if the former 'is

10   an "integral participant" in the unlawful act' of the latter. *Peck v.
     Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (citation omitted). In

11   *Peck*, we summarized our precedent's "integral-participant doctrine"
     as allowing liability 'only if (1) the defendant knew about and

12   acquiesced in the constitutionally defective conduct as part of a
     common plan with those whose conduct constituted the violation, or

13   (2) the defendant set in motion a series of acts by others which the
     defendant knew or reasonably should have known would cause others

14   to inflict the constitutional injury.' *Id.* at 891 (emphasis added).
     Spencer failed to present sufficient evidence to create a triable issue of

15   liability under either theory as to any of the other officers.

16   Although Macklin leaned on Spencer's legs and Shall attached leg
     shackles to Spencer during part of the time that Pew had his knee on

17   Spencer's back, there is no evidence that Macklin or Shall knowingly
     acquiesced in Pew's unlawful conduct 'as part of a common plan' with

18   him. *Peck*, 51 F.4th at 891. Nor did their conduct set in motion acts
     that they reasonably should have known 'would cause' Pew to engage

19   in unlawful conduct. *Id.* (emphasis added). And Rozema's relevant
     actions, which were limited to getting Spencer handcuffed, likewise

20   provide no basis for finding him to be an integral participant in Pew's
     post-handcuffing misconduct.

21

22   *Id.* at *34-35.

23       Again, McKee arrived at the end of the incident after the decedent was

24   handcuffed and for 15 seconds held the decedent's legs down while another officer

25   was, allegedly, on the decedent's back.  If Macklin's conduct in holding Spencer

26   down after he was handcuffed -- conduct more significant and for a longer time

27   ///

28   ///

4

than McKee's conduct -- was insufficient to invoke the "integral participant" theory of liability, then McKee's conduct most certainly is insufficient.

Dated: September 18, 2024               Dean Gazzo Roistacher LLP


                                    By: _/s/ Lee H. Roistacher_
                                        Lee H. Roistacher
                                        Kimberly A. Sullivan
                                        Attorneys for Defendant
                                        Jeffrey McKee
                                        Email:  lroistacher@deangazzo.com
                                                ksullivan@deangazzo.com



**User Name:** Lee Roistacher
**Date and Time:** Wednesday, September 18, 2024 10:49:00AM PDT
**Job Number:** 233837610

## Document (1)

1. *Spencer v. Pew, 2024 U.S. App. LEXIS 23463*

   **Client/Matter:** -None-
   **Search Terms:** 2024 U.S. App. LEXIS 23463
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | Court: State Courts > California |

No *Shepard's* Signal™
As of: September 18, 2024 5:49 PM Z

## *Spencer v. Pew*

United States Court of Appeals for the Ninth Circuit

May 15, 2023, Argued and Submitted, Phoenix, Arizona; September 16, 2024, Decided

No. 21-15521

### Reporter

2024 U.S. App. LEXIS 23463 *

COLE JOSEPH SPENCER, Plaintiff-Appellant, v. AARON PEW, #19183, police officer; JACOB ROZEMA, #15724, police officer; KEVIN SHALL, #1554, deputy sheriff; JUSTIN MACKLIN, #1742, deputy sheriff; MARICOPA COUNTY SHERIFF'S OFFICE, Defendants-Appellees, and MESA POLICE DEPARTMENT; CITY OF MESA, Defendants.

**Prior History:** [*1] Appeal from the United States District Court for the District of Arizona. D.C. No. 2:20-cv-00385-DGC-CDB. David G. Campbell, District Judge, Presiding.

**Disposition:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

### Core Terms

handcuffed, arrest, taser, knee, qualified immunity, resistance, handcuff, arm, excessive force, neck, arrived, punches, district court, minutes, breathe, video, light most favorable, hands behind, non-compliance, stomach, severe, circumstances, responded, factors, legs, grant of summary judgment, clearly established law, reasonable officer, injuries, kneeling

### Summary:

SUMMARY*

**Excessive Force**

The panel affirmed in part and reversed in part the district court's summary judgment in favor of four law enforcement officers in plaintiff's *42 U.S.C. § 1983* action alleging the officers used excessive force during his arrest.

The panel first considered whether Officers Pew, Rozema, and Macklin violated plaintiff's clearly established rights with respect to the force that they used to secure plaintiff's hands in two linked sets of handcuffs. As to this force, the panel affirmed the district court's grant of qualified immunity based solely on the second, "clearly established law" prong of the qualified immunity test. Given that this was not an obvious case and there was no precedent that squarely governed, the panel concluded that defendants were entitled to qualified immunity with respect to their use of force up to the point that plaintiff was

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

handcuffed.

Plaintiff also alleged that Officer Pew violated his clearly established *Fourth Amendment* rights by kneeling on his upper back and neck and by **[*2]** continuing to do so after he protested that it was difficult for him to breathe. Viewing the facts in light most favorable to plaintiff, the panel concluded that Pew's conduct violated clearly established law. Accordingly, in that respect, the panel reversed the district court's grant of qualified immunity to Pew.

Finally, the panel considered whether any of the other officers were also liable for Pew's excessive force. Under this circuit's caselaw, an officer may be culpable for a constitutional violation committed by another officer if the former "is an 'integral participant' in the unlawful act" of the latter. *Peck v. Montoya, 51 F.4th 877, 889 (9th Cir. 2022)*. The panel concluded that plaintiff failed to present sufficient evidence to create a triable issue of liability as to any other of the other officers.

