# EXHIBIT 1

1  **LAW OFFICES OF DALE K. GALIPO**
   Dale K. Galipo, SBN 144074
2  Cooper Alison-Mayne, SBN 343169
   21800 Burbank Boulevard, Suite 310
3  Woodland Hills, California 91367
   Telephone:  (818) 347-3333
4  Email: dalekgalipo@yahoo.com
            cmayne@galipolaw.com
5
   *Attorneys for Plaintiffs*
6  [*Additional counsel on following page*]

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12  DEVONTE STEPHENSON,                    Case No.:  5:21-cv-00526-JAK-KK
    individually and as successor in      *Judge: John A. Kronstadt*
13  interest to Decedent LEROY            *Mag. Judge Kenly Kiya Kato*
    STEPHENSON; LINDEN
14  STEPHENSON, individually and as
    successor in interest to Decedent
15  LEROY STEPHENSON;
    KEANDRE STEPHENSON,                   **PLAINTIFFS RULE 26 INITIAL**
16  individually and as successor in      **EXPERT DISCLOSURES**
    interest to Decedent LEROY
17  STEPHENSON,

18            Plaintiffs,

19       v.                               Complaint Filed:  March 24, 2021
                                          Trial Date: None set
20  STATE OF CALIFORNIA;
    COUNTY OF RIVERSIDE; DANE
21  NOREM; JEFFREY MCKEE,

22            Defendants.

23

24

25

26

27

28

**STEVEN A. LERMAN & ASSOCIATES, INC.**
Steven A. Lerman, Esq. (S.B.N. 55839)
Nicholas M. Lerman, Esq. (SBN: 292656)
6033 West Century Boulevard, Suite 740
Los Angeles, California 90045
Telephone: (310) 659-8166
Email: nlerman@lermanslaw.com

**LAW OFFICE OF GREGORY PEACOCK**
Gregory Peacock, ESQ. (SBN. 277669)
4425 Jamboree Road, Suite 130
Newport Beach, CA 92660
Telephone: (949) 292-7478
Email: gregorypeacockesq@gmail.com

*Attorneys for Plaintiffs*

Pursuant to Federal Rule of Civil Procedure 26, Plaintiffs DEVONTE STEPHENSON, LINDEN STEPHENSON, and KEANDRE STEPHENSON hereby makes their initial expert disclosures pursuant to Rule 26(a)(2)(A) and (C) of the Federal Rules of Civil Procedure as follows:

**RETAINED EXPERTS**

Plaintiff discloses the following retained expert witnesses who may be called upon to give expert testimony at trial pursuant to Rule 16(a)(2)(A) of the Federal Rules of Civil Procedure.

1.    <u>Daniel Wohlgelernter, M.D.</u> – Cardiology Expert. 2299 Century Hill Los Angeles, CA. 90067; (310) 729-2202. Rule 26 report, C.V., fee schedule, and list of prior sworn testimony are collectively attached hereto as "Exhibit 1."

2.    <u>Bennett Omalu, M.D.</u> – Forensic Pathologist. 3031 West March Lane, #323, Stockton, CA 95219; (916) 513-5253. Rule 26 report, C.V., fee schedule, and list of prior sworn testimony are collectively attached hereto as "Exhibit 2."

3.    <u>Jeffrey Noble</u> – Police Practices Expert. P.O. Box 4456, Huntington Beach, CA 92605-4456; (714) 655-4280. Rule 26 report, C.V., fee schedule, and list of prior sworn testimony are collectively attached hereto as "Exhibit 3."

**NON-RETAINED EXPERTS**

Plaintiff further identifies the following expert witnesses who may present evidence pursuant to Rules 702, 703, or 705 of the Federal Rules of Evidence, but who are not retained by Plaintiff to provide expert testimony. Plaintiff hereby discloses the following witnesses and submit the following summaries of the witness' expected testimony pursuant to Rule 26(a)(2)(A) and (C):

1.    <u>Angel D. Mendoza</u> – American Medical Response, 879 Marlborough Ave, Riverside, CA 92507. Angel D. Mendoza was a paramedic and primary caregiver during Stephenson's transportation to Parkview Community Hospital. He is expected to testify to Mr. Stephenson's injuries and physical condition he

observed and diagnosed, any medical conditions he observed and diagnosed, any medical treatment or care that was provided to Mr. Stephenson during transport.

2.    <u>Chevy Buchanan</u> – American Medical Response, 879 Marlborough Ave, Riverside, CA 92507. Chevy Buchanan was an emergency medical technician and caregiver during Stephenson's transportation to Parkview Community Hospital. He is expected to testify to Mr. Stephenson's injuries and physical condition he observed and diagnosed, any medical conditions he observed and diagnosed, any medical treatment or care that was provided to Mr. Stephenson during transport.

3.    <u>Humberto Silva, MD</u> – 3865 Jackson St, Riverside, CA 92503. Humberto Silva was the emergency physician team leader at the time Mr. Stephenson was admitted to Parkview Community Hospital. He is expected to testify to the injuries and medical conditions he observed and evaluated of Mr. Stephenson once he arrived at the hospital, any change in condition or injuries during his time with him, medical treatment provided to him, and any information he may have received regarding the incident.

4.    <u>Physicians and Nurses at Parkview Community Hospital</u> – 3865 Jackson St, Riverside, CA 92503. The names of the physicians and nurses who attended to Mr. Stephenson are yet to be discovered. These individuals are expected to testify to the injuries and medical conditions they observed and evaluated of Mr. Stephenson once he arrived at the hospital, any change in condition or injuries during their time with him, medical treatment provided to him, and any information they may have received regarding the incident.

DATED: September 22, 2023        **LAW OFFICES OF DALE K. GALIPO**


By        */s/ Cooper Alison-Mayne*
Dale K. Galipo
Cooper Alison-Mayne
Attorneys for Plaintiffs

Exhibit 3

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION**

| | |
|---|---|
| Devonte Stephenson, individually and as successor in interest to Decedent Leroy Stephenson; Linden Stephenson, individually and as successor in interest to Decedent Leroy Stephenson; Keandre Stephenson, individually and as successor in interest to Decedent Leroy Stephenson, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) Case No. 5:21-cv-00526-JAK-KK ) |
| v. | ) ) |
| State of California, County of Riverside; Dane Norem; Jeffrey McKee; Matt Borden; and DOES 1 through 100, inclusive, | ) ) ) ) |
| Defendants. | ) |

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.      My name is Jeffrey J. Noble, and I make this report at the request of plaintiff's counsel.

2.      I was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at the Westminster Police Department for nine months.

    a.      I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department, located in southern California.  As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square miles with a population of over 218,000.  I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention.  The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

1

b.  In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police.  My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation.  I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.  As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.  I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California.  I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.  As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption.  For example:

a.  In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.  I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations.  For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department.  In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.  I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois and New Mexico and in federal court

in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

d.  I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.  I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.  I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.  I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.  In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.  I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.  I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.  I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

3

l.   As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

m.   In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.   My experience, training and background are more fully described in my attached resume.

7.   My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.   I reviewed the following material in making my opinions:

- Complaint for Damages
- Scene Photographs (DSC_5431-5481)
- Scene Photographs (DSC_4073-4122)
- CHP Photographs (100_3149-3256)
- Scene Photographs (DSC_6805-6863)
- Scene Photographs (DSC_0001-37)
- Photographs (J1O14727-J1O14907, J1O56478-J1O56589, J1P56591-J1P56800)
- CHP Critical Incident Reconstruction Report (AGO-0001-269)
- Use of Force Training Outline and CHP Policy (AGO 000651-675)
- CHP Use of Force Power Point Presentation
- Unit Activity Search
- CHP Risk Management Use of Force Report (AGO 000648-650)
- February 24, 2020 District Attorney Letter (AGO 000676)
- Dispatch Audio Tape and 911 Calls
- Audio Recordings of Interviews
  - Betancur
  - McKee
  - Norem
  - Peters
- Depositions
  - Matthew Borden
  - Jeffrey McKee
  - Shawn Casteel

4

- o    Eric Leighton
- o    David Popko
- o    Dane Norem
- CHP Emails (AGO 000270-647)
- Mobile Videos
  - o    McKee
  - o    Norem
- CHP Use of Force Power Point
- Use of Force Training Documents (AGO 000651-675)
- Transcription of Statement of Dennis Stout

9.    At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10.    My professional charges for this litigation work is an hourly fee of $400 plus expenses including all travel time.  My fees for deposition and trial testimony are a flat rate of $2,500 for the first four hours and $600 per hour for every additional hour, plus travel time and expenses.

11.    If I am provided additional materials that changes, alter or amends my opinions, I will prepare a supplemental report.

12.    To ensure my methodology was reliable, my opinions are based on a comprehensive review of the provided materials that establishes my understanding of the facts of the case and on the professional and generally accepted principles and practices in policing as of the date of this incident.  "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the field.  A practice is generally accepted when well-educated, well-trained, and experienced professionals would agree that it is conventional, customary, and reasonably standard.  Generally accepted practices in policing reflect technical and specialized knowledge in the law enforcement field.  A practice can be generally accepted without necessarily being universally adopted or rising to the level of a long-established, empirically validated best practice.  Generally accepted practices may be, but are not necessarily, reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Police Foundation, etc.), in agency policies, and in reputable training materials.

13.    To identify and apply the applicable generally accepted practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement.  This includes work in my field of study as a policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and the relevant professional and academic literature. I employ a similar methodology when I conduct

professional evaluations of police officers or agencies as a consultant and when writing for reputable academic and professional publishers. The methodology I applied in this case is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

14.   My use of terminology such as "excessive," "unreasonable," and "disproportionate," etc., is intended to and should be read as references to the professional and generally accepted standards in policing and is not intended and should not be interpreted as references to or the application of legal standards within the sole province of the factfinder or judge.

15.   The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

**Summary of Incident**

16.   On January 24, 2019 at about 12:22 PM, the California Highway Patrol (CHP) received multiple 911 calls reporting a black male carrying a backpack, wearing a white striped shirt and jeans, running across traffic lanes on State Route 91 westbound at Adams Street.  Officer Norem was dispatched and at 12:27 PM, the Riverside Police Department (RPD) contacted the CHP to advise them that RPD Officer Cisneros saw the subject crossing traffic lanes on SR-91 east of Adams.  At 12:31 PM, the RPD contacted the CHP and told them that Officer Cisneros saw the subject jump over a fence and exit the freeway toward Jefferson Street and they no longer needed to respond.

17.   At 12:45 PM, CHP dispatch received additional phone calls reporting the subject was back in traffic lanes on SR-91 westbound at Adams.  CHP Officers Norem and McKee were dispatched to the scene.  Officer Norem arrived at approximately 12:52 PM and saw Mr. Stephenson in the offramp traffic lanes.  Officer Norem directed Mr. Stephenson through his PA system to move to the shoulder of the offramp at Adams Street.  Mr. Stephenson momentarily complied, then immediately ran from the offramp toward the traffic lanes of SR-91 westbound.

18.   Officer Norem said that Mr. Stephenson ran toward traffic lanes and believing that Mr. Stephenson may be struck by passing vehicles, he deployed his Taser at Mr. Stephenson two times.  The first taser deployment was ineffective, so Officer Norem deployed a second taser cartridge.  According to Officer Norem, Mr. Stephenson did not experience neuromuscular incapacitation during the second taser application but he slowed and stumbled onto the roadway.  Officer Norem used his body weight against Mr. Stephenson's upper back to hold Mr. Stephenson on the ground in a prone position and applied three drive stuns with his taser to Mr. Stephenson's right shoulder blade trying to control Mr. Stephenson.  The drive stuns were ineffective, but two Good Samaritans,

6

Mr. Stout and Mr. Leighton, who happened to be driving by, assisted Officer Norem. Both Mr. Stout and Mr. Leighton, who weighed approximately 350 and 400 pounds respectively, used their body weight to hold down Mr. Stephenson's legs.

