1   ROB BONTA
    Attorney General of California
2   DONNA M. DEAN
    Supervising Deputy Attorney General
3   DAVID KLEHM
    Deputy Attorney General
4   State Bar No. 165302
    STEPHANIE A. VOLLMER
5   Deputy Attorney General
    State Bar No. 309407
6    600 West Broadway, Suite 1800
     San Diego, CA 92101
7    Telephone:  (619) 738-9733
     Fax:  (916) 732-7920
8    E-mail:  David.Klehm@doj.ca.gov
    *Attorneys for Defendants State of California,*
9   *Acting by and through the California Highway*
    *Patrol, and Dane Norem*

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14

15  **DEVONTE STEPHENSON,**          5:21-cv-00526-JWH (KKx)
16  **individually and as successor in**
    **interest to Decedent LEROY**   **DEFENDANTS STATE OF**
17  **STEPHENSON; LINDEN**           **CALIFORNIA'S AND DANE**
    **STEPHENSON, individually and as** **NOREM'S MOTION TO STRIKE**
18  **successor in interest to Decedent** **PORTIONS OF TESTIMONY OF**
    **LEROY STEPHENSON; KEANDRE**    **PLAINTIFFS' EXPERT WITNESS**
19  **STEPHENSON, individually and as** **DANIEL WOHLGELERNTER,**
    **successor in interest to Decedent** **M.D.; DECLARATION OF DAVID**
20  **LEROY STEPHENSON,**            **KLEHM IN SUPPORT THEREOF**

21                      Plaintiffs,
                                     Courtroom:   5D
22              v.                   Judge:       The Honorable John A.
                                                  Kronstadt
23  **STATE OF CALIFORNIA; and**
    **DOES 1 through 100, inclusive,** Trial Date:   September 9, 2025
24                                   Action Filed: December 18, 2019
                        Defendants.
25

26

27          Defendants State of California, acting by and through the California Highway

28  Patrol, and Officer Dane Norem (collectively, "Defendants") hereby move for an

1   order striking portions of the testimony of Plaintiffs' Expert Witness Daniel

2   Wohlgelernter, M.D., on the ground that he offered opinions at trial that were not

3   contained in his Rule 26 expert report and never mentioned during his depositions

4   in this case.

5       Defendants move to strike the following testimony during direct and cross-

6   examination, (hereinafter also referred to as the "3-minute cause of death opinion"):

7   Q    And do you have an understanding as to how long Mr. Stephenson
    was kept in a chest down, prone position after he was handcuffed?
8

9   A    Another three minutes.

    Q    Was that important to your opinion related to the cause of death?
10

11  A    Yes.

    Q    Can you explain to the jury why that was important?
12

13  A    During those additional three minutes -- again, face down on a hard
    surface being compressed by people pressing on him -- his lungs were
    not able to bring in adequate oxygen. His lungs were not able to excrete
14  the acid that was building. So his oxygen level was dropping.  His acid
    level was increasing.  And the two of those is a lethal combination that
15  shuts down the heart.

16  (9-11-25 Transcript, p. 638, ll. 3-18.)

17      Defendants also move to strike the following testimony during cross-

18  examination:

19  Q    All right. So getting back to your opinions based on a reasonable
    degree of medical probability about the timing of things, Mr. Galipo was
20  asking you questions about if Mr. Stephenson would have put -- would
    have been put into a recovery position after he was handcuffed.  Do you
21  recall that line of testimony?

22  A    Yes.

23  Q    Okay.  Great.  All right. So how long after Mr. Stephenson was
    handcuffed do you believe it was necessary for him to have been put in a
24  recovery position in order to prevent the cardiac arrest from occurring
    due to the acidosis buildup?  Was it immediately? Would it have been
25  five seconds within being handcuffed?

26  A    Within three minutes.

27  Q    Within three minutes.

28  A    Yes.

Q      So is it your testimony that as long as Mr. Stephenson would have
been put into a recovery position, at any time after being handcuffed
within three minutes, that he would not have died to a reasonable degree
of medical probability?

A      Yes.

***

Q      Very good. And you talked yesterday -- you mentioned that it was
your opinion that, to a reasonable degree of medical probability, if Mr.
Stephenson would have been put in the recovery position within three
minutes of being handcuffed, he might have lived. Do you recall that
testimony?

A      Yes, I do.

Q      And do you recall writing your expert report in this case?

A      Yes.

Q      You never mentioned that opinion in your expert report; right?

A      That's correct.

***

Q      My point is you never expressed any opinion in your expert report
that the time frame that caused Mr. Stephenson's death was only three
minutes and not six minutes.  Is that fair to say?

A      Yes.

Q      And you had your deposition taken twice in this case; right?

A      Yes.

Q      Do you remember that?  Because the first time you had a call that
you had to deal with, with a patient.  Right?

A      Yes.

Q      In your first deposition you never mentioned this three-minute time
frame either; right?  It was only six minutes?

A      I wasn't asked the question specifically like I was yesterday about
the opportunity for recovery position to impact Mr. Stephenson's ability
to survive.  But I agree that in my deposition testimony and in my report,
I did not mention that three-minute window of opportunity.

Q      And you had your deposition taken a second time; correct?

A      Correct.

///

Q    And in that second deposition, you never mentioned that this critical time period for recovery was only three minutes, not six minutes; right?

A    Correct.

(9-11-25 Transcript, p. 664, ll. 5-18; 9-12-25 Transcript, p. 689, l. 22 to 690, l. 9 and p. 690, l. 14 to 691, l. 14.)

## ARGUMENT

### A.    Federal Rule of Civil Procedure 26's Expert Disclosure Requirements and Federal Rule of Civil Procedure 37's Enforcement Provisions

"[A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). "[T]his disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2)(B). The report shall contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i).

Federal Rule of Civil Procedure 37(c) "'gives teeth' to Rule 26's disclosure requirements." *Sankaranarayanan v. Sashidhar*, 2025 U.S. Dist. LEXIS 1082, at *3 (W.D. Wash. Jan. 3, 2025) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).  It "provides that a party that fails to provide information as required by Rule 26(a) may not use that information on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The advisory committee's notes to the 1993 Amendments describe this as an 'automatic sanction.'" *Ruiz v. Walmart Inc.,* 2021 U.S. Dist. LEXIS 49761, at *11 (C.D. Cal. Jan. 21, 2021).

Thus, "the purpose of Rule 26 is to provide notice to the opposing party so attorneys may prepare intelligently for trial" and "experts will be precluded from providing opinions that are not set forth in their reports." *Moller v. Cty. of San*

*Bernardino*, 2024 U.S. Dist. LEXIS 232429, at *11 (C.D. Cal. Jan. 2, 2024); *see also Giacometto Ranch Inc. v. Denbury Onshore LLC*, 2024 U.S. Dist. LEXIS 33596, at *9 (D. Mont. Feb. 27, 2024) ("'[e]xperts may only testify in accordance with their expert reports'").

> **B.    Plaintiffs' Medical Expert Daniel Wohlgelertner, M.D.'s Trial Testimony Must Be Limited to the Opinions Contained in His Rule 26 Report; Therefore, the Court Should Strike His 3-Minute Cause of Death Opinions Because They Are Not Contained in His Rule 26 Report**

On September 22, 2023, plaintiffs served their initial expert witness disclosures identifying Dr. Daniel Wohlgelertner as a cardiologist expert and attaching his report.  Klehm Declaration, ¶ 2 and Exh. 1.  The report contained the following single opinion: "It is my opinion, with a reasonable degree of medical certainty, that Leroy Stephenson's death was due to restraint/compressive asphyxia, secondary to compressive force applied to his shoulders, back, torso and extremities, with prone restraint, with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia +/- metabolic acidosis causing PEA and cardiac arrest." *See* Exh. 1, Dr. Wohlgelertner's   Report, page 4.

