**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEVONTE STEPHENSON, et al, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF CALIFORNIA, et al, <br><br> Defendants. | Case No.: 5:21-cv-00526-JAK-KK <br> Honorable John A. Kronstadt <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B) AND NEW TRIAL UNDER RULE 59** <br><br> Date: April 20, 2026 <br> Time: 8:30 a.m. <br> Courtroom: 5D |



LAW OFFICES OF
**DALE K. GALIPO**
CIVIL RIGHTS ATTORNEYS

1

**TABLE OF CONTENTS**

I.     INTRODUCTION ...........................................................................................5

II.    FACTUAL BACKGROUND .......................................................................5

       A.    The Incident ....................................................................................5

       B.    Causation ........................................................................................8

III.   LEGAL STANDARD ................................................................................11

       A.    Rule 50 ..........................................................................................11

       B.    Rule 59 ..........................................................................................11

IV.    ARGUMENT .............................................................................................12

       A.    Defendants Are Not Entitled to Judgment as a Matter of Law on Causation ......................................................................................12

       B.    Defendants Are Not Entitled to New Trial on Causation ..................14

       C.    Officer Norem's Use of Force Was Unreasonable and Defendants are Not Entitled to Judgment as a Matter of Law or a New Trial ............16

       D.    Officer Norem is Not Entitled to Qualified Immunity .......................19

       E.    New Trial on Wrongful Death Damages Is Warranted ......................22

V.     CONCLUSION .........................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Abdullahi v. City of Madison*
   423 F.3d 763 (7th Cir. 2005).................................................................22

*Abston v. City of Merced*
   506 F. App'x 650 (9th Cir. 2013) ...........................................................21

*Arce v. Blackwell*
   294 F. App'x 259 (9th Cir. 2008) ...........................................................21

*Avina v. United States*
   681 F.3d 1127 (9th Cir. 2012) ...............................................................12

*Benson v. Allphin*
   786 F.2d 268 (7th Cir. 1986).................................................................15

*Champion v. Outlook Nashville, Inc.*
   380 F.3d 893 (6th Cir. 2004) ................................................................22

*District of Columbia v. Wesby*
   583 U.S. 48  (2018) .............................................................................22

*Drummond v. City of Anaheim*
   343 F.3d 1052 (9th Cir. 2003)...............................................20, 21, 23

*E.E.O.C. v. Go Daddy Software, Inc.*
   581 F.3d 951 (9th Cir. 2009).............................................12, 13, 15

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.*
   786 F.2d 1342 (9th Cir. 1986)...............................................................14

*Freund v. Nycomed Amersham*
   347 F.3d 752  (9th Cir. 2003)..........................................................13, 15

*Hayes v. Cnty. of San Diego*
   736 F.3d 1223 (9th Cir. 2013)...............................................................20

*Landes Const. Co., Inc. v. Royal Bank of Canada*
   833 F.2d 1365 (9th Cir.1987)..........................................................13, 15, 16



*Martin v. City of Broadview Heights*
   712 F.3d 951 (6th Cir. 2013)..................................................................22

*McCue v. City of Bangor*
   838 F.3d 55 (1st Cir. 2016) ...................................................................22

*Murphy v. City of Long Beach*
   914 F.2d 183 (9th Cir. 1990)................................................................13

*Rico v. Ducart*
   980 F.3d 1292 (9th Cir. 2020)..............................................................22

*Spencer v. Pew*
   117 F.4th 1130 (9th Cir. 2024).............................................................22

Tennant v. Peoria & Pekin Union Ry. Co.
   321 U.S. 29 (1944).......................................................................13, 17

*Tucker v. Las Vegas Metro. Police Dep't*
   470 F. App'x 627 (9th Cir. 2012) ........................................................21

*Weigel v. Broad*
   544 F.3d 1143 (10th Cir. 2008)............................................................22

*Winarto v. Toshiba Am. Elecs. Components, Inc.*
   274 F.3d 1276  (9th Cir. 2001)........................................................12, 18

*Zelaya v. Las Vegas Metro. Police Dep't*
   682 F. App'x 565 (9th Cir. 2017) ........................................................21

*Zhang v. Am. Gem Seafoods, Inc.*
   339 F.3d 1020 (9th Cir. 2003).......................................................23, 25

**Other Authorities**

C. Wright & A. Miller, Federal Practice and Procedure
   § 2806, at 48–49 (1973) .....................................................................12

**Rules**

Fed. R. Civ. P. 50(a)(1) ..............................................................................11

Federal Rule of Civil Procedure 58(c)(2)(B).................................................5

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

A jury heard nine days of testimony and returned a unanimous verdict finding that Officer Norem used excessive force in restraining Leroy Stephenson face-down on a highway until he stopped breathing and died. The jury awarded $5 million in damages. This Court has already denied Defendants' Rule 50(a) motion on the Fourth Amendment and state law claims. Dkt. 244. Defendants now ask the Court to overturn that verdict or grant a new trial, but none of their arguments warrant relief. Their causation argument under Rule 50(b) is procedurally barred because they never raised it in their 50(a) motion. Their excessive force arguments are identical to those this Court already rejected. Their inconsistent verdict challenge is forfeited because they did not object to the verdict form before it was submitted to the jury. And a new trial under Rule 59 is unwarranted because the verdict is not against the clear weight of the evidence.