The panel remanded for proceedings with respect to Officer Pew, and otherwise affirmed the district court's summary judgment to all defendants.

**Counsel:** Hannah Garland and H.R. Fitzmorris (argued), Certified Law Students; Jeffrey M. Feldman, Supervising Attorney, Summit Law Group PLLC, Seattle, Washington; Elizabeth G. Porter, Faculty Advisor, Ninth Circuit Appellate Advocacy Clinic; University of Washington School of Law, Seattle, Washington; **[*3]** for Plaintiff-Appellant.

Alexander J. Lindvall (argued), Assistant City Attorney; Jason K. Reed, Deputy City Attorney; City of Mesa Attorney's Office, Mesa, Arizona; Anna G. Critz (argued), Joseph J. Branco, Sean M. Moore, and Charles E. Trullinger, Deputy County Attorneys; Rachel H. Mitchell, Maricopa County Attorney; Maricopa County Attorney's Office, Civil Services Division, Phoenix, Arizona; for Defendants-Appellees.

**Judges:** Before: Jacqueline H. Nguyen, Daniel P. Collins, and Kenneth K. Lee, Circuit Judges. Opinion by Judge Collins.

**Opinion by:** Daniel P. Collins

## Opinion

COLLINS, Circuit Judge:

In this action under *42 U.S.C. § 1983*, Plaintiff Cole Spencer alleges that Defendants Aaron Pew, Jacob Rozema, Justin Macklin, and Kevin Shall, who are all law enforcement officers, used excessive force during his arrest on March 21, 2018 in Mesa, Arizona. The district court granted summary judgment to all four Defendants. Spencer now appeals. We affirm in part and reverse in part.

# I

## A

Because this appeal arises from a grant of summary judgment, we view the evidence

in the light most favorable to Spencer and draw all reasonable inferences in his favor. *Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).* Accordingly, where Spencer's sworn statements directly contradict Defendants' statements, **[\*4]** we disregard the latter and credit the former. *Id.* However, to the extent that the uncontested video evidence from the officers' body cameras establishes the timing and occurrence of events, we "view[] the facts in the light depicted by the videotape." [1] *Id. at 380-81.* With those principles in mind, we take the following facts as true for purposes of this appeal.

On March 21, 2018, Mesa Police Department ("MPD") Officers Aaron Pew and Jacob Rozema were driving in an unmarked police vehicle on a street in Mesa, Arizona when another vehicle exiting a driveway pulled out right in front of them. Officer Pew, who was driving the police vehicle, had to "slam on his brakes" in order to avoid colliding with the other vehicle. The officers pulled over the other vehicle for having made an "unsafe and illegal traffic maneuver." Jamie Kern was driving the other vehicle, and Plaintiff Cole Spencer was in the front passenger seat. Spencer appeared visibly nervous as he spoke with the officers, and when asked to identify himself, he falsely stated that his name was "Kenneth Cory." Officer Rozema conducted an immediate records check, which indicated that Spencer did not match the DMV photograph for "Kenneth Cory." **[\*5]**

At that point, Rozema asked Spencer to step out of the vehicle and to "put his hands behind his back." Rozema told Spencer that he was under arrest, although the parties dispute whether Rozema also informed Spencer that the arrest was for "false reporting."

As Spencer stepped out of the vehicle, Rozema grabbed and twisted Spencer's wrist. [2] Spencer then "pushed Rozema with his left shoulder," hitting him in the chest. While Rozema continued to hold Spencer's wrist, one of the officers punched Spencer in the face, knocking Spencer to the ground. It was undisputed in the district court that, from this point forward, Spencer was not successfully handcuffed until after "approximately three-and-a-half minutes of wrestling with [Spencer]" by the officers.

Over the course of the ensuing struggle, Pew deployed a taser against Spencer at least four times, including the specific taser uses that we will discuss momentarily. On the first occasion, the taser was deployed in "probe" mode—meaning that "the taser shot two small, electrically charged probes onto Mr. Spencer"—but Spencer was able to remove the probes from his neck. For the remaining three deployments, the taser was in "drive-stun" mode, **[\*6]** meaning that Pew "activated the taser's electrical contact points and held the device to Mr. Spencer's body." During this time, Spencer was also repeatedly punched and kicked in the face by the officers. Spencer acknowledges that the officers instructed him to give up his

---

[1] Although Spencer contended below that portions of the video and audio are missing from these tapes, he did not contend that the remaining audio and video are inaccurate or unreliable.

[2] There is no video or audio evidence in the record concerning this initial portion of the encounter with Spencer, which involved only Officers Pew and Rozema.

hands and that he did not do so, but he claimed that he told the officers that his hands were "locked up" from the effects of the taser. Spencer denies "throw[ing] a punch, a kick or any type of strike towards any officer" at any point during this struggle with the officers.

At some point after the struggle began, Deputy Kevin Shall from the Maricopa County Sheriff's Office ("MCSO") arrived. Unlike the MPD officers, the various MCSO deputies who arrived had body cameras that captured much of the ensuing events, and we therefore rely primarily on that video and audio evidence in recounting what happened from that point forward. *Scott, 550 U.S. at 380-81*. At the time Shall arrived, Pew, Rozema, and Spencer were on a patch of dirt separating the main road from a dead-end parallel frontage road. Pew and Rozema were kneeling over Spencer who was lying on the ground, and they were attempting to handcuff him. Shall stayed with Kern, who was still [*7] seated in his vehicle nearby, and Shall at this point did not attempt to assist the officers in subduing Spencer.