19.     With Mr. Stout's assistance, Officer Norem was able to handcuff one of Mr. Stephenson's hands and was able to control his other hand, but he could not apply the second handcuff.

20.     Matt Borden, an Investigator with the Riverside County District Attorney's Office, arrived and applied pressure to Mr. Stephenson's left shoulder and upper back with his knee to hold Mr. Stephenson on the ground.  Investigator Borden then used a knife to cut of Mr. Stephson's backpack from his back because it was preventing Officer Norem from applying the second handcuff.  Officer Norem completed the handcuffing at about 12:55 PM, less than three minutes after he arrived.

21.     Investigator Borden later testified that once Mr. Stephenson was handcuffed, he stopped resisting and Investigator Borden deemed the situation was safe.

22.     Instead of immediately placing Mr. Stephenson in a recovery position by sitting him up or rolling him onto his side, Officer Norem left Mr. Stephenson in a prone position and Officer Norem and Investigator Borden maintained pressure on his back with Mr. Leighton using pressure to hold down Mr. Stephenson's legs.  Additionally, an unknown man pressed his foot onto Mr. Srephenson's back.

23.     Officer Norem radioed that he was "Code 4" at 12:57 PM and about that same time Officer McKee was arriving.  Officer McKee's mobile video shows that Officer Norem had his right knee on Mr. Stephenson's back, Investigator Borden was applying pressure to Mr. Stephenson's upper back and shoulders, Mr. Leighton was applying his weight to Mr. Stephenson's legs, and an unknown male was using his right foot to apply pressure to Mr. Stephenson's upper back.  Officer McKee took Mr. Leighton's place and bent Mr. Stephenson's legs up behind his back and applied pressure to hold his legs.

24.     Officer McKee asked Mr. Leighton to relieve him so he could retrieve a nylon leg restraint from his patrol car.  At about 12:59 PM, when Officer McKee returned with the leg restraint, officers saw that Mr. Stephenson had become limp.  Officer McKee said he never saw Mr. Stephenson being combative or actively resisting and he does not recall Mr. Stephenson ever moving.

25.     Investigator Borden said once Mr. Stephenson had been handcuffed, he believed Mr. Stephenson was secure as Mr. Stephenson stopped actively resisting and he believed the situation was safe.

7

26.    At this point, Officer Norem, Investigator Borden and Mr. Leighton all took their body weight off of Mr. Stephenson who had been a prone position for about 6 minutes and for between 3-4 minutes after he had been handcuffed.  The officers discovered that Mr. Stephenson was not breathing and his heart was not beating so they performed CPR on Mr. Stephenson until they were relieved by the paramedics.

27.    Mr. Stephenson was transported to the hospital where he was pronounced dead at 1:54 PM.

**Background**

28.    Officer Dane Norem

a.    January 24, 2019 Statement

1.)    Officer Norem said he was dispatched to a pedestrian in the center divider on SR-91 westbound near Adams and Van Buren.[1]  Officer Norem said when he arrived, he saw a black male who matched the description standing in the roadway on the Adams offramp.  Officer Norem said he directed Mr. Stephenson to the shoulder over the PA system and Mr. Stephenson began to comply but then turned and ran toward the freeway and it appeared he was going to run into traffic lanes.  Officer Norem said he exited his patrol vehicle and for the safety of Mr. Stephenson and the motoring public, he shot his Taser at Mr. Stephenson.[2]

2.)    Officer Norem said he fired a second set of darts because the first set did not appear to be effective.[3]  Officer Norem said Mr. Stephenson fell to the ground[4] and he jumped on top of him trying to restrain him.[5]

3.)    Officer Norem said he laid his upper body on Mr. Stephenson's back and Mr. Stephenson was actively resisting by pulling his arms away and thrashing about.[6]  Officer Norem said there were some civilians who came to render some assistance with weight leverage and he drive stunned Mr. Stephenson.[7]

4.)    Officer Norem said there was a pain noise but no compliance to the drive

---

[1] AGO 00063.
[2] AGO 00064-65.
[3] AGO 00066.
[4] AGO 00067.
[5] AGO 00068.
[6] AGO 00069-70.
[7] AGO 00070.

8

stuns.[8]

    5.)    Officer Norem said he was able to handcuff Mr. Stephenson before any
other uniformed officers arrived.[9]

    6.)    Officer Norem said he does not know how long was between the time
that Mr. Stephenson was handcuffed and when he recognized that Mr.
Stephenson needed assistance, but he estimated 1-2 minutes.[10]

    7.)    Officer Norem said he was in physical contact with Mr. Stephenson until
it was recognized that Mr. Stephenson may not be breathing and at that
time Mr. Stephenson was rolled over.[11]  Officer Norem said he retrieved a
pocket CPR mask and began CPR.[12]

  **b.**    Deposition

    1.)    Officer Norem said the first call was for a male black with a backpack who
was walking on the 91-freeway eastbound near Arlington, but was
cancelled because Riverside Police Departments escorted the subject off
of the freeway.  About 20-30 minutes later, he received a second call
regarding the subject being on the freeway.[13]

    2.)    Officer Norem said he was told that it was possible that Mr. Stephenson
had been hit by a vehicle and he may have been injured.  Officer Norem
said he did not have any information that Mr. Stephenson had a weapon,
had verbally threatened anyone, or committed a violent crime.[14]

    3.)    Officer Norem said his goal on that call was to provide for the safety of
Mr. Stephenson and the motorists in that area.[15]

    4.)    Officer Norem said he is 48 years old, six-feet tall, and weighs about 220-
230 pounds.[16]

    5.)    Officer Norem said when he arrived, he saw Mr. Stephenson in the traffic
lanes of the 91 freeway at Adams Street about halfway down the

---

[8] AGO 00071.
[9] AGO 00073.
[10] AGO 00074-75.
[11] AGO 00077.
[12] AGO 00077.
[13] Norem deposition at 12.
[14] Norem deposition at 14-15.
[15] Norem deposition at 16.
[16] Norem deposition at 16.

offramp.  Officer Norem said he waved at Mr. Stephenson and told him to move to the shoulder of the roadway.[17]  Officer Norem said he then used his PA system and it appeared that Mr. Stephenson initially complied by walking toward the shoulder.[18]

6.)    Officer Norem said Mr. Stephenson abruptly turned toward the freeway and began a fast walk or a slow run toward the traffic lanes.  Officer Norem said he exited his patrol vehicle and deployed his taser at Mr. Stephenson.[19]  Officer Norem said he deployed a second taser at Mr. Stephenson and although it did not appear to have neuromuscular incapacitation, Mr. Stephenson did drop to the ground.[20]

7.)    Officer Norem said Mr. Stephenson fell onto his chest at the gore point between the traffic lanes and the offramp lanes.[21]

8.)    Officer Norem said it is common knowledge not to place a person in a position where they cannot breathe because they may die.[22]

9.)    Officer Norem said he "sprawled out" onto Mr. Stephenson's back to hold him on the ground[23] and when he tased Mr. Stephenson he heard sounds as though Mr. Stephenson were in pain.[24]

10.)    Officer Norem said he believed that he grappled with Mr. Stephenson for 2-3 minutes before he was handcuffed.[25]

11.)    Officer Norem said Investigator Borden held Mr. Stephenson's shoulders as he was being handcuffed.[26]  Officer Norem said he was not aware that others were helping him as well.[27]

12.)    Officer Norem said after the handcuffing was completed, he did not immediate sit Mr. Stephenson up.[28]  Officer Norem said he was trained on the recovery position that he described as a person laying on their

---

[17] Norem deposition at 18.
[18] Norem deposition at 19.
[19] Norem deposition at 20-21.
[20] Norem deposition at 22-23.
[21] Norem deposition at 25.
[22] Norem deposition at 27-28.
[23] Norem deposition at 29.
[24] Norem deposition at 30.
[25] Norem deposition at 31.
[26] Norem deposition at 32.
[27] Norem deposition at 34.
[28] Norem deposition at 34.

side with their legs split and that the recovery position can help a person to breathe.[29]

13.)  Officer Norem said from the time that Mr. Stephenson went to the ground until he was handcuffed, he was chest down.[30]

14.)  Officer Norem said he became aware after Investigator Borden arrived and before Officer McKee arrived that an overweight gentleman assisted by pinning Mr. Stephenson's legs down.[31]

15.)  Officer Norem said after Mr. Stephenson was handcuffed, he had his knee on the top part of Mr. Stephenson's buttocks for about 1 minute because Mr. Stephenson was "like fighting kind of wiggling around hard."[32]

16.)  Officer Norem said he did not request or order the other individuals to get off Mr. Stephenson or to place Mr. Stepheson in a recovery position in the minute after he was handcuffed because Mr. Stephenson was actively resisting by kicking and trying to get up.[33]  During that time, he had his knee on Mr. Stephenson's buttocks, Investigator Borden was on his upper back and the other gentleman was on his legs.[34]

17.)  Officer Norem said Mr. Stephenson never punched or kicked him, he did not verbally threaten him, and he never tried to grab any of his weapons.[35]

18.)  Officer Norem said Mr. Stephenson was eventually placed in a recovery position that he estimates to be about 1 -1 ½ minutes after he was handcuffed, but said it is possible that he was not placed in a recovery position for 3-4 minutes.[36]

19.)  Officer Norem said he considered the possibility that Mr. Stephenson may be under the influence, may have a pre-existing medical condition, or may be suffering a mental health crisis.[37]

---

[29] Norem deposition at 34-35.
[30] Norem deposition at 35-36.
[31] Norem deposition at 37-38.
[32] Norem deposition at 38-39.
[33] Norem deposition at 41-42.
[34] Norem deposition at 43.
[35] Norem deposition at 45-46.
[36] Norem deposition at 48.
[37] Norem deposition at 58.

11

20.)  Officer Norem said the CHP policy states that officers should keep someone in a prone restraint for the shortest amount of time possible[38] and the policy discusses the risks of the prone restraint.[39]  Officer Norem said he was aware that having someone chest down with weight applied to their back could interfere with their ability to breathe before the policy was published.[40]

21.)  Officer Norem said he was aware prior to the incident that if he put a lot of pressure on someone's chest that it could cause a serious injury.[41]

22.)  Officer Norem said it slipped his mind at the time that Mr. Stephenson may have been trying to get up because he was having difficulty breathing.[42]

23.)  Officer Norem said he rolled Mr. Stephenson onto his side when he believed that Mr. Stephenson had stopped breathing.[43]

29.  Officer McKee

a.  Statement

1.)  Officer McKee said he heard the radio broadcasts of the call and it took approximately 10 to 15 minutes for him to arrive at the scene.  When he arrived, he saw Officer Norem along with three Good Samaritans restraining Mr. Stephenson who was handcuffed and lying on the ground on his stomach.  Officer McKee exited his patrol vehicle and assisted restraining Mr. Stephenson's legs.  Officer McKee said he saw a Taser dart and wires on the ground in one dart in Mr. Stephenson's arm.

2.)  Officer McKee returned to his patrol car to retrieve a nylon leg restraint while the Good Samaritan again maintained control of Mr. Stephenson's legs.  As Officer McKee returned, Mr. Stephenson had become limp and appeared to be having a medical emergency.  Officer McKee retrieved his pocket mask and began administering CPR.[44]

---

[38] Norem deposition at 68.
[39] Norem deposition at 70.
[40] Norem deposition at 92.
[41] Norem deposition at 71.
[42] Norem deposition at 74.
[43] Norem deposition at 81.
[44] AGO 00090.