Dr. Wohlgelertner then expounds on his cause of death opinion by specifically opining about a 6-minute time frame of prone restraint compression as follows:

> As seen in the MVARS video and as documented by testimony and statements, Stephenson was subjected to forceful, prolonged (6 minutes) prone restraint, with multiple people pinning him to the ground, in a prone, restrained position, while he was still handcuffed behind his back. These actions carried a high risk of restricting, to a critical degree, Stephenson's ability to breathe. … [2021 study reference omitted]
>
> These results are relevant to the death of Stephenson, in that they point toward the handcuffing, restraint, and prone positioning as triggers for his cardiopulmonary arrest. Based on the preceding discussion, the restraint applied to Stephenson while he was prone and handcuffed, in combination with the other draws on his oxygen reserves (agitation, exertion, methamphetamine ingestion, and pain/discomfort from forcible restraint), served as a highly probable trigger for the cardiopulmonary arrest that resulted in his death."

*See* Exh. 1, Dr. Wohlgelertner's   Report, page 5.

1    Dr. Wohlgelertner's report contains *no opinions regarding a 3-minute* time

2  frame of prone restraint compression as being the cause of death, or similarly, that

3  if Mr. Stephenson was moved to a recovery position within three minutes after

4  being handcuffed that, to a reasonable degrees of medical probability, he would not

5  have died.

6    Accordingly, this Court must strike Dr. Wohlgelertner's testimony at trial

7  about his "3-minute cause of death opinion."

8                                   **CONCLUSION**

9    Defendants respectfully submit that this Court should grant defendants' joint

10  motion in full.

11  Dated:  September 15, 2025                    Respectfully submitted,

12                                                ROB BONTA
                                                  Attorney General of California
13                                                DONNA M. DEAN
                                                  Supervising Deputy Attorney General
14

15                                                *s/ David Klehm*

16                                                DAVID KLEHM
                                                  Deputy Attorney General
17                                                STEPHANIE A. VOLLMER
                                                  Deputy Attorney General
18                                                *Attorneys for Defendants State of*
                                                  *California, Acting by and through the*
19                                                *California Highway Patrol, and*
                                                  *Dane Norem*

20

21

22

23

24

25

26

27

28

## DECLARATION OF DAVID KLEHM

I, David Klehm, hereby declare as follows:

1.      I am a duly appointed Deputy Attorney General, and, I am assigned to represent Defendants State of California, by and though the California Highway Patrol, and Dane Norem in the above-captioned action.  The facts set forth herein are within my personal knowledge, except where otherwise indicated, and if called to testify herein I could and would competently testify thereto.

2.      Attached hereto as Exhibit 1 are true and correct copies of relevant excerpts from the trial testimony in this case of Plaintiffs' Cardiologist Expert Witness, Daniel Wohlgelernter, M.D.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Rule 26 report provided by Plaintiffs' Cardiologist Expert Witness, Daniel Wohlgelernter, M.D., in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 15, 2025, at San Diego, California.


_s/*David Klehm*_____

David Klehm

# EXHIBIT "1"

450

1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE JOHN A. KRONSTADT, U.S. DISTRICT JUDGE

4

5   DEVONTE STEPHENSON, et al.,        )
                                       )
6            PLAINTIFFS,               )    CASE NO.
                                       )
7            vs.                       )    CV 21-0526-JAK
                                       )
8   STATE OF CALIFORNIA,               )
    DANE NOREM, and, JEFFREY MCKEE,    )
9                                      )    VOLUME 3
                                       )    PAGES 450 TO 677
10           DEFENDANTS.               )
                                       )
11

12

13

14                    REPORTER'S TRANSCRIPT OF
                         JURY TRIAL DAY 3
15           THURSDAY, SEPTEMBER 11, 2025
                        10:47 A.M.
16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22       _____

23

```
                    MIRANDA ALGORRI, CSR 12743, RPR, CRR
24                      FEDERAL OFFICIAL COURT REPORTER
                       350 WEST 1ST STREET, SUITE 4455
25                      LOS ANGELES, CALIFORNIA 90012
                       MIRANDAALGORRI@GMAIL.COM
```

                                                                451

 1                      APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4        LAW OFFICES OF DALE K. GALIPO
          BY:  DALE K. GALIPO
 5        BY:  COOPER ALISON-MAYNE
          21800 Burbank Boulevard
 6        Suite 310
          Woodland Hills, California 91367
 7

 8   FOR THE DEFENDANTS STATE OF CALIFORNIA AND DANE NOREM:

 9        DEPARTMENT OF JUSTICE
          OFFICE OF THE ATTORNEY GENERAL
10        BY:  DAVID KLEHM
          600 West Broadway
11        Suite 1800
          San Diego, California 92010

12

13        DEPARTMENT OF JUSTICE
          OFFICE OF THE ATTORNEY GENERAL
14        BY:  STEPHANIE VOLLMER
          455 Golden Gate Avenue
15        Suite 11000
          San Francisco, California 94102

16

17   FOR THE DEFENDANT JEFFREY MCKEE:

18        DEAN GAZZO ROISTACHER
          BY:  LEE H. ROISTACHER
19        BY:  KIMBERLY A. SULLIVAN
          440 Stevens Avenue
20        Suite 100
          Solana Beach, California 92075

21

22

23

24

25

452

1                          INDEX OF WITNESSES

2

3   WITNESSES                                          PAGE

4   MCKEE, Jeffrey Robert

5          Cross-examination by Mr. Galipo             462
           Direct examination by Mr. Roistacher       493
6          Recross-examination by Mr. Galipo          521
           Redirect examination by Mr. Klehm          530
7
    NOBLE, Jeffrey J.
8
           Direct examination by Mr. Galipo           545
9          Cross-examination by Mr. Klehm             583
           Cross-examination by Mr. Roistacher        610
10         Redirect examination by Mr. Galipo         613
           Recross-examination by Mr. Klehm           616
11
    WOHLGELERNTER, M.D., Daniel
12
           Direct examination by Mr. Galipo           623
13         Cross-examination by Mr. Klehm             657

14

15

16

17

18

19

20

21

22

23

24

25

453

1                          INDEX OF EXHIBITS

2                                              FOR          FOR
                                         IDENTIFICATION   EVIDENCE
3    NUMBER   DESCRIPTION                      PG.          PG.

4    7A       MVR Clip                         505          505

5    18       Photographs                      478          478

6    101      Book                             597

7

8

9

10

11

12

13

14

15

16

13     Q     And --

14            THE COURT:  Excuse me.  Do you -- Doctor, do you

15   have your report in front of you?

16            THE WITNESS:  Yes.

17            THE COURT:  If you would just not refer to your

18   report unless you're asked about it specifically --

19     Q     BY MR. GALIPO:  What we will do, if you know it

20   from memory, that's good.  If you need to refer to your report

21   to refresh your recollection as to a particular detail, ask,

22   and the judge will let you know if that's okay.

23     A     Okay.

24     Q     All right.  We have to follow certain procedures.

25            So six minutes.  Does that include some time

631

1   prior to handcuffing and some time after handcuffing?

2     A     Yes.

3     Q     Now, if we just take the time frame prior to

4   handcuffing, was that more or less approximately three minutes,

5   based on your review?