The motion should be denied in full. To the extent Defendants seek relief on the Fourteenth Amendment claim, that portion of the motion is moot because the Court has already ruled in their favor on that claim. Dkt. 244 at 9.[1]

### II.   FACTUAL BACKGROUND[2]

####    A.   The Incident

In evaluating whether force was excessive, we look to the totality of the circumstances, not just the 3 minutes and 39 seconds after Stephenson was handcuffed.

---

[1] Plaintiffs agree with the Court's analysis that a reasonable juror could conclude that there was a Fourteenth Amendment violation for all the reasons discussed in the Court's Order.

[2] Defendants argue that judgment was entered as a matter of law on February 20, 2026 under Federal Rule of Civil Procedure 58(c)(2)(B). Motion at 3–4. Plaintiffs strongly disagree for the reasons discussed in their March 25, 2026 brief on the subject. Plaintiff's believe the Court has the discretion to strike the Motion as untimely and allow Defendants' to refiled it after the Court has entered judgment.

On January 24, 2019, on a weekday afternoon, Norem responded to reports of a pedestrian on the 91 Freeway near the Adams Street exit in Riverside. Tr. 190:25–191:1 (Dkt. 214–221); Tr. 192:7-8; Tr. 234:16–17; Tr. 444:7-9. Norem knew the man had been running on the freeway and appeared to be talking to himself and flailing his arms. Tr. 239:3-11. He considered that Stephenson might be having a mental health crisis or be under the influence. Tr. 191:12-16. Norem had no information that Stephenson had a weapon, had hurt or threatened anyone, or had any criminal history. Tr. 191:2-192:4.

When Norem arrived, Stephenson was on the off-ramp, not in the through lanes of travel. Tr. 192:5-10. No car had come close to hitting him. Tr. 192:14-18. Norem used his patrol vehicle's PA system to direct Stephenson to the shoulder. Tr. 312:7-12. Stephenson initially walked in that direction, then turned and began moving toward the freeway lanes. Tr. 312:13-18. Norem caught up to him and deployed his Taser in dart mode. Tr. 235:10-15.

The second Taser deployment brought Stephenson to the ground "pretty much immediate[ly]." Tr. 193:20-24. He landed chest and stomach down on the gore point. Tr. 194:2-6. Within seconds, Norem, who weighed 200 pounds plus 20 pounds of equipment, sprawled out on Stephenson's back using his chest and belly to press Stephenson down. Tr. 194:12-14; Tr. 189:11-16. From that moment forward, Stephenson never got off the ground; he remained chest down for the entirety of the incident. Tr. 196:7-10; Tr. 196:13-18. While sprawled on Stephenson's back, Norem drive-stunned him three additional times on his right shoulder and mid-back. Tr. 197:9-14; Tr. 199:1-8, 23-24. Combined with the two cartridge deployments, Stephenson was tased five times total. Tr. 244:19–21.

Investigator Borden arrived and took hold of Stephenson's shoulder blades. Tr. 262:10-12. Civilian bystanders Stout and Leighton held his legs. Tr. 277:25-278:3. By the time of handcuffing, Stephenson had already been prone for

6

approximately two and a half to three minutes, tased five times, and restrained chest down by multiple people. Tr. 244:19–21; Tr. 1005:11-14; Tr. 526:7-8.

Stephenson stopped resisting either shortly before or shortly after being handcuffed. Tr. 339:4-5; Tr. 372:15-16; Tr. 474:9-11; Tr. 1228:9-13; Tr. 1222:3-11; Tr. 341:23-25. But Norem did not turn him into a recovery position or stand him up; instead, he kept weight on his back. Leighton testified Norem kept his knee on Stephenson's shoulder blade until Leighton stood up, which we know occurred after McKee arrived. Tr. 370:12-14; Tr. 378:6-10. At that point, McKee arrived, and he testified that Stephenson was not combative, not actively resisting, not moving; but Norem kept Stephen prone and pinned to the ground. Tr. 474:9-24. Stephenson was so restrained, McKee was not sure how anybody would be able to move. Tr. 477:1-3.

Eventually, after being restrained chest down for approximately six minutes, Stephenson was placed in a recovery position, but it was too late — he was not breathing and had no pulse. Tr. 345:2-4. Despite CPR efforts on scene and by paramedics, Stephenson never regained consciousness and died that day. Tr. 150:17-18; 1206:4–6; 345:2–8; 772:8–12. Throughout the entire incident, Stephenson never punched anyone, never kicked anyone, never threatened to harm anyone. Tr. 195:18-25.