As Pew and Rozema struggled with Spencer, one of the officers yelled at him, "Put your hands behind your back! Hands behind your back!" Spencer can be heard saying something about his "hands" in response. This was followed by the sound of a taser, and Spencer then screamed, "I have a pacemaker!" At this point in the struggle, Spencer had shifted to being on his knees, with his head bent down towards his knees, and Officers Pew and Rozema were above Spencer, still attempting to handcuff him.

As the officers continued to struggle with Spencer, one of them shouted, "Why are you resisting? Put your hands behind your back!"

Just at this point, Deputy Macklin arrived. As Macklin approached, Spencer was on his back, and one of the officers punched Spencer in the stomach. Spencer then turned to his side. Officer Pew pressed Spencer's face into the dirt as one of them stated, "Relax your arm, my man." Deputy Macklin began to assist Officers Pew and Rozema in subduing Spencer, and the officers managed to turn him onto his stomach. While pinning Spencer's head to the ground, Officer [*8] Pew repeatedly struck Spencer in the face with his knee. [3] Pew then grabbed Spencer's head and slammed it into the ground twice. With Macklin lying on top of Spencer to pin him down, one of the officers instructed another to "grab his left arm." Around this time, a third MCSO officer, Sergeant Clark, arrived and approached the officers and Spencer, but he did not intervene. As the officers tried to handcuff Spencer, one of them again told him, "Put your hand behind your back."

Pew then placed Spencer's head between his knees, and, while swearing, picked up Spencer's head and slammed it into the ground several times. Pew tasered Spencer in the neck for approximately 12 seconds, before then beginning to apply pressure to

---

[3] According to his post-incident report, Officer Pew wrote that he (1) "delivered 3-4 knee strikes to [Spencer's] face with negative results," (2) "shoved [Spencer's] face into the ground 3-4 times," and (3) "placed [Spencer's] head between my knees with his head face down, put [m]y thumbs on the back of his neck . . . where I believed his carotid artery was located and squeezed . . . hoping [Spencer] would go unconscious, so we could control him."

Spencer's carotid artery using what he called in his police report the "carotid control technique." *See supra* note 3. While he was doing so, an officer again instructed Spencer, "Put your hand behind your back!" Simultaneously, another officer had handcuffed Spencer's left hand and was attempting to handcuff his other hand. An officer asked, "where's the other hand?" The officers were unable to bring Spencer's hands close enough to secure him in a single set of handcuffs, **[*9]** and so they chained two sets of handcuffs together in order to connect Spencer's left and right hands. Shortly thereafter, an officer said, "Clasp it, clasp it, clasp it, there you go." At that point, Spencer's right arm was also handcuffed. Around this point, Pew ceased applying pressure to Spencer's neck.

Once Spencer was handcuffed, Deputy Macklin, who had been laying on top of Spencer, picked himself up to his knees. Spencer was face down, and given the slack in his double-handcuffs, he was able to move his hands toward his side. One of the officers said, "Stop! We're going to f**k you up unless you put your hands behind your back." Another officer said, "Hey, next time don't lie to me about your name." Pew got up and placed a knee on Spencer's upper back, as another officer asked, "You gonna tell me your name?" As Spencer lay on the ground with Pew's knee on his upper back, Pew said, "Stop f**king kicking me." Spencer squirmed on the ground, saying "please stop!" and "please help me!" Pew continued to place his knee on Spencer's upper back, as Spencer said, "I can't breathe. I cannot breathe." An officer

responded by telling him "Ok, well relax!" while another said, "If you're **[*10]** screaming and fighting, man, you can breathe. You need to calm down." The camera revealed that Spencer's face was covered in blood.

Spencer attempted to turn himself so that he would not be on his stomach, but Pew flipped him back over and held him down with his knee. Spencer continued to complain that he could not breathe, and the officers allowed him to turn onto his right side. Pew stood up a few seconds later. The officers then held him down by pressing on his left arm while Macklin continued to kneel and straddle Spencer's legs. Shall then took Macklin's place. Spencer asked Shall to get off his legs, and he also asked to be able to move back to lying on his stomach, but the officers said no. About 30 seconds later, however, they did allow him to move back onto his stomach. For the next several minutes, one or more officers held Spencer in place while Shall remained straddled over his legs. At one point, Spencer said, "Please untighten it," and an officer responded, "Hold on, Fire's here and they're going to check you out." Subsequently, an officer said, "Hey, Fire's gonna come over here and look at you, you're not gonna act stupid are you?" Spencer was then asked his name, and **[*11]** he responded that it was "Cole Spencer." Emergency medical personnel then arrived to attend to Spencer.

**B**

Six months after his arrest, Spencer pleaded guilty to aggravated assault for pushing

Officer Rozema as well as to additional unrelated charges. At the change of plea hearing, Spencer's counsel stated that the factual basis for the plea was that Spencer "pushed the officer and made a movement." The prosecutor then pointed out that an element of the offense was that Spencer had "intentionally, knowing, or recklessly caus[ed] physical injury." When the court asked what was the factual basis for that element, the prosecutor stated that the officer "has injuries to his hip and also multiple abrasions and cuts." The court then asked whether that additional factual basis was disputed, and Spencer's counsel responded, "No dispute."