12

b.    Deposition

1.)    Officer McKee said he graduated from police academy in 2006 and he does not recall receiving any academy training on positional asphyxia.[45]

2.)    Officer McKee said he responded to the call of a pedestrian on the freeway, and he heard a radio call that a Taser had been deployed and a request for a supervisor.[46]

3.)    Officer McKee said when he first arrived, he saw Mr. Stephenson on the asphalt lying on his stomach and Mr. Stephenson had been handcuffed. Officer McKee said Officer Norem was the only other police officer present and Officer Norem was partially kneeling on Mr. Stephenson's buttocks/upper leg area.  Officer McKee said there were three civilians present assisting Officer Norem: one was standing near Mr. Stephenson's shoulders, one was on Mr. Stephenson's right side near his shoulders, and the third was at Mr. Stephenson's feet/lower legs.[47]

4.)    Officer McKee said he took control of Mr. Stephenson's legs and placed his legs into a "figure 4."  Officer McKee said Mr. Stephenson was not kicking[48] and he had contact with Mr. Stephenson for about 10-20 seconds[49] before he returned to his vehicle to obtain a nylon restraint.[50]

5.)    Officer McKee said he never saw Mr. Stephenson combative or actively resisting and he does not recall Mr. Stephenson ever moving.[51]

6.)    Officer McKee said when he left to get the restraint, he asked one of the citizens to hold or set by Mr. Stephenson's legs.[52]

7.)    Officer McKee said after he obtained the restraint and when he was walking back toward the scene, he realized something may be wrong and he saw the civilian who had been on Mr. Stephenson's legs let Mr. Stephenson's legs go.[53]

---

[45] McKee deposition 12.
[46] McKee deposition 15-16.
[47] McKee deposition at 23.
[48] McKee deposition at 24.
[49] McKee deposition at 27.
[50] McKee deposition at 30.
[51] McKee deposition at 28.
[52] McKee deposition at 35-36.
[53] McKee deposition at 39.

13

8.)     Officer McKee said he has been trained to put a restraint on a person while they are in a prone position.[54]

9.)     Officer McKee said he does not recall anyone putting pressure on Mr. Stephenson's back, neck, or throat.[55]

30.    Officer William Betancur - Statement

a.     Officer Betancur said when he arrived, he saw Officer Norem, Officer McKee and three Good Samaritans attempting to take Mr. Stephenson into custody.  Officer Betancur got off his motorcycle and relieved one of the Good Samaritans who identified himself as a District Attorney investigator.  Officer Betancur said immediately upon relieving the investigator, he saw that Mr. Stephenson was handcuffed and heard, as did Mr. Stephenson had stopped breathing.  Officer Betancur checked Mr. Stephenson's carotid pulse, but did not find a pulse.

b.     Officer Betancur said he rolled Mr. Stephenson onto his side and placed them in a recovery position and determined Mr. Stephenson was not breathing.  Officers Norem and McKee then began CPR.[56]

31.    Officer Shawn Casteel – Deposition

a.     Officer Casteel worked for the Riverside Police Department between June 1999 and April 2022.[57]

b.     Officer Casteel said on the date of the incident, he was working day shift as a motor officer.[58]

c.     Officer Casteel said he first saw Mr. Stephenson in the eastbound lanes of the 91 freeway west of Madison.[59]  It appeared that Mr. Stephenson was trying to stop westbound traffic by standing in a traffic lane of the freeway.[60]  Mr. Casteel then jumped on the hood of a car.[61]  Officer Casteel that he believed Mr. Stephenson was either having a mental episode or under the influence of some type of drug.[62]

---

[54] McKee deposition at 42.
[55] McKee deposition at 59.
[56] AGO 00094.
[57] Casteel deposition at 22.
[58] Casteel deposition at 32.
[59] Casteel deposition at 32.
[60] Casteel deposition at 36.
[61] Casteel deposition at 37.
[62] Casteel deposition at 38.

14

      d.      Officer Casteel said Mr. Stephenson then ran in a northwest direction off the freeway.[63]  Officer Casteel said he believed Mr. Stephenson ran because Mr. Stephenson recognized him as a police officer and he did not want to be stopped or detained for being on the freeway.[64]

      e.      Officer Casteel said he made an area check Mr. Stephenson, but could not locate him.[65]

      f.      Officer Casteel said he did not have any other contact with Mr. Stephenson that day and he never saw Mr. Stephenson in a prone position.[66]

32.      Eric Leighton – Deposition

      a.      Mr. Leighton said he was a passenger in a car driven by his wife, on the 91 freeway when he saw a police vehicle on the offramp with its doors wide open and the officer on the ground with someone.[67]

      b.      Mr. Leighton said at the time of the incident, he was 6 feet - 2 inches tall and weighed about 400 pounds.[68]

      c.      Mr. Leighton said it appeared that the officer was fighting with the subject and trying to get the subject in custody.[69]  Mr. Leighton said when he got out of the car, the officer had his knee on the subject's back in the subject was face down on the ground.[70]  Mr. Leighton said two other subjects arrived to assist the officer before he arrived.[71]

      d.      Mr. Leighton said the officer was trying to control the subject's hands and the subject was pulling his hands away trying to get free.  Mr. Leighton said it appeared the subject was trying to get his hands away from the officer and he was trying to get up and the officer was having a hard time getting his wrists behind his back.[72]

      e.      Mr. Leighton described one of the subject's who stopped to assist as a male about 6 feet tall weighing about 180-230 pounds.  The other subject was about 5

---

[63] Casteel deposition at 40.
[64] Casteel deposition at 41.
[65] Casteel deposition at 44.
[66] Casteel deposition at 45.
[67] Leighton deposition at 46.
[68] Leighton deposition at 47.
[69] Leighton deposition at 51.
[70] Leighton deposition at 52.
[71] Leighton deposition at 53.
[72] Leighton deposition at 57.

feet 10 and weighed between 350-400 pounds.[73]

f.    Mr. Leighton said the smaller subject had his right knee on Mr. Stephenson's right shoulder and a larger subject was at Mr. Stephenson's feet.[74]

g.    Mr. Leighton said he asked if he could help and the subject at Mr. Stephenson's feet asked if he could take over.[75]  Mr. Leighton said he began to restrain Mr. Stephenson's legs.[76]

h.    Mr. Leighton said the officer was telling Mr. Stephenson, "Calm down, everything is okay, relax, dude, it's over."[77]

i.    Mr. Leighton said the officer handcuffed Mr. Stephenson's hands behind his back.[78]  Mr. Leighton said when Mr. Stephenson was handcuffed, the uniformed officer had a knee on Mr. Stephenson's left shoulder blade, the thinner gentleman had his knee on Mr. Stephenson's right shoulder and he had Mr. Stephenson's ankles crossed and was holding his ankles back toward Mr. Stephenson's butt.[79]  Mr. Leighton said at that point, Mr. Stephenson was still trying to roll to the left and right as though he was trying to get up.[80]

j.    Mr. Leighton said he could not tell if the thinner gentleman was placing any weight on his Mr. Stephenson's back.[81]

k.    Mr. Leighton said when he was restraining Mr. Stephenson's ankles, he was not putting any of his body weight on Mr. Stephenson.[82]

l.    Mr. Leighton said after a few times of Mr. Stephenson pushing and screaming, he stopped making any noise and stopped fighting.  At about that time, he got off Mr. Stephenson as other officers had arrived.[83]

m.    Mr. Leighton said he believes it was approximately one minute from when he first made contact with Mr. Stephenson until he stopped resisting.[84]

---

[73] Leighton deposition at 61-62.
[74] Leighton deposition at 62-63.
[75] Leighton deposition at 63.
[76] Leighton deposition at 64.
[77] Leighton deposition at 66.
[78] Leighton deposition at 69.
[79] Leighton deposition at 69.
[80] Leighton deposition at 70.
[81] Leighton deposition at 74.
[82] Leighton deposition at 77.
[83] Leighton deposition at 80.
[84] Leighton deposition at 83.

n.      Mr. Leighton said Mr. Stephenson was actively resisting for about a minute and 45 seconds and then he just abruptly stopped.[85]

o.      Mr. Leighton said after he let go of Mr. Stephenson, he walked off and didn't see much because he was sick with the flu and was trying not to throw up.[86]

p.      Mr. Leighton said he did not hear Mr. Stephenson ever made any complaints about having trouble breathing, and he did not see anyone may contact with Mr. Stephenson's neck.[87]

q.      Mr. Leighton said he did not see a Taser deployment, but he did see a Taser on the ground.[88]

r.      Mr. Leighton said once Mr. Stephenson was in handcuffs, he did not believe that Mr. Leighton was an immediate threat, but he did continue to flail and kick his legs.[89]

s.      Mr. Leighton said he does not recall telling an investigator that another bystander approached and put his foot on Mr. Stephenson's back.[90]

33.    Matthew Borden, Riverside County District Attorney Investigator

a.      Investigator Borden worked for the Riverside County Sheriff's Office between July, 2002 and April, 2017 when he became an investigator with the Riverside County District Attorney's Office.[91]

b.      Investigator Borden said he was not familiar with the term "positional asphyxiation," and he was never trained that keeping a person in a prone position can lead to suffocation, or that placing weight on a person's back can deprive the person of oxygen.[92]

c.      Investigator Borden said he was driving westbound SR-91 about to exit at Adams when he saw a CHP unit on the offramp with his driver's door ajar and its lights and siren on.  Investigator Borden said he saw Mr. Stephenson in a prone

---

[85] Leighton deposition at 86.
[86] Leighton deposition at 90.
[87] Leighton deposition at 94.
[88] Leighton deposition at 96.
[89] Leighton deposition at 111.
[90] Leighton deposition 124.
[91] Borden deposition at 15-16.
[92] Borden deposition at 17-19.

position near the slow lane struggling with Officer Norem and two civilians.[93]

d.    Investigator Borden said he stopped to assist and saw Mr. Stephenson flailing his arms, trying to lift up, and kicking his legs.[94]  Investigator Borden said the two civilians were on Mr. Stephenson's legs and he placed his knee on Mr. Stephenson's left shoulder.[95]

e.    Investigator Borden said Officer Norem was having difficulty handcuffing Mr. Stephenson and he used his knife to cut Mr. Stephenson's backpack off his body and then Officer Norem was able to handcuff Mr. Stephenson.[96]

f.    Investigator Borden said he did not hear Officer Norem give Mr. Stephenson any commands and he did not give any commands to Mr. Stephenson.  Investigator Borden said he saw a Taser on the ground and saw that the Taser wires had been expended.[97]

g.    Investigator Borden said once Mr. Stephenson was handcuffed, he took his knee off Mr. Stephenson and monitored Mr. Stephenson's head and face.  Investigator Borden said Mr. Stephenson was yelling, moaning, and making nonsensical statements.[98]  Investigator Borden said once Mr. Stephenson had been handcuffed, he believed Mr. Stephenson was secure and he took his knee off Mr. Stephenson within seconds.  Investigator Borden said once Mr. Stephenson had been handcuffed, he stopped actively resisting and he believed the situation was safe.[99]

h.    Investigator Borden said he noticed Mr. Stephenson stop breathing and he rolled Mr. Stephenson into a recovery position and used a sternum rub and tried to take Mr. Stephenson's pulse.  Investigator Borden said approximately 30 seconds expired between the time he removed his knee from Mr. Stephenson until the time Mr. Stephenson was rolled into a recovery position.[100]

i.    Investigator Borden said another CHP officer had arrived with Mr. Stephenson was placed in the recovery position.[101]

j.    Investigator Borden said he believes his knee was on Mr. Stephenson for

---

[93] Borden deposition at 23-24.
[94] Borden deposition at 24-25.
[95] Borden deposition at 26.
[96] Borden deposition at 27-28.
[97] Borden deposition at 29-30.
[98] Borden deposition at 31.
[99] Borden deposition at 32.
[100] Borden deposition at 33-34.
[101] Borden deposition at 35.

approximately 15 seconds.[102]

   k.    Investigator Borden said he never saw anyone on Mr. Stephenson's back and that Officer Norem had his right knee on Mr. Stephenson's butt or lower back.[103]

   l.    Investigator Borden said he weighed approximately 175 – 180 pounds at the time of the incident.[104]