6     A     Yes.

7     Q     Based on the position he was in, as you

8   understand the materials, do you have an opinion from a medical

9   point of view whether his breathing was being restricted to any

10   extent?

3    acidosis means the buildup of acid in the body -- and that it

4    was increasing.  It was increasing because he was struggling.

5    He was moving his muscles to try to get out of the restraint

6    position and, therefore, he was producing more acid.

7              And his lungs, as we mentioned before, were

8    restricted.  Lying face down on a hard surface, his ribcage

9    couldn't fully expand in that direction.  People on his back,

10   meaning his ribcage couldn't expand in the other direction.  So

11   his lungs are kind of squished.  They cannot fully expand to

12   bring in oxygen and blow out the acid.  So the acid is building

13   up at the same time as the oxygen is being depleted and is

14   dropping.

15        Q     If someone's oxygen intake is being depleted

16   because of inability to breathe fully and they're building up

17   acid at the same time, could that cause someone's death?

18        A     Yes.

19        Q     At some point you understand he was handcuffed.

20        A     Yes.

21        Q     And that was around 12:55?

22        A     Yes.

23        Q     And assuming he was still alive at that point,

24   which the records seem to indicate, if he had been sat up or

25   put in a recovery position, let's say within 20 seconds after

636

1  he was handcuffed, would that have helped him medically, in

2  your opinion, either with respect to the oxygen or the

3  acidosis?

4              THE COURT:  Just a moment.

5              What's the objection?

6              MR. KLEHM:  It's argumentative and misstates

7  testimony.  There's no "seem to indicate" that he was alive

8  when he was handcuffed.  The uncontroverted testimony is that

9  Mr. Stephenson was alive when he was handcuffed.  Not seemed to

10 be alive.

11             MR. GALIPO:  I can reword it if I need to.

12             THE COURT:  That's fine.  Please do that.

13      Q      BY MR. GALIPO:  Is it your understanding that

14 Mr. Stephenson was still alive at the time he was handcuffed?

15      A      Yes.

16      Q      And at that time, do you have an opinion as to

17 whether his oxygen was depleted?

18      A      Yes.

19      Q      Was it?

20      A      Yes, it was.

21      Q      And do you have an opinion as to whether he was

22 building up acidosis up until the point of being handcuffed?

23      A      Yes.

24      Q      Assuming that he had been, very soon after he was

25 handcuffed, put in a recovery position on his side or sitting

24   would have lived?

25        A     Yes.

638

1        Q     What is your opinion?

2        A     My opinion is that he would have lived.

3        Q     And do you have an understanding as to how long

4   Mr. Stephenson was kept in a chest down, prone position after

5   he was handcuffed?

6        A     Another three minutes.

7        Q     Was that important to your opinion related to the

8   cause of death?

9        A     Yes.

10        Q     Can you explain to the jury why that was

11   important?

12        A     During those additional three minutes -- again,

13   face down on a hard surface being compressed by people pressing

14   on him -- his lungs were not able to bring in adequate oxygen.

15   His lungs were not able to excrete the acid that was building.

16   So his oxygen level was dropping.   His acid level was

17   increasing.   And the two of those is a lethal combination that

18   shuts down the heart.

19        Q     If there's been a description that at some point

20   after he was handcuffed he was starting to mellow out or chill

21   out or start resisting less, is that consistent with your

22      Q       All right.  So getting back to your opinions

23   based on a reasonable degree of medical probability about the

24   timing of things, Mr. Galipo was asking you questions about if

25   Mr. Stephenson would have put -- would have been put into a

664

1   recovery position after he was handcuffed.  Do you recall that

2   line of testimony?

3       A       Yes.

4       Q       Okay.  Great.  All right.

5               So how long after Mr. Stephenson was handcuffed

6   do you believe it was necessary for him to have been put in a

7   recovery position in order to prevent the cardiac arrest from

8   occurring due to the acidosis buildup?  Was it immediately?

9   Would it have been five seconds within being handcuffed?

10      A       Within three minutes.

11      Q       Within three minutes.

12      A       Yes.

13      Q       So is it your testimony that as long as

14   Mr. Stephenson would have been put into a recovery position, at

15   any time after being handcuffed within three minutes, that he

16   would not have died to a reasonable degree of medical

17   probability?

18      A       Yes.

19      Q       All right.  And you certainly have read the

21

22

23

24

25

677

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15             DATED THIS  12TH  DAY OF SEPTEMBER, 2025.

16

17

18

                         _____

19                    MIRANDA ALGORRI, CSR NO. 12743, CRR
                        FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25

678

1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE JOHN A. KRONSTADT, U.S. DISTRICT JUDGE

4

5   DEVONTE STEPHENSON, et al.,      )
                                     )
6              PLAINTIFFS,           )     CASE NO.
                                     )
7          vs.                       )     CV 21-0526-JAK
                                     )
8   STATE OF CALIFORNIA,             )
    DANE NOREM, and, JEFFREY MCKEE,  )
9                                    )     VOLUME 4
                                     )     PAGES 678 TO 860
10             DEFENDANTS.           )
                                     )
11

12

13

14                    REPORTER'S TRANSCRIPT OF
                        JURY TRIAL DAY 4
15              FRIDAY, SEPTEMBER 12, 2025
                        8:31 A.M.
16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22
    _____
23

<pre>
                    MIRANDA ALGORRI, CSR 12743, RPR, CRR
24                  FEDERAL OFFICIAL COURT REPORTER
                    350 WEST 1ST STREET, SUITE 4455
25                  LOS ANGELES, CALIFORNIA 90012
                    MIRANDAALGORRI@GMAIL.COM
</pre>

♠

679

 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4        LAW OFFICES OF DALE K. GALIPO
          BY:  DALE K. GALIPO
 5        BY:  COOPER ALISON-MAYNE
          21800 Burbank Boulevard
 6        Suite 310
          Woodland Hills, California 91367
 7

 8   FOR THE DEFENDANTS STATE OF CALIFORNIA AND DANE NOREM:

 9        DEPARTMENT OF JUSTICE
          OFFICE OF THE ATTORNEY GENERAL
10        BY:  DAVID KLEHM
          600 West Broadway
11        Suite 1800
          San Diego, California 92010

12

13        DEPARTMENT OF JUSTICE
          OFFICE OF THE ATTORNEY GENERAL
14        BY:  STEPHANIE VOLLMER
          455 Golden Gate Avenue
15        Suite 11000
          San Francisco, California 94102

16

17   FOR THE DEFENDANT JEFFREY MCKEE:

18        DEAN GAZZO ROISTACHER
          BY:  LEE H. ROISTACHER
19        BY:  KIMBERLY A. SULLIVAN
          440 Stevens Avenue
20        Suite 100
          Solana Beach, California 92075

21

22

23

24

25

✦

680

1                          INDEX OF WITNESSES

2

3    WITNESSES                                                PAGE

4    WOHLGELERNTER, M.D., Daniel

5            Cross-examination by Mr. Klehm                    686
             Redirect examination by Mr. Galipo               703
6            Recross-examination by Mr. Klehm                 713

7    GRAHAM, M.D., Michael

8            Direct examination by Mr. Klehm                  722
             Cross-examination by Mr. Galipo                  740
9            Redirect examination by Mr. Klehm                765
             Recross-examination by Mr. Galipo                772
10           Further redirect examination by Mr. Klehm        774

11   OMALU, M.D., Bennet

12           Direct examination by Mr. Galipo                 750
             Cross-examination by Mr. Klehm                   808
13           Cross-examination by Mr. Roistacher              816
             Redirect examination by Mr. Galipo               821
14           Recross-examination by Mr. Klehm                 823

15   STEPHENSON, Keandre

16           Direct examination by Mr. Galipo                 826
             Cross-examination by Mr. Klehm                   842
17           Cross-examination by Ms. Sullivan                843

18

19

20

21

22

23

24

25

↑

681

1                          INDEX OF EXHIBITS

2                                              FOR          FOR
                                          IDENTIFICATION   EVIDENCE
3    NUMBER   DESCRIPTION                       PG.          PG.