It is universally known in policing that prolonged prone restraint with weight on the back can kill, and this is part of police training, including POST Learning Domain 34. Tr. 559:16-20; Tr. 560:7-14; Tr. 562:21-24; Tr. 558:18-22. That is why the basic standard for police requires putting a handcuffed person in a recovery position as soon as possible to facilitate breathing and assess their condition. Tr. 561:21-562:1; Tr. 563:9-11; Tr. 563:15-18; Tr. 563:23-24; Tr. 565:1-5. Expert Jeff Noble confirmed this has been a nationwide standard since the 1990s, endorsed by DOJ and IACP. Tr. 560:15; Tr. 561:1-3.

7

The Defendants focus on the perceived danger of being on a highway. Mr. Klehm spent a significant portion of his closing remark on the topic and joked that he was thinking about having a three-word closing argument:, "methamphetamine and freeway." Tr. 1515:6-10. Norem even admitted that if this had happened in a parking lot, he would not have continued to hold Stephenson in a prone position after handcuffing. Tr. 425:3-7.

But the evidence supported the opposite conclusion. The video on the incident shows people moving and repositioning throughout the incident, and they do not appear concerned that they're in a dangerous place. Leighton, who was closer to traffic than Norem, confirmed that he did not feel like he was in any danger of being struck by a car. Tr. 377:20-22.[3]

### B.    Causation

Both plaintiffs' medical experts agreed: Stephenson's death was caused by prone restraint. Tr. 630:9-12; Tr. 646:7-13; Tr. 795:22-796:1. Their opinions rested not on timing alone, but on the physiological mechanism of death and objective medical data recorded at the scene.

Dr. Wohlgelernter, a board-certified cardiologist, explained the mechanism by which prone restraint kills: when a person is held face-down on a hard surface with people pressing on his back, the ribcage cannot expand, the lungs cannot take in adequate oxygen or expel acid, acid accumulates in the bloodstream, and the heart is eventually paralyzed. Tr. 632:5-14; 634:4-22; 635:7-14. He testified that this is what happened to Stephenson, and that the cause of death was restraint asphyxia. Tr. 628:2-8.

---

[3] Defendants assert that the MVARS video shows weight was not applied continuously. Motion at 13. But the video does not compel that conclusion. The jury viewed the video and heard competing testimony about the nature and degree of force applied throughout the restraint. McKee testified that Stephenson was so restrained he was not sure how anybody would be able to move. To the extent Defendants ask this Court to reinterpret the video evidence in their favor, that is precisely the kind of factual reweighing is prohibited at this stage.

Dr. Wohlgelernter's opinion was corroborated by objective data. Paramedics recorded Stephenson's cardiac rhythm as pulseless electrical activity ("PEA"). Tr. 643:22-644:9. Dr. Wohlgelernter testified that "PEA is characteristic of low oxygen and high acid" — the hallmarks of asphyxia — and that PEA is not what is seen in deaths caused by heart attack or methamphetamine, which instead produce ventricular fibrillation ("V-fib") or ventricular tachycardia ("V-tach"). Tr. 644:14-18; 645:4-7; 645:17-21. Experts from both sides agreed that the initial rhythm was PEA, that PEA is consistent with asphyxia, and that V-fib or V-tach cannot convert to PEA in the short time between death and when paramedics measured his vitals. Tr. 760:2-7; 763:2-5; 1002:8-10; 1004:13-14; 1004:23-24; 1358:11-13. Dr. Wohlgelernter further testified that Stephenson's end-tidal CO2 reading of 28, taken after five minutes of CPR had already been lowering the level, was consistent with a death caused by breathing failure, not a cardiac event, where the reading would typically be below 10. Tr. 654:7-24; 655:5-12; 656:1-18.

Dr. Wohlgelernter considered and ruled out alternative causes. He testified that methamphetamine "was not the cause of death," but that it made Stephenson "more sensitive and more vulnerable to the impact of prone restraint because he had even more need for his lungs to be fully expanded." Tr. 641:5-12. He reviewed the autopsy findings showing a 75% blockage in one coronary artery and an enlarged heart, and testified that neither caused Stephenson's death; the blockage was "not uncommon for males his age," and the heart size was not "exceptionally abnormal" for a person of Stephenson's height and weight. Tr. 652:11-22; 653:1-6. Dr. Omalu independently reached the same conclusion. Tr. 823:5-14; 804:8-9; 805:14-17.