While incarcerated, Spencer filed a pro se complaint pursuant to _42 U.S.C. § 1983_ against Officers Pew and Rozema, Deputies Shall and Macklin, the City of Mesa, the Mesa Police Department, the Maricopa County Sheriff's Office, and the County of Maricopa. The operative complaint alleged that the officers, in arresting Spencer, had used excessive force in violation of the _Fourth Amendment_. Spencer **[*12]** sought compensatory and punitive damages.

After screening the complaint in accordance with _28 U.S.C. § 1915A_, the district court dismissed without prejudice the claims against the City, County, and their respective law enforcement agencies. The court, however, ordered Pew, Rozema, Shall, and Macklin to respond to the claim for excessive force. [4] Nearly a year later, the district court granted summary judgment to all four officers.

The district court concluded that Officers Pew and Rozema were shielded by qualified immunity because no clearly established law prohibited the degree of force they used in arresting Spencer. The court concluded that "it is not clearly established that officers cannot use significant force when an arrestee actively resists arrest, shows unusual strength, and refuses to submit to handcuffing despite multiple orders to do so."

As to Deputy Macklin, who "arrived after Plaintiff was on the ground and Defendants Pew and Rozema were trying to gain control of him," the district court also granted summary judgment based on qualified immunity. Although "Macklin did not know why Plaintiff was being arrested," the district court stated that he could reasonably "conclude that Plaintiff's **[*13]** crime was severe given his level of resistance." Beyond that one difference, the court held that the same analysis "applied to the conduct of Pew and Rozema applies equally to Macklin."

The district court noted that Deputy Shall "did not use any force in the interaction with Plaintiff" inasmuch as he was merely "standing near the altercation" with his attention "focused on the driver of the vehicle." The court further concluded that there was "no evidence that Defendant Shall had sufficient information from which he could conclude that he should intervene in an excessive use of force." The court therefore granted summary judgment to

---

[4] The court noted that the pro se complaint could be construed as also asserting a malicious prosecution claim against Shall and Macklin, but the court dismissed that claim without prejudice. That dismissal is not challenged on appeal.

Shall on the merits of the *Fourth Amendment* claim, rather than based on qualified immunity.

Spencer timely appealed the resulting judgment, and we have jurisdiction under *28 U.S.C. § 1291*. We review de novo the district court's grant of summary judgment to Defendants. *S.B. v. County of San Diego, 864 F.3d 1010, 1013 (9th Cir. 2017).*

## II

We first address the district court's grant of summary judgment to Pew, Rozema, and Macklin based on qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which **[*14]** a reasonable person would have known.'" *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)* (citation omitted). To defeat the defense of qualified immunity, the plaintiff must satisfy a two-pronged burden: (1) the plaintiff must allege or show (depending upon the stage of the litigation) sufficient facts to "make out a violation of a constitutional right"; and (2) the plaintiff must demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id. at 232* (citation omitted). The courts are not required to consider these two prongs in any particular order, and judges therefore have discretion to uphold a claim of qualified immunity based solely on the ground that,

even if there was a violation of the Constitution, the plaintiff has not shown that the claimed right was "clearly established." *Id. at 242-43*. As noted earlier, that was the course the district court took in concluding that Pew, Rozema, and Macklin were entitled to qualified immunity.

## A

We consider first whether Pew, Rozema, and Macklin violated Spencer's clearly established rights with respect to the force that they used to secure Spencer's hands in the two linked sets of handcuffs. As to this force, we affirm the district court's grant of qualified **[*15]** immunity based solely on the second, "clearly established law" prong of the qualified immunity test.

## 1

"Any claim that an officer used excessive force 'in the course of an arrest, investigatory stop, or other "seizure" of a free citizen' is governed by the *Fourth Amendment's* standard of objective reasonableness." *Demarest v. City of Vallejo, 44 F.4th 1209, 1225 (9th Cir. 2022)* (quoting *Graham v. Connor, 490 U.S. 386, 395-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*). "[W]hether an officer has used excessive force 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest

by flight.'" *Kisela v. Hughes, 584 U.S. 100, 103, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018)* (quoting *Graham, 490 U.S. at 396*).

Although these general standards have long been established, that does not mean that any violation of them can therefore be said to violate "clearly established" law. Rather, the qualified-immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5, 142 S. Ct. 4, 211 L. Ed. 2d 164 (2021)* (citation omitted). Indeed, the Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela, 584 U.S. at 104* (citation omitted). Accordingly, for a **[*16]** right to be "clearly established," the "right's contours" must have been "sufficiently definite that any reasonable official *in the defendant's shoes* would have understood that he was violating it." *Plumhoff v. Rickard, 572 U.S. 765, 778-79, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014)* (emphasis added). "Specificity is especially important in the *Fourth Amendment* context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Rivas-Villegas, 595 U.S. at 6* (simplified). Because "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' . . . police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the specific facts at issue." *Kisela, 584 U.S. at 104*

(emphasis added) (citation omitted).

In light of these principles, the Supreme Court has held that, except for an "obvious case" in which *Graham*'s general standards are alone sufficient to "'clearly establish' the answer," the plaintiff "must *identify a case* that put [the officer] on notice that his specific conduct was unlawful." *Rivas-Villegas, 595 U.S. at 6* (emphasis added). Although the plaintiff does not need to find a "case directly on point," he or she must identify a binding precedent that is not "materially **[*17]** distinguishable" and that can be said to "govern the facts of this case" in the sense that it "place[s] the statutory or constitutional question beyond debate." *Id. at 5-6* (citations omitted). "In other words, [a plaintiff] must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful." *Sharp v. County of Orange, 871 F.3d 901, 911 (9th Cir. 2017)* (emphasis in original). With respect to the force used to handcuff him, Spencer has failed to show either that this is an "obvious case" under *Graham*'s standards or that there is a materially indistinguishable precedent that squarely governs this case.