34.    David Popko – Deposition

   a.    Mr. Popko said he was driving on the 91 freeway when he saw officers performing CPR on Mr. Stephenson, so he stopped to ask if they needed assistance.[105]  Mr.  Popko said two CHP officers were performing CPR.[106]

   b.    Mr. Popko said he assisted by applying a bag mask for ventilation on Mr. Stephenson and he checked for Mr. Stephenson's pulse.[107]

   c.    Mr. Popko said he did not see any officer use any restraint or force on Mr. Stephenson and he arrived after the officers had already begun CPR.[108]

35.    Statement of Dennis Stout

   a.    Mr. Stout said that he was driving on the 91 freeway and saw a CHP officer at the Adams offramp who was in a confrontation with Mr. Stephenson.  Mr. Stout said it appeared that Mr. Stephenson was trying to run into traffic and the officer had to tase him.[109]

   b.    Mr. Stout said the officer took Mr. Stephenson to the ground and he exited his vehicle and assisted the officer by holding Mr. Stephenson's legs down[110] by putting his knees on Mr. Stephenson's legs.[111]  Mr. Stout said the officer was having a hard time holding Mr. Stephenson down.[112]

---

[102] Borden deposition at 43.
[103] Borden deposition at 49.
[104] Borden deposition at 58.
[105] Popko deposition at 60.
[106] Popko deposition at 64.
[107] Popko deposition at 68.
[108] Popko deposition at 77.
[109] Stout statement at 3.
[110] Stout statemen tat 4.
[111] Stout statement at 10.
[112] Stout statement at 9.

    c.      Mr. Stout said when Mr. Stephenson was hit with the taser "he just kind of locked up" and went stiff.[113]

    d.      Mr. Stout said Mr. Stephenson was struggling and the officer had difficulty handcuffing him.[114]

    e.      Mr. Stout said another man assisted by holding Mr. Stephenson's shoulders down.[115]

36.    Mr. Stephenson was 48 years old, 65 inches tall and weighed approximately 240 pounds.[116]

37.    Officer McKee's Mobile Video

    a.      11:29 – Officer McKee drove the wrong way down the offramp and parked his vehicle on the median between the offramp and the lanes of traffic. Mr. Stephenson is in a prone position. Officer Norem is holding Mr. Stephenson down, Investigator Borden appears to have his right foot on Mr. Stephenson. Mr. Leighton is kneeling to Mr. Stephenson's side.

    b.      11:35 – Mr. Leighton stands up as Officer McKee walks up.

    c.      11:40 – Officer McKee grabs Mr. Stephenson's legs, crosses his ankles and pushes his legs toward his back.

    d.      11:42 – The male at Mr. Stephenson's legs stands and walks away. Investigator Borden still has his right foot on Mr. Stephenson.

    e.      11:50 – Investigator Borden moves away and it appears that Mr. Stephenson is handcuffed. It appears that both Officer Norem and Officer McKee are kneeling on Mr. Stephenson.

    f.      11:58 – Officer McKee asks Mr. Leighton to hold Mr. Stephenson's legs. Mr. Leighton kneels near Mr. Stephenson and controls his legs. Officer McKee walks back toward his vehicle.

    g.      12:21 – Mr. Leighton releases Mr. Stephenson's legs as Officer McKee, who is holding a restraint strap, returns.

---

[113] Stout statement at 8.
[114] Stout statement at 11.
[115] Stout statement at 12.
[116] AGO 00021.

h.       12:25 – Officer Betancur arrives on his motorcycle.

i.       12:30 – Someone asks, "Is he breathing?"

j.       12:39 - "Subject not breathing."  The officers roll Mr. Stephenson to his side.

k.       12:55 – A CHP Sergeant arrives.

l.       13:10 – "We need to open his airway."

m.      13:18 – "It's excited delirium, dude."  The officers roll Mr. Stephenson onto his left side.

n.       14:15 – "Get the cuffs off of him and we'll roll him over on his back."

o.       14:38 – The handcuffs are removed, and Mr. Stephenson is on his back.

p.       14:41 – An officer begins chest compressions.

q.       15:21 – Mr. Popko arrives with his medical bag.

38.   The Medical Examiner found Mr. Stephenson's cause of death to be acute methamphetamine intoxication, atherosclerotic cardiovascular disease, and physical confrontation with law enforcement.[117]

**Officer Norem's Failure to Place Mr. Stephenson in a Recovery Position After he was Secured in Handcuffs was Inconsistent with Generally Accepted Police Practices**

39.   It is generally accepted in policing that, under certain circumstances, restraint techniques, including physically holding a subject down, can constitute a use of force.[118] Moreover, Officers are responsible for the health, safety and welfare of people in their custody and must protect them from known risks of harm. Officers learn that they can, when appropriate, put a subject into a prone (face down) position on the ground to facilitate handcuffing or to secure the individual.  However, it is well known and generally accepted that keeping handcuffed individuals in the prone position after handcuffing can negatively affect the subject's breathing and cause or contribute to

---

[117] AGO 000181.

[118] SETH W. STOUGHTON, JEFFREY J. NOBLE, GEOFFREY P. ALPERT, EVALUATING POLICE USES OF FORCE 195-96, 202-03 (2020).

positional asphyxia.[119]  It is generally accepted in policing that the risks of asphyxiation are magnified when officers apply weight or pressure to a handcuffed, prone subject.

40.    It is also generally accepted that subjects who appear to be in an agitated or excited state, usually due to mental illness, intoxication, or a combination, and are acting delirious or irrational, have a significantly elevated need for oxygen and are therefore more susceptible to positional asphyxiation.  Compounding the risk is that people who are in such a state of "excited" or "agitated" "delirium," while frequently not involved in any significant criminal activity, nevertheless are not responsive to "officer presence" and verbal commands that are effective to gain compliance without the use of force in most other situations.  Officers not infrequently have to use devices such as Tasers and wrestle the subject into restraints.  The altercation itself further increases the demand for oxygen and increases the risk of positional asphyxiation from a prone restraint.

41.    Importantly, it is also generally accepted that the oxygen deficit that can result in positional asphyxia does not preclude speech.  As an article first published in 2015 by Calibre Press—one of the largest publishers of police media, if not *the* largest publisher of police media, in the United States—explained, the idea that someone can breathe because they are speaking is a "major misconception" and "perhaps one of the **most lethal** misconceptions in . . . law enforcement."[120]

42.    As an industry, policing has known about the risks of positional asphyxia for over thirty years.  In 1988, four doctors published an article describing that keeping individuals "prone, handcuffed, 'and hog-tied'" had negatively affected their ability to recover "peripheral oxygen saturation and heart rate" when compared to individuals "at rest" and "during exercise."[121]  The authors, writing in the American Journal of Medical Pathology, contended that "the physiological effects produced by positional restraint should be recognized in deaths where such measures are used."[122]  This was followed, several years later, by an article in the same journal reporting a case study of three in-

---

[119] Some commentators have distinguished between "positional asphyxia" and "compression asphyxia" on technical grounds. In technical usage, positional asphyxia is typically used to refer to situations in which the subject's respiration (breathing) is compromised by the positioning of the subject's body, while compression asphyxia is typically used to refer to situations where weight or pressure on the subject can mechanically limit the subject's respiration. Both positional asphyxia and compression asphyxia are types of mechanical asphyxia, a phrase that refers to some mechanical interference with normal breathing. Commentators also sometimes use the phrase "restraint asphyxia" to refer to a combination of separate factors that, *in toto*, can contribute to mechanical asphyxia. As an industry, however, policing has generally adopted less technical terminology, often using "positional asphyxia" in a somewhat generalized way to refer to a combination of mechanical factors that can inhibit a restrained subject's breathing.

[120] Steve Cole, *Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe"*, Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ (emphasis in original).

[121] Donald T. Reay *et al.*, *Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise*, 9 Am. J. Forensic Med. & Pathology 16 (1988).

[122] *Id.*

custody deaths "attributed to positional asphyxia."[123]  Early research focused particularly on the risks of keeping a "hog-tied" individual—that is, someone who is handcuffed behind their back with their legs bound at the ankles and connected to their wrists such that their legs are bent with their feet brought to a position near their buttocks—but it was quickly recognized that handcuffed individuals were at heightened risk of positional asphyxia even when they were not hog-tied.[124]

43.     This issue was brought into the forefront of police policymaking in the early 1990s, after a 16-year-old died after being restrained by San Diego Police Department officers.  A police task force surveyed the medical literature and hundreds of police agencies around the country before issued a series of recommendations, including "[o]nce an individual has been controlled and handcuffed, the officer should roll the subject onto his/her side, or into a sitting position as soon as possible to reduce the risk of positional asphyxia."[125]

44.     The International Association of Chiefs of Police—the world's oldest and largest professional policing organization—endorsed this directive in 1993, writing, "when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freed from that weight as soon as possible in order to allow him to breathe freely. In order to facilitate the individual's breathing, he should also be rolled onto his side or into a sitting position as soon as possible."[126]  In 1995, the United States Department of Justice provided a bulletin that stated, "[A]s soon as the suspect is handcuffed, get him off his stomach."[127]  Any failure to do so, the bulletin made clear, could create a "vicious cycle of suspect resistance and officer restraint" in which the handcuffed, prone subject's breathing becomes labored as they begin to experience an oxygen deficit, the subject responses to the oxygen deficiency by struggling, and the officers respond to the subject's struggling by putting more weight

---

[123] Donald T. Reay, *et al.*, *Positional Asphyxia During Law Enforcement Transport*, 13 AM. J. FORENSIC MED. & PATHOLOGY 90 (1992). Later articles disputed the degree of risk posed by positional asphyxia and criticized the methodology of earlier research, but such research suffered from its own methodological flaws. Specifically, later research was based on experiments involved healthy, non-obese, and usually younger, individuals without preexisting health conditions who were not under the influence of drugs or alcohol and who did not violently struggle with officers. Such study participants are not, of course, representative of the at-risk population with whom the police interact. Indeed, there is good reason to think that a researcher proposing an experimental study involving individuals from the relevant population would be denied approval on ethical grounds because such research would be too dangerous. Additionally, experimental studies generally did not try to replicate field conditions. As one such study acknowledged, "It is possible that a combination of factors, including underlying medical condition, intoxication, agitation, delirium, and struggle as well as body position, may result in respiratory compromise that would not be detected by our study." Theodore C. Chan, *et al.*, *Restraint Position and Positional Asphyxia*, 30 ANNALS OF EMERGENCY MEDICINE 578, 585 (1997).

[124] See, e.g., Ronald L. O'Halloran & Janice G. Frank, *Asphyxial Death During Prone Restraint Revisited; A Report of 21 Cases*, 21 AM. J. FORENSIC MED. & PATHOLOGY 39, 48 (2000).

[125] SAN DIEGO POLICE DEP'T, FINAL REPORT OF THE CUSTODY DEATH TASK FORCE (1992).

[126] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, TRAINING KEY NO. 429, CUSTODY DEATH SYNDROME (1993).

[127] United States Department of Justice, National Institute of Justice, *Positional Asphyxia—Sudden Death*, June 1995, https://bit.ly/36o4lXc.

on their back, which further compromises the subject's breathing.[128]  In 1998, the International Association of Chiefs of Police wrote, "during the past decade police departments have been repeatedly warned not to permit the restraint of prisoners in the prone position."[129]  In 2001, the Department of Justice advised police agencies to "develop use of force policies that address . . . particular use of force issues such as . . . positional asphyxia."[130]  In the 2015 consent decree with the City of Ferguson, the Department of Justice required the adoption of procedures and training that "[m]inimiz[e] the risk of positional asphyxia" and instruct officers to "use restraint techniques that do not compromise a subject's breathing."[131]  A 2017 textbook on policing, *Police in America*, states that "positional asphyxia occurs when a person's body position prevents normal and adequate breathing," and that this "[u]sually" occurs "when the subject is face down with hands secured behind the back."[132]  In short, concerns about positional asphyxia and the corresponding directive to avoid keeping handcuffed individuals in the prone position had become generally accepted in policing by at least the turn of the century.