4    1-19       Photograph                      840         840

5    1-26       Photograph                      839         839

6    1-27       Photograph                      840         840

7

8

9

10

11

12

13

14

15

16

3    diaphragm.

4                    Do you recall that testimony?

5        A       Yes.

6        Q       Okay.  And you had said that the diaphragm

7    doesn't -- actually, does -- would be impacted by

8    Officer Norem's knee on the belt line of Mr. Stephenson.

9                    Do you recall that testimony?

10       A       Yes.  I said the diaphragm is the muscle that

11   separates the chest cavity from the abdominal cavity and

12   anything that compresses the abdominal contents would push up

13   against the diaphragm, restricting its movement and restricting

14   its ability to help expand the lungs.

15       Q       So you weren't trying to imply that the diaphragm

16   itself is near the belt line; correct?

17       A       No, I was not.

18       Q       Okay.  Because the diaphragm is underneath the

19   lungs; right?

20       A       Correct.

21       Q       Very good.

22                   And you talked yesterday -- you mentioned that it

23   was your opinion that, to a reasonable degree of medical

24   probability, if Mr. Stephenson would have been put in the

25   recovery position within three minutes of being handcuffed, he

689

1    might have lived.

2              Do you recall that testimony?

3      A     Yes, I do.

4      Q     And do you recall writing your expert report in

5    this case?

6      A     Yes.

7      Q     You never mentioned that opinion in your expert

8    report; right?

9      A     That's correct.

10     Q     The opinion in your expert report dealt with

11   six minutes only; correct?   Six minutes.

12     A     It talked about the impact of six minutes on his

13   development of acidosis and low oxygen, yes.

14     Q     My point is you never expressed any opinion in

15   your expert report that the time frame that caused

16   Mr. Stephenson's death was only three minutes and not six

17   minutes.   Is that fair to say?

18     A     Yes.

19     Q     And you had your deposition taken twice in this

20   case; right?

21     A     Yes.

22     Q     Do you remember that?   Because the first time you

23   had a call that you had to deal with, with a patient.   Right?

24     A     Yes.

25     Q     In your first deposition you never mentioned this

690

1    three-minute time frame either; right?    It was only six

2    minutes?

3         A       I wasn't asked the question specifically like I

4    was yesterday about the opportunity for recovery position to

5    impact Mr. Stephenson's ability to survive.    But I agree that

6    in my deposition testimony and in my report, I did not mention

7    that three-minute window of opportunity.

8         Q       And you had your deposition taken a second time;

9    correct?

10        A       Correct.

11        Q       And in that second deposition, you never

12   mentioned that this critical time period for recovery was only

13   three minutes, not six minutes; right?

14        A       Correct.

15        Q       Okay.  But then yesterday you said that you had a

16   conversation with Mr. Galipo before you testified; right?

17        A       Yes.

18        Q       Okay.  Did you have a conversation with

19   Mr. Galipo wherein he asked you to drop down your six-minute

20   number to three minutes because that suited his case better?

21        A       No.

22        Q       Did you ever have a conversation with Mr. Galipo

23   where he asked you to drop the number down from six minutes to

11  you.

12              You're excused.

13              MR. GALIPO:  Thank you, Your Honor.

14              (Proceedings concluded at 1:35 p.m.)

15

16

17

18

19

20

21

22

23

24

25

860

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7  THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8  PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13    THE UNITED STATES.

14

15               DATED THIS  13TH  DAY OF SEPTEMBER, 2025.

16

17

18

19           MIRANDA ALGORRI, CSR NO. 12743, CRR
               FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25

# EXHIBIT "2"

**Exhibit 1**
**Wohlgelertner, D.**
11/02/23
*@ptus*

DANIEL WOHLGELERNTER, M.D

2299 Century Hill
Los Angeles, CA.  90067

phone (310) 729-2202
Fax (310) 492-9793
Email: drdan@iheartdrdan.com

September 3, 2023

Cooper Alison-Mayne
Associate Attorney
The Law Offices of Dale K. Galipo
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367

Re: Stephenson et al.  v. CHP et al.
Case No.
**5:12-cv-00526-JAK-KK**

Decedent:   LEROY STEPHENSON   dob:  2-28-1970

Date of incident:  1-24-2019     Date of death:  1-24-2019

Dear Attorney Alison-Mayne:

I am a board-certified cardiologist with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the director of the ICU and CCU at Providence- St. John's Hospital in Santa Monica, CA, and in my current position as Section Chief of Cardiology at Providence-St. John's.

I am knowledgeable about peer-reviewed medical and scientific research on the topics of pathophysiology of cardiac arrest and specific type of arrhythmia, known as as PEA (pulseless electrical activity), associated with cardiac arrest.  The knowledge base that I utilize has been formed by my 40 years of clinical practice and experience,  and my previous and ongoing review of clinical and experimental literature.

I was retained as an expert to review relevant materials and provide expert opinion on this matter, date of incident, 1-24-2019, and to consider and render expert opinion as to whether the restraining process was contributory to the death of Mr. LEROY STEPHENSON, and to rebut alternative opinions and theories regarding the cause of death.

1

I have reviewed the following materials:

Complaints & Pleadings

Portions of Depositions:
1.     Matt Borden
2.     Eric Leighton
3.     Jeffrey McKee


Dispatch and Log:

    1.     Annex 13 incident communication
    2.     Dispatch call log

Medical Records:

    1.   Annex 10 ambulance
    2.   Annex 11 EMT report
    3.   Annex 12 autopsy protocol
    4.   Annex 21 pulse log
    5.   Annex 3 Bio Tox lab
    6.   Folder of Images

MVARS Videos:

    1.   McKee- Complete
    2.   Dane Norem- Clip

Portions of Statements - Admin:

    1.   Dane Norem
    2.   Dennis Owen Stout
    3.   Other Statements:  McKee; William Betancur; Lynn Peters


**<u>PERTINENT HISTORY</u>**:

On January 24, 2019, at approximately 1222 hours and again at 1245, CHP received multiple calls requesting a check on a subject (subsequently identified as LEROY STEPHENSON) behaving oddly and running across traffic lanes on SR-91.  CHP Officer Norem, Riverside Area Unit 74-23, was dispatched and advised of the situation.

Officer Norem deployed his electronic control device (ECD) twice from approximately 20 feet away, after Stephenson continued to run toward the freeway. Officer Norem then immediately positioned himself on top of Mr. Stephenson's back and used his body weight to restrict Stephenson's movement as he tried to apply hand cuffs on the wrists. Norem then used his ECD to drive-stun Stephenson, but this was ineffective and the ECD was discarded.

Dennis Owen Stout and Eric Leighton, citizens who happened on the scene, stopped, and assisted Officer Norem. Mr. Stout, approximate body weight-350 pounds, arrived first and controlled Stephenson's legs by applying weight to his legs. Leighton, approximate body weight-400 pounds, also applied his weight to control Stephenson's legs.

Matt Borden, an Investigator with the Riverside County DA's Office, arrived and aided Officer Norem. Borden applied pressure to Stephenson's left shoulder and upper back with his knee.