Defendants argue that the jury was speculating about whether Norem's continued restraint of Stephenson caused his death. Motion at 10–11. But Dr. Omalu testified on this point directly. He explained in great detail the physiological effects of prone restraint over the course of five to six minutes and explained that

"[b]efore they reach the point of irreversibility, if you stop the prone positioning and the compression, the person will survive. They'll turn around." Tr. 798:25-799:2.[4] The medical examiner's own findings were consistent with plaintiffs' experts: the manner of death was classified as homicide, with "physical confrontation with law enforcement" listed as a significant condition. Tr. 651:10-15; 802:22-25; 998:3-4.

The alternative theories of causation presented by Defendants were unconvincing. In his opening argument, Mr. Klehm claimed that the evidence would show this was a "heart attack." But his own expert, Dr. MacGregor, testified unequivocally that this was not a heart attack. Tr. 1351:13-15 ("Q: So following up on a few things that you have said, would you agree that Mr. Stephenson did not have a heart attack? A: Yes.") Dr. Omalu also explained that the information in the autopsy was sufficient on its own to establish that this was not a heart attack. Tr. 805:22-806:4. Nor was this a drug overdose. Dr. Wohlgelernter explained that if Stephenson's death were caused by methamphetamine overdose, the expected rhythm would be V-fib or V-tach, not PEA. Tr. 645:17-21; Tr. 704:10-16. Experts from both sides opined that his initial rhythm was PEA. Tr. 1004:23-24. And experts from both sides testified it is highly unlikely or impossible to go from V-fib/V-tach to PEA in the short period of time between when he died and when his vitals were measured by paramedics. Tr. 647:24-648:9; Tr. 763:2-5; Tr. 1004:13-14.

---

[4] The Court instructed the jury to disregard Dr. Omalu's opinion that three to five minutes is sufficient time to reach this point of irreversibility and limited his opinion to his report which stated five to six minutes. Tr. 799:9-15. But this has not effect on the strength and persuasiveness of the cited testimony because the actual time of prone restraint here was within or greater than the five to six minute window and his opinion stands that if the prone positioning and compression ceased Stephenson would have been able to recover.

## III.   LEGAL STANDARD

### A.   Rule 50

Judgment as a matter of law is appropriate only where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A Rule 50(b) motion renewing the challenge after verdict is "limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). In ruling on such a motion, the court does not make credibility determinations or weigh the evidence, and must view all inferences in the light most favorable to the nonmoving party. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). Because the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," judgment as a matter of law in such cases "should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012).

### B.   Rule 59

Defendants ask the Court to grant a new trial under Rule 59(a) because the jury's verdict is against the clear weight of the evidence. The Ninth Circuit has provided the following guidance for ruling on such a motion:

> [A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter . . . . If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

11

*Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir.1987) (citing C. Wright & A. Miller, Federal Practice and Procedure § 2806, at 48–49 (1973)).

Where a movant claims that a verdict is against the clear weight of the evidence, doubts about the correctness of the verdict are not sufficient grounds for a new trial. *Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987). "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35 (1944).

## IV.   ARGUMENT

### A.   Defendants Are Not Entitled to Judgment as a Matter of Law on Causation

Defendants argue that Plaintiffs failed to present legally sufficient evidence of causation because, after the Court struck Dr. Wohlgelernter's "shorter-time" opinion, they assert that no admissible expert testimony supported a finding that less than five to six minutes of prone restraint caused Stephenson's death. Motion at 7–11. That argument is procedurally barred and wrong on the merits.

"[A] proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Thus, a party cannot properly "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (citing Rule 50 advisory committee's notes to the 1991 amendments stating: "A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."); *see also Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged in a directed verdict [motion].").

In their Motion, Defendants list the arguments they raised in their 50(a), and causation is not among them. Motion at 3. A review of the 50(a) motion confirms this as the words "cause" and "causation" do not appear in their motion or even their reply brief. Defendants could have supplemented their 50(a) motion orally before deliberations but chose not to..

Defendants' causation argument is precisely the type of sufficiency-of-the-evidence challenge that Rule 50 requires a party to raise before the case goes to the jury. The entire purpose of the Rule 50(a) requirement is to give the nonmoving party notice of the alleged deficiency in its proof so that it has an opportunity to cure it before submission to the jury. *See Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342 (9th Cir. 1986) ("If the moving party is then permitted to make a later attack on the evidence through a motion for judgment notwithstanding the verdict or on appeal, the opposing party may be prejudiced by having lost the opportunity to present additional evidence before the case was submitted to the jury"). Had Defendants challenged the sufficiency of Plaintiffs' causation evidence at the close of evidence, Plaintiffs could have assessed whether additional testimony or evidence was needed and acted accordingly. Defendants said nothing. They cannot now, after a $5 million verdict, raise for the first time the argument that Plaintiffs' causation evidence was legally insufficient.

The Advisory Committee Notes to the 1991 Amendment underscore why Rule 58 requires this result:

> Paragraph (a)(2) retains the requirement that a motion for judgment be made prior to the close of the trial, subject to renewal after a jury verdict has been rendered. The purpose of this requirement is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment.