2

As noted earlier, *Graham*'s objective test for assessing the reasonableness of the use of force in effectuating an arrest turns on "the facts and circumstances of each particular case," including certain specific factors that the Court there identified. *490 U.S. at 396*. Consideration of these factors makes clear

that this is not an "obvious case" in which the general standards alone suffice to make clear to every reasonable officer that the arresting officers' conduct up to the point of the handcuffing was unreasonable in violation of the *Fourth Amendment*.

The first *Graham* factor—"the severity of the crime at **[*18]** issue"—weighs in favor of Defendants. Spencer emphasizes that he was initially told, upon stepping out of the car, that he was being arrested for the offense of making a false statement to a police officer, which is only a misdemeanor. *See ARIZ. REV. STAT. § 13-2907.01(A)*. But once Spencer pushed Officer Rozema with his shoulder, he had committed the offense of aggravated assault—an offense to which he subsequently pleaded guilty—and that offense is a felony. *See id.* § 13-1204(G). This was a sufficiently serious offense to warrant the use of potentially significant force to ensure that Spencer submitted to arrest.

The second *Graham* factor—which we have identified as the "most important," *Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011)* (en banc)—is the extent to which "the suspect poses an immediate threat to the safety of the officers or others." *Graham, 490 U.S. at 396*. Construing the evidence in the light most favorable to Spencer, we conclude that a reasonable jury could find that, after the initial assault on Rozema, Spencer did not thereafter strike any of the officers. Spencer specifically denied under oath that he had thrown any punches, kicks, or strikes at the officers. Nor does the video evidence disclose any instance in which Spencer struck any of the officers.

Moreover, as Spencer notes, **[*19]** after the paramedics had arrived, someone asked Shall if Spencer had "throw[n] any blows or anything like that," and Shall responded, "No." To the extent that Spencer presented any threat to the officers as they attempted to handcuff him, it was primarily the incidental result of the difficulty they had in doing so.

The third *Graham* factor is whether the person "is actively resisting arrest or attempting to evade arrest by flight." *490 U.S. at 396*. Viewing the evidence in the light most favorable to Spencer, we agree that a reasonable trier of fact could conclude he was not trying to run away from the officers at the time that he was tackled. Spencer claims that he shoved the officer "to create separation between" himself and them, that he did not break free of the officer's grip, and that he did not run up the street as the officers claimed. However, the video evidence makes indisputably clear that it took very substantial effort to secure Spencer in a set of double-linked handcuffs.

Spencer emphasizes that a reasonable trier of fact could conclude that he did not *subjectively* intend to resist the officers: as he later claimed in his declaration, he "had little to no control over [his] body," because his **[*20]** "legs and arms were going in and out of being locked up." And to the extent that his non-compliance involved "voluntary movements," he contends, they "were not resistance, but an attempt to block punches." But "[t]he qualified immunity analysis . . . is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question,"

*Hernandez v. Mesa, 582 U.S. 548, 554, 137 S. Ct. 2003, 198 L. Ed. 2d 625 (2017)*, and so Spencer's subjective intentions are not relevant except to the extent that they were communicated to the officers. Spencer averred that he informed the officers at one point that "my hands were locked up," and we are unable to say that this claim is contradicted by the video evidence. As noted earlier, the video evidence at one point shows that Spencer said something about his "hands" in response to an instruction to put his hands behind his back, shortly before he also tells the officers, "I have a pacemaker!" But even taking as true that Spencer told the officers that his hands were "locked up," we cannot say that every reasonable officer, considering the objective circumstances concerning the nature and length of Spencer's non-compliance, would have taken his statements at face value. *See Winterrowd v. Nelson, 480 F.3d 1181, 1184 (9th Cir. 2007)* (noting that **[*21]** an officer need not "unduly credit[]" a suspect's claim that he is "physically unable to comply with a request").

Spencer also argues that there is a factual dispute as to whether the officers correctly characterized his non-compliant behavior as involving "superhuman strength" and "high pain tolerance." But even setting aside these characterizations, the video evidence indisputably shows that, for nearly three full minutes after Shall arrived, the officers had great difficulty in getting Spencer handcuffed. And for two of those three minutes, Macklin had joined the other two officers in attempting to handcuff Spencer.

Considering these factors together in light of all of the circumstances, "this is not an 'obvious case' where 'a body of relevant case law' is not needed." *District of Columbia v. Wesby, 583 U.S. 48, 65, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018)* (citation omitted). Keeping in mind that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly **[*22]** evolving—about the amount of force that is necessary in a particular situation," *Kisela, 584 U.S. at 103* (citation omitted), we are unable to say that this is an "obvious" case in which, from the *Graham* factors alone, "*every* reasonable official would have understood that what he is doing violates" the right to be free from excessive force, *Mullenix v. Luna, 577 U.S. 7, 11, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)* (emphasis added) (citation omitted). Even taking the evidence in the light most favorable to Spencer, his objective actions made it very difficult for the officers to handcuff him, resulting in an extended struggle and multiple uses of various types of force (a stomach punch, head strikes, and taser shots) that each could reasonably be thought to be likely to reduce Spencer's non-compliance with being handcuffed.[5]

---

[5] Spencer contends that there is a triable issue as to whether the officers acted, not with the purpose of inducing compliance, but with the "punitive" purpose of dispensing "punishment for his having provided a false name." But as the Supreme Court made clear in *Graham*, "the subjective motivations of the individual officers . . . has no bearing on whether a particular seizure is 'unreasonable' under the *Fourth Amendment*." *490 U.S. at 397*.