45.    Today, many police agencies around the United States have policies explicitly restricting the use of prone restraint; those policies overwhelmingly direct officers to avoid keeping handcuffed individuals in the prone position for any extended period of time.[133]  Many

---

[128] *Id.*

[129] International Association of Chiefs of Police, *The Prone Restraint–Still A Bad Idea*, 10 Pol'y Rev. 1,2 (1998).

[130] United States Dep't of Justice, Principles for Promoting Police Integrity 4 (2001).

[131] Consent Decree at 41, United States v. City of Ferguson, No. 4:16-cv-00180 (E.D. Mo. Apr. 19, 2016), https://bit.ly/3mp0VZZ. In the 2016 consent decree with the City of Cleveland, the Department of Justice required officers to be trained in and to follow protocols related to "the risks of positional asphyxia," specifically in "using restraint techniques that do not impair the subject's respiration" following the use of pepper spray or electronic control weapons. Settlement Agreement at 17, 19, United States v. City of Cleveland, No. 1:15-cv-01046-SO (N.D. Ohio June 12, 2015), https://bit.ly/3fUBo8n.

[132] Steven G. Brandl, Police in America 252 (2018).

[133] *See, e.g.*, Berkeley Police Department, Handcuffing and Restraints, Policy 302 ("If the person being handcuffed is on the ground or in a prone position, officers should, as soon as possible, place the person in an upright sitting position or on their side for respiratory recovery and to mitigate the potential for positional asphyxia.), Albuquerque Police Department, Use of Force, SOP 2-52 at 5, https://bit.ly/33wYrRJ ("In situations when the individual is forced into a face down position, officers shall release pressure/weight from the individual and position the individual on their side or sit them up as soon as they are restrained and it is safe to do so."), Charlotte-Mecklenburg Police Department, Directive 500-003, https://bit.ly/3mp7uM7 ("Avoid placing a subject in a position that is likely to contribute to positional asphyxia . . . control restraints while lying on back/stomach should be avoided."); Denver Police Department, Operations Manual, Force Related Policies, 105.01(5)(e), https://bit.ly/3lmIq77 ("[O]fficers will immediately cease applying body weight to an individual's back, head, neck, or abdomen once the individual is restrained and other control tactics may reasonably be utilized other than body weight. As soon as possible after an individual has been handcuffed, the individual should be turned onto his/her side or allowed to sit up, so long as the individual's actions no longer place officers at risk of imminent injury. Officers will make all reasonable efforts to ensure that the individual is not left in a prone position for longer than absolutely necessary to gain control over the resisting individual."); Detroit Police Department, Use of Force, 304.2-7, Duty to Report/Render Aid, https://bit.ly/2HR7h59 ("Restrained subjects should be placed in an upright or seated position to avoid Positional Asphyxia which can lead to death, when a subject's body position interferes with breathing."); Indianapolis Police Department, General Order 8.1, Prisoner Handling, Transportation and Escape, https://bit.ly/2HQFFx0 ("A subject placed on their chest or stomach, with the legs and arms restrained behind the

other agencies do not have specific policies, but officers are still expected to mitigate the risks of positional asphyxia by not keeping subjects in the prone position after handcuffing.

46.    The IACP developed a Model Policy in 2017 that was accompanied by a Concepts and Issues Paper on Excited Delirium.  That policy directed that, "When restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck or head.  Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.  Officers should check the subject's pulse and respiration on a continuous basis until transferred to EMS personnel. Officers shall ensure the airway is unrestricted and be prepared to administer CPR or an automated external defibrillator (AED) if the subject becomes unconscious. Following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing. However, if the subject becomes calm and breathing is not labored during or after the application of restraints, it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest."

47.    As mentioned above, it is also well known and generally accepted in policing that there are certain factors that exacerbate the risk of positional asphyxia.  The 1995 DOJ bulletin, for example, identified certain factors that "appear to be associated most often with" in-custody deaths, including "cocaine-induced excited delirium," "[d]rug and acute alcohol intoxication," "[v]iolent struggle," and "unresponsiveness of subject during or immediately after a struggle."[134]  A 2017 policing textbook described positional asphyxia risk factors that include drug-induced "psychosis," "preexisting physical conditions," and "pressure on the abdomen" that can result from officers "holding a person down in the prone position."[135]  In 2019, *Police Magazine*, a police-oriented publication, published

---

back, may have difficulty breathing, leading to serious injury or death. 1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used. 2. The subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible."); New Orleans Police Department, Operations Manual, Chapter 1.3.1.1, Handcuffing and Restraint Devices, https://bit.ly/3lokG2u ("If a subject has been placed on his or her stomach, turn him or her on the side or in a seated position as soon as handcuffs are properly applied. If the subject continues to struggle, *do not* sit, lie or kneel on the subject's back." (emphasis in original)); New York Police Department, Patrol Guide, Use of Force, 221-02, https://on.nyc.gov/37ixnXG ("Avoid actions which may result in chest compression, such as sitting, kneeling, or standing on a subject's chest or back, thereby reducing the subject's ability to breathe. . . . Position the subject to promote fee breathing, as soon as safety permits, by sitting the person up or turning the person onto his/her side."); Metropolitan Police Department (Washington, D.C.), General Order 901.07, Use of Force, https://bit.ly/3moUnum ("In order to avoid asphyxiation, members shall …[p]osition the individual in a manner to allow free breathing once the subject has been controlled and placed under custodial restraint using handcuffs or other authorized methods.…Members are prohibited from: Placing a person in a prone position (i.e., lying face down) for a prolonged period of time … except during exigent circumstances. Prisoners shall be carefully monitored while in a prone position as a prone position may be a contributing factor to cause a prisoner to suffocate, also referred to as positional asphyxiation.").

[134] *Id.*

[135] *Id.*

an article titled *How to Prevent Positional Asphyxia*, which identified positional asphyxia as "a potential danger of some common physical restraint techniques," and explained that "positional asphyxia is not just about the position of the subject's body.  There are precipitating factors that make positional asphyxia deadly. These factors include intoxication due to alcohol, drug use, obesity, psychiatric illnesses, and physical injury," as well as "predisposing medical conditions" and "violent struggle."[136]  The article instructs officers that they should "avoid the use of prone restraint techniques" when feasible and "[o]nce the suspect is handcuffed, get them off the face-down position."[137]

48.    Indeed, California Peace Officers Standards and Training (POST), the state organization that sets minimum standards for police training in the State of California, identifies that positional asphyxia, or body positioning that restricts breathing, could lead to inadequate breathing and potential respiratory arrest.[138]

49.    There are four specific factors that, officers learn, can indicate that a subject is particularly susceptible to the risks of positional asphyxia.

a.    First, officers learn that positional asphyxia results when a subject cannot take in sufficient oxygen over time to sustain themselves.  For that reason, indications that a subject is becoming oxygen deprived indicate a particular susceptibility to positional asphyxia.  It is generally accepted in policing that officers must take seriously and should never ignore a subject's statements that they cannot breathe.[139]

b.    Second, officers are taught that pre-existing health conditions can exacerbate the risk of positional asphyxia.[140]

c.    Third, officers are taught that intoxication and substance abuse can exacerbate the risk of positional asphyxia.[141]

d.    Fourth, officers are taught that excited delirium can exacerbate the risk of positional asphyxia.[142]

---

[136] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU.

[137] *Id.*

[138] POST LD 34 at 5-7. https://post.ca.gov/portals/0/post_docs/basic_course_resources/workbooks/LD_34_V-6.1.pdf

[139] See, e.g., Steve Cole, Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe", Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ

[140] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[141] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[142] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

50. Here, Mr. Stephenson was walking on the freeway and did not comply with Officer Norem's instructions to move to the shoulder of the roadway. When Mr. Stephenson began to move toward traffic lanes, Officer Norem used force by discharging his taser at Mr. Stephenson two times. While Officer Norem reported that the taser did not cause neuro-muscular incapacitation, he said it did cause Mr. Stephenson to fall to the ground. Officer Norem then applied his body weight to Mr. Stephenson's back to hold him in a prone position and he applied three drive stuns[143] trying to take Mr. Stephenson into custody.

51. Officer Norem was assisted by motorists and by Investigator Borden and was able to apply handcuffs to Mr. Stephenson. During that process, Officer Norem, Investigator Borden, Mr. Leighton, Mr. Stout, and an unidentified male, all applied body weight to Mr. Stephenson to hold him in a prone position.

52. While the uses of force to place Mr. Stephenson in handcuffs was consistent with generally accepted police practices, once Mr. Stephenson was secured in handcuffs, police officers are trained to move the subject into a recovery position by rolling them onto their side or sitting them up. Officer Norem said he was trained on the recovery position that he described as a person laying on their side with their legs split and that the recovery position can help a person to breathe and said it is common knowledge not to place a person in a position where they cannot breathe because they may die.

53. Indeed, there is evidence that Mr. Stephenson was not resisting after he was handcuffed.

   a. Investigator Borden said once the handcuffs were applied that the scene was safe and Mr. Stephenson was no longer resisting.

   b. Officer McKee said he never saw Mr. Stephenson combative or actively resisting and he does not recall Mr. Stephenson ever moving.

   c. While Officer Norem said he did not request or order the other individuals to get off Mr. Stephenson after he had been handcuffed and he did not place Mr. Stephenson in a recovery position in the minute after he was handcuffed because Mr. Stephenson was actively resisting by kicking and trying to get up, the video evidence does not show any movement by Mr. Stephenson.

54. Instead of placing Mr. Stephenson in a recovery position, Officer Norem continued to use his body weight and applied pressure to Mr. Stephenson's back. Moreover, Officer Norem allowed Mr. Leighton to apply pressure to Mr. Stephenson's legs, Investigator Borden to apply pressure to Mr. Stephenson's back and an unknown male used his foot to apply pressure to Mr. Stephenson's upper back, all while Mr. Stephenson remained in

---

[143] Drive stuns are pain compliance and do not cause neuro-muscular incapacitation.

27

a prone position. Officer Norem was in charge of the arrest and he should have given the civilians and Investigator Borden commands to stop placing their body weight on Mr. Stephenson so he could place him in a recovery position.

55.    Officer Norem said he believed Mr. Stephenson was placed in a recovery position about 1 -1 ½ minutes after he was handcuffed, but said it is possible that he was not placed in a recovery position for 3-4 minutes. Officer McKee's mobile video records Officer Norem radioing that he had Mr. Stephenson detained at 9:00[144] and Mr. Stephenson was not rolled onto his side until 12:39, showing that Officer Norem held Mr. Stephenson in a prone position for about 3 minutes and 39 seconds after he had been handcuffed.

56.    A reasonable police officer in these circumstances would have immediately placed Mr. Stephenson in a recovery position after he was handcuffed and Officer Norem's failure to do so was inconsistent with generally accepted police practices.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Rancho Santa Margarita, CA.

_____          9/14/23
Jeffrey J. Noble                                    Date

---

[144] Officer Norem said when he radioed that Mr. Stephenson was detained, it would indicate that he was in handcuffs. Norem deposition at 60.

# JEFFREY J. NOBLE

Rancho Santa Margarita, CA 92688

Telephone: (949) 279-4678
*Email:* jeffnoble@cox.net
www.policeconduct.net

## EXPERIENCE

*CONSULTANT/EXPERT WITNESS* (2005 – Present)

Provide consulting and expert witness services on a wide range of law enforcement and personnel issues including misconduct, corruption, use of force, workplace harassment, pursuits, police administration, training, police operations, criminal and administrative investigations, interviews and interrogations, civil rights violations, police procedures, and investigations.

*FEDERAL COURT APPOINTED MONITOR*

Santa Clara, California, Sheriff's Department (March 2019 – present)

Review of policies, procedures and use of force applications in the Santa Clara County Jails as part of a federal court consent decree in the matter of *Chavez v. County of Santa Clara*.

*DEPUTY CHIEF OF POLICE* (April 2014 – January 2015)

Westminster Police Department, California
(Sworn 87; Civilian – 40; Population- 91,377; 10 sq. mi.)