Norem completed handcuffing Stephenson at approximately 1255, less than 3 minutes after he arrived at the scene.  After Stephenson had been handcuffed, Norem and Borden maintained pressure on Stephenson's back. Leighton and Stout continued with weight application, controlling Stephenson's legs.

At approximately 1257, Officer McKee arrived at the scene. His MVARS shows that at that point there were five people applying weight to Stephenson: 1. Norem applying his right knee into Stephenson's back; 2.Borden applying weight via his knee to Stephenson's upper back and shoulders; 3. Stout applying weight on Stephenson's thighs; 4. Leighton applying weight to Stephenson's calves; 5. An unidentified Hispanic man with his foot pressed into Stephenson's shoulder or back.

Between 1258 and 1259, Borden noticed that Stephenson did not appear to be breathing. Norem, Borden, and Leighton stopped applying pressure and restraint to Stephenson. Stephenson had been maintained in a prone restraint position for more than 6 minutes by this time. Emergency medical intervention was initiated, including CPR performed by Norem and McKee. The Riverside Fire Department and American Medical Response ambulance were dispatched to assist.

AMR was on scene at 1304.   On examination, Stephenson was noted to be unresponsive, without detectable pulse.

The following findings were noted:

| Time | AVPU | BGL | BP | HR | ECG | RR | ETCO2 | GCS | Assessed by |
|---|---|---|---|---|---|---|---|---|---|
| 13:04:19 | Unresponsive | 203 | Supine / | Cardiac Monitor | PEA | Mechanically Assisted (BVM, CPAP, etc) | 28 | 3 | Mendoza, Angel D. |
| 13:09:19 | Unresponsive | | / | 62 Cardiac Monitor | PEA | | | 3 | Mendoza, Angel D. |
| 13:14:19 | Unresponsive | | / | 71 Cardiac Monitor | PEA | | 53 | 3 | Mendoza, Angel D. |
| 13:24:19 | Unresponsive | | / | 97 Cardiac Monitor | PEA | | 43 | 3 | Mendoza, Angel D. |
| 13:28:28 | Unresponsive | | / | 86 Cardiac Monitor | PEA | Mechanically Assisted (BVM, CPAP, etc) | 38 | 3 | Mendoza, Angel D. |
| 13:33:28 | Unresponsive | | / | 57 Cardiac Monitor | PEA | | 26 | 3 | Mendoza, Angel D. |
| 13:38:28 | Unresponsive | | / | 137 Cardiac Monitor | PEA | Mechanically Assisted (BVM, CPAP, etc) | 32 | 3 | Mendoza, Angel D. |
| 13:43:28 | Unresponsive | | / | 73 | | Mechanically Assisted (BVM, CPAP, etc) | 32 | 3 | Mendoza, Angel D. |

Stephenson was transported to Parkview Community Hospital (PCH) in Riverside, California, at 1339. He was pronounced deceased at 1354.

**Autopsy**

Autopsy was conducted on 1-25-19 by the Riverside County Coroner's Bureau Forensic Pathologist, Allison Hunt, MD.  Dr. Hunt's report included the following:

### CAUSE OF DEATH:    ACUTE METHAMPHETAMINE INTOXICATION

### OTHER SIGNIFICANT CONDITIONS:  ATHEROSCLEROTIC CARDIOVASCULAR DISEASE, PHYSICAL CONFRONTATION WITH LAW ENFORCEMENT

CARDIOVASCULAR FINDINGS:

The pericardial sac is intact and contains a physiologic amount of thin, yellow fluid.  The 500 gram heart has a smooth, glistening epicardial surface with multiple punctate red petechiae.  The coronary arteries arise normally and have a left dominant configuration. The coronary ostia are patent.  The right coronary artery has up to 75% stenosis focally of the mid portion.  The left anterior descending and left circumflex coronary arteries have up to 30% stenosis by focal atherosclerosis. The bilateral, atria are of normal size and the fossa ovalis is fused.  The atrial appendages are free of antemortem thrombi.  The endocardium is smooth and glistening.  The myocardium is dark red-brown and has no areas of fibrosis or hemorrhage. The left and right ventricles are 1.5 and 0.4 centimeters in thickness, respectively.  The valves are normal.  The chordae tendineae are normal. The aorta branches normally and has mild atherosclerosis.

POST-MORTEM TOXICOLOGY
blood d-Methamphetamine level:

```
METHAMPHETAMINE, LC/MS/MS            1.690 mg/L
```

**ANALYSIS & OPINIONS- D. WOHLGELERNTER, MD**

It is my opinion, with a reasonable degree of medical certainty, that Leroy Stephenson's death was due to restraint/compressive asphyxia, secondary to compressive force applied to his shoulders, back, torso and extremities, with prone restraint, with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia +/- metabolic acidosis causing PEA and cardiac arrest.

Potential causes of Leroy's cardiopulmonary arrest and subsequent death:
Based on the fact pattern surrounding Leroy's death and autopsy findings and
reports, the list of potential causes of death for Leroy Stephenson is as follows:

• **Restraint related**
- Asphyxia due to compression of back, torso and extremities, with concomitant development of metabolic acidosis

4

**• Non-restraint related**
- Acute methamphetamine toxicity
- Pre-existing cardiovascular disease

As seen on the MVARS footage,  Stephenson was subjected to full-body restraint, including force at back, torso and extremities, while he was still handcuffed behind his back.

Asphyxia is defined as a lack of oxygen (i.e., hypoxia) caused by an impairment in breathing, and is a well-known trigger of PEA and cardiac arrest.
Positional asphyxia, in the context of restraint, typically refers to increased difficulty with breathing that is associated with the use of restraint that is used on a prone person, but can occur in any position in which a person is forced into a position that limits their ability to breathe.

As seen in the MVARS video and as documented by testimony and statements, Stephenson was subjected to forceful, prolonged ( 6 minutes) prone restraint, with multiple people pinning him to the ground, in a prone, restrained position, while he was still handcuffed behind his back.  These actions carried a high risk of restricting, to a critical degree, Stephenson's ability to breathe.

A study published in 2021 ("Thoracic weighting of restrained subjects during exhaustion recovery causes loss of lung reserve volume in a model of police arrest" by Campbell et al; Scientific Reports | (2021) 11:15166 | https://doi.org/10.1038/s41598-021-94157-w) evaluated the lung reserve volume in subjects under the cumulative circumstances potentially experienced during police restraint. The authors evaluated the effect on lung function of 1) physical exertion, 2) prone positioning, 3) restraint, and 4) body compression, individually, and in combination.
The study conclusively demonstrated that a prone and restrained individual who also is pinned to the ground with the equivalent of at least 35% of their body weight on their chest or back, will incrementally experience worsened breathing function, until the weight is removed.

These results are relevant to the death of Stephenson, in that they point toward the handcuffing, restraint, and prone positioning as triggers for his cardiopulmonary arrest.
Based on the preceding discussion, the restraint applied to Stephenson while he was prone and handcuffed, in combination with the other draws on his oxygen reserves (agitation, exertion, methamphetamine ingestion, and pain/discomfort from forcible restraint), served as a highly probable trigger for the cardiopulmonary arrest that resulted in his death.