13

Rule 50, Notes of Advisory Committee on Rules — 1991 Amendment; *see also Benson v. Allphin*, 786 F.2d 268 (7th Cir. 1986) ("the motion for directed verdict at the close of all the evidence provides the nonmovant with an opportunity to do what he can to remedy the deficiencies in his case").

The Notes further require that "the moving party articulate the basis on which a judgment as a matter of law might be rendered," and that "[t]he articulation is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof." Rule 50, Notes of Advisory Committee on Rules — 1991 Amendment. Defendants never articulated any challenge to the sufficiency of Plaintiffs' causation evidence. Their 50(b) motion on causation is therefore procedurally barred and must be denied. *Go Daddy*, 581 F.3d at 961; *Freund*, 347 F.3d at 761; *Murphy*, 914 F.2d at 186.[5]

**B.     Defendants Are Not Entitled to New Trial on Causation**

Unlike Rule 50(b), Rule 59 does not require that a party preserve an argument and therefore, that portion of the Motion is not procedurally barred. Nonetheless, the Defendants argument for a new trial on causation fails on the merits. A new trial is warranted only where the court, giving full respect the the jury's findings, is left with "the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987). No such conviction is justified here, because Defendants' causation argument rests on a fundamental mischaracterization of the trial record. They frame this case as though Plaintiffs' entire causation theory depended on a single proposition that death could result from less than five minutes of prone

---

[5] Should the Court reach the merits, the arguments in Section IV.B below demonstrate that the jury had a legally sufficient evidentiary basis for its causation finding.

restraint, and that once the Court struck that "shorter-time" opinion, Plaintiffs were left with nothing. Motion at 7–8.

As set forth in Section II.B, *supra*, Plaintiffs' causation case did not rest on timing alone. Two independent medical experts, Dr. Wohlgelernter and Dr. Omalu, testified that Stephenson died of restraint asphyxia, and their opinions were grounded in the physiological mechanism of death, corroborated by objective medical data, and confirmed by the systematic exclusion of alternative causes. The PEA cardiac rhythm recorded by paramedics was consistent with asphyxia and inconsistent with heart attack or methamphetamine overdose. Defendants' own expert conceded this was not a heart attack. And the medical examiner classified the manner of death as homicide.

Critically, Dr. Omalu testified that prone restraint kills through a progressive physiological process and that, before reaching the point of irreversibility, "if you stop the prone positioning and the compression, the person will survive." Tr. 798:25–799:2. That testimony gave the jury a direct evidentiary basis to find that Norem's continued restraint of a handcuffed, non-resisting individual caused his death.

Defendants' fixation on the 3 minutes and 39 seconds after handcuffing ignores the totality of what happened. Motion at 7, 13. Stephenson had already been chest down for approximately two and a half to three minutes before he was cuffed, initially he was pressed down to the ground by Norem, then by Norem and several other individuals. The relevant period for evaluating causation is the full six minutes of restraint, not a truncated post-handcuffing window.

This is not a case where the Court could be left with the "definite and firm conviction that a mistake has been committed." *Landes*, 833 F.2d at 1371–72. Defendants' disagreement with the verdict amounts to nothing more than "doubts about the correctness of the verdict," which "are not sufficient grounds for a new trial." *Id*. at 1372. Courts "are not free to reweigh the evidence and set aside the

jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35 (1944). The motion for new trial on causation should be denied.[6]

### C.   Officer Norem's Use of Force Was Unreasonable and Defendants are Not Entitled to Judgment as a Matter of Law or a New Trial

This Court has already evaluated the sufficiency of the evidence on Plaintiffs' Fourth Amendment excessive force claim and denied judgment as a matter of law. Dkt. 244 at 10–12. The Court also denied the motion as to the parallel state law claims for battery and negligence, finding that "[t]hat same evidence is sufficient as to the parallel state tort causes of action." Dkt. 244 at 14. Defendants recycle the same arguments the Court rejected and offer no new basis to disturb those rulings.

As the Court recognized, the trial evidence "was sufficient for a reasonable juror to conclude that the use of force was deadly." Dkt. 244 at 11. Norem, who weighed 200 pounds plus 20 pounds of equipment, sprawled out on Stephenson's back. Tr. 194:12–14; 189:11–16; 246:12–247:4. He drive-stunned Stephenson three additional times on his right shoulder and mid-back while Stephenson was already prone. Tr. 197:9–14; 199:1–8, 23–24. Combined with the two cartridge deployments, Stephenson was tased five times. Tr. 244:19–21. Borden took hold of Stephenson's shoulder blades. Tr. 262:10–12. Civilians held his legs. Tr. 277:25–278:3. Stephenson remained chest down for the entirety of the incident, approximately six minutes. Tr. 196:7–10; 196:13–18.