The *Graham* factors, standing alone, do not clearly establish that the sort of significant force employed here cannot be used against a defendant who objectively appears to resist being handcuffed for a serious crime and who does so to such a degree that it took three officers several minutes even to get a linked set of double handcuffs on him.

**3**

Because this is not an "obvious" case under *Graham*'s general framework, Spencer "must identify a case that put [the officers] on notice **[\*23]** that [their] specific conduct was unlawful." *Rivas-Villegas, 595 U.S. at 6*. He has failed to do so.

With respect to the force used up to the point of handcuffing, Spencer first points to *Jones v. Las Vegas Metropolitan Police Department, 873 F.3d 1123 (9th Cir. 2017)*. In *Jones*, officers used one or more tasers continuously "for over ninety seconds" in the course of arresting Anthony Jones, an unarmed suspect who had fled on foot from a routine traffic stop and who had "neither threatened [the officers] nor committed a serious offense." *Id. at 1130*. One officer "tased Jones essentially nonstop that whole time." *Id. at 1127*. As soon as the tasing stopped, Jones's "body went limp" and he "was pronounced dead shortly thereafter." *Id.* Here, the officers did not simultaneously use multiple tasers, nor did they tase Spencer for 90 seconds straight until he was literally at the point of death. And unlike Jones, Spencer had committed an assault on a police officer, which is a much more serious offense than running from a traffic

stop. Given these significant differences, *Jones* does not "'squarely govern[]' the specific facts at issue." *Kisela, 584 U.S. at 104* (citation omitted).

Spencer also relies on *Mattos v. Agarano, 661 F.3d 433 (9th Cir. 2011)* (en banc), but it too "is materially distinguishable and thus does not govern the facts of this case." *Rivas-Villegas, 595 U.S. at 6*. *Mattos* involved consolidated appeals from two entirely **[\*24]** separate cases, one involving the use of a taser against Malaika Brooks and the other involving taser use against Jayzel Mattos. *Mattos, 661 F.3d at 436 & n.1*. Although we held that qualified immunity applied in both cases, we also held that the taser use in each case constituted excessive force in violation of the *Fourth Amendment*. *Id. at 443-46, 448-52*.

In the first case, Brooks refused to sign her speeding ticket for driving 32 miles per hour in a 20-mile-per-hour school zone, and when the officers stated that she needed to step out of the car and that she would be arrested, she refused to move and instead "stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remove her from the car." *Id. at 437*. Noting that the officers had succeeded in removing Brooks's keys from the car's ignition and that the officers knew that Brooks was seven months pregnant, we held that the officers' application of a taser three times in "rapid succession" was excessive in light of the "minor" nature of her alleged offenses, the lack of any "immediate threat to the safety of the officers or others," and the absence of any other exigency. *Id. at*

445-46. Here, Spencer had committed a much more serious offense than speeding and refusing to sign a ticket. And Spencer **[*25]** was not a seven-months pregnant woman who passively resisted leaving her car; video evidence shows he was a relatively large and strong person with whom multiple officers struggled on the ground for nearly three minutes. *Id. at 445-46* (stating it was an "overwhelmingly salient" fact that the officers made rapid successive use of a taser on a person the officers knew to be seven months pregnant).

In the second case addressed in the *Mattos* opinion, Mattos asked her 14-year-old daughter to call the police in connection with a domestic incident that was then occurring between Mattos and her husband Troy. *661 F.3d at 438*. When the officers arrived, they found Troy sitting outside with "a couple of open beer bottles lying nearby" and "smell[ing] of alcohol." *Id.* The officers attempted to question the 200-pound, 6-foot-3-inch Troy about the domestic dispute, but he became "agitated and rude." *Id.* After Troy went inside to get Mattos, an officer followed him into the home. *Id. at 438-39*. Mattos came into the living room, approached the officer, and agreed to speak with him outside. *Id. at 439*. Before she could do so, however, a second officer entered the home, announced that Troy was under arrest, and "pushed up against [Mattos's] chest" as **[*26]** he approached Troy, who was then behind Mattos. *Id.* Mattos "extended her arm to stop her breasts from being smashed against [the passing officer's] body," all while she continued speaking with the first officer. *Id.*

The second officer stated to Mattos, "Are you touching an officer?" *Id.* Then, without warning, that officer deployed his taser on Mattos in "dart-mode" while Troy was handcuffed by the two other officers who were then in the room. *Id.* We held that, because Mattos's resistance was "minimal," she was otherwise cooperating with the officers, and she "posed no threat to the officers," the use of a taser in dart mode without warning was unreasonable. *Id. at 451*. Here, by contrast, Spencer's objective level of resistance was more than minimal, and he was the person sought to be arrested and not an "innocent" victim of a domestic dispute. *Id.*

In his reply brief, Spencer also cites two cases—*Blankenhorn v. City of Orange, 485 F.3d 463 (9th Cir. 2007)*, and *Winterrowd, 480 F.3d 1181*—for the proposition that "[o]fficers cannot use significant force against a noncomplying suspect if the noncompliance is involuntary or unintentional." Neither precedent squarely governs this case.