Served as an interim Deputy Chief of Police to review Internal Affairs, auditing processes, department policies and procedures, risk management and to facilitate the efforts of a new external oversight agency.

*DEPUTY CHIEF OF POLICE* (September 1984 – July 2012)

Irvine Police Department, California
(Sworn – 205, Civilian – 100; Population: 217,000; 70 sq. mi.)

Served as a Patrol Officer, Narcotics Detective, Traffic Detective, Training Sergeant, SWAT sergeant and Commander, Internal Affairs, Sergeant, Lieutenant, Commander and Deputy Chief of Police.  As the Deputy Chief of Police, I was responsible for all operations of the Irvine Police Department including Patrol, Traffic and Investigations.

# JEFFREY J NOBLE

## EDUCATION

*Western State University, College of Law* (Irvine, California)
J.D. *with honors*, 1993.
Assistant Editor, Consumer Law Journal.  California State Bar, 1994, #170911.

*California State University at Long Beach*
B.A. Criminal Justice, 1989

*Senior Management Institute for Police*
Police Executive Research Forum.  Boston University, Boston, Massachusetts, 2002

## PUBLICATIONS

### *Books:*

Stoughton, S., Noble, J. and G. Alpert, *Evaluating Police Uses of Force*, New York University Press (2020).
Noble, J., and G. Alpert, *Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight*.  Prospect Heights, IL. Waveland Press (2008).

### *Book Chapters:*

Alpert, G., J. Noble and J. Rojek, *Solidarity and the Code of Silence,* Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).
Noble, J., and G. Alpert, *State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?* (Updated) Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).
Noble, J., and G. Alpert, *State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?* Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Sixth Edition (2009).

## JEFFREY J NOBLE

*Articles:*

Stoughton, S., Noble, J., and Alpert, G., *How to Actually Fix America's Police*, The Atlantic (June 2020)

Stoughton, S., Noble, J., and Alpert, G., *George Floyd's death shows exactly what police should not do,* The Washington Post (May 29, 2020)

Stoughton, S., Alpert, G. and Noble, J., *Why Police Need Constructive Criticism*, The Atlantic (December 23, 2015)  http://www.theatlantic.com/politics/archive/2015/12/officer-porter-mistrial-police-culture/421656/

Stoughton, S., Noble, J. and Alpert G., *Better Information is the Key to Policing Reform,* The Atlantic, (September 24, 2015) http://www.theatlantic.com/politics/archive/2015/09/better-information-is-the-key-to-policing-reform/406696/

Noble, J., *Rethinking Tactical Team Warrant Entries*, The Tactical Edge (Summer 2014).

Noble, J. *Assessing Police Discretion,* The Journal of California Law Enforcement (Vol. 47, No. 4, 2013).

Noble, J. and G. Alpert, *Criminal Interrogations of Police Officers After Use-of-Force Incidents,* FBI Law Enforcement Bulletin (September 2013).

Noble, J. and G. Alpert, *What Do We Really Know About American Policing?* The Journal of California Law Enforcement (Vol. 47, No. 1, 2013).

Noble, J., *Do I Need A SWAT Team?  Threat Assessments for Warrant Services*, The Tactical Edge (Winter 2013).

Alpert, G., J. Rojek and J. Noble, *The Cognitive Interview in Policing: Negotiating Control*. ARC Centre of Excellence in Policing and Security: Briefing Paper, Australian Government Research Council (June 2012).

Noble, J. and G. Alpert, *Evaluating the Quality of Law Enforcement Investigations: Standards for Differentiating the Excellent, Good and Reasonable, From the Unacceptable*.  The Journal of California Law Enforcement (Vol. 46, No. 1, 2012)

Noble, J., *Police Explorers: Protecting a Valued Asset.* The Journal of California Law Enforcement (Vol. 45, No. 3, 2011).

Noble, J., and G. Alpert, *Lies, True Lies and Conscious Deception: Police Officers and the Truth*.  Police Quarterly, Volume 12, Number 2 (June 2009).

Noble, J., Assessing *Witness Credibility*.  International Association of Chiefs of Police, Training Key #597 (2006).

Noble, J., Albertsons *Homicide: An Active "Shooter" Response*, The Tactical Edge (Fall 2004).

Noble, J., Police *Officer Truthfulness and the <u>Brady</u> Decision*, Police Chief Magazine (October 2003).

Noble, J., *The Boomerang Employee – What to do When a Fired Employee Comes Back*, The Journal of California Law Enforcement (Volume 37, No. 1, 2003).

Noble, J., Why *Appearance Matters*, Network – California Peace Officers' Association Newsletter (August 2001).

# JEFFREY J NOBLE

Noble, J., *Tactical Team Basics: Warrants*, The Tactical Edge (Summer 2000).

Noble, J., *Encouraging Interaction*, Minnesota Cities Magazine (Volume 84, Issue 11, November 1999).

Noble, J., *Neighborhood Watch Evolves Into Community Engagement Tool in Irvine*, Community Policing Consortium.  www.communitypolicing.org/publications/artbytop/w6/w6noble.htm (October 1999).

Noble, J., Childhood Experiences Find a Place in Today's Public-Safety Strategies, Community Links (Ph. VI, No.3, Issue 9 - Summer 1999).

Noble, J., *Police Pursuits: Law Enforcement or Public Safety?* The Journal of California Law Enforcement (Volume 33, No.1, 1999).

Noble, J., *Alternative Work Schedules can be an Evolution of Team Policing*, Network - California Peace Officers' Association Newsletter (December 1998).

Noble, J., *Continuing Police Training: The Interactive Multimedia Approach*, The Journal of California Law Enforcement (Volume 29, No.1, 1995).

Noble, J., *Environmental Advertising Claims: "Ozone Friendly"* Consumer Protection, 2 W. St. U. Consumer L.J. 95 (1993).


## SELECTED PROFESSIONAL ACTIVITIES

*Peer Review* – Law Enforcement Dog Encounters Training Toolkit for Law Enforcement, DOJ, Office of Community Oriented Policing Services, COPS, (December 2018)

*Presenter* – Developing or Revitalizing an Internal Affairs Unit.  Public Agency Training Council: Internal Affairs Conference (December 2014)

*Presenter* – Addressing Police Misconduct: Standards to Consider.  The International Association of Chiefs of Police Annual Conference (October 2014).

*Presenter* – Reducing Traffic-Related Officer Injuries and Deaths.  The International Association of Chiefs of Police Annual Conference in Orlando, Florida (October 2014).

*Participant* – Reducing Violence and Improving the Rule of Law: Organized Crime, Marginalized Communities, and the Political Machine.  Carnegie Endowment for International Peace. Washington, D.C. (September 2014)

*Presenter* – Preventing Corruption in Police Institutions.  Police Accountability in Democracies: First International Congress on Police Internal Affairs. Los Cabos, Baja California Sur, Mexico (October 2013).

*Presenter* – Testilying: Lies, True Lies, and Conscious Deception: Police Officers' Truth and the Brady Decision. American Psychological Association Annual Conference in Honolulu, Hawaii (July 2013).

*Presenter* – Police Misconduct Issues: Police Explorers and Reasonableness of Internal Affairs Investigations, The International Association of Chiefs of Police Annual Conference in San Diego, California (October 2012).

*Peer Review* – Building and Enhancing Criminal Justice Researcher-Practioner Partnerships, National Institute of Justice (June 2012).

*Committee Chairperson* – California Peace Officers' Association Communications Sub-Committee.

# JEFFREY J NOBLE

Responsible for publication of the Journal of California Law Enforcement (Jan. 2012 – present)

*Presenter* – The Lying Police Officer: Is Any Deception Acceptable?  With Karen Kruger.   The International Association of Chiefs of Police Annual Conference in Denver, Colorado (Nov. 2009).

*Presenter* – State-Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?  The Academy of Criminal Justice Sciences Annual Meeting in Boston, Massachusetts. (March 2009).

*Committee Chairperson* – Major Cities Chiefs of Police Task Force in Internal Affairs. Los Angeles, California (2005-2008).

*Peer Review* – Boston Police Department: Enhancing Cultures of Integrity Technical Assistance Guide, Office of Community Oriented Policing Services #TDL 2008-371 (July 2008)

*Peer Review* – Undocumented Immigrants in U.S./Mexico Border Counties: The Cost of Law Enforcement and Criminal Justice Services, National Institute of Justice #TDL 2008- 321 (December 2007).

*Presenter* – Truth or Consequences: Dealing with the Deceitful Police Officer, with Jeffrey Schlanger and Michael Stone, The International Association of Chiefs of Police Annual Conference, Los Angeles, California (November 2004).

*Presenter* - Albertsons Homicide: An Active "Shooter" Response, The California Association of Tactical Officers Annual Conference, Palm Springs, California (September 2004).

*Presenter* – Boomerang Employees, COPS Conference, Washington, D.C. (2002).

## PROFESSIONAL AFFILIATIONS

*California Peace Officers' Association* – Chair, Communications Sub-Committee (2012 – 2018)
*Police Executive Research Forum*
*International Association of Chiefs of Police*
*National Tactical Officers' Association*
*Special Olympics Torch Run* Southern California Region, Assistant Director (1997 – 2012)

## CONSULTING/EXPERT WITNESS

2022    <u>Barragan v. LAPD</u>, (Plaintiff) (Expert Report)
        Positional Asphyxia
        Dominique Boubion, Carrillo Law Firm, 1499 Huntington Drive, Suite 402, South Pasadena, CA 91030

2022    <u>Sen v. Los Angeles</u>, (Plaintiff) (Expert Report)
        High-Risk Car Stop Tactics
        Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2022    <u>Ibarra v. Lee (Rogers County, OK)</u>, (Plaintiff) (Expert Report)
        Officer involved Shooting

Updated February 23, 2022

## JEFFREY J NOBLE

Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2022 <u>Tate v. Chicago</u> (Defense) (Expert Report)
Monell Allegations
Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2022 <u>Lunneen v. Berrien Springs</u> (Plaintiff) (Expert Report)
Use of Force
Noah W. Drew, Spence Lawyers, 15 S. Jackson Street, Jackson, WY 83001

2021 <u>Carr v San Diego County Sheriff</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Joseph M. McMullen, Law Offices of Joseph M. McMullen, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2021 <u>Mountford v. City of Santa Monica</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Jeremy D. Jass, 4340 Von Karman Avenue, Suite 100, Newport Beach, CA 92660

2021 <u>State v. Dagas </u>(Prosecution) (Trial Testimony)
Allegation of False Police Report
Judy Taschner, Deputy District Attorney, Special Operations Division, San Diego County District Attorney's Office, East County Regional Center, 250 E. Main Street, El Cajon, CA 92020

2021 <u>Stickney v. City of Phoenix</u> (Defense) (Expert Report)
Use of Force
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021 <u>Evans v City of Austin</u> (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2021 <u>Rennells v. Kenealy</u> (Plaintiff) (Expert Report)
Use of Force
James End, First, Albrecht & Blondis, 158 N. Broadway, Suite 600 Milwaukee, WI 53202

2021 <u>Johnson v Baltimore</u> (Defense) (Expert Report)
*Monell* Allegations
Kara K. Lynch, Chief Solicitor, Baltimore City Department of Law, 100 N. Holliday Street, Room 101, Baltimore, Maryland 21202

2021 <u>Brown v City of Chicago</u> (Defense) (Expert Report) (Deposition)
*Monell* Allegations
Dan Nolan, Reiter-Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2021 <u>Gonzalez v. CHP</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