Steinberg ("Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology"- DOI: 10.1177/0025802420988370- Medicine, Science and the Law 0(0) 1–12-2021) has coined the term "prone restraint cardiac arrest" as opposed to "restraint asphyxia" or "positional asphyxia", to underscore the adjuvant role of metabolic acidosis due to restraint, in addition to the asphyxia-producing impact of prone restraint.  "Agitated individuals may be in a state of preexisting metabolic acidosis. Restraint in the prone position may exacerbate this state via inadequate ventilation and a decrease in cardiac output. These physiologic derangements can lead to pulseless electrical activity (PEA) cardiac arrest."  Stephenson's methamphetamine levels contributed to his state of agitation after he was restrained:  methamphetamine intoxication typically leads to a hyperactive, stimulated behavior pattern.  These physiologic derangements contribute to the development of metabolic acidosis.  Restraint in the prone position means that subjects cannot extricate themselves from that prone position or increase their ventilatory capacity to compensate for the increased

metabolic demands of the situation.  Prolongation of this situation will result in continued carbon dioxide accumulation and development of lethal metabolic acidosis.

CARDIAC RHYTHM ANALYSIS & PATHOPHYSIOLOGIC SIGNIFICANCE

After the cardiorespiratory arrest, PEA rhythm was confirmed, and resuscitation measures were not successful. American Medical Response paramedics noted that Stephenson was unresponsive and pulseless, and EKG monitoring documented PEA.

The fact that Stephenson had PEA at the time of his cardiac arrest is further confirmation that his cardiac arrest and death were Restraint related:  Asphyxia due to compression of back, torso and extremities, with concomitant development of metabolic acidosis.

PEA generally occurs from underlying non-cardiac etiologies, whereas a ventricular arrhythmia (VFib or VTach) occurs from a primary cardiac etiology, such as myocardial ischemia or infarction, cardiomyopathy, or congenital long QT syndrome.  There is always an underlying cause for the PEA, and most prominent among these causes, in the context of a restraint-related death, are hypoxia and metabolic acidosis.   Steinberg, in the aforementioned article cited above, pointed out that most police in-custody deaths involving prone restraints have manifested either PEA or asystole, with less than 10% showing an initial ventricular arrhythmia.

Pulseless electrical activity (PEA), also known as electromechanical dissociation, refers to cardiac arrest in which the electrocardiogram shows a heart rhythm that should produce a pulse, but does not.  The AED rhythm strips obtained at the time of the cardiac arrest demonstrated PEA (pulseless electrical activity).

 The following medical literature is informative regarding PEA cardiac arrest:

2005 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care (December 2005). "Part 7.2: Management of Cardiac Arrest".
Circulation. 112 (24 Suppl): IV 58–66. doi:10.1161/CIRCULATIONAHA.105.166557.

As is documented in the cardiology literature, PEA may be caused by many conditions, but its most frequent causes are hypovolemia and hypoxemia.

"Hypoxia secondary to respiratory failure is probably the most common cause of PEA, with respiratory insufficiency accompanying 40-50% of PEA cases."  emedicine.medscape.com/article/161080-overview#a6-  updated 11/20/17.

In reviewing the literature and as confirmed by my extensive experience as a cardiologist,  the only plausible and possible cause of PEA cardiac arrest in Mr. Stephenson was hypoxia/hypoxemia, secondary to restraint/compressive asphyxia.   No other cause of PEA is plausible or relevant in the case of Mr. Stephenson.


**REBUTTAL OF alternative opinions and theories regarding the cause of Leroy Stephenson's cardiac arrest & death.**

**METHAMPHETAMINE**

Given the low per-dose risk of death associated with methamphetamine use, there is no reason to believe that simply because Stephenson had methamphetamine in his blood, that the cause of his death

was related to methamphetamine toxicity.  The NHTSA reports that the upper limit for recreational use of methamphetamine is 2.5 mg/L and Stephenson only had 1.69 mg/L on the County's autopsy toxicology.

Methamphetamine isn't like cyanide or some other poison, which is invariably the cause of death when it is found in a decedent. Like alcohol, most of the time that methamphetamine is present in a decedent it is not the cause of death.

Logan et al., in their article, "Cause and manner of death in fatalities involving methamphetamine" (J Forensic Sci 1998 Jan;43(1):28-34.), stated the following:

"Neither apparently toxic nor therapeutic concentrations should be used in isolation to establish conclusively whether a death was caused by methamphetamine; proper classification of deaths involving methamphetamine requires complete death investigation, including investigation of the scene and circumstances of death, and a complete autopsy."

The determination that methamphetamine is directly responsible for the immediate cause of death should be considered only when there is a reasonably complete understanding of the circumstances or facts surrounding the death. Another, more obvious and immediate cause of death must be absent.

In the case of Leroy Stephenson, there certainly was a more obvious and immediate cause of death; i.e., restraint/compressive asphyxia, AKA "prone restraint cardiac arrest".

I totally reject the contention that the cause of Stephenson's sudden cardiac arrest and death was methamphetamine.  The undeniable fact that the cardiac rhythm at the time of cardiac arrest was PEA is incompatible with the theory that methamphetamine was the culprit.  The hypothesis that methamphetamine caused the cardiac arrest would only be plausible if the cardiac monitor at the time of the cardiac arrest showed ventricular tachycardia or ventricular fibrillation.  Methamphetamine, even at lethal levels of intoxication,  does NOT cause PEA.   The only acceptable pathophysiologic explanation of the PEA in this case is hypoxia/hypoxemia  +/- metabolic acidosis due to prone restraint.  Dominic et al., in their article, "Stimulant Drugs of Abuse and Cardiac Arrhythmias"- (Circ Arrhythm Electrophysiol. 2022;15:e010273. DOI: 10.1161/CIRCEP.121.010273), document the association of methamphetamine with ventricular arrhythmias,  but they do not report any association with PEA.

## Cardiovascular disease

In addition, I reject the contention that the cardiac pathology discovered by the Coroner was a significant contributing factor to Stephenson's cardiac arrest.  There was no autopsy evidence of acute or prior myocardial infarction. Autopsy did demonstrate Cardiomegaly (500 grams); however, this is not of sufficient severity to cause sudden cardiac arrest.   Moreover, if these findings were causative, the EKG rhythm at the time of the cardiac arrest would have been ventricular fibrillation or ventricular tachycardia, and not PEA, which was documented at the time of Stephenson's cardiac arrest.

There is no available medical information that indicates that Stephenson was at imminent risk of any cardiac event at the time of his fatal encounter with the CHP. Moreover, the fact that the cardiac rhythm at the time of cardiac arrest was PEA is incompatible with the theory that underlying heart disease was the culprit.  The hypothesis that heart disease caused the cardiac arrest would only be plausible if the cardiac monitor at the time of the cardiac arrest showed ventricular tachycardia or ventricular fibrillation.  PEA generally occurs from underlying non-cardiac etiologies (e.g., hypoxia and/or metabolic acidosis), whereas a ventricular arrhythmia ( VFib or VTach) occurs from a primary cardiac etiology.