---

[6] Defendants' characterization of Plaintiffs' closing argument as "misconduct" is meritless. Argument is not evidence, and the jury was so instructed. Moreover, the cited argument drew a permissible inference from admitted evidence, including but not limited to Dr. Omalu's testimony that prone restraint is a progressive process and that removal of compression before the point of irreversibility would allow survival. Tr. 798:25–799:2.

Defendants claim that "no one ever put their weight on Mr. Stephenson's head, neck, or back above the waist and below the shoulders" and that "Officer Norem used his knee to control Mr. Stephenson's hip." Motion at 13–14. The jury heard otherwise. Leighton testified that Norem kept his knee on Stephenson's shoulder blade. Tr. 370:12–14; 378:6–10. Norem himself testified that he sprawled out on Stephenson's back using his chest and belly to press him down and then transitioned to pressing his knee into the lower spine, where the "curvature of the body goes." Tr. 194:12–14;  Tr. 246:12–247:4; Tr. 267:2–7. This Court is not free to reweigh the evidence or resolve credibility disputes in Defendants' favor. *Winarto v. Toshiba Am. Elecs. Components, Inc*., 274 F.3d 1276, 1283 (9th Cir. 2001).

The Court already found that all three *Graham* factors weighed in favor of a finding that the force was unreasonable. Dkt. 244 at 11–12.

On the first factor, the Court concluded that the crime was not severe. Dkt. 244 at 11. Stephenson's conduct amounted to irrational, nonviolent behavior on a freeway, at most, misdemeanor resisting. He had no weapon, had not threatened violence, had not committed violence, and had no criminal history. Tr. 191:2–192:4. Norem recognized that Stephenson might be having a mental health crisis or be under the influence. Tr. 191:12–16.

On the second and third factors, the Court found that "after Stephenson was handcuffed and prone, a reasonable juror could conclude that he was no longer resisting and no longer posed a threat to the safety of the officers, civilians or motorists." Dkt. 244 at 12. The trial evidence overwhelmingly supported that finding. Stephenson stopped resisting either shortly before or shortly after being handcuffed. Tr. 339:4–5; 372:15–16; 474:9–11. McKee testified that when he arrived Stephenson was not combative, not actively resisting, and not moving. Tr. 474:9–24. McKee was not sure how anybody in Stephenson's position would even be able to move. Tr. 477:1–3. Throughout the entire incident, Stephenson never

17

punched anyone, never kicked anyone, and never threatened to harm anyone. Tr. 195:18–25.

Defendants argue that Stephenson posed an ongoing danger because he could "break free from the restraint and resume running through freeway traffic lanes." Motion at 14. But the evidence showed this concern was speculative at best. Stephenson was handcuffed, tased five times, physically controlled by multiple people; a jury could have simply not believed there was any significant risk that he could have broken free. Tr. 474:9–24; 477:1–3. Moreover, the dangerousness of the location was in dispute. Leighton, who was closer to traffic than Norem, confirmed that he did not feel like he was in any danger of being struck by a car. Tr. 377:20–22. And the video shows people moving and repositioning throughout the incident without apparent concern about their proximity to traffic.

Defendants contend that "there was no training on positional asphyxiation or putting a suspect in a recovery position in 2019." Motion at 13–14. The trial evidence showed the opposite. Expert Jeff Noble testified that the risk of death from prolonged prone restraint with weight on the back is universally known in policing and is part of police training, including POST Learning Domain 34. Tr. 559:16–20; 560:7–14; 562:21–24. Noble confirmed this has been a nationwide standard since the 1990s, endorsed by the DOJ and IACP. Tr. 560:15; 561:1–3. Norem himself testified that POST provides instruction on positional asphyxia. Dkt. 244 at 7 (citing Dkt. 216 at 110). The jury was entitled to credit this testimony over Defendants' witnesses.

Defendants also argue that "both plaintiffs' and Defendants' police practices experts agreed that Officer Norem's actions through the time of handcuffing was reasonable." Motion at 13. That concession only underscores Plaintiffs' point. This case was never about the force used to handcuff Stephenson. It is about what happened after: the continued prone restraint with weight on the back of a handcuffed, non-resisting individual for over three and a half additional minutes.

LAW OFFICES OF
DALE K. GALIPO
CIVIL RIGHTS ATTORNEYS

The Court recognized this distinction, nothing that there was expert testimony that alternative methods of restraint were available, including "moving Stephenson into an upright recovery position." Dkt. 244 at 12. Norem himself admitted he would not have continued holding Stephenson prone after handcuffing if this had occurred in a parking lot. Tr. 425:3–7.