In *Blankenhorn*, several officers struggled on the ground with Blankenhorn while they attempted to arrest him **[*27]** for trespassing, and one of them used punches in an effort to get Blankenhorn to free up his hands so that he could be handcuffed. *Blankenhorn, 485 F.3d at 478, 480*. Noting that the officer's justification for the punches was that Blankenhorn kept his arms underneath himself, we noted that, in light of Blankenhorn's contrary testimony, we had to take as true that Blankenhorn "never pinned his arms underneath his body." *Id. at 480*. Under those facts, Blankenhorn's arms

*were* accessible to the officers, and the punches were simply unnecessary and excessive. *Id.* Here, by contrast, the undisputed evidence shows that, at the time of the various strikes to Spencer, his arms were not comparably available to the officers for handcuffing.

*Winterrowd* involved a *Terry* stop of a motorist based on suspicion that his car's "plates were invalid." *480 F.3d at 1182*. After Winterrowd was unable to produce any registration for the car, the officers asked him to step out of the vehicle. *Id.* As the officers then attempted to perform a "routine pat-down for officer safety"—and not an arrest—Winterrowd stated that he could not put his hands behind his back due to a shoulder injury. *Id. at 1182-83*. Without making any further inquiry, the officers "forc[ed] him onto the hood of the car" and **[*28]** then grabbed his arm "and forced it up." *Id. at 1183*. When Winterrowd "screamed in pain," the officer "applied greater pressure, pumping his arm up and down." *Id.* "After several seconds of this treatment, [the officer] released Winterrowd, who fell to the ground." *Id.* In holding that the force used was unreasonable, we emphasized that our decision did "*not* require officers to risk their own safety by crediting a suspect's claim that he is injured." *Id. at 1186* (emphasis added); *see also id. at 1184* (noting that "some suspects may feign injury" during a police seizure). We instead held that, given the very minor offense involved, the lack of any "immediate threat" or resistance from Winterrowd, and the availability of "other means" for the officers

to pat down Winterrowd, the officers were unjustified in proceeding to conduct the pat down "in a manner that will cause the suspect pain." *Id. at 1186*. Here, by contrast, Spencer's offense was not minor; he was being arrested, not patted down during a *Terry* stop; and his objective behavior involved protracted and substantial noncompliance. *Winterrowd* does not establish that, in such circumstances, the officers were required to credit Spencer's claims about why he was not cooperating. [6]

Given **[*29]** that this is not an obvious case and there is no precedent that squarely governs, we conclude that Defendants are entitled to qualified immunity with respect to their use of force up to the point that Spencer was handcuffed.

**B**

However, Spencer's allegations of excessive force are not limited to Defendants' conduct before he was handcuffed. Spencer also alleges that Pew violated Spencer's clearly established *Fourth Amendment* rights by kneeling on his upper back and neck and by continuing to do so after Spencer protested that it was difficult for him to breathe. Viewing the facts in the light most favorable to Spencer, we conclude that Pew's conduct violated clearly established law. In particular, we agree with Spencer that, with

---

[6] Spencer also relies on *Beaver v. City of Federal Way, 507 F. Supp. 2d 1137 (W.D. Wash. 2007)*, in which a magistrate judge, noting that "the case law on use of Tasers is not well developed," purported to establish a series of bright-line rules about the use of tasers. *Id. at 1149*. However, district court decisions "are insufficient to create a clearly established right." *Marsh v. City of San Diego, 680 F.3d 1148, 1159 (9th Cir. 2012)*.

respect to Pew's conduct after Spencer was handcuffed, our decision in *Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003)*, is not "*materially* distinguishable" and that it therefore "govern[s] the facts of this case." *Rivas-Villegas, 595 U.S. at 6* (emphasis added).

In *Drummond*, officers responding to a call found Drummond in a parking lot "hallucinating and in an agitated state." *343 F.3d at 1054*. While awaiting an ambulance, they "decided to take him into custody, 'for his own safety.'" *Id.* Drummond offered no resistance and was handcuffed after being knocked to the ground. *Id. [*30]* One officer "put his knees into Mr. Drummond's back and placed the weight of his body on him," while a second officer "also put his knees and placed the weight of his body on him, except that he had one knee on Mr. Drummond's neck." *Id.* The officers continued to kneel on Drummond's back and neck despite his pleas that "he could not breathe and that they were choking him." *Id. at 1054-55*. Drummond was subsequently placed in a "hobble restraint," and one minute later he fell unconscious. *Id. at 1055*. Although he was revived after several minutes, he remained in a "permanent vegetative state." *Id.*

In holding that the force was excessive, we emphasized several considerations. First, the level of force used was "severe," because "two officers continued to press their weight on [Drummond's] neck and torso as he lay handcuffed on the ground and begged for air." *Drummond, 343 F.3d at 1056*. Second, although Drummond concededly may have presented a danger to

himself or others *before* being handcuffed, once he was on "'the ground where the officers cuffed his arms behind his back as he lay on his stomach,' a jury could reasonably find that he posed only a minimal threat to anyone's safety." *Id. at 1057-58* (simplified). Third, a jury could find that, once handcuffed, [*31] Drummond was not resisting and "there was therefore little or no need to use any further physical force." *Id. at 1058*. Fourth, Drummond's obvious mental illness suggested that officers should have considered using less severe measures. *Id.* In light of these factors, we held that any reasonable officer "should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id. at 1059*.