Updated February 23, 2022

# JEFFREY J NOBLE

2021   <u>Baney v City of Chapin</u> (Plaintiff) (Expert Report)
       Use of Force
       Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201
2021   <u>Washington v City of Chapin</u> (Plaintiff) (Expert Report)
       Use of Force
       Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201
2021   <u>King v. Fontana</u> (Plaintiff) (Expert Report) (Deposition)
       Officer Involved Shooting
       Hang Le, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367
2021   <u>Harbin v. City of Breckenridge Hills, Missouri</u> (Plaintiff) (Expert Report)
       Use of Force
       Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101
2021   <u>Green v St. Louis</u> (Plaintiff) (Expert Report)
       Officer Involved Shooting
       Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101
2021   <u>Debeaubien v CHP</u> (Plaintiff) (Expert Report) (Deposition)
       Failure to Investigate
       Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825
2021   <u>Love v. Chicago</u> (Defense) (Expert Report) (Deposition)
       Officer Involved Shooting
       Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law
       Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602
2021   <u>Groom v Paso Robles</u> (Plaintiff) (Expert Report)
       Sexual assault by police officer
       Neda Lotfi, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266
2021   <u>Barrera v. City of Woodland</u> (Plaintiff) (Expert Report) (Deposition)
       Use of Force
       Neil Gehlawat, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266
2021   <u>Shorter v. City of Greenville, MS</u> (Plaintiff) (Expert Report)
       Officer Involved Shooting
       Tiffany Wright, Co-Director, Human and Civil Rights Clinic, Howard University School of Law
2021   <u>Andrich v. City of Phoenix</u> (Defense) (Expert Report)
       Officer Involved Shooting
       Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281
2021   <u>Monk v. Gulick (Chesterfield, VA)</u>, (Plaintiff) (Expert Report)
       Use of Force
       Thomas Johnson, Bricker, Anderson & Johnson, 411 East Franklin Street, Suite 504, Richmond, VA 23219
2021   <u>Hernandez v. City of Los Angeles</u> (Plaintiff) (Expert Report)
       Officer Involved Shooting

Updated February 23, 2022

# JEFFREY J NOBLE

Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2021   Garten v. City of Costa Mesa, (Plaintiff) (Expert Report) (Deposition)
Detention and search.
Richard Herman, Law Office of Richard P. Herman, P. O. Box 53114, Irvine, California 92619-3114

2021   Green v. City of St. Louis, (Plaintiff) (Expert Report)
Officer Involved Shooting
Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101

2021   Harris v. City of Phoenix, (Defense) (Expert Report)
Officer Involved Shooting
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021   Gagliani v. Lexington County Sheriff, SC, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Eric Cavanaugh, Cavanaugh & Thickens, LLC, 1717 Marion St, Columbia, SC 29201

2021   Torres v. City of Cheyenne, WY (Plaintiff) (Expert Report)
Use of Force
Thomas B. Jubin, Jubin & Zerga, LLC., 2614 Pioneer Avenue, P.O. Box 943, Cheyenne, Wyoming 8203-0943

2021   Velez v. City of Sacramento, (Plaintiff) (Expert Report)
Officer Involved Shooting
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2021   Mojarrad v.  Edwards, City of Raleigh, NC, (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Cate Edwards, Edwards Kirby, 3201 Glenwood Avenue, Suite 100, Raleigh, North Carolina 27612

2021   Pope v. Hill, (Plaintiff) (Deposition)
Pursuit
Bart Turner, Savage, Turner, Durham, Pinckney & Savage, 102 East Liberty Street, Eight Floor (31401), PO Box 10600, Savannah, GA 31412

2021   Rightsell v. Indiana State Police, (Plaintiff) (Expert Report)
Officer Involved Shooting
Bruce Kehoe, Wilson Kehoe Winingham, 859 N Meridian St, Indianapolis, IN 46208

2021   Mendez v City of Chicago, (Defense) (Expert Report) (Deposition)
Monell Allegation
Marion Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law, Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2021   Helvie v Jenkins (Adams County Sheriff, CO.), (Defense) (Expert Report)
Use of Force
Kerri A. Booth, Adams County Attorney's Office, 4430 South Adams County Pkwy., 5th Floor, Suite C5000B, Brighton, CO 80601

2021   State of Minnesota v. Chauvin (State) (Expert Report)

Updated February 23, 2022

# JEFFREY J NOBLE

Use of Force
Steve Schlescher, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1400, St. Paul, MN 55101

2021 <u>Humphrey v. Friar (City of Millington, TN)</u>, (Plaintiff) (Expert Report) (Deposition)
Sexual Misconduct
Andrew C. Clarke, The Cochran Firm – Midsouth, One Commerce Square, Suite 1700, Memphis, Tennessee 38103

2021 <u>Skommesa v. City of Murrieta</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Michael R. Marrinan, Law Office of Michael R. Marrinan, 501 W. Broadway, Suite 1510
San Diego, CA. 92101

2021 <u>Dominguez v. City of Escondido</u> (Defense) (Expert Report)
Use of Force
Keith Phillips, Assistant City Attorney, City Attorney's Office, City of Escondido, 201 N. Broadway, Escondido, CA 92025

2021 <u>Brown v. Ontario</u> (Defense) (Expert Report)
Use of Force
Daniel S. Roberts, Cole Huber LLP, 3401 Centrelake Dr., Ste. 670, Ontario, CA 91761

2021 <u>Galloway v. Nassau County Police</u> (Plaintiff) (Expert Report)
Allegation of wrongful conviction
Gabriel P. Harvis, Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New York 10005

2021 <u>Richards v. Las Vegas Metropolitan Police</u> (Plaintiff) (Expert Report)
Officer involved shooting
E. Brent Bryson, 32302 West Charleston Blvd., Las Vegas, NV 89102

2021 <u>Hall v. City of Atlanta</u> (Plaintiff) (Expert Report) (Deposition)
Monell Allegation
Shean Williams, The Cochran Firm, 100 Peachtree Street NW, Suite 2600, Atlanta, Georgia, 30303

2021 <u>Drew v. Irby, Fauquier County Sheriff, VA</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force, Arrest
Victor M. Glasberg, 121 S. Columbus Street, Alexandria, VA 22314

2021 <u>Alves v. Riverside County Sheriff's Department</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2020 <u>VanGilder v. McClean and Beale</u> (Plaintiff) (Expert Report)
Failure to Render Medical Assistance
Mark J. Krudys, The Krudys Law Firm, PLC, SunTrust Center, 919 East Main Street, Suite 2020, Richmond, VA 23219

2020 <u>Hood/Washington v. Chicago</u> (Defense) (Expert Report) (Deposition)

# JEFFREY J NOBLE

Monell Allegations
George Yamin, The Sotos Law Firm, 550 East Devon Avenue, Suite 150, Itasca, IL 60143

2020  Grabbingbear v. Europe (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Donald Sisson, Elkus and Sissnon, PC, 7100 E. Belleview Ave., Suite 101, Greenwood Village, CO 80111

2020  Thurman v. Spokane County Sheriff's Department (Defense) (Expert Report)
Reasonableness of Internal Investigation
Michael Kitson, Lane Powell, 1420 5th Avenue, #4200, Seattle, WA 98101

2020  Dew v. City of Seaside (Plaintiff) (Expert Report)
Officer Involved Shooting
Karen C. Joynt, Joynt Law, 225 S. Lake Ave., Suite #300, Pasadena, CA 91101

2020  Arnold v. City of Olathe, Kansas (Plaintiff) (Expert Report) (Deposition)
Tactical Decision Making
Ryan J. Gavin, Kamykowski, Gavin & Smith, P.C., 222 S. Central Ave., Suite 1100, St. Louis, MO 63105

2020  Scott and Johnson v. Detroit (Plaintiff) (Expert Report)
Allegation of Wrongful Convictions
Nick Bourland, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020

2020  Chinaryan v. LAPD (Plaintiff) (Expert Report) (Trial)
High-risk car stop
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2020  Lisner v. Huntington Park (Plaintiff) (Expert Report)
Employment Action
Michael J. Grobaty, Murtaugh Treglia Stern & Deily LLP, 2603 Main Street, Penthouse, Irvine, CA 92614

2020  Meadows v. Town of Rising Sun, MD (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeffrey Nusinov, Nusinov, Smith, LLP, 6225 Smith Avenue, Suite 200B, Baltimore, MD 21209

2020  People v. Nelson (King County, Washington) (People) (Expert Report)
Officer Involved Shooting
Kathy Van Olst, King County Prosecuting Attorney's Office, 516 Third Avenue, W400 Seattle, WA 98104

2020  Mesa v. Leon Valley, Texas (Plaintiff) (Expert Report)
Pursuit
Gene Toscanao, 846 Culebra Road, San Antonio, Texas 78201

2020  Doe v. Charlotte Board of Education (Defense) (Expert Report) (Deposition)
Police investigation
Lori Keeton, The Law Offices of Lori Keeton, 13850 Ballantyne Corporate Place, Suite 500,

# JEFFREY J NOBLE

Charlotte, North Carolina 28277

2020   Bisetti v. City of Austin (Plaintiff) (Expert Report)
Arrest and Disciplinary Action
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2020   Amaral v. City of San Diego (Plaintiff) (Expert Report) (Deposition)
Use of force
Gastone Bebi, 501 West Broadway, Suite 1340, San Diego, CA 92101

2020   Baker v. Coburn and McHugh (Stratford, Texas) (Plaintiff) (Expert Report)
Officer Involved-Shooting
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2020   Scott v. Charlotte (Defense) (Deposition)
Officer Involved Shooting
Mark Newbold, Deputy City Attorney, Charlotte-Mecklenburg, 601 E. Trade Street
Charlotte, NC 28202

2020   Dudley v. City of Kinston (Plaintiff) (Expert Report) (Deposition)
Allegation of Wrongful Conviction
David Rudolf, Rudolf-Widenhouse, 225 East Worthington Ave., Suite 100, Charlotte, NC 28203

2020   Taylor v. Los Angeles County Sheriff's Department (Plaintiff) (Expert Report)
Internal Investigation, Failure to Render Medical Aid
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2020   McBean v. Peraza (Plaintiff)
Officer Involved Shooting
David I. Schoen, 2800 Zelda Road, Suite 100-6, Montgomery, Alabama  36106

2020   Hayes v. City of Portland (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Bill Manlove, Portland Office of the City Attorney, 1221 SW Fourth Avenue, Room 430,
Portland, OR 97204

2020   Eatherton v. County of Riverside (Plaintiff) (Expert Report)
Use of force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2020   Godifay v. King County, WA (Defense) (Expert Report)
Alleged police pursuit
Daniel L. Kinerk, King County Senior Deputy Prosecuting Attorney, 900 King County
Administration Building, 500 Fourth Avenue, Seattle, WA 98104-2316

2020   Doxator v. O'Brien, Green Bay Police Department (Plaintiff) (Expert Report) (Deposition)
Use of Force
Forrest K. Tahdooahnippah, Dorsey & Whitney, 50 South Sixth Street, Suite 1500, Minneapolis,
MN 55402

2020   Krechmery v. City of Ontario (Plaintiff) (Expert Report)
Use of Force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

## JEFFREY J NOBLE

2019  Taylor v. Seattle, (Defense) (Expert Report)
Officer Involved Shooting
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104

2019  Thomas v. County of Sacramento (Plaintiff) (Expert Report)
Officer Involved Shooting
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2019  Elifritz v. City of Portland, (Defense) (Expert Report)
Monell allegation
Naomi Sheffield, Deputy City Attorney, Portland Officer of the City Attorney, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2019  People v. Krichovich and LaCerra (Broward County, FLA) (State) (Deposition)
Use of Force
Christopher Killoran, Assistant State Attorney, Seventeenth Judicial Circuit of Florida
Broward County Courthouse, 201 S.E. Sixth Street, Fort Lauderdale, FL 33301-3360

2019  Wilson v. City of Mission, TX (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Victor Rodriguez, 121 North 10th Street, McAllen, TX 78501

2019  Davis v. Waller (Georgia Bureau of Investigations) (Defense) (Expert Report)
Officer Involved Shooting
Ron Stay, Assistant Attorney General, Georgia Department of Law, 40 Capitol Square SW, Atlanta, Georgia