7

The opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Sincerely yours,

*Daniel Wohlgelernter*

Verified by pdfFiller
09/15/2023

DANIEL WOHLGELERNTER, MD

DANIEL WOHLGELERNTER, M.D.   *- CURRICULUM VITAE*
_____

Full name: DANIEL WOHLGELERNTER

**Mailing address:**          **2299 Century Hill**
                              **Los Angeles,  CA.  90067**

Phone:  (310) 729-2202;  Fax: (310) 492-9793
e-mail address:  drdan@iheartdrdan.com

EDUCATION

| Institution | Degree | Year | Major Field | Awards |
|---|---|---|---|---|
| Yeshiva College | BA Summa Cum Laude | 1973 | Biology | Valedictorian Biology Award |
| Yale University School of Medicine | M.D. | 1977 | Medicine | Highest honors Alpha Omega Alpha |

POST-GRADUATE TRAINING

Internship:  Yale-New Haven Hospital, Internal Medicine, 7/77-6/78

Residency:  Yale-New Haven Hospital, Internal Medicine, 7/78-6/80

Special appointment:  Chief Resident and Instructor in Medicine,
Yale-New Haven Hospital/ Yale University School of Medicine, 7/80-6/81

Fellowship:  Yale-New Haven Hospital, Cardiology, 7/81-6/83

PROFESSIONAL  APPOINTMENTS

1) Assistant Professor of Medicine
   Yale University School of Medicine  7/83-6/85
2) Associate Director, Cardiac Catheterization Laboratory
   Yale-New Haven Hospital, New Haven, CT. 7/83-6/85
3) Director, Cardiac Exercise Laboratory
   Yale-New Haven Hospital                    7/84-6/85

Daniel Wohlgelernter, M.D.----- Curriculum Vitae

4) Principal Investigator, TIMI Study (Thrombolyis In
   Myocardial Infarction); Yale U. School of Medicine    12/83-6/85
5) Assistant Professor of Medicine
   UCLA School of Medicine                    7/85-6/87
6) Director, Cardiac Catheterization Laboratory
   UCLA Medical Center, Los Angeles, Ca.    7/85-6/87
7) Medical Administrative Director
   Daniel Freeman Heart Center                7/87-6/89
   Daniel Freeman Memorial Hospital, Inglewood,CA.
8) Staff Cardiologist
   Santa Monica-UCLA Medical Center        6/89------6/2017
9) Staff Cardiologist
   Saint John's Hospital and Health Center
   Santa Monica, CA.                        6/89------
10) Staff Cardiologist
    UCLA Medical Center   Los Angeles        1/94---6/2006
11) Director, Coronary Care Unit
    Santa Monica-UCLA Medical Center
    Santa Monica, CA.                        6/92-8/98
12) Executive Medical Board- Member          12/94--1/98
    Santa Monica-UCLA Medical Center
13) Participating physician- National Registry    6/92-1/98
    of Myocardial Infarction
14) Assistant Clinical Professor of Medicine    7/95---12/2017
    UCLA School of Medicine
15) Vice-Chief of Staff; Santa Monica-UCLA    1/96--1/97
    Medical Center
16) Medical Director,  PCCU; St. John's Hospital & Health Center;
    Santa Monica, CA.                        6/2007- 12/2013
17) Vice-President, Medical Staff; St. John's Hospital & Health Center;
                                             1/2010---1/2011
18) Cardiology Section Chief- Providence-St. John's Hospital- Santa Monica, CA.
                                             2/2016-


LICENSURE

1) State of Connecticut: 1978-1985
2) State of California:   1985-------


CERTIFICATION

1) American Board of Internal Medicine: 1981
2) American Board of Internal Medicine- Cardiovascular : 1983
3) American Board of Internal Medicine-Interventional Cardiology-2001-2011

Daniel Wohlgelernter, M.D.----- Curriculum Vitae

## PROFESSIONAL SOCIETIES

1) American Heart Association
2) American College of Cardiology (Fellow of the College)
3) California Medical Association
4) Los Angeles County Medical Association
5) Alpha Omega Alpha Honor Medical Society

## PROFESSIONAL  AWARDS

1) Research Grant: American Heart Association- 1985- for project, "Does PTCA cause Sustained Myocardial Dysfunction?".
2) Thomas L. Stern M.D. Award- 1990- Santa Monica Hospital Medical Center- Family Practice Residency Program:  "In Appreciation for Excellence in Teaching"
3) Southern California  *Super Doctors*- 2010-2021 ; featured in *Los Angeles Magazine*
4) Named one of US News and World Report's 'Top Doctors'- September 2012.
5) Named one of California's *Top Doctors*-  2015-2020- *Los Angeles magazine*

## LECTURE PANEL APPOINTMENTS

1) Novartis  National Speakers' Panel- for topics relating to anti-hypertensive therapy.
2) Merck  Lecturers Panel- for topics relating to antihypertensive agents and cholesterol-lowering therapy.
3) Wyeth pharmaceuticals Speakers' Panel- for topics relating to ACE-inhibitor  therapy.
4) Du Pont Pharmaceuticals Lecturers Bureau- for topics relating to anticoagulation.
5) American Academy of Family Physicians- Clinical Seminar Instructor- 1995 Scientific Assembly

## MEDICAL JOURNAL APPOINTMENTS

1) American Heart Journal - manuscript reviewer, 1986-89.
2) Catheterization and Cardiovascular Diagnosis- manuscript reviewer, 1990-97.

## PUBLICATIONS

JOURNAL MANUSCRIPTS
1) Systemic and Discoid Lupus Erythematosus: Analysis of Pulmonary Function. Yale J Biol and Med  1978, 51:157-164.
2) Pulmonary Function Abnormalities in Systemic Lupus Erythematosus. Am Rev Resp Dis  1977, 115:180.
3) Infection with CDC Group DF-2 Gram-Negative Rod. Arch Int Med  1980, 140:657-58.

3

Daniel Wohlgelernter, M.D.----- Curriculum Vitae

4) Common Cardiovascular Problems After General Surgery. Cardiovasc Med 1984,9:763-777.

5) Myocarditis Presenting with "Silent" Atrium and Left Atrial Thrombus. Am Heart J 1984, 108:1557-58.

6) Intact Systolic Left Ventricular Function in Clinical Congestive Heart Failure. AmJ Cardiol 1985, 55:1032-36.

7) Ventricular Septal Rupture Complicating Unrecognized Myocardial Infarction. Am Heart J 1985, 110:667-670.

8) Regional Myocardial Dysfunction During Coronary Angioplasty: Evaluation by Two-Dimensional Echocardiography and 12-Lead Electrocardiography. J Am Coll Cardiol 1986, 7:1245-1254.

9) Prevention of Ischemia During Percutaneous Transluminal Coronary Angioplasty by Transcatheter Infusion of Oxygenated Fluosol DA-20%. Circulation 1986, 74:555-562.

10) Percutaneous Transluminal Coronary Angioplasty of the "Culprit" Lesion for Management of Unstable Angina Pectoris with Multivessel Coronary Artery Disease. Am J Cardiol 1986, 58:460-464.

11) Reversal of Ischemic Myocardial Dysfunction by PTCA in a Cardiac Transplant Patient. Am Heart J 1986, 112:837-39.

12) Right Atrial-Esophageal Fistula and Hydropneumopericardium following Esophageal Dilatation. J Am Coll Cardiol 1987, 9:969-972.

13) Coronary Vasospasm Culminating in Thrombosis and Infarction Following "Successful" Coronary Angioplasty. Am Heart J 1987, 113:1220-22.

14) Silent Ischemia During Coronary Occlusion Produced by Balloon Inflation: Relation to Regional Myocardial Dysfunction. J Am Coll Cardiol 1987, 10:491-98.

15) Preservation of Left Ventricular Ejection Fraction During Percutaneous Transluminal Coronary Angioplasty by Distal Transcatheter Coronary Perfusion of Oxygenated Fluosol DA 20%. Am Heart J 1988, 115:1156-64.

16) Acute Coronary Bypass Graft Closure Resulting from Heparin-Associated Thrombocytopenia. Cardiovascular Rev & Reports 1987, 8:65-67.

17) Resetting of Ventricular Tachycardia: Implications for Localizing the Area of Slow Conduction. J Am Coll Cardiol 1988, 11:522-29.