The jury heard all of this evidence, weighed the credibility of the witnesses, and returned a verdict finding that Norem's use of force was unreasonable. That verdict is consistent with the Court's own analysis on the Rule 50(a) motion and is amply supported by the record. Defendants are not entitled to judgment as a matter of law or a new trial on any of these claims.[7]

### D.    Officer Norem is Not Entitled to Qualified Immunity

This Court has already denied qualified immunity on the Fourth Amendment claim. Dkt. 244 at 12–13. Defendants raise the same arguments this Court rejected and offer no basis to revisit that ruling.

The Court found that *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), and its progeny provided Norem with "adequate and fair notice that the prolonged force used on Stephenson violated his Fourth Amendment rights under clearly established law." Dkt. 244 at 13. Twenty years before this incident, the Ninth Circuit declared that "any reasonable person[] should have known that squeezing the breath from a compliant, prone, and handcuffed individual . . . involves a degree of force that is greater than reasonable." *Drummond*, 343 F.3d at 1059. Defendants' attempt to distinguish *Drummond* fails for the reasons this Court has already identified.

---

[7] As this Court has already held, Plaintiffs' state law claims for battery and negligence are "analyzed under the same standard of objective reasonableness used in Fourth Amendment claims." Dkt. 244 at 14 (citing *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013)). Because the trial evidence was sufficient for a reasonable juror to conclude that Norem used excessive force in violation of the Fourth Amendment, "that same evidence is sufficient as to the parallel state tort causes of action." Dkt. 244 at 14. The jury's verdict on the state law claims should stand.

Defendants contend that *Drummond* is "materially distinguishable" because Drummond was detained in a parking lot rather than on a freeway, and because an officer in Drummond placed a knee on the suspect's neck. Motion at 15–16. But the clearly established principle from Drummond is not limited to parking lots or neck compression. It is that applying body weight to a prone, handcuffed individual who is no longer resisting constitutes excessive force. As the Court recognized, "[a]ll three Graham factors would have permitted the use of only minimal force once [the plaintiff] was handcuffed and lying on the ground." Dkt. 244 at 12 (quoting *Drummond*, 343 F.3d at 1058).

The freeway setting does not change the analysis. Once Stephenson was handcuffed, tased five times, and held prone by multiple people, any exigency that existed had passed. As the Court found, "after Stephenson was handcuffed and prone, a reasonable juror could conclude that he was no longer resisting and no longer posed a threat to the safety of the officers, civilians or motorists." Dkt. 244 at 12. The continued application of compressive force to a restrained, non-resisting person who does not pose a serious threat to others is prohibited under *Drummond*.

Since *Drummond*, the Ninth Circuit has repeatedly applied its holding to deny qualified immunity under analogous circumstances. *See Zelaya v. Las Vegas Metro. Police Dep't*, 682 F. App'x 565, 567 (9th Cir. 2017) (officers pinned man with body weight after he was motionless and no longer resisting); *Abston v. City of Merced*, 506 F. App'x 650, 653 (9th Cir. 2013) (body compression to restrain prone and bound suspect despite minimal resistance); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2012) (body pressure on delirious, prone, handcuffed individual who posed no serious safety threat); *Arce v. Blackwell*, 294 F. App'x 259, 261 (9th Cir. 2008) (same). This Court relied on precisely these cases in denying qualified immunity. Dkt. 244 at 13. Defendants dismiss them as unpublished and non-precedential, but the Court correctly recognized that while "unpublished decisions alone typically do not sustain a

20

finding that the law was clearly established, they may inform a qualified immunity analysis." Dkt. 244 at 13 (citing *Rico v. Ducart*, 980 F.3d 1292, 1300–01 (9th Cir. 2020)). Read alongside *Drummond*, these cases establish a robust consensus that compressive prone restraint of a handcuffed, non-resisting individual violates clearly established Fourth Amendment law.

Moreover, the Ninth Circuit's recent published decision in *Spencer v. Pew*, 117 F.4th 1130 (9th Cir. 2024), confirms the continued vitality of *Drummond*. In *Spencer*, the Ninth Circuit reversed a grant of qualified immunity to an officer who kept a handcuffed suspect prone with a knee on his back for nearly three minutes, holding that *Drummond* clearly established that post-handcuffing compressive force is unconstitutional when the suspect is no longer resisting or posing a serious threat. *Id*. But the facts of this case present an even stronger case for Plaintiffs than the facts of *Spencer*. In *Spencer*, the suspect had been fighting with officers and had injured one of them; here, Stephenson never punched, kicked, or threatened anyone. In *Spencer*, the restraint did not kill or severely injure the suspect; here, the restraint killed Stephenson. And in *Spencer*, the suspect remained responsive throughout; here, Stephenson became unresponsive during the restraint. While *Spencer* post-dates the January 2019 incident and therefore cannot itself establish the law as of that date, it demonstrates that the Ninth Circuit continues to read *Drummond* exactly as this Court did, as clearly prohibiting the kind of compressive prone restraint Norem applied.[8]

Defendants' argument that the six-minute duration of the prone restraint distinguishes this case from *Drummond* misses the point. The facts of this case