We believe that *Drummond* is sufficiently materially similar to this case to provide adequate notice to Pew that his post-handcuffing compression of Spencer's back and neck with his knee was excessive. *Kisela, 584 U.S. at 105*. While the two cases present very different facts prior to the handcuffing of the detainee, they are materially similar in the relevant respects post-handcuffing.

As the body camera footage shows, once Spencer was handcuffed, Pew knelt on Spencer, placing his full body weight onto Spencer's upper back and neck as other officers held him down. Except for a few seconds in which he briefly knelt next to Spencer, Pew had one or both knees on Spencer's back for nearly three minutes. During that time, Spencer complained that

he could [*32] not breathe at least four separate times. At one point, Pew simultaneously had his right knee on Spencer's head and his left knee on Spencer's back for more than 10 seconds. Viewed in the light most favorable to Spencer, these facts are not materially distinguishable from *Drummond*. Here, as in *Drummond*, Pew "continued to press [his] weight on [Spencer's] neck and torso as he lay handcuffed on the ground and begged for air." *343 F.3d at 1056*. Although Spencer continued to move somewhat on the ground, he was handcuffed and surrounded by multiple officers, and a jury could reasonably conclude that he was no longer providing any serious resistance and that "he posed only a minimal threat to anyone's safety." *Id. at 1057-58*. Although some force might have been warranted to check his remaining movements, every reasonable officer would recognize that full-body-weight compression of a then largely "compliant, prone, and handcuffed individual despite his pleas for air involve[d] a degree of force that is greater than reasonable." *Id. at 1059*. Although *Drummond* involved a mentally ill person rather than someone who had resisted handcuffing and involved two officers rather than one, we do not think these factual differences are material to *Drummond*'s controlling holding [*33] here.

Nor does it matter that, in *Drummond*, the detainee's injuries—*viz.*, severe brain damage—were much more grievous than Spencer's claim that he suffered "two fractured vertebrae" in his lower back and

experiences lingering pain and numbness in his shoulder, back, and neck. At the time that Pew acted, he could not know the exact extent of the injuries that might result from his unwarranted use of severe compression on Spencer's back. *See Hernandez v. Mesa, 582 U.S. at 554* (stating that the qualified immunity inquiry "is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question" (citation omitted)). While the later-revealed extent of a detainee's injuries may provide some objective evidence of the amount of force used, *see Felarca v. Birgeneau, 891 F.3d 809, 817 (9th Cir. 2018)*, the claimed injuries here, although different, are not minor and provide no basis for materially distinguishing *Drummond*.[7]

Viewing the facts in the light most favorable to Spencer, we conclude that Pew violated clearly established law in connection with his kneeling on Spencer after Spencer was handcuffed. Accordingly, in that respect, we reverse the district court's grant of qualified immunity to Pew.

## III

The only remaining question is whether any of [*34] the other officers are also liable for

---

[7] Contrary to what Defendants contend, *Rivas-Villegas* provides no basis for escaping *Drummond*'s controlling holding here. In sharp contrast to this case, the kneeing of the back that occurred in *Rivas-Villegas* lasted "for no more than eight seconds." *595 U.S. at 7*. And because we conclude that *Drummond* squarely governs here, we need not resolve the parties' disputes as to whether our decision in *LaLonde v. County of Riverside, 204 F.3d 947 (9th Cir. 2000)*, also sufficed to clearly establish that Pew violated Spencer's *Fourth Amendment* rights.

Pew's excessive force. Spencer contends that the other Defendants are also liable as so-called "integral participants" in Pew's constitutional violation, [8] but this theory fails as a matter of law.

Although "vicarious liability" is not available under *§ 1983*, *see Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*, our caselaw has held that an officer may be culpable for a constitutional violation committed by another officer if the former "is an 'integral participant' in the unlawful act" of the latter. *Peck v. Montoya, 51 F.4th 877, 889 (9th Cir. 2022)* (citation omitted). In *Peck*, we summarized our precedent's "integral-participant doctrine" as allowing liability "*only* if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Id. at 891* (emphasis added). Spencer failed to present sufficient evidence to create a triable issue of liability under either theory as to any of the other officers.

Although Macklin leaned on Spencer's legs and Shall attached leg shackles to Spencer during **[*35]** part of the time that Pew had

his knee on Spencer's back, there is no evidence that Macklin or Shall knowingly acquiesced in Pew's unlawful conduct "as part of a common plan" with him. *Peck, 51 F.4th at 891*. Nor did their conduct set in motion acts that they reasonably should have known "would *cause*" Pew to engage in unlawful conduct. *Id.* (emphasis added). And Rozema's relevant actions, which were limited to getting Spencer handcuffed, likewise provide no basis for finding him to be an integral participant in Pew's post-handcuffing misconduct.

* * *

For the foregoing reasons, we reverse in part the district court's grant of summary judgment as to Officer Pew, and we remand for proceedings with respect to him that are consistent with this opinion. We otherwise affirm the district court's grant of summary judgment to all Defendants.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

---

**End of Document**

---

[8] Strictly speaking, Spencer only invoked the integral-participant doctrine with respect to Deputies Macklin and Shall, but that is because his brief takes the position that Rozema was equally directly culpable as Pew in all respects. We construe the latter argument as subsuming within it the lesser-included argument that Rozema would also alternatively be liable as an integral participant.