2019  Yatsko v. Graziolli (Cleveland Police Department) (Plaintiff) (Expert Report)
Officer Involved-Shooting
Jeremy Tor, Spangenberg, Shibley & Liber, 1001 Lakeside Ave. East, Suite 1700, Cleveland, OH 44114

2019  Contreras v. City of Granger, WA (Plaintiff) (Expert Report)
Employment
Aaron V. Rocke, Rocke Law Group, PLLC, 101 Yesler Way, Suite 603, Seattle, WA 98104

2019  Doolittle v. Hickory, N.C. (Plaintiff) (Expert Report) (Deposition)
Use of Force
Paul Tharpe, Arnold & Smith, 200 North McDowell Street, Charlotte, NC 28204

2019  Slater v State of Arizona Department of Game and Fish (Defense) (Expert Report)
Use of Force
Timothy Watson, Assistant Attorney General, Liability Management Section, 2005 N. Central Ave., Ste. 100, Phoenix, AZ 85004

2019  Howard v. City of Durham, NC (Defense) (Expert Report) (Deposition)
Allegation of Wrongful Conviction
J. Nicholas Ellis, Poyner Spruill, 130 S. Franklin, Rocky Mount, NC 27804

2019  Tate v. City of Seattle (Defense) (Expert Report)
Detention and Use of Force
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104

# JEFFREY J NOBLE

2019   McNally v. San Diego (Plaintiff) (Expert Report) (Deposition) (Trial)
       Use of Force
       Mike Marrinan, 501 W. Broadway, Suite 1510, San Diego, CA 92101
2019   Godinez v. Chicago (Defense) (Expert Report)
       Monell allegation
       Avi Kamionski, Nathan and Kamionski, LLP, 140 S. Dearborn, Suite 1510, Chicago, IL 60603
2019   Shortridge v. City of Arvada, CO (Defense) (Expert Report)
       Use of Force
       Julie Richards, Senior Assistant City Attorney, City Attorney's Office, 8101 Ralston Road
       Arvada, CO 80002
2019   Dunn v. City of Seattle (Defense) (Expert Report)
       Violent Persons File – NCIC
       Brian Esler, Miller, Nash, Graham & Dunn, LLP, 2801 Alaskan Way, Suite 300, Seattle, WA
       98121
2019   Heard v. City and County of Denver (Defense) (Expert Report)
       Use of Force
       Michele Horn, City and County of Denver, City Attorney's Office, 201 W. Colfax Ave., Dept
       1108, Denver, CO 80202
2019   Windle v. State of Indiana (Plaintiff) (Expert Report) (Deposition)
       Use of Force
       Zaki Ali, 522 West 8th Street, Anderson, Indiana 46016
2019   Wisdom v. County of Nassau (Plaintiff) (Expert Report)
       Allegation of False Arrest
       Gabriel Harvis, Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New
       York 10005
2019   Castaway v. City of Denver (Defense) (Expert Report)
       Officer Involved-Shooting
       Wendy Shea, City and County of Denver, City Attorney's Office, 201 W. Colfax Ave., Dept
       1108, Denver, CO 80202
2019   Mosquera v. City of San Gabriel (Plaintiff) (Expert Report)
       Identification Procedures
       John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks
       Avenue, Pasadena, California 91103
2019   Harper v. Zoelling (Snohomish County Sheriff's Department), (Plaintiff) (Expert Report)
       (Deposition)
       Police Practices
       Jeff Kallis, Kallis Law, 321 High School Rd., Suite D3, Bainbridge Island, WA 98110
2019   Elmansoury v. Garden Grove (Plaintiff) (Expert Report) (Deposition)
       Use of Force
       Jeremy Jass, Jass Law, 4510 E. Pacific Coast Hwy., Suite 400, Long Beach, CA 90804
2019   Lee v. San Diego (Plaintiff) (Expert Report) (Deposition)

# JEFFREY J NOBLE

Use of Force
Mike Marrinan, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2019    <u>Kubiak v. City of Chicago</u> (Defense) (Expert Report) (Deposition)
Allegation of code of silence
David Seery, Deputy Corporation Counsel, Administration, City of Chicago, Department of Law
121 N. LaSalle Street, Room 600, Chicago, Illinois 60602

2019    <u>People v Krook</u> (Prosecutor) (Grand Jury Testimony) (Trial)
Officer Involved Shooting
Richard Dusterhoft, Office of the Ramsey County Attorney, Criminal Division Director

2019    <u>Roque v. Austin</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2019    <u>Green v Lara</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Victor Rodriguez, 121 North 10th Street, McAllen, TX 78501

2018    <u>Estate of McIntosh v. City of Chicago</u> (Defendant) (Expert Report) (Deposition)
*Monell* Allegations
Patrick R. Moran, Rock Fusco & Connelly, LLC, 321 North Clark Street Suite 2200, Chicago, Ill 60610

2018    <u>Delacruz v. City of Port Arthur, TX</u> (Plaintiff) (Expert Report)
Use of Force
Mo Aziz, Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz, 800 Commerce, Houston, TX 77002

2018    <u>Westfall v. Luna (Southlake PD, TX)</u> (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Grant Schmidt, Winston & Strawn, 2121 N. Pearl, Suite 900, Dallas, TX 75201

2018    <u>Lyles v. Seattle</u> (Defense) (Expert Report)
Officer Involved Shooting
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104

2018    <u>Le v. King County (WA)</u> (Defense) (Expert Report)
Officer Involved Shooting
Dan Kinerk, King County Prosecuting Attorney's Office, 500 Fourth Avenue, Seattle, WA

2018    <u>Sweet v. City of Mesa, AZ</u> (Defense) (Expert Report) (Deposition)
Reasonableness of tactics
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2018    <u>Collins v. San Diego County</u> (Plaintiff) (Expert Report) (Trial)
Reasonableness of Detention and arrest
Elizabeth Teixeira, Law Offices of Robert Vaage, 110 West "A" Street, Suite 1075, San Diego, CA 9201

2018    <u>Ballew v. City of Pasadena</u> (Plaintiff) (Expert Report)
Use of Force

Updated February 23, 2022

# JEFFREY J NOBLE

John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2018   <u>Valverde v. City of Denver</u> (Defense) (Expert Report)
Officer Involved Shooting
Michele Horn, Assistant City Attorney, Civil Litigation Section, City and County of Denver

2018   <u>Port Authority Police Benevolent Association v. The Port Authority of New York and New Jersey</u> (Defense) (Expert Report) (Arbitration Testimony)
Contract Dispute
Jason Stanevich, Littler, 265 Church Street, Suite 300, New Haven, CT 06510

2018   <u>Smith v. Chicago</u> (Defense) (Expert Report)
Policies and practices
Dan Nolan, Reiter-Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2018   <u>Carpenter v. Cleveland County Sheriff, N.C.</u> (Plaintiff) (Expert Report) (Trial)
Officer Involved Shooting
Paul Tharp, Arnold & Smith, PLLC, 200 N. McDowell Street, Charlotte, NC 28204

2018   <u>Courts v. Lee</u> (Defense) (Deposition)
Traffic Collision
Jennifer Russel, Ford, Walker, Haggerty & Behar, One World Trade Center, 27th Floor, Long Beach, CA 90831

2018   <u>Studdard v. Shelby County (TN)</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Daniel Seward, 4510 Chickasaw Road, Memphis, TN 38117

2018   <u>Farmer/Milliner v. City of Chicago</u> (Defense) (Expert Report)
Monell allegations
Raoul Mowatt, Chicago Law Department, 30 North LaSalle, 900, Chicago, IL 60602

2018   <u>Milke v City of Phoenix</u> (Defense) (Expert Report) (Deposition)
Allegation of wrongful conviction
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2018   <u>Kager v. Virginia Beach</u> (Plaintiff) (Expert Report) (Deposition) (Trial)
Officer Involved shooting
Ed Brady, Brady, Fischel & Daily, LLC, 721 Melvin Ave., Annapolis, MD 21401

2018   <u>Davis v. Chicago</u> (Defense) (Expert Report) (Trial)
Employment
Howard Levine, Chicago Law Department, 30 North LaSalle, 1020, Chicago, IL 60602

2018   <u>Williams v. King County, WA</u> (Defense) (Expert Report)
Officer Involved Shooting
Dan Kinerk, King County Prosecuting Attorney's Office, 500 Fourth Avenue, Seattle, WA

2018   <u>Faria v. McCarrick</u> (Plaintiff) (Expert Report) (Deposition)
Wrongful Conviction
Bevis Schock, 7777 Bonhomme Ave., 1300, St. Louis, MO 63105.

2018   <u>Zuniga v. CHP</u> (Plaintiff) (Deposition) (Trial)

# JEFFREY J NOBLE

Arrest and Use of Force
Dicks and Workman, 750 B Street, 2720 Symphony Towers, San Diego, CA 92101

2018 Walker (Sanders) v. City of Independence, LA (Plaintiff) (Expert Report)
Pursuit
Neile deGravelles, deGravelles & Palmintier, 618 Main Street, Baton Rouge, LA 70801

2018 Espinoza v. City of Tracy (Defense) (Expert Report)
Reasonableness of Internal Affairs Procedures and Investigation
Jesse Maddox, Liebert Cassidy Whitmore, 5250 N. Palm Avenue, Suite 310, Fresno, CA 93704

2018 Luque-Villanueva v. County of San Diego (Plaintiff) (Expert Report)
Reasonableness of arrest
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2018 Flores v. San Bernardino (Plaintiff) (Expert Report) (Deposition)
Officer Involved- Shooting
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

| UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA | FOR COURT USE ONLY |
|---|---|
| **TITLE OF CASE (Abbreviated)**<br>Stephenson, et al. vs. State of California | |
| **ATTORNEY(S) NAME AND ADDRESS**<br>Dale K. Galipo [CA SBN 144074]<br>LAW OFFICES OF DALE K. GALIPO<br>21800 Burbank Blvd, Suite 310<br>Woodland Hills, California 91367<br>Fax: (818) 347-4118<br>Email:  dalekgalipo@yahoo.com | |
| **ATTTORNEY(S) FOR: Plaintiffs** | Case No.   5:21-cv-00526-JAK-KK<br>Dept. 10B<br>Judge:   John A. Kronstadt |

## DECLARATION OF SERVICE

I, Santiago G. Laurel, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action.  My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367. On September 22, 2023, I served the foregoing document described as: **PLAINTIFFS RULE 26 INITIAL EXPERT DISCLOSURES** on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as specified below:

### SEE ATTACHED SERVICE LIST

## METHOD OF SERVICE

☐    (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the address specified above.

☐    I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

☐    I placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of this office for the collection, processing and mailing of documents.  On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒    (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

I declare that I am employed in the office of member of the bar of this Court at whose direction the service was made.

Executed on September 22, 2023

_____
Santiago G. Laurel

## <u>SERVICE LIST</u>

**DEAN GAZZO ROISTACHER LLP**
Lee H. Roistacher, Esq.
Kimberly A. Sullivan, Esq.
440 Stevens Avenue, Suite 100
Solana Beach, CA 92075
Facsimile: (858) 492-0486
E-mail: lroistacher@deangazzo.com; ksullivan@deangazzo.com

*Attorney for Defendant Jeffrey McKee*

Douglas E Baxter
CAAG - Office of Attorney General
California Department of Justice
600 West Broadway Suite 1800
San Diego, CA 92101
Fax: 619-645-2581
Email: Douglas.Baxter@doj.ca.gov

*Attorneys for Defendants State of California and Dane Norem*

STEVEN A. LERMAN & ASSOCIATES, INC.
Steven A. Lerman, Esq.
Nicholas M. Lerman, Esq.
6033 West Century Boulevard, Suite 740
Los Angeles, California 90045
Email: nlerman@lermanslaw.com

LAW OFFICE OF GREGORY PEACOCK
Gregory Peacock, ESQ.
4425 Jamboree Road, Suite 130
Newport Beach, CA 92660
Email: gregorypeacockesq@gmail.com

*Attorneys for Plaintiffs*