18) Complicated Atherosclerotic Lesions: A Potential Cause of Ischemic Ventricular Arrhythmias in Cardiac Arrest Survivors Who Do Not Have Inducible Ventricular Tachycardia? Am Heart J 1988, 116:

19) Fractionated Endocardial Electrograms Are Associated with Slow Conduction in Humans: Evidence from Pace-Mapping. J Am Coll Cardiol 1989, 13: 369-76.

20) Localization of Slow Conduction in a Ventricular Tachycardia Circuit: Implications for Catheter Ablation. Am Heart J 1987,114: 1253-58.

21) Reduction of Myocardial Ischemia During Percutaneous Transluminal Coronary Angioplasty with Oxygenated Fluosol. Am J Cardiol 1990, 66:279-84.

22) Left Main Coronary Artery Rupture After Percutaneous Transluminal Angioplasty. J Invasive Cardiol 1991, 3:50-52.

23) Detection of Coronary Artery Disease with Positron Emission Tomography and Rubidium 82. Am Heart J 1992, 123: 646-52.

24) Myocardial Dysfunction During Percutaneous Transluminal Coronary Angioplasty. Circulation 1990, 81 (3):Suppl IV:14-19.

25) Reversal of Prolonged Myocardial Ischemia by Intracoronary Catheter Infusion

Daniel Wohlgelernter, M.D.----- Curriculum Vitae

of Oxygenated Fluosol DA-20%: Report of Two Cases.  Am Heart J  1990,
26) Myocardial Protection with Fluosol During PTCA: Principles and Practice.  J Invasive Cardiol  1993, 5: 3A-5A.
27) The Mitigation of Ischemia in a Patient at High Risk. J Invasive Cardiol  1993, 5: 13A-15A.
28) Why Clinicians should request measured rather than estimated values of LDL cholesterol from the lab.  CLP: Clinical Lab Products  March 2000: Volume 29, Number 3, page 38
29) Cardiac Rupture and Tamponade as captured on ventriculography. Clinical Cardiology 2003, 26:520


TEXTBOOK CHAPTERS & REVIEW ARTICLES
1) "Postmyocardial Infarction Management and Rehabilitation". Edited by J.K. Vyden. New York, Marcel Dekker, Inc., 1983.  Book Review- Yale J Biol and Med  1984,57:716-17.
2) Oxygenated Fluosol DA-20% Distal Infusion During Coronary Angioplasty. Progress in Clinical and Biological Research.  Vol. 211; Transfusion Medicine: Recent Technological Advances, 1986, pages 21-27.
3) Cardiovascular Evaluation of Adolescents and Young Adults: Salient Aspects of the Examination.  Postgrad Med  1986, 79:111-19.
4) Myocardial Changes During Coronary Angioplasty. Cardiology Board Review 1987, 4:17-23.
5) Myocardial Protection During PTCA. CARDIO  1987, 4:39-41.
6) Percutaneous Transluminal Coronary Angioplasty of the "Culprit Lesion" in Unstable Angina.   Cardiology Board Review 1987, 4:85-98.
7) As I See It: A Case Review. Interventional Cardiology  1988, January.
8) Silent Ischemia During Coronary Angioplasty. J Angina and Silent Ischemia  1989,
9) Myocardial Protection During Coronary Angioplasty- a chapter in the textbook, Supported Complex and High Risk Coronary Angioplasty, edited by Fayaz A. Shawl,M.D.; Kluwer Academic Publishers, Boston- 1991.


ABSTRACTS
1) Treatment of Hypertension with Nitrendipine, a Calcium Channel Blocking Agent. Clin Research  1983, 31:2-337A.
2) Normal Systolic Left Ventricular Performance in Patients with Congestive Heart Failure. Circulation  1983, 68:III-101.
3) Third Heart Sound in Patients with Clinical Congestive Heart Failure and Normal Left Ventricular Systolic Performance. J Am Coll Cardiol  1984, 3:543.
4) Prognostic Impact of Normal Left Ventricular Systolic Performance in Patients with Clinical Congestive Heart Failure. Circulation 1984, 70: II-304.
5) Ischemic Regional Left Ventricular Dysfunction During Coronary Angioplasty. Clin Research  1985, 33:2-24A.
6) Multiple, Prolonged Balloon Inflations During Coronary Angioplasty Do Not Cause Regional Left Ventricular Dysfunction.  Clin Research  1985, 33:2-176A.
7) Effects of ATP-MgCl2 on Coronary Blood Flow and Myocardial Oxygen Consumption. Circulation 1985, 72: III-315.
8) Fluosol DA-20% Prevents Ischemic Mechanical Dysfunction During Coronary Angioplasty. Circulation 1985, 72:III-470.

Daniel Wohlgelernter, M.D.----- Curriculum Vitae

9) Coronary Angioplasty of the "Culprit Lesion" : An Alternative Approach in the Management of Unstable Angina with Multivessel Disease. J Am Coll Cardiol 1986,7:19A.

10) Attenuation of Ischemic Electrocardiographic Responses Following Multiple Balloon Inflations During Coronary Angioplasty. Clin Research 1986, 34:286A.

11) The Relevance of Angina in Determining the Severity of Ischemia During Balloon Inflation in Coronary Angioplasty. Texas Heart Institute supplement- Sept. 1986.

12) Silent Ischemia During Coronary Occlusion: Relationship to Regional Myocardial Dysfunction.  Circulation 1986, 74:II-5.

13) Quantitative Reduction of Ischemia During Angioplasty. Circulation  1986, 74:II-362.

14)Functionally Directed Revascularization Using Coronary Angioplasty: An Alternative Approach in the Management of Multivessel Disease.   J Am Coll Cardiol  1987, 9:15A.

15) Impact of Distal Coronary Perfusion on the Ejection Fraction Response to Balloon Inflation During PTCA.  J Am Coll Cardiol  1987, 9: 69A.

16) Entrainment as a Guide for Localizing the Site of Ventricular Tachycardia. J Am Coll Cardiol  1987, 9:153A.

17) Percutaneous Angioplasty of Atherosclerotic Aortocoronary Vein Grafts.  Texas Heart Institute supplement- October 1987.

18) Reduction of Ischemia During PTCA with Oxygenated Fluosol. Circulation  1987, 76: IV-27.

19)Do Fractionated Electrograms Indicate Slow Conduction ? Evidence from Pace-Mapping.  Circulation  1987, 76:IV-83.


MONOGRAPHS

1) Primary Treatment of Occluded Circumflex: Dispatch Infusion Catheter Case Study. SciMed Life Systems-New Modalities.  Fall 1995.

2) Real Measure, Right Decisions:  Why clinicians should routinely request measured (not estimated) clinical laboratory values of LDL cholesterol.  GENZYME Diagnostics. October 1999.


Updated-  January 3, 2021

# DANIEL WOHLGELERNTER, M.D.

----------------------------------------------------------------------------------------------------------------

2299 Century Hill
Los Angeles, CA. 90067
Phone: (310) 729-2202   Fax: (310) 492-9793
e-mail: drdan@iheartdrdan.com


January 3, 2021


## EXPERT WITNESS- FEE SCHEDULE


\* FOR REVIEW AND ANALYSIS OF MEDICAL RECORDS,DEPOSITION
TRANSCRIPTS,ETC. &  FOR PHONE CONFERENCES/MEETINGS;
                              $ 550/ hour


- RETAINER requirement:   $ 3,000


\* FOR  APPEARANCE at DEPOSITION:
                        $750/hour  ($1,500 minimum-  must be paid in advance )


\* FOR TRIAL/ARBITRATION TESTIMONY:
                        $4,800/ half-day + travel time & expenses


\*FOR  IME (INDEPENDENT MEDICAL EXAMINATION)
                        $750/hour ( prepayment required)