---

[8] Other circuits have reached the same conclusion. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013); *Weigel v. Broad*, 544 F.3d 1143, 1152–55 (10th Cir. 2008); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004); *McCue v. City of Bangor*, 838 F.3d 55, 63–64 (1st Cir. 2016); *Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005). This cross-circuit consensus further confirms that the unlawfulness of Norem's conduct was "beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

21

need not be identical to the facts of *Drummond*, it is only required that the constitutional rule be specific enough to put a reasonable officer on notice. The rule is clear: once a suspect is handcuffed, prone, and no longer resisting, the continued application of compressive body weight is unconstitutionally excessive. Therefore, the motion for qualified immunity on the Fourth Amendment claim should be denied.

### E.    New Trial on Wrongful Death Damages Is Warranted

Defendants argue that because the Court granted qualified immunity on the Fourteenth Amendment claim, the jury's single-line damages award may include grief and emotional distress damages that are not recoverable under California wrongful death law, and that a new trial on damages is therefore required. Motion at 21–22. But under settled Ninth Circuit law, this argument is forfeited because Defendants did not raise this issue before the case was submitted to the jury.

The Ninth Circuit requires that a party raise any potential for an inconsistent verdict before the case is submitted to the jury as a prerequisite to a renewed motion after the jury has reached a verdict. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Defendants did not do so.

Without a contemporaneous objection, a party could identify a potential defect in the verdict form, say nothing, wait to see how the verdict comes out, and only if the result is unfavorable, raise the issue for the first time post-trial. That is precisely what Defendants have done here.

The alleged ambiguity in the damages award was not merely foreseeable, it was a direct consequence of Defendants' own litigation strategy. On September 17, 2026, Defendants filed their motion for judgment as a matter of law on the Fourteenth Amendment claim, arguing that Officer Norem was entitled to qualified immunity. At the time they filed that motion, Defendants knew the Court had already granted qualified immunity on the same Fourteenth Amendment claim in McKee's earlier summary judgment motion. Dkt. 96 at 26. Having successfully

22

obtained dismissal of the 14A claim against McKee on that basis, Defendants had every reason to believe their own motion would succeed, and every reason to anticipate that if it did, the jury's wrongful death damages award could not properly include grief and emotional distress damages tied to that claim.

Yet during the very same period, as the parties and the Court extensively discussed the verdict form, the jury instructions, and the categories of wrongful death damages, Defendants never raised the potential for an inconsistent verdict. They never requested a separate verdict line to isolate grief damages from the remaining wrongful death categories. They never objected to the verdict form on this basis at all. They said nothing, even though they were simultaneously litigating the motion that would create the precise ambiguity they now seek to exploit.

This is particularly significant because the parties disagreed about the number of lines on the wrongful death damages portion of the verdict form: Defendants wanted fewer lines, Plaintiffs wanted more. Tr. 1414–1421. Had Defendants proposed a separate line for grief damages, as their own pending motion should have prompted them to do, Plaintiffs would have readily agreed. Had Defendants raised the possibility of an inconsistent verdict, the issue could have been resolved before submission. Instead, Defendants chose to stay silent, secure in the knowledge that if their Rule 50(a) motion succeeded, they could manufacture a post-verdict challenge to the damages award. Having created the very ambiguity they now complain of through their own strategic choices, Defendants cannot be permitted to exploit it after an unfavorable verdict.

Defendants claim that their proposed verdict form would have solved this issue, but that is incorrect. Motion at 21. Their proposed verdict form (Dkt. 128) listed "love, companionship, comfort, care, assistance, protection, affection, society, and moral support," which are categories simply duplicative of what appeared in the jury instructions. It did not include a separate line for grief and mental anguish. It did not ask the jury to allocate damages by claim. Even

Defendants' own proposed form failed to address the issue they now raise, confirming that this argument has not been preserved.

Under *Zhang*, a party that fails to raise a potential verdict inconsistency before submission to the jury cannot raise it for the first time in a post-verdict motion. 339 F.3d at 1035. Defendants had every opportunity to object to the verdict form or request a separate line for grief damages, and they chose not to. That choice forecloses the argument they now attempt to make, and their damages challenge should be denied on that basis.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for judgment as a matter of law and motion for new trial in their entirety.

Dated: March 27, 2026          **LAW OFFICES OF DALE K. GALIPO**

By:    */s/   Cooper Mayne*
Dale K. Galipo
Cooper Mayne
*Attorneys for Plaintiffs*

## Certificate of Compliance

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains **7,000** words, which complies with the 7,000 word limit of L.R. 11-6.1.

Dated: March 27, 2026

**LAW OFFICES OF DALE K. GALIPO**

By:  /s/   *Cooper Mayne*
Dale K. Galipo
Cooper Mayne

*Attorneys for Plaintiffs*