ROB BONTA
Attorney General of California
DONNA M. DEAN (State Bar No. 187104)
Supervising Deputy Attorney General
DAVID KLEHM (State Bar No. 165302)
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
San Diego, CA 92186-5266
Telephone: (619) 738-9773
Fax: (619) 645-2581
E-mail: David.Klehm@doj.ca.gov
*Attorneys for Defendants*
*State of California, acting by and through*
*the California Highway Patrol, and Dane Norem*

**UNITED STATES DISTRICT COURT FOR THE**

**CENTRAL DISTRICT OF CALIFORNIA**

**DEVONTE STEPHENSON, individually and as successor in interest to Decedent LEROY STEPHENSON; LINDEN STEPHENSON, individually and as successor in interest to Decedent LEROY STEPHENSON; KEANDRE STEPHENSON, individually and as successor in interest to Decedent LEROY STEPHENSON,**

Plaintiffs,

v.

**STATE OF CALIFORNIA; DANE NOREM; and JEFFREY MCKEE,**

Defendants.

Case No.: 5:21-cv-0526-JAK-KK

[*Hon. John A. Kronstadt*]

**DECLARATION OF JAMES P. SCHRATZ IN SUPPORT OF DEFENDANTS STATE OF CALIFORNIA ACTING BY AND THROUGH THE CALIFORNIA HIGHWAY PATROL AND DANE NOREM'S OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

Judge: Honorable John A. Kronstadt

# TABLE OF CONTENTS


EXECUTIVE SUMMARY ..... 1

DECLARATION OF JAMES P. SCHRATZ ..... 2

ADDITIONAL NOTES RE: AUDITS IN GENERAL ..... 4

SCOPE OF REVIEW ..... 7

AUDIT METHODOLOGY ..... 7

SCOPE OF AUDIT ..... 8

STANDARD OF REVIEW ..... 8

BILLING RECORDS ..... 10

FINDINGS AND OPINIONS ..... 11

I. BILLING FOR CLERICAL WORK ..... 11

II. THE REQUESTED BILLING RATES ARE UNSUPPORTED AND UNJUSTIFIED ..... 12

A. Not Usual and Customary Rates That Are Paid by Clients or Awarded by Courts ..... 13

B. The Declaration of Carol A. Sobel Does Not Provide Relevant Data ..... 15

C. Reference Rates and Recommended Rates ..... 19

III. EXCESSIVE INTRA-OFFICE CONFERENCING ..... 21

IV. VAGUE BILLING FOR TRIAL PREPARATION AND LONG DAYS ..... 25

SUMMARY OF FINDINGS ..... 28

## EXECUTIVE SUMMARY

Plaintiffs' Counsel seeks an order awarding a "lodestar" figure of $1,748,287.50 based on 1,815.25 hours of work. However, my audit found several areas of concern:

1. Plaintiffs' Counsel's litigation assistants billed for non-recoverable administrative and clerical work which I recommend be disallowed in its entirety.

2. The requested hourly rates are not reasonable considering recent prior fee awards for Mr. Galipo and Plaintiffs' Counsel has failed to provide relevant data related to hourly rates for attorneys of comparable skill and reputation practicing in the United States District Court for the Central District of California.

3. Plaintiffs' Counsel engaged in excessive intra-office conferencing which I recommend be reduced.

4. Mr. Galipo's billing descriptions for trial preparation are vague and consist of excessively long days which lack credibility.

In summary, my fee adjustments result in a total recommended fee disallowance of **$482,009.03** and total recommended allowed fees of **$1,266,278.47.**

# DECLARATION OF JAMES P. SCHRATZ

I, JAMES P. SCHRATZ, hereby declare:

1. I am an attorney at law licensed to practice in the State of California and have been so licensed since 1976. I received my law degree from the University of San Francisco School of Law in June 1976, where I was the Editor-in-Chief of *The Law Review*. In September 1976, I joined the law firm of Heller, Ehrman, White & McAuliffe, where I worked as an associate in its litigation department. It must be emphasized that if the court has any questions about my declaration, I am more than willing to appear at the hearing to answer them. I never want to give the appearance that I am "hiding" from questioning by either opposing counsel or the court and merely relying on the declaration. The purpose of my declaration in all the cases I handle is to hopefully give the court whatever benefit there may be in my 50 years of experience. I have personally reviewed the case billings, deposition and trial transcripts, and other case documents as detailed below. I believe it is imperative to review all available pleadings, depositions, and, where available, arbitration or trial transcripts in order to give a full and fair opinion on the reasonableness of the fees requested and that any opinions that are based on other than such a complete review lack a proper foundation.

2. In March 1978, I left Heller, Ehrman, White & McAuliffe and joined a smaller firm until August 1980, when I joined Fireman's Fund Insurance Company in San Francisco, California, in its General Counsel's Office. My responsibilities included representing Fireman's Fund as attorney of record in various litigation matters throughout the country. In addition, I supervised outside counsel throughout the country on various types of cases, including many complex civil litigation cases and many employment cases.

3. In 1984, I left the General Counsel's Office and transferred to the Claims Department where I established the Major Litigation Unit, which was responsible for managing complex litigation throughout the country, including the

$65 million bankruptcy of The Woodson Company. In this role, I was responsible for approximately 1,000 cases and a staff of ten people. I also became very familiar with the rates charged not only by Fireman's Fund "panel counsel," but also rates charged by solo practitioners and small, medium, and large law firms throughout the United States.

4. In July 1990, I was promoted to Vice President Major Claims, where my duties were expanded to include responsibility for any case throughout the world that had potential exposure of $3 million or more, and responsibility for supervising approximately 100 adjusters. Again, I continued my involvement in supervising cases throughout the United States and stayed abreast of what solo practitioners and small, medium, and large law firms charged their respective clients.

5. On January 1, 1994, I left Fireman's Fund to establish my own litigation management and consulting firm. I am the principal of Jim Schratz and Associates, a firm that conducts legal fee audits of various law firms throughout the country. Over the past thirty-two years, I have personally supervised or conducted approximately 4,000 legal fee audits throughout the country on behalf of both clients and law firms, including governmental agencies, insurance companies, corporations, and private individuals.

6. Many of these audits have involved plaintiff's fee requests in fee-shifting cases. In that role, I have performed legal fee audits of various law firms on behalf of the California Department of Justice, the City and County of San Francisco, the City of Huntington Beach, the Sonoma County Sheriff's Office, the State of Wisconsin, United Airlines, and Avis Rent-A-Car, among others. The amount of the fee requests audited ranges from a low of a few hundred thousand dollars to approximately $60 million.

7. A description of several of the cases in which I have provided expert opinions and/or testimony is attached as **Exhibit 1**.

8. I know of no expert whose opinion is wholly accepted by courts 100 percent of the time. Like most other experts, not all courts have accepted my audit findings. Over the years, I have attempted to track all cases that have rejected, in whole or in part, my opinions and it appears that out of approximately 4,000 audits only a few cases have done so.

9. My analysis of those cases in which the courts have not accepted my audit findings or have criticized aspects of my methodology or credentials is attached as **Exhibit 2**.

10. If Plaintiffs' Counsel in this case or anybody else has other cases to add to this list then I am more than willing to do so. It is my firm belief that all experts should be fully transparent and inform both the court and all parties involved of all cases which did not accept their opinions. More specifically, I believe all the declarants in a case should provide any and all information concerning any declarations they have filed in the past where the courts have rejected, in whole or in part, their statements. I believe we all owe that to the court and to the opposing party.

## ADDITIONAL NOTES RE: AUDITS IN GENERAL

11. An audit does not always uncover overbilling. On numerous occasions, I have been retained by a client to audit a legal bill and have informed the client that there is little, if any, overbilling and that the client should pay most, if not all, of the invoice.

12. For example, previously I have been retained by the California Department of Insurance to audit a number of law firms in connection with numerous matters, including the insolvency of Golden Eagle Insurance Company, which was located in San Diego, California (and was declared insolvent by the California Insurance Commissioner). On a number of these audits, I found that most, if not all, of the fees involved were reasonable and necessary, and recommended to the client that it pay most, if not all, of the fees audited.

13. As a standard practice, I make an offer to all of my clients to review the bills free of charge and arrive at a preliminary opinion as to whether an audit would uncover any overbilling, so as to make an audit cost efficient. I estimate that in approximately 10 to 15 percent of the requests I receive, I suggest to the client that an audit is not cost justified.

14. On numerous occasions, I have been retained by a law firm engaged in litigation with a client to conduct an audit, and if the audit discloses no overbilling, I testify as an expert witness on behalf of the law firm. The following is a partial list of the law firms that I have audited where the audit disclosed that most, if not all of the fees, were reasonable.

Sidley & Austin
Manatt, Phelps & Phillips
Mower, Koeller, Nebeker, Carlson & Halluck
Lanahan & Reilley
Lurie & Zepeda
Banning, Micklow, Bull & Lopez
Robles & Castles
Thelen Reid & Priest
Stoel Rives
Robinson & Cole
LeBoeuf, Lamb, Greene & MacRae
Husch & Eppenberger
Parson, Behle & Latimer
Christiensen Miller Fink Jacobs Glaser Weil & Shapiro, LLP
Berding & Weil
Meredith Weinstein & Numbers
Spector Law Offices
Epstein Becker and Green
Pillsbury Winthrup
Latham and Watkins

15. The following is a sampling of cases where I have provided deposition and/or trial testimony in support of a law firm's fee request. It is important to emphasize that we use the same legal fee audit methodology whether we are retained by a law firm in support of its fee request or retained by an opposing party in opposition to the fee request. The purpose of the audit is to give an honest, unbiased opinion on the reasonableness of the legal fees.

- In *PNY Technologies, Inc. v. Miller, Kaplan, Arase & Co., LLP*, Case No. 3:15-cv-01728-MMC, in the United States District Court, Northern District of California, I testified in support of the national law firm Winston & Strawn's request for fees.

- In *Gen. Charles E. Yeager, Victoria Yeager, Charles E. Yeager Revocable Living Trust, and General Chuck Yeager Foundation v. Don A. Lesser, The Lesser Law Group, and Does 1 through 20, inclusive*, Case No. 34-2011-00109638, in the Superior Court of California, County of Sacramento, I testified in support of the law firm's request for fees.

- In *North Coast Engineering, Inc. v. State Farm General Insurance Company, et al.,* Case No. SCV 243762, in the Superior Court of California, County of Sonoma, I testified in support of a request for fees submitted by the Law Offices of Duncan James.

- In *Victaulic Company v. American Home Assurance Company, et al.,* Case No. RG12642929, in the Superior Court of California, County of Alameda, I testified in support of Pillsbury Winthrop's request for fees.

- In *Sonic Automotive, Inc., v. Chrysler Insurance Company, et al.,* Case No. 1:10CV717, in the United States District Court for the Southern District of Ohio – Western Division, we were retained to audit fees and expenses for over $10 million submitted by the law firms of Hinshaw & Culbertson LLP, Broad & Cassel, James McElroy & Diehl, P.A., and Williams & Connolly LLP. We performed a legal fee audit according to our standard audit methodology.

- In *EDUCAP, Inc. et al., v. Philadelphia Indemnity Insurance Company*, Civil Action No. 1:13-cv-72 LO/IDD, in the United States District Court for the Eastern District of Virginia – Alexandria Division, we were retained to audit $3.9 million in fees for the law firms of Williams & Connolly LLP, Simpson Thacher & Bartlett LLP, Skadden, Arps, Alte, Meagher & Flom LLP, and Jaffe Raitt Heuer & Weiss PC. We performed a legal fee audit according to our standard audit methodology.

16. I have published approximately 35 articles, many of which involve the control of legal fees and abuses in the billing practices of attorneys. Over the past several years, I have given numerous presentations on legal auditing and controlling legal costs throughout the United States, Canada, and England. I have made a

number of presentations to various Bar Associations, insurance industry groups, and other organizations, including the American Bar Association, on how to assist the court in analyzing fee requests. I wrote an article on employing legal fee auditors in fee-shifting cases, which was published in *Trial Diplomacy Journal.* I also wrote an article, "How to Win a Fee Petition," which was published in a number of publications including *The Rhode Island Bar Journal*, *The Practical Litigator*, *The Federal Lawyer* and Business Laws, Inc.'s *Law Department Management Adviser*. Among other points, this article listed various "red flags" or questionable billing practices that should be avoided in submitting a fee application.

17. Attached hereto as **Exhibit 3** is a true and correct copy of my Curriculum Vitae, which lists my work history, my publications, and my general experience.

## SCOPE OF REVIEW

18. I have been retained by the State of California through Deputy Attorney General, David Klehm, to review the Motion for Attorneys' Fees Pursuant to 42 U.S.C. § 1988 and supporting declarations (collectively, "Fee Motion") (ECF 268) and provide opinions as to the reasonableness of the fees requested.

19. As part of this audit, I conferred with Mr. Klehm regarding this case and analyzed the Fee Motion and all available deposition and trial transcripts as well as numerous pleadings and motions as set forth in **Exhibit 4** hereto.

20. I am not being compensated based upon my "success" at reducing the requested fees.

## AUDIT METHODOLOGY

21. As part of the audit process the billing time records were input into a computer database to allow for comprehensive searching and analysis. The computerized database permitted creation of summary reports of billing by categories of activities. To the best of my information and belief, these reports accurately reflect the information contained in the submitted billing records. Having

the records in the computer database also allowed for accurate quantification of various other issues including, but not limited to, those discussed in this declaration. My staff and I analyzed each of the 1,668 billing entries for necessity and reasonableness.

## SCOPE OF AUDIT

22. The starting point in any audit is to determine the lodestar, or the amount being requested. Plaintiffs' Fee Motion states that they are requesting fees of $1,748,287.50 based on 1,815.25 hours. (ECF 268, page 2, line 6.) My independent calculations of Plaintiffs' Counsels' billing entries match the hours and fees requested. Accordingly, I use **$1,748,287.50** as the starting point of the audit.

## STANDARD OF REVIEW

23. Based on my experience as an attorney, client, and legal fee expert, it is my opinion that billing standards have changed over the past 30 years. In the past, many courts and clients were not sensitive to the numerous potential problems caused by block billing, vague entries, or excessive minimum billing increments. However, as academics such as William G. Ross, the Albert P. Brewer Professor of Law and Ethics in Samford University's Cumberland School of Law in Birmingham, Alabama and author of The Honest Hour, published in 1996, began to study both the prevalence of such billing practices and their potentially harmful effects, both courts and clients began to pay close attention. In response, the profession of legal fee auditing developed to aid clients and the courts in quantifying those potentially harmful effects. Courts began to look at these expert reports and then developed an increasing body of case law that the legal fee experts used as part of their methodology.

24. As law firm fees began to be reduced because they were employing these questionable billing practices, law firms began establishing their own internal billing guidelines requiring timekeepers to refrain from such practices. I have personally put on presentations to such law firms. In addition, many law firms

instituted Quality Control procedures to assure themselves that such questionable billing practices would not be permitted within the law firm. These Quality Control procedures developed because the law firms realized that certain questionable billing practices such as block billing, vague entries, excessive minimum billing increments, and excessive intra-firm conferencing were within the control of the law firm and to the degree they could be controlled or eliminated the law firm increased its chances of recovering its fees. Many of the more sophisticated law firms even issued their own internal billing guidelines prohibiting such practices.

25. In conducting a legal fee audit, I analyze the invoices and work product generated in light of one of two standards. The first standard is contained in any retainer agreement between the law firm and client, or in billing guidelines or any other instructions provided by the client to the law firm. In addition to looking at such agreement, guidelines, or instructions, I look to established case law for what are acceptable billing practices as the second standard. To the extent there are instructions from the client, State Bar opinions and case law may supplement or even override the instructions. **The case law referenced in this report is not being cited for its legal authority, but to establish that there is a foundation for the opinions stated herein.** In that way the cases may be analogized to Generally Accepted Accounting Principles, commonly known as GAAP, which are a collection of commonly followed accounting rules and standards for financial reporting. I am not aware of any billing guidelines that may be in place in this matter.

26. This case was taken on contingency. (ECF 268, page 20, lines 1-2.) In a fee-shifting case such as this, if a jury or court found that the defense prevailed, plaintiff would not be entitled to any attorneys' fees whatsoever. On the other hand, if a jury or court found that plaintiff prevailed on the merits of a fee-shifting claim, then they would be entitled to seek to recover their reasonable and necessary

attorneys' fees and costs related to those fee-shifting claims from the defendant(s) against whom they prevailed.

27. In my experience, a significant issue related to attorneys' fees in contingency fee matters is that there are no billing guidelines and the firm's billing is not contemporaneously, regularly, or ever reviewed by the client. Even if the client is given one or more opportunities to review the billing, as the client knows they are not responsible for paying any of the amounts, the review is, most likely, cursory and uncritical. The lack of any external oversight can lead to lax internal oversight of billing practices, particularly where billing overages accrue to the benefit of the ones who are billing. This lack of this extra, external incentive to control fees is especially troublesome in light of the magnitude of the fees requested in this case.

28. I approach all legal fee audits with the assumption that most attorneys do not intentionally inflate their bills. However, where it is difficult to determine the nature and extent of the possible overbilling due to the firms' questionable billing practices, such as block billing or vague entries, it is incumbent upon the law firms, as the moving party, to justify their fees.

**BILLING RECORDS**

29. I view a law firm's billing records as a representation by the law firm that a particular task was performed on a particular day, by a particular timekeeper, and that the timekeeper spent the amount of time stated on the invoice. Billing format or billing practice irregularities that bring into question the credibility, integrity or reliability of a law firm's billing records are not only unacceptable, they are potentially grounds for a significant disallowance of fees.

30. To the extent that reconstructed records (i.e., non-contemporaneously-recorded time entries) are submitted, a judge is not required to evaluate "reconstructed" time with the same credibility and presumption of accuracy as contemporaneously-recorded time. (*Horsford v. Board of Trustees of California*

*State University*, F051782 (Cal. App. 9/4/2008), fn 2 ["This is not to say that contemporaneous time records are required as part of every attorney fee application; they are not]; (see *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 270-272.) Still, the trial court is entitled to evaluate the records that are submitted and is not required to treat all records as equally informative or accurate. (See, e.g., *PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1096, fn. 4.)" A true and correct copy of the *Horsford* opinion is attached hereto as **Exhibit 5**.

**FINDINGS AND OPINIONS**

**I. BILLING FOR CLERICAL WORK**

31. While only seven timekeepers billed to this case, two of the timekeepers (Litigation Assistants, Darci Gilbert and Santiago Laurel) performed almost entirely clerical and administrative work which is generally not recoverable because it is considered overhead. Instead, it should be taken into account when a law firm sets its attorneys' hourly rates.

32. Litigation Assistant, Darci Gilbert, billed 59.60 hours and $14,900 in fees at a requested rate of $250. (ECF 268, page 28, ¶ 6, lines 3-18, and page 30, lines 16-17.) However, with the exception of a few entries for attending calendar meetings and intra-office conferencing, the remaining nearly 200 entries are devoted to clerical and administrative work consisting of e-mails related to scheduling, filing documents, downloading documents, printing and documents.

33. Litigation/Legal Assistant, Santiago Laurel billed 52.75 hours and $13,187.50 in fees at a requested rate of $250. (ECF 268, page 28, ¶ 7, line 19 to page 29, line 6, and page 30, lines 18-19.) Like Ms. Gilbert, Mr. Laurel's entries overwhelmingly consist of clerical and administrative work related to scheduling, calendaring, downloading documents and saving documents.

34. "[C]lerical or ministerial costs are part of an attorney's overhead and are reflected in the charged hourly rate." (*Jeremiah B. v. Dep't of Educ.* (D.Haw.

Jan 29, 2010) Civil No. 09-00262 DAE-LEK, 2010 WL 34654, at *5, citing *Sheffer v. Experian Info. Solutions, Inc.* (E.D. Pa. 2003) 290 F. Supp. 2d 538, 549.)

35. As the Court in *Pelayo Playa, et al. v. Platinum Limousine Services, Inc., et al.* (D.Haw. 2016) 2016 WL 5402185 (Civil No. 15-00023, September 27, 2016) stated:

> Clerical costs, on the other hand, are part of an attorney's overhead and are subsumed in the attorney's charged hourly rate. *Jeremiah B. v. Dep't of Educ.*, 2010 WL 346454, at *5 (D. Haw. Jan. 29, 2010) (citation omitted). *See also Frankl v. HGH Corp.*, 2012 WL 1755423, at *8 (D. Haw. Apr. 23, 2012), F&R adopted by 2012 WL 1753644 (D. Haw. May 14, 2012) ("[I]t is not customary to bill for purely clerical or secretarial work separately from attorney's services. As previously stated, in this district, such tasks are subsumed in an attorney's overhead costs.")

*Pelayo* at *7.

36. Clerical work is also not recoverable simply because an attorney or paralegal actually does the work. "…[F]ee requests for ministerial tasks performed by counsel such as 'file organization' should not be allowed as compensable time." (In re Taylor (Bankr. D. Colo. 1989) 100 B.R. 42, 44) And, "…[t]ruly ministerial services such as xeroxing and filing documents with the Court should not be compensated at the same rate as those services which are legal. Even if an attorney or paralegal performs the ministerial services, it does not increase the value of that service." (Ibid.)

37. All of time billed by Mr. Laurel and Ms. Gilbert collectively totaling **$28,087.50** in fees is attached as **Exhibit 6** hereto which I recommend be disallowed in its entirety as non-recoverable clerical and administrative work.

**Recommended Disallowance:**
**Requested Fees: $1,748,287.50**
**Clerical Work Disallowance: - $28,087.50**
**Net Fees: $1,720,200.00**

## II. THE REQUESTED BILLING RATES ARE UNSUPPORTED AND UNJUSTIFIED.

38. I regularly have access to current law firm rates in conducting legal fee audits and auditing law firms' billing invoices. I also regularly review court opinions on attorneys' fee motions and requests and I am familiar with what law firms practicing in Riverside County Superior Court and the United States District Court for the Central District of California are seeking as hourly rates and what courts are awarding. Based on my experience in having conducted approximately 4,000 legal fee audits, my experience as an attorney and expert in legal fees over the past 50 years, and my review of the above-mentioned material, I have personal knowledge of hourly billing rates for attorneys and staff in Riverside County Superior Court and the United States District Court for the Central District of California market areas. On that basis, as well as my analysis of the evidence submitted by Plaintiffs' Counsel, it is my opinion that the billing rates being claimed in the Fee Motion are unreasonable for the reasons set forth below and that the requested rates should be adjusted.

### A. Not Usual and Customary Rates That Are Paid by Clients or Awarded by Courts.

39. **Dale K. Galipo.** Mr. Galipo states that he was awarded $1,100 per hour in April 2020. (ECF 268, Attachment 1, Galipo Decl., ¶ 20; Ex. 3.) According to the court order (*Id.* at Ex. 3, p. 3), he sought $1,200 per hour. After analysis, the court found that a "modest reduction of the requested rate [for Mr. Galipo] is warranted. Galipo requests $1,200 per hour, which outpaces the upper quartile of litigation partners in this forum [the Central District] by almost $300." (*Id.*at Ex. 3, p. 4.) The court awarded him the $1,100 he cites.

40. Mr. Galipo states that he was awarded $1,100 per hour in September 2021. (*Id.* at ¶ 21; Ex. 4.)

41. Mr. Galipo states that he was also awarded $1,100 per hour in May 2022. (*Id.* at ¶ 22; Ex. 5.)

42. Mr. Galipo states that he was awarded $1,200 per hour in two cases in February 2023 for attorney's fees related to appeals to the Ninth Circuit and the Supreme Court." (*Id.* at ¶¶ 23-24; Exs. 6-7.)

43. Mr. Galipo states that he was also awarded $1,300 per hour in June 2024. (*Id.* at ¶ 25; Ex. 8.)

44. Mr. Galipo states that he was awarded $1,400 per hour in February 2024. (*Id.* at ¶ 26; Ex. 9.) However, as he points out, this was for his work on the appeal, not the underlying case. (*Id.* at ¶ 26.) The defendant did "not contest Plaintiffs' requested rates." (*Id.* at Ex. 9 at p. 6, ¶ 1.)

45. Mr. Galipo states that he was awarded $1,300 per hour in April 2025. (*Id.* at ¶ 27, Ex. 11.)

46. Mr. Galipo also cites to <u>very recent</u> fee awards where he was awarded $1,400 per hour on August 18, 2026 and July 29, 2026 (*Id.* at ¶¶ 28-29; Exs. 13-14, respectively.)

47. **Cooper Alison-Mayne.** Mr. Alison-Mayne was admitted to the State Bar of California is March 2022. (ECF 268, Attachment 16, Alison-Mayne Decl., ¶ 5.) He states in his declaration, without any citation to authority or prior fee awards, that his reasonable rate is $700 per hour. (*Id.* at ¶ 11.)

48. **Santiago Laurel.** Mr. Laurel is a litigation/legal assistant and seeks an hourly rate of $250 which he was recently awarded. (ECF 268, Attachment 18, Laurel Decl., ¶¶ 1, 7.) However, he references *paralegal* rates to seek to justify his requested rate. (*Id.* at ¶ 7.) He states that "paralegal rates are currently awarded at $150 to $325 per hour…" (*Id.*) There are at least two problems with this statement.

49. First, while both legal assistants and paralegals are non-attorneys, they have different roles and responsibilities. According to ThompsonReuters[1], "A legal assistant, also known as a legal secretary, is a professional who provides

---

[1] https://legal.thomsonreuters.com/blog/legal-assistant-vs-paralegal-the-differences/, last accessed Jul. 26, 2026.

administrative and legal support to lawyers and law firms. Legal assistants are responsible for administrative and legal tasks ….” In contrast, “A paralegal is a type of legal assistant who has received specialized education and training in legal procedures and practices, often with a college degree.”

50. In addition, California Business and Professions Code § 6450(c)-(d) imposes certain requirements on paralegals that are not required of legal assistants. Therefore, paralegal rates do not seem to be applicable for legal assistants. However, as noted above, I recommend that his fees be disallowed in their entirety as non-recoverable clerical and administrative work.

51. **Darci Gilbert.** Ms. Gilbert is a litigation assistant and seeks an hourly rate of $250 which she was recently awarded in July 29, 2026. (ECF 268, Attachment 20, Gilbert Decl., ¶¶ 1, 7.) However, as noted above, I recommend that her fees be disallowed in their entirety as non-recoverable clerical and administrative work.

52. **Steve A. Lerman.** Mr. Lerman states that he has practiced law in the City of Los Angeles for over fifty years and requests an hourly rate of $900. (ECF 268, Attachment 22, S. Lerman Decl., ¶¶ 2, 6.) Despite his lengthy legal career, Mr. Lerman does not provide any citation to authority or prior fee awards

53. **Nicholas M. Lerman.** Mr. Lerman states that he has practiced law in the City of Los Angeles for the past 12 years and requests an hourly rate of $600. (ECF 268, Attachment 24, N. Lerman Decl., ¶¶ 3, 7.) Mr. Lerman does not provide any citation to authority or prior fee awards

54. **Gregory Peacock.** Mr. Peacock was admitted to California State Bar in 2011 and requests an hourly rate of $800. (ECF 268, Attachment 26, Peacock Decl., ¶¶ 3, 8, 12.) Mr. Peacock does not provide any citation to authority or prior fee awards

**B. The Declaration of Carol A. Sobel Does Not Provide Relevant Data.**

55. Plaintiffs' Counsel has submitted a declaration from Carol A. Sobel in support of a fee request "recently filed in another case." (ECF 268, Attachment 1, ¶ 34; Ex. 12 (Sobel Decl.))

56. Ms. Sobel states that she has attached fee awards and declarations in cases in the Los Angeles legal market to support her opinion on the reasonableness of the fees sought by this motion. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 28.) By "fees," I believe that she means the "rates" as she does not address the reasonableness or necessity of the tasks or hours billed in this case, only the rates.

57. While she does attach Los Angeles-area rates, most of them are in practice areas other than civil rights or excessive force. With all due respect to lemon law and debt collection lawyers, someone practicing in those areas of law for 37 years (the same length of time that Mr. Galipo has been a member of the bar) would be laughed out of court if they tried to compare themselves to Mr. Galipo and claimed $1,500 per hour as their reasonable rate. As legal technology company Clio states, "The types of legal services that lawyers provide will also affect how much they charge."[2]

58. The first case she references is a declaration from an attorney in an anti-SLAPP lawsuit. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 36; Ex. 3.)

59. The second case she references is a patent case. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶¶ 37-38; Ex. 4.)

60. The third case she references involved alleged violations of the Americans with Disabilities Act, Constitutional violations, and several state claims.[3] Ms. Sobel has attached a copy of a contract between the City of Los

---

[2] https://www.clio.com/resources/legal-trends/compare-lawyer-rates/, last accessed Jul. 26, 2026.

[3] https://clearinghouse.net/case/43959/, last accessed Jul. 23, 2026.

Angeles and Gibson, Dunn & Crutcher, one of the largest firms in the country, to handle that case. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶¶ 40-44; Ex 5.)

61. The fourth case she references involved another anti-SLAPP motion in a defamation case.[4] (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 45; Ex 6.) The pertinent attorney whose rate she is referring to is another Gibson, Dunn associate. (*Id.*)

62. The fifth case she references is from another anti-SLAPP motion in an unfair competition law case. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 46; Ex. 7.)

63. The sixth case she references is a class action involving mass arrests and direct use of force by the Santa Monica Police Department in response to protests following the death of George Floyd. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 47; Ex. 8.)

64. Ms. Sobel also attaches a rate sheet for a class-action law firm. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 49; Ex. 10.) The Ninth Circuit has a benchmark percentage for attorneys' fee awards in class actions (25 percent of the settlement) and the hourly rate usually, but not always, only comes into play as a lodestar cross-check on the size of fee award. (See, e.g., *Fischel v. Equitable Life Assurance Soc'y* (9th Cir. 2002) 307 F. 3d 997, 1006.) Similar percentage calculations for attorneys' fees are typical in class actions in other Federal Courts[5].

65. In 2016, the California Supreme Court joined "the overwhelming majority of federal and state courts" in permitting the use of a percentage of a class action common fund to determine a reasonable attorneys' fee. (*Lafitte v. Robert*

---

[4] https://globalfreedomofexpression.columbia.edu/cases/herring-networks-v-maddow/, last accessed Jul. 23, 2026.

[5] See https://www.daeryunlaw.com/us/insights/class-action-lawyers-nyc-on-class-action; https://legalclarity.org/class-action-attorney-fees-awards-and-settlement-deductions/; https://legalwritingexperts.com/attorney-fees-in-class-action-suits/. (All sites last visited Jul. 16, 2026.)

*Half Int'l., Inc.* (2016) 1 Cal. 5th 480, 503.) When using this method, the lodestar is simply used as a cross-check on the reasonableness of the fee award. (*Id.*, at p. 506.)

66. If the lodestar cross-check comes within reasonable reach of the requested award in a class action (and sometimes even if it doesn't) the attorneys' fee award is typically unopposed and is approved. In rare instances, courts do adjust hourly rates in a class action, but this is not typical. Furthermore, class actions involve multiple plaintiffs typically against one or more large entities, entailing a different type of litigation than was encountered here. Therefore, fee awards in class actions are uninstructive and offer little to no relevant probative information for appropriate rates in the type of case at bar.

67. The same analysis applies to Ms. Sobel's reference to a case in ¶ 49 of her declaration (ECF 268, Attachment 1, Ex. 12.) That was a class action in which fees were awarded based on 30 percent of the common fund. The lodestar was simply used as a cross-check on the size of the award.

68. The seventh and eighth cases that Ms. Sobel references relate to fee motions involving employment matters under the Labor Code against the United Parcel Service and Catholic Church, respectively. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ ¶ 50-51; Ex. 11-12.)

69. Ms. Sobel also refers to the 2025 Real Rate Report. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶¶ 52-.54.) However, earlier in her declaration, she stated the following:

> When the specific rate evidence identified in the preceding paragraph is available, I usually do not rely on surveys because, in my opinion, they do not meet the standards for the lodestar analysis. In my experience, fee surveys report market rates in sweeping categories with no identification of the comparable skill, experience and reputation of the individual attorneys included in the survey and often no indication of the relevant legal market. *See, e.g., Shirrod v. Director, Office of Workers' Compensation Programs*, 809 F.3d 1082, 1089 (9th Cir. 2015) (reversing where the lower court relied on a national survey rather than local rates).

(ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 25.)

70. In one place in her declaration she states that in her opinion, "rate surveys do not meet the standards for the lodestar analysis." Then later in the same declaration, she approvingly cites to one such rate survey and says "The Real Rate Report for Los Angeles supports the reasonableness of the rates sought." (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 52.) In my opinion, this is an inconsistency in methodology.

71. I also note that Ms. Sobel states that the 2025 Real Rate Report identifies the third-quartile rate for partners in Los Angeles is $1,334 an hour, while the third-quartile rate for an attorney in Los Angeles with seven or more years of experience was $1,065 an hour. (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶ 53; Ex. 13.) This piece of data will become important below.

72. In addition, the cases she cites are based on her opinion as to what constitutes "similarly complex litigation" with no supporting information as to how she makes that determination (ECF 268, Attachment 1, Ex. 12 (Sobel Decl.), ¶¶ 24, 28.)

**C. Reference Rates and Recommended Rates.**

73. The fee applicant must "produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." (*Dang v. Cross* (9th Cir. 2005) 422 F.3d 800, 814.)

74. In my opinion, Plaintiffs' Counsel has not submitted evidence that would support the reasonableness of the hourly rates sought.

75. It is my opinion that Plaintiff's attorneys have not *demonstrated* the rates being sought in this matter are reasonable and appropriate market rates based on the cases and prior fee awards they seek.

76. **Mr. Galipo.** Based on Mr. Galipo's very recent fee awards where he was awarded $1,400 per hour on July 29, 2026 and August 18, 2026, I recommend that Mr. Galipo's requested rate of $1,500 similarly be reduced to $1,400 in this matter. (ECF 268, Attachment 1, Galipo Decl., ¶¶ 28-29; Exs. 13-14, respectively.)

77. **Steve A. Lerman.** While Mr. Lerman does not provide any authority or information related to prior fee awards, based on Mr. Lerman's 53 years of experience as a 1973 admittee to the State Bar, I recommend that he be awarded his requested hourly rate of $900. (ECF 268, Attachment 22, Ex. 12 (S. Lerman Decl.), ¶¶ 2, 6.)

78. **The Other Attorneys' Requested Rates.** Nicholas Lerman was admitted to the State Bar of California in 2013 and requests an hourly rate of $600. (ECF 268, Attachment 24 (N. Lerman Decl.), ¶¶ 3, 7.) Cooper Alison-Mayne was admitted to the State Bar of California in March 2022 and requests an hourly rate of $700. (ECF 268, Attachment 16 (Alison-Mayne Decl.), ¶¶ 5, 11.) Gregory Peacock was admitted to California State Bar in 2011 and requests an hourly rate of $800. (ECF 268, Attachment 26 (Peacock Decl.), ¶¶ 3, 8, 12.)

79. It is my opinion that Mr. Alison-Mayne's requested rate of $700 is entirely unreasonable considering the experience and requested rates from the other attorneys in this matter. There does not appear to be any rhyme or reason to Nicholas Lerman, as the managing partner at Steven A. Lerman & Associates, Inc. and with 13 years of experience seeking an hourly rate of $600, while Mr. Alison-Mayne has 4 years of experience and is seeking a rate of $700. This is all the more glaring when compared to Steve Lerman's requested hourly rate of $900 based on 53 years of experience.

80. Further, the purportedly comparable rates cited in the Fee Motion in support of Mr. Alison-Mayne's requested rate relate to an "8-year associate" awarded $750/hour, "$800 to $850 per hour for attorneys in a single-plaintiff civil rights case" with an unknown level of experience, and the vague "awarding associates at the Law Offices of Dale K. Galipo $800 per hour in 2024", again, with an unknown level of experience. These "reference" rates simply do not serve as comparable groups for Mr. Alison-Mayne with only 4 years of experience. (ECF 268, page 26, lines 3-16.).

81. Based on my experience as an attorney's fees expert since 1994 including familiarity with hourly rates awarded in the Central District, including Mr. Galipo's recent awards of $1,400/hour, and Steve Lerman's requested hourly rate of $900, as well as Mr. Alison-Mayne's failure to provide relevant comparable data for attorneys of comparable skill and experience, I recommend that Mr. Alison-Mayne's hourly rate be reduced to $350, with comparable recommended rates reductions with Nicholas Lerman's rate reduced to $475 and Mr. Peacock's hourly rate reduced to $525 based on their respective years of experience.

82. The table below reflects the hourly rate adjustments for each timekeeper based on the recommended hourly rates. As discussed above, I do not have recommended rates for Mr. Laurel and Ms. Gilbert as the work they performed is overwhelming non-recoverable clerical work which I recommend be disallowed in their entirety:

| **Tmkpr** | **Admit Year (Years)** | **Req. Rate** | **Hours** | **Req. Fees** | **Adj. Rate** | **Adjusted Fees** | **Fee Diff.** |
|---|---|---|---|---|---|---|---|
| Dale Galipo | 1989 (37) | $1,500 | 656.2 | $984,300 | $1,400 | $918,680 | -$65,620 |
| Cooper Alison-Mayne | 2022 (4) | $700 | 610 | $427,000 | $350 | $213,500 | -$213,500 |
| Gregory Peacock | 2011 (15) | $800 | 208 | $166,400 | $525 | $109,200 | -$57,200 |
| Steven Lerman | 1973 (53) | $900 | 17.6 | $15,840 | $900 | $15,840 | $0 |
| Nichols Lerman | 2013 (13) | $600 | 211.1 | $126,660 | $475 | $100,273 | -$26,388 |
| | | | **1,702.90** | **$1,720,200** | | **$1,357,493** | **-$362,708** |

**Recommended Disallowance:**
**Net Fees: $1,720,200**
**Hourly Rate Reduction: - $362,708**
**Net Fees: $1,357,492**

## III. EXCESSIVE INTRA-OFFICE CONFERENCING

83. Although attorneys and staff within a firm need to coordinate work and discuss strategy, when done to excess, such intra-office conferencing becomes troubling. Especially where law firms claim expertise and experience in a given area of law, the need for such conferencing should be minimal. Here, the lead Plaintiffs' firm claims a great amount of experience with the type of claim involved in this case as well as experience with trials.

84. To quantify the extent of intra-office conferencing in Plaintiffs' attorneys' billing records, I conducted word searches for words pertaining to conferencing such as "meet with," "discuss," "call," "correspond," or "team." I also searched in the task descriptions for the names or initials of the timekeepers who billed to this matter for entries that would indicate communications with those personnel. All intra-office conferencing entries I identified are included in the table attached as **Exhibit 7** totaling 127.10 hours and $63,921.25 in fees at adjusted hourly rates. While all of the entries in Exhibit 7 contain intra-office conferencing, some of the entries contain blocked billed descriptions which make it impossible for an auditor to discern the exact amount of conferencing billed in such entries.

85. Conferencing is not necessarily directly related to any particular work product and consists of exactly what it says – attorneys and staff discussing the case amongst themselves, giving or receiving assignments, and other such communications. In my experience, excessive conferencing is typically subject to disallowance by courts. Some strategic conferencing among attorneys does have value, but not when done to excess.

86. In *Munoz v. California Business Bureau, Inc.* (E.D. Cal., July 14, 2017) Case No. 1:15-cv-1345-BAM, 2017 U.S. Dist. LEXIS 212842, the court examined the issue of intra-office conferencing in the context of evaluating a fee request. A true and correct copy of this opinion is attached as **Exhibit 8**. The court reasoned as follows:

> With regard to the time and labor required, the Court has reviewed the billing records submitted by Plaintiff's counsel and finds that, with two exceptions, the number of hours expended to be reasonable. First, a review of counsels' billing records reveals that counsel billed over 10 attorney hours for interoffice conversations between all three attorneys to discuss case status or strategy. While it is reasonable to spend some time coordinating legal resources, it is not reasonable to double or triple-bill a client for internal meetings, many of which appear to be for partner, Mr. Hyde, to provide instructions to his junior associates, Mr. Connolly and Ms. Dorman. *See Gauchat-Hargis v. Forest River, Inc.*, No. 2:11-cv-02737-KJM-EFB, 2013 U.S. Dist. LEXIS 128508, 2013 WL 4828594, (E.D. Ca l. Sep. 6, 2013) (finding it unreasonable for partners and associates to collectively "triple-bill" a client for attending internal meetings).
>
> For example, on June 16, 2016, Mr. Connolly and Ms. Dorman each billed .4 hours to "speak with Robert Hyde" about "opposing counsel's summary judgment letter." (Doc. 29-8, Exh. A at 4). Mr. Hyde billed a slightly longer .6 hours for that same meeting ostensibly in preparation to provide Mr. Connolly and Ms. Dorman further instruction at the meeting. Given the triple-billing here for these kinds of internal communications, the Court agrees with Defendant that such charges are excessive. *See Chalmers,* 796 F.2d at 1211 (The court may reduce those hours where a case is overstaffed and hours are duplicated and where the hours expended are deemed to be excessive). Thus, while the billing of 3.3 hours to conduct strategy meetings by Mr. Hyde was reasonable, the additional duplicative billing to attend those meetings was not. Accordingly, the Court will deduct the 3.3 hours each spent by Ms. Dorman and Mr. Connolly to attend meetings with co-counsel for a total reduction of 6.6 hours.

(*12-13.)

87. The court thus allowed the time for one timekeeper to be involved in a meeting, but disallowed the time billed by other timekeepers for that same meeting. The same analysis can apply in cases in which one timekeeper bills to draft and send an email or memo and another timekeeper bills to receive and review that communication.

88. In *Scott v. Jayco, Inc.* (E.D. Cal. Dec. 18, 2021) 1:19-cv-0315 JLT, at *7-8, the court said:

> As this Court previously observed, "many courts ... reduced fee awards for time spent in 'interoffice conferences' or other internal communications." *Gauchat-Hargis v. Forest River, Inc*., 2013 WL 4828594 at *3 (E.D. Cal. Sept. 9, 2013) citing, *e.g., Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1194 (S.D. Cal. 2003); *see also United States v. One 2008 Toyota Rav 4 Sports Util. Vehicle,* 2012 WL 5272281 at *9 (C.D. Cal. Oct. 18, 2012) ("[w]hen attorneys hold a telephone or personal conference, good 'billing judgment' mandates that only one attorney should bill that conference

> to the client, not both attorneys" [citation omitted]); *Coles v. City of Oakland*, 2007 WL 39304, at *10 (N.D. Cal. Jan. 4, 2007) (observing that billing for communications between attorneys may be a sign of overstaffing, warranting a reduction in hours billed).

A true and correct copy of this order is attached as **Exhibit 9**.

89. In *Lemmons v. Ace Hardware Corp.* (N.D. Cal. Feb. 1, 2015) Case No. 12-cv-03936-JST, the court reduced fees due to excessive and vague conferencing.

> The Court knows that co-counsel sometimes need to strategize. But lawyers who are experts in the field of disability litigation, working at a small firm that exclusively handles that kind of work, should not need to bill 259 separate entries for strategizing. "The Ninth Circuit has approved of reductions in fees for unnecessary and duplicative intra-office conferences," and other courts in this District have "previously been critical of excessive conferencing by Rein Law." *Hernandez*, 2014 WL 1724356 at *10. Compounding these concerns is that some entries lack any specificity, such as "Meet w/ co-co re: pending issues" or "Strategize w/ staff re current case issues," which make such review more difficult and cause the Court some concern. ECF No. 130-8 at 3, 5.

> Because the Court finds that Defendants' criticisms of the excessive nature of Plaintiff's counsel's billing for internal meetings are valid, it will exercise its discretion to reduce the $39,048.00 that Defendants characterize as having been billed for time spent on internal meetings by 50%, awarding $19,524.00 for these entries.

(*4.) A true and correct copy of this opinion is attached as **Exhibit 10**.

90. Plaintiff's attorneys state their credentials, experience, and expertise. However, given their credentials, experience, and expertise in this area of law, they have not explained the need for so much conferencing.

91. Over the past 30+ years, I have audited major national and international law firms and, in general, I have found that the amount of intra-office conferencing in well-managed litigation averages between two to four percent of the total fees. The conferencing here by Plaintiffs' Counsel is not within this reasonable amount. Plaintiffs' Counsel billed 127.10 hours and $63,921.25 in fees (at adjusted hourly rates) for conferencing which is 7% of 1,815.25 total hours and 4.71% of total net fees of $1,357,492 at adjusted hourly rates after the disallowance of hours and fees for Plaintiffs' litigation assistants for clerical work.

92. Based upon the above analysis, it is my opinion that the intra-office conferencing billing entries that are greater than $54,299.72 or 4.0 percent of the total net fees after the above disallowances should be disallowed which amounts to a recommended disallowance of **$9,621.53.**

**Recommended Disallowance:**
**Net Fees: $1,357,492**
**Conferencing Disallowance: - $9,621.53**
**Net Fees: $1,347,870.47**

## IV. VAGUE BILLING FOR TRIAL PREPARATION AND LONG DAYS

93. Mr. Galipo used vague task descriptions for reviewing case documents and trial preparation, as indicated in the following entries (in alphabetical order):

| Date | Description | Hours |
|---|---|---|
| 7/21/2023 | Review case materials | 4.2 |
| 7/22/2023 | Review case materials | 3.8 |
| 7/29/2023 | Review case materials | 3.5 |
| 8/1/2023 | Review case materials | 2.7 |
| 8/2/2023 | Review case materials | 3.3 |
| 9/15/2023 | Review expert reports – Case Materials | 2.1 |
| 9/16/2023 | Review expert reports – Case Materials | 1.4 |
| 9/17/2023 | Review expert reports – Case Materials | 3.3 |
| 9/23/2023 | Review expert reports – Case Materials | 2.7 |
| 9/24/2023 | Review expert reports – Case Materials | 2 |
| 7/12/2025 | Review expert reports – related case materials | 4.7 |
| 7/14/2025 | Review video | 0.8 |
| 9/9/2025 | Trial - Trial preparation * | 16.5 |
| 9/10/2025 | Trial – Trial preparation * | 16 |
| 9/11/2025 | Trial – Trial preparation * | 15.8 |
| 9/12/2025 | Trial – Trial preparation * | 16.2 |
| 9/15/2025 | Trial – Trial preparation * | 15.9 |
| 9/16/2025 | Trial – Trial preparation * | 16.1 |
| 9/17/2025 | Trial – Trial Preparation * | 14 |

| | | |
|---|---|---|
| 9/13/2025 | Trial preparation * | 13 |
| 9/14/2025 | Trial preparation * | 13.2 |
| 9/3/2025 | Trial preparation * (Dr. Clark – Dr. Vilke – Norem - McKee) | 14.1 |
| 9/1/2025 | Trial preparation * (Dr. Hunt - Dr. Clark - Dr. Graham - Norem) | 12.7 |
| 8/31/2025 | Trial preparation * (Matt Borden - Eric Leighton - Dennis Stout) | 13.5 |
| 9/2/2025 | Trial preparation * (McKee) | 3.3 |
| 9/4/2025 | Trial preparation * (opening, Noble – Dr. Omalu – Dr. Wohlgelernter) | 12.9 |
| 9/5/2025 | Trial preparation * (opening/closing, Dane Norem and Jeffrey McKee) - Experts | 11.7 |
| 9/6/2025 | Trial preparation * (opening/closing, Dane Norem and Jeffrey McKee) – Experts | 12.3 |
| 8/30/2025 | Trial preparation *(opening statement - Dane Norem – Jeffrey McKee Examination) | 12.5 |
| 9/8/2025 | Trial preparation *(opening, witnesses and expert examinations) | 14.7 |
| 9/7/2025 | Trial preparation *(opening, witnesses, experts, examinations ) | 13.3 |

94. At the end of his billing entries, the following "explanation" is provided:

> *Trial Preparation includes review of investigation reports, officer statements, witness statements, expert reports, deposition transcripts, exhibits, photos of scene, dispatch tape, motions in limine, witness list, exhibit list, jury instructions, verdict form, outlining examination of defendants' and officers, outlining examination of witnesses, outlining examination of plaintiff, outlining examination of experts, preparing voir dire, preparing opening statement, and preparing for direct and cross examinations and closing arguments.

(ECF 268, Attachment 2, (Galip Decl.), Ex 1, page 6.)

95. In other words, trial preparation means everything and anything that could conceivably go into the "trial preparation" bucket.

96. All vague billing for trial preparation entries I identified are included in **Exhibit 11** totaling **291.40** hours and **$407,960.00** fees at adjusted hourly rates.

97. I am not questioning whether or not the work listed in the exhibit was done. However, in general, the billing records ought to provide: "…sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." *United Slate, Tile & Composition v. G&M Roofing* (6th Cir. 1984) 732 F.2d 495, 502 n.2.

98. The California State Bar issued Arbitration Advisory 2016-02 on March 25, 2016. It is titled "Analysis of Potential Bill Padding and Other Billing Issues."

> Furthermore, generalized time entries such as "research issues", "review file", "attention to file", "discovery", "prepare for trial", "trial prep", and other similar general statements are not specific enough to let the client know what was done. If a lawyer uses such nonspecific task descriptions, it may be appropriate for the arbitrator to place on the lawyer the burden of clarifying what was actually done to assess whether the generalized time entries are actually compensable and appropriate.

Arbitration Advisory 2016-02, ¶ 5. A true and correct copy of this document is attached as **Exhibit 12**.

99. It is the obligation of the moving party to "submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." (*Hensley, supra*, 461 U.S. at p. 433). Billing records must at least identify the general subject matter of time expenditures so as to enable the reviewing court to determine whether the time spent is related to a prevailing claim. *Id.* 461 U.S. at 437, fn 12. If plaintiff's counsel fails to do so, the Court may be justified in "throwing up its hands and refusing to award any fees whatsoever." (*Norris v. Sysco Corp.* (9th Cir. 1999) 191 F.3d 1043, 1052.) In the motion at hand, premised upon billing records that include vague entries, it is my opinion that there are sufficient grounds to disallow an appropriate portion of the vague fees claimed on account of inadequate documentation of hours billed.

100. In *In re Samuel R. Pierce, Jr.* (D.C. Cir. 1999) 190 F.3d 586, 593-594, the D.C. Circuit confirmed that its general practice was to reduce vaguely entered hours of plaintiffs' attorneys by 10 percent. Similarly, the Eighth Circuit in *H.J. Inc. v. Flygt Corp.* (8th Cir. 1991) 925 F.2d 257, 260 upheld a district court's reduction of hours billed by the prevailing petitioner's attorneys by 20 percent for vague billing entries. Finally, in *Gratz v. Bollinger* (E.D. Mich. 2005) 353 F.Supp.2d 929, 939, District Judge Duggan reduced requested fees 10 percent due to block billing and vague entries.

101. Mr. Galipo's vague entries are also combined with what appear to be excessively long days consisting of 18 entries between 11.7 to 16.5 hours each for "trial preparation". Based on the vagueness of Mr. Galipo's entries, as well as potentially excessively long days, I recommend that a 20% disallowance of the entries totaling $407,960.00 at adjusted hourly rates in Exhibit 11 which amounts to **$81,592.00**.

**Recommended Disallowance:**
**Net Fees: $1,347,870.47**
**Vague Billing Disallowance: - $81,592.00**
**Net Fees: $1,266,278.47**

## SUMMARY OF FINDINGS

102. As discussed above, there are several billing issues presented when examining Plaintiffs' Counsel's fee entries. Below is a summary of the recommended disallowances:

| | |
|---|---|
| **Requested Lodestar** | **$1,748,287.50** |
| Clerical Entries | -$28,087.50 |
| Hourly Rate Adjustment | -$362,708 |
| Excessive Intra-Office Conferencing | -$9,621.53 |
| Vague Billing for Trial Preparation and Long Days | - $81,592.00 |
| | |
| **Total Disallowed** | **-$482,009.03** |
| **Total Allowed** | **$1,266,278.47** |

103. In my opinion, the total fees that should be awarded to Plaintiffs' Counsel is **$1,266,278.47.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 6th day of October 2026 at Sonoma, California.

James P. Schratz

# EXHIBIT 1

1. In March 1978, I left Heller, Ehrman, White & McAuliffe and joined a smaller firm until August 1980, when I joined Fireman's Fund Insurance Company in San Francisco, California, in its General Counsel's Office. My responsibilities included representing Fireman's Fund as attorney of record in various litigation matters throughout the country. In addition, I supervised outside counsel throughout the country on various types of cases, including many complex civil litigation cases and many employment cases.

2. In 1984, I left the General Counsel's Office and transferred to the Claims Department where I established the Major Litigation Unit, which was responsible for managing complex litigation throughout the country, including the $65 million bankruptcy of The Woodson Company. In this role, I was responsible for approximately 1,000 cases and a staff of ten people. I also became very familiar with the rates charged not only by Fireman's Fund "panel counsel," but also rates charged by solo practitioners and small, medium, and large law firms throughout the United States.

3. In July 1990, I was promoted to Vice President Major Claims, where my duties were expanded to include responsibility for any case throughout the world that had potential exposure of $3 million or more, and responsibility for supervising approximately 100 adjusters. Again, I continued my involvement in supervising cases throughout the United States and stayed abreast of what solo practitioners and small, medium, and large law firms charged their respective clients.

4. On January 1, 1994, I left Fireman's Fund to establish my own litigation management and consulting firm. I am the principal of Jim Schratz and Associates, a firm that conducts legal fee audits of various law firms throughout the country. Over the past thirty-one years, I have personally supervised or conducted approximately 4,000 legal fee audits throughout the country on behalf of both clients and law firms, including governmental agencies, insurance companies, corporations, and private individuals. Approximately 500 to 1,000 audits have been in Southern California with most of them having been in Los Angeles and I have qualified as an expert witness on attorneys' fees in Los Angeles County Superior Court.

5. Many of these audits have involved plaintiff's fee requests in fee-shifting cases. In that role, I have performed legal fee audits of various law firms on behalf of the California Department of Justice, the City and County of San Francisco, the City of Huntington Beach, the Sonoma County Sheriff's Office, the State of Wisconsin, United Airlines, and Avis Rent-A-Car, among others. The amount of the fee requests audited ranges from a low of a few hundred thousand dollars to approximately $60 million.

6. In 1999, I was appointed by the District Court for the Northern Mariana Islands to audit approximately $22 million in legal fees in *In re the Estate of Larry Lee Hillblom*, one of the founders of DHL Express, whose estate was valued at approximately $1 billion. I was also retained by the United States Department of Justice to conduct an audit of a fee request in a nationwide class action lawsuit against the Immigration and Naturalization Service. I have served as an arbitrator for the Sonoma County Bar Association and the State Bar of California in their mandatory fee arbitration programs.

7. In January 2010, I was retained by investor Carl Icahn to serve as special litigation counsel to review approximately $60 million in legal fees in *In re Tropicana Entertainment, LLC, et al*, Case No. 08-10856 (KJC) in the United States Bankruptcy Court for the District of Delaware.

8. In February 2010, in *Department of Fair Employment and Housing v. United Dominion Realty* (Case Nos. 07CC12067, 02CC12069), the court accepted our audit findings stating:

> In awarding fees in these amounts, the court has fully accepted the declaration of James P. Schratz in opposition to the motion, including all of his recommended reductions. The court finds his qualifications to be impressive. Likewise, his reasoning as to why the fees sought are excessive is persuasive.

9. In April 2010, I was again retained by Mr. Icahn to serve as special litigation counsel to review an additional $6 million in legal fees in *In re Adamar of New Jersey, Inc. and Manchester Mall, Inc.*, Case No. 09-20711 and 09-20716 in the United States Bankruptcy Court for the District of New Jersey.

10. I have qualified as an expert witness in numerous state courts, including San Francisco County Superior Court, Alameda County Superior Court, Sacramento County Superior Court, Los Angeles County Superior Court, Orange County Superior Court, and Sonoma County Superior Court, District Court in Corpus Christi, Texas, and Seattle Washington, and in Federal District Court in California, Pennsylvania, Michigan, and Oklahoma.

11. In the case of *Madrid v. Gomez*, No. C-90-3094, United States District Court for the Northern District of California, I was retained by the California Department of Justice to audit a fee request of $8.3 million in connection with a prisoners' civil rights case at Pelican Bay State Prison. The audit disclosed a number of billing concerns and the audit report was submitted to Judge King, the settlement judge. The case resulted in a negotiated settlement of $4.25 million, or a reduction of approximately 50 percent. A copy of an article from *The Recorder* dated September 26, 1995, describing the settlement is attached as **Exhibit 1-1**.

12. In *Rios v. Rowland*, No. 330211, Superior Court of California, County of Sacramento, I was retained to audit a fee request of $1.5 million. The audit disallowed a significant amount of the fees requested. The court upheld the audit results and reduced the fee request to approximately $227,000.

13. In *CVB Corporation v. John Cavallucci*, No. 156505, Superior Court of California, County of Marin, I was retained to audit a fee request of approximately $2 million pursuant to a contractual provision. The audit uncovered a number of billing abuses and the court disallowed approximately 50 percent of the fee request.

14. In *Aguilar v. Avis Rent-A-Car System*, No. 948597, Superior Court of California, County of San Francisco, I was retained to audit a fee request of approximately $1.3 million. The audit disclosed a number of problem areas and disallowed a significant amount. The court followed the audit findings and reduced the request by approximately 50 percent, to $650,000.

15. In *McCauley v. BFC Direct Mailing*, No. 5711562, Superior Court of California, County of Orange, the plaintiff alleged violations of campaign election laws and sought attorneys' fees of $1.1 million. The defendant, Howard Jarvis Tax Reform Movement, hired this office to conduct a legal fee audit, and we disallowed approximately 50 percent of the fees. The court followed the audit findings and awarded approximately $525,000 of the $1.1 million requested.

16. In *Florida Asset Financing Corp. v. Borton, Petrini & Conron*, United States District Court, Central District of California, Southern Division (Santa Ana), Case No. 8:96 cv 01144 AHS-MLG, we were retained by a private client to audit a fee request of $600,000. Based on the audit report, the court awarded $80,000.

17. I conducted an audit of plaintiff's motion for attorneys' fees in *Adam v. Norton,* Northern District of California, Case No. C-98-2094 CW, a case in which plaintiff sought total fees in the sum of $1,726,312.92. The Special Master appointed by Judge Claudia Wilken to adjudicate the fee petition cited my declaration and recommended a total award of only $434,581.95 in attorneys' fees, less than 25 percent of the amount originally sought. The Special Master stated, "I believe Mr. Schratz' expert testimony meets the standard. Schratz's testimony is relevant, in that Schratz has provided a useful breakdown of the time spent by plaintiff's attorneys, and reliable, in that Schratz has accurately summarized the time and expenses claimed by plaintiff's attorneys." It must be stated the Special Master did not follow all of the audit recommendations. However, the Special Master did recommend reducing the fee request by approximately 75 percent, from $1,726,312.92 to $434,581.95, a result that Judge Claudia Wilken adopted in toto in July 2005.

18. In January 2004, in *Frieders v. City of Glendale*, No. BC263271, Los Angeles County Superior Court Judge David A. Workman adopted our findings with respect to an audit of plaintiff's fee request. As a result, plaintiff's request of $4.1 million in fees was reduced to $1.1 million. The court specifically referred to our audit and reduced the fee request by approximately 75 percent. A copy of that order is attached as **Exhibit 1-2**.

19. In August 2005, in *Rose v. Lancaster School District,* No. BC 303843, Superior Court of California, County of Los Angeles, the court adopted the methodology, analysis, and recommendations contained in our audit, and reduced plaintiff's request for fees by 58 percent from $498,000 to $209,000.

20. In *North Pacifica, LLC v. City of Pacifica*, United States District Court, Northern District of California, Case No. C-01-4823 EMC, plaintiff sought damages at trial of approximately $16 million. I was retained by the defendant to audit plaintiff's request for $2,046,759.16 in fees and costs. In awarding plaintiffs only $453,810.75 in fees, Magistrate Judge Edward M. Chen cited my audit with approval with respect to various billing issues. A copy of the order dated December 16, 2005 is attached as **Exhibit 1-3**, and states, in pertinent part:

> [B]ased on the information provided in the declaration, Mr. Schratz has demonstrated that he is qualified to opine about fee awards and that his methodology in evaluating the billing records of NP's attorneys in this case is reasonable and sufficiently reliable. For example, Mr. Schratz's approach to categorizing the nature of the work of the attorneys is reasonable and sufficiently reliable as is, overall, his approach to unblocking the block-billed time entries.

21. In *Poland v. L.A. Boxing*, Orange County Superior Court, Case No. 30-2009 0121184, plaintiff filed a lawsuit alleging eight causes of action against the defendants. Based upon their expert's testimony at trial, plaintiff had suffered $4,959,023 to $6,423,566 in damages. The jury found in favor of the plaintiff on two causes of action and on the statutory failure to pay owed wages claim awarded $2,800. This was the only cause of action on which they were successful that contained a statutory attorneys' fee provision. Plaintiff's counsel submitted a motion for attorneys' fees. They submitted bills totaling $709,242.50 and initially sought a 1/6 allocation (because two causes of action had been dismissed just prior to trial), or $118,207.08 in fees. I was retained by the defendant to audit plaintiff's request. Based upon deficiencies in the billing records such as block billing, redactions, excessive time to create deposition summaries, and excessive internal conferencing, and allocation issues, I

recommended that plaintiff's counsel only be awarded fees in the range of $25,000 to $30,000. In a subsequent supplemental declaration, plaintiff increased the amount of attorneys' fees sought to approximately $350,000. In July 2011, the Court found that plaintiff should only be awarded $30,000 – which is the amount that I had recommended.

22. In *Shiow Huey-Chang v. County of Santa Clara, et al.*, Santa Clara County Superior Court, Case No. 5:15-cv-02502-RMW, plaintiff filed a lawsuit alleging excessive force by police. Plaintiff prevailed at jury trial and was awarded $40,000.00, although certain parts of the verdict were overturned by a defense post-trial motion for judgment as a matter of law. Plaintiff was deemed the prevailing party for purposes of attorneys' fees, and defendants did not dispute that finding for purposes of the fee motion. Plaintiff sought $970,063.74 in attorneys' fees and costs. I was retained by the defendant to audit plaintiff's request. I recommended that the billing rates being requested be reduced and that fees related to excessive staffing and time billed for certain aspects of the case be adjusted. I recommended that the fee request should be reduced to $236,860.38 plus costs of $27,575.72 for a total of $264,436.10. The court's reasoning and deductions tracked many of those set forth in my declaration and it ruled that plaintiff's fee award, including costs, should be reduced to $350,000.00.

23. In *Carroll v. State of California, et al.,* Sacramento County Superior Court Case No. 34-2012-00135527-CU-OE-GDS, plaintiff was dismissed from her employment as a Staff Attorney with the California Commission on Teacher Credentialing. She filed suit alleging the termination was a wrongful retaliation for whistleblowing. Plaintiff prevailed at trial and sought attorneys' fees of $1,542,397.75, plus a 2.0 multiplier for a total of $3,084,795.50. I recommended that the billing rates being requested be reduced and that fees related to transient billers, unsuccessful claims, clerical billing, and duplicative billing be adjusted. I recommended that the fee request should be reduced to $323,720.37. The court awarded $638,484 or approximately 21 percent of the fees requested after reducing the requested billing rates, reducing the time billed for certain tasks, and reducing the requested multiplier.

24. In *Violante v. Jayco, Inc.,* Los Angeles Superior Court Case No. 21AVC00911, plaintiffs brought suit under the Song-Beverly Act seeking damages for breach of express and implied warranties arising out of their purchase of a 2017 Jayco motorhome. The parties settled the matter but left the issue of attorneys' fees for the court. Plaintiffs' attorney claimed $140,342.00 as their reasonable fees based upon 11 generalized categories of work without submitting any billing records, let alone detailed billing records. Plaintiffs' attorney also requested a 0.50 multiplier. It was my opinion that the Song-Beverly Act was unique in explicitly requiring any award of fees to be tied to "actual time expended" and that generalized categories of work did not meet that requirement. I also identified block billing and billing for an unsuccessful appeal that mostly mirrored arguments made at the trial court level. Based upon my analysis, I recommended that no more than $41,860 be awarded as fees with no multiplier. This is precisely what the court awarded.

25. In *Ashley Howell v. Department of State Hospitals for the State of California,* Napa County Superior Court Case No. 20CV000794, plaintiff asserted five causes of action against defendant claiming, among other issues, discrimination and wrongful termination. Plaintiff prevailed on a single cause of action before the jury and was awarded $28,941 in damages. Plaintiff's attorneys sought fees of $1,745,450. I reviewed the fee request and found that Plaintiff's attorneys had not provided detailed billing records but only broad, general categories of work; were requesting rates that were not reasonable; the fees requested were inconsistent with the representations they made at the Mandatory Settlement Conference earlier

in the year; claimed an apparently excessive number of hours for trial preparation; and that their request for a multiplier was not supported. In ruling on the fee motion, although the court did not directly reference my report, it reduced the lead plaintiff's attorney's rate to the rate I had recommended. The court also noted the discrepant representations of plaintiff's attorney's fees and found that a multiplier was not warranted. I had recommended that plaintiff's attorneys should be awarded no more than $395,460 in fees. The court awarded $135,102.

26. In *Johnson v. City of San Jose*, USDC ND Cal. Case No. 5:21-cv-01849-BLF, plaintiff took part in a protest in the City of San Jose following the death of George Floyd. At the protest, plaintiff was struck by a police projectile, leading to his filing of a lawsuit against the police officer who shot the projectile and against the City. The jury found for plaintiff against only the officer. Thereafter, plaintiff's attorneys moved for attorneys' fees of $3,041,032.50 plus a 1.50 multiplier. I reviewed the fee request and among other issues found that the requested rates were unsupported and unreasonable. I also found and criticized a partner-heavy staffing model where more than half of the hours billed and two-thirds of the fees claimed were billed by partners. I further found excessive intra-office conferencing, with one timekeeper billing over half of their hours on conferencing and vague billing, including for trial preparation. Based upon my analysis, I opined that plaintiff's attorneys should receive no more than $2.10M in fees at requested rates and anywhere from $1.17M to $1.22M in fees at adjusted rates. In its August 15, 2025 order, the court found that some of the requested rates were justified but reduced other rates. The court agreed with me that the billing was "astonishingly partner heavy." The court also found that plaintiff's attorneys overbilled for trial preparation, including using vague task descriptions, allowing partner-level attorneys to bill approximately 75 hours in preparation for each hour of trial presentation. Based upon the court's adjustments and reductions, the lodestar was reduced to $1,884,867.25 and the court analyzed and rejected the request for a multiplier.

THE RECORDER

119TH YEAR No. 185 $1

BAY AREA LEGAL NEWSPAPER SINCE 1877

TUESDAY, SEPTEMBER 26, 1995

# *Wilson, Sonsini Audit Reveals Heavy Staffing*

### *34 lawyers, 146 staff billed on Pelican Bay - some for more than 24 hours in a day*

By HOWARD MINTZ

Wilson, Sonsini, Goodrich & Rosati may never have seen the state audit of its proposed fees for litigating the Pelican Bay State Prison case, but the thick document nevertheless had a profound influence on forcing the firm to settle for roughly half of its original fee demand.

The audit, believed to be a first for the California attorney general's office, produced the kind of ammunition the AG rarely has at its disposal in fee litigation. The audit found that Wilson, Sonsini -- lead plaintiff's counsel in a class action challenge to conditions at Pelican Bay -- submitted an $8.3 million fee request that was bloated with overstaffing and inefficiencies, including two instances of Wilson, Sonsini employees billing more than 24 hours in a day.

"I think the audit worked," said Deputy Attorney General William Jenkins, who hired **Santa Rosa legal consultant James Schratz** to examine the Palo Alto firm's voluminous billing records. "It provided us with significant evidence of inefficiency and overstaffing.

The attorney general's office and the plaintiffs' team in the Pelican Bay case recently negotiated a $4.25 million settlement of the fee issue, avoiding the need for litigation before Chief U.S. District Judge Thelton Henderson. In January, Henderson issued a 344-page ruling decrying conditions at Pelican Bay and appointing a special monitor to oversee improvements at California's toughest maximum security prison.

Wilson, Sonsini and San Quentin's Prison Law Office mounted what most view as a successful challenge to the prison's operation, punctuated by a three-month court trial last year before Henderson. Wilson, Sonsini and its fee counsel firm Rosen, Bien & Asaro call the fee settlement a fair compromise that avoids the usual bitter court battles which accompany a petition for fees.

According the portions of the audit shown to *The Recorder*, Wilson, Sonsini may have had trouble justifying some of its billing had the matter gone before Henderson. The audit reveals that the firm had 180 different people billing on the case during the four years of litigation, including 34 attorneys, 27 case assistants, 12 law clerks, 22 paralegals and 58 "temporary case assistants."

In addition, the audit shows that eight Wilson, Sonsini staffers billed more than 2,000 hours on the case; 12 billed between 1,000 and 2,000 hours; and 20 billed between 500 and 1,000 hours. The breakdown did not indicate which of these billers were lawyers as opposed to support staff. These numbers alone account for at least 38,000 hours of billing.

The AG's office, by comparison, had a similar number of lawyers on the case -- 35 -- but just two of them billed a lion's share of the hours, deputy AG's Peter Siggins and Susan Lee, who tried the case. They put in roughly 4,000 hours. The big difference came in support staff: Just three paralegals worked on the case for the AG, logging about 1,000 hours apiece.

During settlement negotiations, the attorney general's office also complained about Wilson, Sonsini's billing rates. The firm's partner rates ranged from $265 an hour to $360 an hour, and its associate rates were between $135 and $210. The Prison Law Office, incidentally, billed at partner rates of $280 to $295 an hour, and associate rates of $160 to $200. The audit focused on Wilson, Sonsini because it accounted for the bulk of the fees; it found no particular problems with the Prison Law Office's billings.

The audit did find problems with some of Wilson, Sonsini's "long days." In addition to the two instances of billing more than 24 hours in a day, State officials would not disclose other details, including the names of the billers.

"I don't know what the explanation is," Jenkins said. "It shouldn't appear on bills, no matter what the explanation."

The state has not released the audit to Wilson, Sonsini, in large part because the settlement has not been finalized by the state Legislature and it could still wind up as fodder in litigation. But Wilson, Sonsini has rejected the accusations of overstaffing, saying the firm never set out to litigate the complex, public interest case for profit.

On Monday, Wilson partner David Steuer repeated his contention that the firm felt understaffed during the litigation because of the scope of the claims against Pelican Bay. Plaintiffs cite the lengthy trial and Henderson's massive opinion as evidence of the complexity of the case.

As for the long days, Steuer said there was likely a mistake in a billing submission if more than 24 hours were sought for a day. Steuer added that it would not be a shock if a lawyer billed 20-some hours: He recalls lead partner Susan Creighton working through the night at times during the trial.

"We put on a better case," Steuer said. "The real reason [we put in more hours] is we had the burden and they didn't. We had to prepare the case. They had the ability to sit back and say, 'Prove it.'"

Rosen, Bien partner Michael Bien, who helped negotiate the settlement for Wilson, Sonsini, has also pointed out that the state audited raw billing records that were never pared down by the firm, as it would have before filing a fee petition with Henderson. And finally, Wilson, Sonsini notes that most of the fees are going into the firm's charitable foundation, which makes contributions to local groups.

The state, meanwhile, got a major return on its investment in the auditing process: The AG's office will wind up paying around $58,000 to a company that created a database of Wilson, Sonsini's billing records, and roughly another $12,000 to **Schratz**.

"We saved $4 million," Jenkins says. "That's a good investment. Without the audit, it would be very difficult for me to go in front of a judge and say, 'The right thing to do is cut this bill.'"

EXHIBIT 1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 01/30/04 | DEPT. 40 |
| HONORABLE David A. Workman JUDGE | R. MCGLOTHIN DEPUTY CLERK |
| HONORABLE JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| 10. J. COLLINS, C.A. Deputy Sheriff | NONE Reporter |

| | | |
|---|---|---|
| 8:30 am | BC263271<br><br>KATHRYN FRIEDERS ET AL<br>VS<br>CITY OF GLENDALE ET AL | Plaintiff Counsel<br>NO APPEARANCES<br>Defendant Counsel |

**NATURE OF PROCEEDINGS:**

RULING ON SUBMITTED MATTER [MOTION OF PLAINTIFFS FOR ATTORNEYS FEES OF $4,136,967.00].

The Court, having after hearing on October 30, 2003 taken the matter under submission, and having further considered the moving, opposing and reply papers and the argument of counsel at the hearing, now rules as follows:

The Court denies the defendant's request for judicial notice.

The Court overrules defendant's objections filed October 20, 2003, to plaintiffs' evidence proffered in support of the motion, and overrules plaintiffs' objections filed October 27 to defendant's evidence proffered in opposition to the motion.

The Court sustains defendant's objection filed December 23, 2003, to plaintiffs' supplemental declaration filed December 16.

The Court is persuaded by the declaration of James P. Schratz, Esq., proffered in oppositon to the motion, that the attorney fees claimed by plaintiffs are unreasonable and excessive in the extreme for the reasons therein explicated. Accordingly, the motion is granted not as prayed, but in the reduced sum of $1,146,505.40, which the Court finds to be fair and reasonable in the premises.



MINUTES ENTERED
01/30/04
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| DATE: 01/30/04 | | | DEPT. 40 |
| HONORABLE David A. Workman | JUDGE | R. MCGLOTHIN | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| 10. J. COLLINS, C.A. | Deputy Sheriff | NONE | Reporter |

| | | |
|---|---|---|
| 8:30 am | BC263271<br>KATHRYN FRIEDERS ET AL<br>VS<br>CITY OF GLENDALE ET AL | Plaintiff Counsel<br>NO APPEARANCES<br>Defendant Counsel |

**NATURE OF PROCEEDINGS:**

Having carefully considered and weighed the several factors outlined in case authority that can affect the enhancement or reduction of the award, some of which in this case the Court finds militate in favor of enhancement and others reduction, the Court declines to apply a lodestar multiplier to do either. Serrano v. Priest (1977) 20 Cal.3d 25, 49; Weeks v. Baker & McKenzie (1998) 63 Cal.App.4th 1128, 1174-1176.

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of 1/30/04 upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage thereon fully prepaid.

Date: 1/30/04

John A. Clarke, Executive Officer/Clerk

By: ______________________



MINUTES ENTERED
01/30/04
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| DATE: 01/30/04 | | | DEPT. 40 |
| HONORABLE David A. Workman | JUDGE | R. MCGLOTHIN | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| 10. J. COLLINS, C.A. | Deputy Sheriff | NONE | Reporter |

| | | | |
|---|---|---|---|
| 8:30 am | BC263271<br><br>KATHRYN FRIEDERS ET AL<br>VS<br>CITY OF GLENDALE ET AL | Plaintiff Counsel<br><br>Defendant Counsel | NO APPEARANCES |

**NATURE OF PROCEEDINGS:**

R. McGlothin

GOLDBERG & GAGE
Terry M. Goldberg
Bradley C. Gage
23002 Victory Blvd.
Woodland Hills, CA 91367

LIEBERT CASSIDY WHITMORE
Irma Rodriquez Moisa
Sergio Bent
6033 W. Century Blvd., Suite 500
Los Angeles, CA 90045

LAW OFFICES OF C. STEPHEN LOVE
C. Stephen Love
4766 Park Granada, Suite 206
Calabasas, CA 91302

CHRISTOPHER BRIZZOLARA
1528 16th Street
Santa Monica, CA 90404



MINUTES ENTERED
01/30/04
COUNTY CLERK

FILED

DEC 16 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

592

NORTH PACIFICA, LLC,

Plaintiff,

v.

CITY OF PACIFICA, *et al.*,

Defendants.

___________________________________/

No. C-01-4823 EMC

**ORDER RE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES (Docket No. 528)**

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

# TABLE OF CONTENTS

I. FACTUAL & PROCEDURAL BACKGROUND . . . . . -4-
II. DISCUSSION . . . . . -6-
A. Lodestar . . . . . -7-
1. Reasonable Hourly Rate . . . . . -10-
a. Keith Fromm . . . . . -11-
b. Jaquelynn Pope . . . . . -16-
2. Reasonable Number of Hours . . . . . -17-
a. NP's Motion to Strike Declaration of James P. Schratz . . . . . -18-
b. Adequacy of Documentation of Hours Expended . . . . . -20-
i. Excessive Block Billing . . . . . -20-
ii. Excessive Long Billing Days . . . . . -22-
iii. Vague Time Entries . . . . . -23-
c. Noncompensable Hours . . . . . -25-
i. Fees Billed Prior to Supplemental Complaint . . . . . -25-
ii. Fees Billed on Unrelated Litigation . . . . . -26-
iii. Fees Billed by Mr. Fromm as Member or Principal of NP . . . . . -37-
iv. Cure Costs . . . . . -40-
d. Billing Judgment . . . . . -44-
i. Clerical Tasks . . . . . -46-
ii. Travel Time . . . . . -47-
iii. Cross-Motions for Summary Judgment . . . . . -49-
iv. Trial Preparation . . . . . -50-
v. Deposition Attendance . . . . . -51-
vi. Other Failures to Exercise Billing Judgment . . . . . -54-
(a) Case Management or Status Conference Attendance . . . . . -54-
(b) Case Management or Status Conference Statements . . . . . -55-

(c) Trial Exhibits . . . -56-
(d) Trial Brief for Damages Phase . . . -57-
(e) Miscellany . . . -57-
vii. Summary re Billing Judgment . . . -58-
3. Total Lodestar . . . -60-
B. Adjustment to Lodestar . . . -60-
1. Unrelated Claims -- Hours Incurred Prior to July 15, 2002 . . . -60-
2. Unrelated Claims -- Hours Incurred After July 15, 2002 . . . -64-
a. Hours Incurred Between Approximately July 15, 2002, and June 30, 2003 . . . -66-
b. Hours Incurred After June 30, 2003 . . . -67-
c. Summary . . . -68-
3. Limited Success on Condition 13(b) Claim . . . -69-
C. Work on Fee Application . . . -70-
D. Costs . . . -73-
III. CONCLUSION . . . -75-

United States District Court
For the Northern District of California

Having considered the parties' briefs and accompanying submissions as well as the argument of counsel, and good cause appearing therefor, the Court hereby GRANTS Plaintiff North Pacifica LLC's ("NP") motion for attorney's fees pursuant to 42 U.S.C. § 1988.

## I. FACTUAL & PROCEDURAL BACKGROUND

On December 7, 2001, NP filed suit against Defendant the City of Pacifica, asserting claims for denial of substantive due process, denial of equal protection, violation of 42 U.S.C. § 1983, and declaratory relief. *See* Docket No. 1. In essence, NP challenged the City's handling and treatment of NP's permit application for the development of a condominium project on a parcel known as the "Bowl." Subsequently, on January 7, 2002, NP filed a first amended complaint raising the same claims. *See* Docket No. 5.

The City moved to dismiss NP's first amended complaint. On June 12, 2002, pursuant to leave of the Court, NP filed a second amended complaint which included the four claims in the first amended complaint and added a fifth cause of action for denial of substantive due process with respect to a parcel known as the "Fish." *See* Docket No. 34.

On July 30, 2002, the Court granted in part and denied in part the City's motion to dismiss the first amended complaint. *See* Docket No. 40. More specifically, the Court dismissed the substantive due process claim as well as the claim for declaratory relief but allowed the equal protection claim to proceed. Subsequently, on November 26, 2002, the Court dismissed the second substantive due process claim raised in the second amended complaint. *See* Docket No. 69.

On November 26, 2002, the Court also addressed NP's motion, asking the Court to reconsider its order dismissing the substantive due process claim asserted in the first amended complaint. The Court granted the motion to reconsider but ultimately dismissed the claim on another basis. *See* Docket No. 70. Thus, as of November 26, 2002, the case was proceeding on NP's claim for equal protection only.

The parties thereafter filed cross-motions for summary judgment on the equal protection claim. In its briefing, NP argued that the City had violated NP's right to equal protection in six different ways: (1) by sending NP seven deficiency letters from August 16, 1999, to December 4, 2000, thus delaying the completion date of NP's development permit application; (2) by treating



United States District Court
For the Northern District of California

NP's development permit application as if it had been terminated in December 2000, thereby delaying the completion date of the application and necessitating a second initial study and environmental impact report ("EIR"); (3) by waiting until the last minute to tell NP that its development project did not comply with the City's design guidelines, thus forcing NP to incur added expense; (4) by imposing joint and several liability on the individual homeowners for the development project's common areas, a more onerous condition (known as Condition 13(b)) than that imposed on other development projects, (5) by banning Keith Fromm, a member and principal of NP, from meeting with the Planning Department staff; and (6) by delaying in giving funds to a geotechnical consultant.

On June 30, 2003, the Court issued a summary order denying NP's motion for summary judgment in its entirety and granting in part and denying in part the City's. *See* Docket No. 180. On July 15, 2003, the Court issued a detailed order explaining its ruling on the summary judgment motions. *See* Docket No. 216.

First, the Court refused to consider the fifth equal protection violation because NP had not included allegations regarding the banning in its second amended complaint and had no reason not to include such allegations, having known the underlying facts all along. Although NP had not included any allegations regarding the third and fourth violations in its second amended complaint, this was because the underlying facts did not arise until after the second amended complaint was filed. Given these circumstances as well as the absence of any prejudice to the City, the Court allowed NP to file a supplemental complaint to assert the third and fourth violations. NP filed that supplemental complaint on July 18, 2003. *See* Docket No. 219.

Second, the Court refused to consider the sixth violation because NP only argued the delay in providing funds as part of the declaration of Mr. Fromm, not its motion for summary judgment.

Third, regarding the merits of the first through fourth violations, the Court granted summary judgment to the City on the first through third violations but denied summary judgment to the City on the fourth violation. This left for trial only the fourth equal protection for violation -- *i.e.*, that the City had violated NP's right to equal protection through Condition 13(b), which imposed joint and

United States District Court
For the Northern District of California

several liability on the individual homeowners for the development project's common areas, a more onerous condition than that imposed on other development projects.

On July 28, 2003, the liability phase of the trial on Condition 13(b) began.[1] It concluded on August 1, 2003. Subsequently, on October 23, 2003, the Court issued its findings of fact and conclusions of law on the Condition 13(b) claim. *See* Docket No. 264. It determined that the City had in fact violated NP's right to equal protection by imposing on it Condition 13(b).

On February 7, 2005, the damages phase of the trial began. Testimony and evidence were presented from February 7 to 11, 2005, and closing arguments on March 16, 2005. On May 4, 2005, the Court issued its findings of fact and conclusions of law, holding that NP was entitled to damages in the amount of $156,741.19 (including prejudgment interest but exclusive of attorney's fees). *See* Docket No. 493. NP had sought damages in the amount of $10.1 to $16.3 million (exclusive of both attorney's fees and prejudgment interest). Final judgment was entered on May 4 as well. *See* Docket No. 494.

Subsequently, on June 2, 2005, NP asked the Court for an indication that it would entertain or grant a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b). According to NP, a recent Supreme Court decision, *Lingle v. Chevron*, 125 S. Ct. 2074 (2005), presented a change of law that resuscitated the substantive due process claim presented in its first amended complaint. On August 4, 2005, the Court declined NP's request. *See* Docket No. 521.

Now pending before the Court is NP's motion for attorney's fees.

## II. DISCUSSION

Under 42 U.S.C. § 1988, a court has the discretion to "allow the prevailing party [in a § 1983 case], other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). NP argues that it was the prevailing party in the instant litigation because the Court found that the City had violated NP's equal protection rights with respect to Condition 13(b) and awarded it more than $150,000 in damages. The City does not dispute that NP was the prevailing party. *See Farrar v. Hobby*, 506 U.S. 103, 111 (1992) ("[T]o qualify as a prevailing party, a civil rights plaintiff

---

[1] On July 7, 2003, the Court had bifurcated the trial into a liability phase and a damages phase. *See* Docket No. 198.



United States District Court
For the Northern District of California

must obtain at least some relief on the merits of his claim."). Rather, the City challenges the amount of attorney's fees sought by NP as unreasonable.

While not all of the City's arguments persuasive, the Court does conclude that the fee award sought by NP is unreasonable. The specific reasons for this conclusion are provided below.

A. Lodestar

The fee applicant has the burden of proving a reasonable attorney's fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (stating that "the fee applicant bears the burden of establishing entitlement to an award [of attorney's fees] and documenting the appropriate hours expended and hourly rates"). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433. This is commonly known as the lodestar.

According to NP, the lodestar for Mr. Fromm is $1,182,468 (based on an hourly rate of $300 for fees incurred prior to January 1, 2004, and $350 for fees incurred thereafter and a total of 3,682.1 hours), and for Ms. Pope $803,255 (based on an hourly rate of $240 and a total of 3,255.32 hours). *See* Mot. at 2. Based on the billing records submitted, however, NP made errors in its calculations.

| **KEITH FROMM** | | |
|---|---|---|
| **DATE** | **HOURS** | **FEES** |
| As of 10/31/01 | 8.00 | $2,400 |
| As of 11/26/01 | 21.25 | $6,375 |
| As of 12/18/01 | 32.00 | $9,600 |
| As of 1/31/02 | 23.50 [not 24.50] | $7,050 [not $7,350] |
| As of 2/28/02 | 56.50 | $16,950 |
| As of 3/31/02 | 111.50 | $33,450 |
| As of 4/28/02 | 188.50 | $56,550 |
| As of 5/7/02 | 10.00 | $3,000 |
| As of 6/28/02 | 113.50 | $34,050 |
| As of 7/31/02 | 115.00 | $34,500 |
| As of 8/30/02 | 131.50 [not 132.00] | $39,450 |
| As of 9/26/02 | 40.00 | $12,000 |

United States District Court
For the Northern District of California

| DATE | HOURS | FEES |
|---|---|---|
| As of 10/30/02 | 58.50 | $17,550 |
| As of 11/22/02 | 32.00 | $9,600 |
| As of 12/4/02 | 1.00 | $300 |
| As of 2/25/03 | 20.50 | $6,150 |
| As of 3/31/03 | 125.00 [not 127.00] | $37,500 [not $38,100] |
| As of 4/29/03 | 288.00 [not 290.00] | $86,400 [not $87,000] |
| As of 5/31/03 | 263.00 [not 267.50] | $78,900 [not $80,250] |
| As of 6/16/03 | 71.00 | $21,300 |
| As of 7/31/03 | 213.00 | $63,900 |
| As of 8/29/03 | 81.50 | $24,450 |
| As of 10/27/03 | 10.00 | $3,000 |
| As of 11/19/03 | 45.00 | $13,500 |
| As of 12/25/03 | 55.60 | $16,680 |
| As of 1/25/05 | 100.00 | $35,000 |
| As of 2/26/04 | 33.00 | $11,550 |
| As of 3/31/04 | 70.5. | $24,675 |
| As of 4/28/04 | 6.50 | $2,275 |
| As of 5/24/04 | 19.00 | $6,650 |
| As of 6/30/04 | 53.50 [not 53.00] | $18,725 [not $18,550] |
| As of 7/29/04 | 52.00 | $18,200 |
| As of 8/30/04 | 105.75 | $37,012.50 |
| As of 9/29/04 | 22.00 | $7,700 |
| As of 10/31/04 | 106.50 | $37,275 |
| As of 11/19/04 | 127.50 | $44,625 |
| As of 12/31/04 | 199.00 | $69,650 |
| As of 1/31/05 | 341.00 | $119,350 |
| As of 2/25/05 | 167.00 | $58,450 |
| As of 3/22/05 | 56.00 | $19,600 |
| As of 5/31/05 | 44.00 | $15,400 |
| As of 6/16/05 | 23.50 | $8,225 |

| DATE | HOURS | FEES |
|---|---|---|
| As of 9/7/05 | 18.50 | $6,475 |
| **TOTAL** | **3,660.60** | **$1,175,442.50** |

| JAQUELYNN POPE | | |
|---|---|---|
| **DATE** | **HOURS** | **FEES** |
| 12/10/01 Statement | 86.30 | $20,712 |
| 1/16/02 Statement | 18.50 [not 18.00] | $4,440 [not $4,320] |
| 2/10/02 Statement | 12.3. | $2,952 |
| 3/13/02 Statement | 56.00 [not 56.52] | $13,440 [not $13,565.44] |
| 4/11/02 Statement | 54.60 [not 53.60] | $13,104 [not $12,864] |
| 5/10/02 Statement | 73.00 | $17,520 |
| 6/19/02 Statement | 54.35 [not 54.85] | $13,044 [not $13,164] |
| 7/26/02 Statement | 51.75 | $12,420 |
| 8/26/02 Statement | 74.7 | $17,928 |
| 9/12/02 Statement | 108.00 [not 109.00] | $25,920 [not $26,160] |
| 10/11/02 Statement | 40.00 | $9,600 |
| 12/10/02 Statement | 43.50 | $10,440 |
| 5/1/03 Statement | 290.00 | $69,600 |
| 6/1/03 Statement | 251.50 | $60,360 |
| 8/2/03 Statement | 386.00 | $92,640 |
| 10/25/03 Statement | 93.50 | $22,440 |
| 12/31/03 Statement | 700 | $16,800 |
| 3/1/04 Statement | 101.40 | $24,336 |
| 7/5/04 Statement | 152.60 | $36,624 |
| 9/5/04 Statement | 136.80 | $32,832 |
| 11/5/04 Statement | 159.00 | $38,160 |
| 12/1/04 Statement | 141.00 | $33,840 |
| 2/1/05 Statement | 384.50 | $92,280 |
| 4/1/05 Statement | 288.50 | $69,240 |

United States District Court
For the Northern District of California

| DATE | HOURS | FEES |
|---|---|---|
| 9/6/05 Statement | 111.50 | $26,760 |
| **TOTAL** | **3,239.30** | **$777,432** |

Taking into account the errors in calculation, the lodestar -- at least based on the billing records -- for Mr. Fromm is $1,175,442.50 (based on an hourly rate of $300 for fees incurred prior to January 1, 2004, and $350 for fees incurred thereafter and a total of 3,660.6 hours), and for Ms. Pope $777,432 (based on an hourly rate of $240 and a total of 3,239.3 hours).

1. <u>Reasonable Hourly Rate</u>

In *Blum v. Stenson*, 465 U.S. 886 (1984), the Supreme Court held that the hourly rates to be employed in calculating reasonable fees are determined by the "prevailing market rates in the relevant community, regardless of whether the plaintiff is represented by private or nonprofit counsel." *Id.* at 895. The Supreme Court acknowledged that

> determining an appropriate "market rate" for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill, and reputation, varies extensively – even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely. . . .
>
> In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to – for convenience – as the prevailing market rate.

*Id.* at 896 n.11.

As made clear by the Supreme Court in *Blum*, in making a determination about prevailing market rates, a court must take into account the experience, skill, and reputation of the attorneys whose fees are at issue. *See also Chalmers v. Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986) ("In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

reputation."). Furthermore, as suggested in *Blum*, a party cannot meet its burden of establishing the prevailing market rates by relying on the affidavits of its own self-interested counsel alone. *See also Jordan v. Multnomah County*, 815 F.2d 1258, 1263 (9th Cir. 1987) ("The fee applicant has the burden of producing satisfactory evidence, *in addition to the affidavits of its counsel*, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation.") (emphasis added).

In the instant case, the services of two of NP's attorneys are at issue: Mr. Fromm (in-house counsel for NP as well as a member and principal of NP) and Ms. Pope (outside counsel for NP). NP argues that the reasonable hourly rate for Mr. Fromm was $300 until January 1, 2004, and thereafter $350. For Ms. Pope, NP argues that the reasonable hourly rate was $240.

a. <u>Keith Fromm</u>

NP's "proof" of the reasonableness of Mr. Fromm's $300-$350 hourly rate is premised solely on Mr. Fromm's own declaration. The declaration establishes only that: (1) Mr. Fromm was in-house counsel for NP and, as of February 2003 or so, a litigation attorney of record; (2) Mr. Fromm was admitted to the California Bar in 1977; and (3) Mr. Fromm has primarily practiced real estate and land use law. *See* Fromm Decl. ¶ 6. It should be noted that Mr. Fromm has played several roles for NP. He is a principal and co-owner of NP. He has handled the bulk of the administrative and legal work in prosecuting the permit applications. He has also served as co-counsel in the litigation. Mr. Fromm claims fees only in his role as litigation attorney for NP. Although he has experience in other roles, his declaration provides no evidence demonstrating that he has any prior experience as a litigator.

In his declaration, Mr. Fromm asserts that he "interviewed several land use lawyers in Los Angeles, and their hourly rates were $350 to in excess of $500 an hour." *Id.* However, Mr. Fromm does not identify how many lawyers were interviewed, nor does he provide any information about who those lawyers are, let alone their experience, skill, and reputation. More important, Mr. Fromm

does not provide any evidence about the hourly rates of litigators as opposed to land use attorneys.[2] As noted above, NP claims fees for Mr. Fromm as a litigator in this case, not as a transactional attorney working on a real estate deal.

In his declaration, Mr. Fromm also claims that two attorneys who were potential experts in the case, Sanford Skaggs and Daniel Curtin, have a customary hourly fee of $600. *See id.* However, Mr. Fromm does not provide any information about their relative experience, skill, and reputation. Furthermore, there is no indication that Mr. Skaggs and Mr. Curtin are litigators as opposed to land use attorneys.

Finally, in his declaration, Mr. Fromm points out that outside counsel for the City, Michelle Kenyon and Natalie West (both from the McDonough, Holland & Allen firm) charge $230 and $285 an hour respectively. While Ms. Kenyon and Ms. West are both litigators, Mr. Fromm does not provide any information about their experience, skill, and reputation as compared to his experience, skill, and reputation as a litigator.

The Court finds that NP has failed to satisfy its burden of producing satisfactory evidence that the requested rates for Mr. Fromm are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.[3] First, NP has failed to provide any evidence in support of Mr. Fromm's fees other than the self-interested declaration of Mr. Fromm himself. Second, NP cannot establish the proper rates for Mr. Fromm just by referring to the rates actually charged NP, especially since he is a principal of NP. *See Chalmers*, 796 F.2d at 1210-11 ("Determination of a reasonable rate is not made by reference to rates actually charged the prevailing party. In determining a reasonable hourly rate, the district court should be guided by the

---

[2] The Court does not address whether the appropriate legal community would be Los Angeles or the San Francisco Bay Area. *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992) ("[T]he general rule is that the rates of attorneys practicing in the forum district, here the Eastern District of California -- Sacramento, are used. Although we have not ruled on the issue, a number of circuits have held that rates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case.").

[3] Although the City did not in its opposition brief expressly challenge the rates requested by NP for either Mr. Fromm or Ms. Pope, it has challenged the lodestar and the reasonableness of the fees sought. As noted above, NP has the burden of establishing reasonable hourly rates for each attorney.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation."). The fact that Mr. Fromm is a principal for NP suggests that any arrangement between him and NP for legal services was not an arms' length transaction. Third, Mr. Fromm's declaration speaks largely to his experience but says very little about his reputation and skill, factors that are equally important under Supreme Court case law. *See* Fromm Decl. ¶ 6 (mentioning at best his "lectur[ing] on real estate law and related matters at such educational institutions as University of Southern California and Mount St. Mary's College"). Fourth, Mr. Fromm's declaration discusses the rates of other attorneys but provides no reason why these attorneys are reasonably comparable to Mr. Fromm in terms of skill, experience, and reputation as a litigator. Finally, contrary to what Mr. Fromm claims in his declaration, a proper comparator is *not* a land use attorney because, although this case involves land use issues, it is not a transactional matter but rather a litigation matter. The services for which fees are sought are Mr. Fromm's efforts as a litigator representing NP. There is no evidence that any client has paid Mr. Fromm the rates he asserts for his services as a litigator.[4] *See Blum*, 465 U.S. at 896 n.11 (noting that requested rates should be "in line with those prevailing in the community for *similar services* by lawyers of reasonably comparable skill, experience, and reputation") (emphasis added); *Navarro v. General Nutrition Corp.*, No. C 03-0603 SBA, 2005 WL 2333803, at *10 (N.D. Cal. Sept. 22, 2005) (Armstrong, J.) (in employment discrimination case, noting that "it is not even clear from Mr. Hoffman's Supplemental Declaration whether Mr. Rosenthal actually practices civil litigation or has any experience with employment litigation in particular."); *Finkelstein v. Bergna*, 804 F. Supp. 1235, 1244 (N.D. Cal. 1992) (Brazil, J.) (report and recommendation) (looking to "hourly rates for cases of roughly comparable complexity across the full spectrum of case types in federal court litigation").

Although NP has not met its burden of establishing a reasonable hourly rate for Mr. Fromm, the Court shall not therefore deny NP any attorney's fees as a result. This is because a court may consider not only evidence submitted by the parties but also its own knowledge and experience of

---

[4] In his reply declaration, Mr. Fromm claims that other people have tried to hire him after NP prevailed in one of the state cases involving NP and the City. *See* Fromm Reply Decl. ¶ 35. However, not only does Mr. Fromm not identify who and how many people tried to hire him, but he also fails to say whether those people wanted to hire him as a litigator.

local hourly rates; indeed, a court's knowledge and experience generally assume greater weight if the parties provide only scant evidence. *See Oberfelder v. City of Petaluma*, No. C-98-1470 MHP, 2002 U.S. Dist. LEXIS 8635, at *13-14 (N.D. Cal. Jan. 29, 2002) (Patel, J.) ("Fee applicants sustain their burden of proof by submitting sufficient evidence that requested rates are comparable to the current market rates. Alternatively, in evaluating the requested hourly rate, a district court may rely on its own knowledge of comparable rates charged by other lawyers in the district."); *Keith v. Volpe*, 644 F. Supp. 1312, 1316 (C.D. Cal. 1986) (in absence of submissions from defendants controverting rates requested by plaintiffs, relying on "its prior orders in this case, the rates recently awarded in comparable cases, and its own experience of legal practice in Los Angeles in determining appropriate hourly rates"); *see also Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940) ("The court, either trial or appellate, is itself an expert on the question and consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value.").

Mr. Fromm has not substantiated any prior experience as a litigator. The Court must therefore presume that he has none. Accordingly, although experienced in land use transactions, Mr. Fromm has no more litigation experience (based on the record) than a starting associate. NP contends, however, that Mr. Fromm should be awarded a higher rate "because of his special knowledge and experience of real estate law, including his experience drafting CC&R's and the process of approval by the California Department of Real Estate, and further, and as importantly, his specific familiarity with the history between NP and the City and the administrative proceedings herein." Reply at 13.

There are several problems with this argument. First, Mr. Fromm brought much of this knowledge as a member of NP – *i.e.*, as a *client*. Second, at most, Mr. Fromm's background in real estate was helpful (as NP argued at the hearing on the motion for attorney's fees) with respect to the depositions of experts. This would not, however, entitle Mr. Fromm to a fee he might command as a land use attorney for all aspects of his work in this litigation. Third, whatever the value of Mr. Fromm's real estate background, that value was largely compromised because of his lack of skill as a litigator (and lack of independent billing judgment, being a member and principal of NP). This was



United States District Court
For the Northern District of California

evident throughout the litigation of this case but was perhaps most evident during the liability phase of the trial where Mr. Fromm repeatedly asked long, confusing, and tortured questions of witnesses and also spent large amounts of time – in a bench trial – having witnesses read documents out loud until NP was left with very little time to complete the presentation of its case. Moreover, this litigation has been papered to death by NP, with seemingly little restraint.

Taking into account all of the above, the Court concludes that a reasonable hourly rate for Mr. Fromm is the rate for a relatively junior litigator. Although arguably his rate should be no more than a first-year litigation associate, the Court shall give some credit (albeit limited) to Mr. Fromm's real estate background so as to support a slightly higher rate. A rate higher than this is not justified given the utter lack of litigation experience by Mr. Fromm. Moreover, such a rate is not appropriate because the result in this case could have been obtained by a litigator with a broad range of experience, and not just a litigator with land use experience. *See Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 988 (N.D. Cal. 2005) (Illston, J.) (stating that result in the case "could have been obtained by lawyers with a broad range of experience" such that attorney's "customary hourly rate as a partner for a global law firm with nearly 30 years of experience on behalf of corporate clients in complicated environmental and securities litigation is not the reasonable market for this case.").

Accordingly, the Court shall award Mr. Fromm an hourly rate of $225. This award is consistent with awards made by other judges in this District for relatively junior litigation associates. *See, id.* at 990 (awarding as market rates for highly qualified civil rights attorneys $225 for a second-year associate and $260 for third-year associate); *Fleming v. Kemper Nat'l Servs.*, 373 F. Supp. 2d 1000, 1012 (N.D. Cal. 2005) (Chesney, J.) (taking note of declaration of partner at "Lieff, Cabraser, Heimann & Bernstein LLP who litigates class actions involving ERISA, product defects, and employment issues, which stated that firm's hourly billing rate for second-and third-year associates is $ 285; ultimately awarding first-year associates $200); *Velez v. Roche*, No. 02-0337 EMC (awarding $225 hourly rate for 2001 graduate); *Oberfelder*, 2002 U.S. Dist. LEXIS 8635, at *15 (awarding hourly rates from $190 to $250 for junior associates).

United States District Court
For the Northern District of California

b. Jaquelynn Pope

Similarly, NP's "proof" of the reasonableness of Ms. Pope's $240 hour rate is premised solely on Ms. Pope's own declaration. The declaration establishes only that: (1) Ms. Pope was a litigation attorney of record since the inception of this case; (2) Ms. Pope was admitted to the California Bar in 1977; (3) Ms. Pope has primarily practiced appellate and civil litigation, "especially in the areas of real estate and land use"; (4) Ms. Pope's "current customary charge" is $400 per hour and (5) Ms. Pope has "charged more recent land use clients (in 1994) that rate." Pope Decl. ¶ 3. Ms. Pope's declaration reflects that her experience has mostly been in state court, although her experience in state court involves all levels, including the California Supreme Court. *See Galland v. City of Clovis*, 24 Cal. 4th 1003 (2001) (identifying Ms. Pope along with Worthington & Worthington as counsel for plaintiffs and respondents).

For reasons similar to above, the Court finds that NP has failed to satisfy its burden of producing satisfactory evidence that the requested rate for Ms. Pope is in line with that prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. Moreover, although an attorney's customary billing rate is relevant to the market value of the attorney's services, it is not binding or conclusive. *See* 2 Schwartz & Kirklin, Section 1983 Litigation § 5.5, at 261. Moreover, an attorney's current stated hourly rate is not necessarily his actual customary rate. *See Yahoo!, Inc. v. Net Games, Inc.*, 329 F. Supp. 2d 1179, 1192 (N.D. Cal. 2004) (noting that billing rates do not say anything "about discounts given clients, write-off time, collection experience or the host of other matters that determine the attorney fees that actually prevail in the market").

That being said, the Court finds that, based on its knowledge and experience of local hourly rates, a rate of $240 an hour for Ms. Pope's services is not unreasonable. Such a rate is well in line, at least, with the rates of litigators with comparable years of experience. The Court emphasizes, however, that its award of $240 per hour is reasonable based not only on experience but also her skill demonstrated in this litigation. Although some attorneys with comparable experience may charge higher rates, Ms. Pope's conduct of this litigation has not been commensurate with her experience level. Ms. Pope, for example, repeatedly filed supplemental papers without leave of Court, filed

United States District Court
For the Northern District of California

long and rambling declarations often containing useless or marginally relevant information, asked to lodge over 18,000 pages of exhibits for the liability phase of the trial, and repeatedly called chambers asking for essentially legal advice as to basic procedural questions.

2. Reasonable Number of Hours

A trial court has discretion in determining the number of hours reasonably expended in advancement of the litigation. *See Chalmers*, 796 F.2d at 1211; *see also Hensley*, 461 U.S. at 437 (noting that a district court has discretion in determining the amount of a fee award, which is "appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters").

The fee applicant bears the burden of "documenting the appropriate hours expended" in the litigation and therefore must "submit evidence supporting the hours worked." *Id.* at 433, 437. Moreover, the fee applicant

> should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. In the private sector, billing judgment is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Id.* at 434 (internal quotation marks omitted; emphasis in original). Or, to state the matter somewhat differently, "the question is not how many hours did one work, but how many hours are properly billed to one's clients." *Chrapliwy v. Uniroyal, Inc.*, 583 F. Supp. 40, 50 (N.D. Ind. 1983).

Importantly, "[t]he lawyer must not abandon self-restraint or careful billing judgment because of the expectation that the obligation to pay the fee will be statutorily shifted to the losing party." *Hall v. Borough of Roselle*, 747 F.2d 838, 841 (3d Cir. 1984). Moreover, "'overkill,' or the indulgence of the plaintiff's counsel in the expenditure of excessive hours on a case, cannot be justified on the grounds that counsel was striving to provide representation of the highest possible quality." 2 Schwartz & Kirklin, Section1983 Litigation § 4.3, at 173; *see also Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 953 (1st Cir. 1984) (rejecting the assumption underlying the fee application "that the standard of service to be rendered and compensated is one of perfection, the best that illimitable expenditures of time can achieve").

a. NP's Motion to Strike Declaration of James P. Schratz

As a preliminary matter, the Court addresses NP's challenge to the declaration of the City's expert, James P. Schratz, upon which the City largely relies in contesting the reasonableness of the number of hours. NP makes essentially four arguments in support of its motion to strike.

First, NP argues that the Schratz declaration should be stricken because the City did not disclose Mr. Schratz as an expert pursuant to Federal Rule of Civil Procedure 26(a)(2). *See* Fed. R. Civ. P. 26(a)(2). This rules provides, *inter alia*, that "a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence" and that, "[i]n the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial." The Court rejects NP's argument. Rule 26(a)(2)'s concern is with expert testimony to be used for a trial; here, the Court is dealing with a *post*-trial motion for attorney's fees. Moreover, the City could not be expected to disclose any expert it intended to use until after NP's motion for attorney's fees was filed.

NP protests still that the Schratz declaration is problematic because it is incomplete, missing, for example, a recitation of the information or data used in reaching his opinions and a statement about the compensation he received. Neither is a compelling reason to strike the Schratz declaration. It is clear that Mr. Schratz's declaration is based on an evaluation of the billing records provided by NP's records and his experience gleaned from other audits. *See* Fed. R. Evid. 702, 2000 advisory committee notes ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."). Also, the Court is aware of the fact that Mr. Schratz is not an objective neutral but rather a retained expert. The exact amount of his compensation is unlikely to be material. It is also important to note that the Court gave NP the opportunity to depose Mr. Schratz but NP chose not to do so. NP's claim that it decided not to take this one deposition because it was too expensive and burdensome is not credible.

Second, NP contends that the Schratz declaration should be stricken because Mr. Schratz is not an auditor, *i.e.*, a certified public accountant, within the meaning of California Business & Professions Code § 5058 and in any event has no credible expertise because he failed to account for



United States District Court
For the Northern District of California

the fact that the City's attorneys expended virtually the same number of hours as NP's attorneys. Again, the Court is not persuaded by either argument. Nowhere in Mr. Schratz's declaration does he claim to be a certified public accountant and it is clear from the substance of the declaration what he means by using the terms "auditor" and "audit." *See* 16 Cal. Code Regs. § 16 (stating only that it is likely that the terms "accountant," "auditor, "accounting," or auditing" would be confused with the title "certified public accountant" or "public accountant"). Also, as discussed below, how many hours the City's attorneys worked on the case is not dispositive. At most, Mr. Schratz's failure to address the hours worked by the City's attorneys would go to the weight of his declaration, not its admissibility.

Third, NP argues that Mr. Schratz does not qualify as an expert pursuant to Federal Rule of Civil Procedure 702 and that admitting his declaration would unfairly prejudice NP pursuant to Federal Rule of Evidence 403. Again, neither argument is persuasive. The undersigned and other judges in this District have in other cases considered Mr. Schratz's expert opinion with respect to fee awards, at least to a limited extent. *See, e.g., Lopez*, 385 F. Supp. 2d 981, 993 ("The Court will not strike the Schratz declaration in its entirety; however, it will consider the declaration only when it is accompanied by specific factual support."). More important, based on the information provided in the declaration, Mr. Schratz has demonstrated that he is qualified to opine about fee awards and that his methodology in evaluating the billing records of NP's attorneys in this case is reasonable and sufficiently reliable. For example, Mr. Schratz's approach to categorizing the nature of the work of the attorneys is reasonable and sufficiently reliable as is, overall, his approach to unblocking the block-billed time entries. NP's challenges to Mr. Schratz's declaration largely go towards weight rather than admissibility. As for prejudice to NP pursuant to Rule 403, the Court notes that there has been no undue delay by the City because Rule 26(a)(2) does not appear to be applicable. Furthermore, there has been no prejudice because the Court gave NP an opportunity to challenge Mr. Schratz as an expert, both through a deposition and through an extension for NP to file its reply brief in response to the City's opposition.

Finally, NP protests that the exhibits attached to Mr. Schratz's declaration constitute an expert report which is inadmissible hearsay. The Court rejects this argument because Mr. Schratz



United States District Court
For the Northern District of California

could have testified to the same if the Court conducted an evidentiary hearing. In addition, the exhibits are admissible as facts relied on by an expert. *See* Fed. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.").

As for NP's specific objections to the Schratz declaration, they are denied on the basis that they are largely duplicative of the arguments made in the motion to strike and primarily go to weight rather than admissibility.

b. Adequacy of Documentation of Hours Expended

As noted above, the fee applicant bears the burden of "documenting the appropriate hours expended" in the litigation and therefore must "submit evidence supporting the hours worked." *Hensley*, 461 U.S. at 433, 437. To support the hours claimed, NP's attorneys have provided their contemporaneous billing records. The City argues, however, that the contemporaneous billing records of Ms. Pope and Mr. Fromm do not support the claimed hours for several reasons: (1) because of the excessive use of block billing, (2) because of excessive long billing days, and (3) because of vague time entries.

i. Excessive Block Billing

The Court acknowledges that block billing is generally frowned upon because the practice makes it difficult to determine whether the amount of time spent on a specific task was reasonable. *See Defenbaugh v. JBC & Associates, Inc.*, No. C-03-0651 JCS, 2004 U.S. Dist. LEXIS 16256, at *25 (N.D. Cal. Aug. 10, 2004) (Spero, J.); *see also Freitag v. California Dep't of Corr.*, No. C 00-02278 THE, 2003 U.S. Dist. LEXIS 26579, at *12 (N.D. Cal. Oct. 17, 2003) (Henderson, J.) (stating that "the better practice would be to avoid block billing altogether"). Indeed, California State Bar's Committee on Mandatory Fee Arbitration has taken note that "[t]he practice hides accountability and may increase time by 10% to 30%. [Thus,] [t]he larger the block, the more care should be exercised." *Welch v. Metro. Life Ins. Co.*, No. CV 04-00084 PA (CTx), 2004 U.S. Dist. LEXIS 28576, at *8-9 (C.D. Cal. Sept. 20, 2004) (internal quotation marks omitted); *see also*



United States District Court
For the Northern District of California

*Trulock v. Hotel Victorville*, 92 Fed. Appx. 433, 434 (9th Cir. 2004) (noting that "block billing creates some impediments to the analysis of attorney fee bills," but adding that "the Supreme Court has indicated that it is not a basis for refusing to award attorneys' fees"; also stating that the case law did not require the district court to do more than consider block billing as "one factor that 'led the Court to conclude that a reduction in the number of hours charged should be imposed'").

According to Mr. Schratz, both Mr. Fromm and Ms. Pope engaged in excessive block billing. *See* Schratz Decl. ¶ 16(A) at 11. Mr. Fromm, for example, routinely engaged in "'daily' billing -- [*i.e.*,] all tasks from a single day were billed in a single, collective time entry." *Id.* Moreover, many of the time entries did not provide an actual explanation of work performed but rather "read like 'stream of consciousness,' diary-like entries." *Id.* ¶ 16(A) at 12 & Ex. G. As for Ms. Pope, "[a]pproximately 46 percent of all hours and fees billed . . . contain at least two or more different block-billed tasks," and "20 percent of the total hours she billed contained three or more different block-billed tasks." *Id.* ¶ 16(A) at 11.

Based on the Court's review of the billing records, it is clear that Mr. Fromm and Ms. Pope did engage in block billing and that this practice has hampered the Court in assessing the reasonableness of each specific task. That being said, it is possible -- as demonstrated by Mr. Schratz himself -- to "'unblock' the blocked time entries by manually reviewing each entry, and to the extent possible, allocat[e] time to each tasks within that entry to reach the most accurate results possible." *Id.* ¶ 14, at 9. The Court has reviewed the unblocking done by Mr. Schratz and deems it, on the whole, reasonable. For example, in spite of what Mr. Fromm argues in his reply declaration, *see* Fromm Reply Decl. ¶ 31, it was reasonable for Mr. Schratz to assume -- absent any evidence to the contrary -- that, for a block time entry that included a telephone conference call, the call would usually last no longer than half an hour. To the extent the "unblocking" may disfavor NP, that is a consequence to be borne by NP because its attorneys engaged in the discouraged practice of block billing. But the Court shall not deny NP its fees outright or make a generalized across-the-board percentage reduction simply because of block billing.

According to the City, however, there is another problem beyond the "basic" block billing by Mr. Fromm and Ms. Pope that makes the billing records unreliable. More specifically, Mr. Schratz



United States District Court
For the Northern District of California

states in his declaration that traditionally law firms have billed in one-tenth-of-an-hour increments but, in the instant case, the majority of time entries by NP's attorneys are billed in large time increments of every half hour or every hour. *See* Schratz Decl. ¶ 17(A)(1) at 18.

Although there are instances in which NP's attorneys did bill in one-tenth-of-an-hour increments, and also in one-quarter-of-hour increments, based on the Court's review of the billing records, Mr. Schratz is correct that the majority of time entries are in larger increments of every half hour or every hour. Indeed, in her reply declaration, Ms. Pope admits that she "do[es] generally round to the nearest half hour." Pope Reply Decl. ¶ 12. The only defense Ms. Pope tenders for this practice is that "it is not true that I always round up[;] I am just as likely to round down to the nearest half hour." *Id.* While the Court does not condone the practice, the Court is not persuaded that the above evidence is sufficient proof of unreliability such that the Court should deny NP its fees altogether or make an across-the-board percentage reduction. The evidence does, however, lend support to the Court's conclusion, discussed below, of the repeated failure of NP's attorneys to exercise billing judgment.

ii. Excessive Long Billing Days

The City claims that not only excessive block billing but also excessive long billing days (*i.e.*, eight hours or more in one day) render the billing records of NP's attorneys unreliable. According to Mr. Schratz, "long days account for approximately 75 percent of the total hours billed by Mr. Fromm and 62 percent of the total hours billed by Ms. Pope." Schratz Decl. ¶ 17(A)(2) at 19. Mr. Schratz questions the extensive long billing days because, *inter alia*, "a succession of days of long hours raises questions about the timekeeper's implied endurance, if not the accuracy of the billed time. Long hours are also markers for inefficient or unnecessary effort, as well as excessive billing estimates." *Id.*

The Court acknowledges that Mr. Schratz's concerns are valid. However, the time periods identified by Mr. Schratz as problematic correlate with "large" events in this litigation -- *e.g.*, cross-motions for summary judgment and trial preparation. To the extent Mr. Fromm and/or Ms. Pope may have billed an excessive number of hours for these events, such is addressed below.

United States District Court
For the Northern District of California

iii. Vague Time Entries

Finally, the City questions the hours claimed by NP because of vague time entries in Mr. Fromm and Ms. Pope's billing records. *See* Schratz Decl. ¶ 16(A) at 12. The examples provided by Mr. Schratz in his declaration are not very compelling. The Ninth Circuit has emphasized that "plaintiff's counsel is not required to record in great detail how each minute of his time was expended" but rather "can meet his burden -- although just barely -- by simply listing his hours and identifying the general subject matter of his time expenditures." *Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (internal quotation marks omitted). The examples provided by Mr. Schratz do identify the general subject matter of the time expenditures.

That being said, based on the Court's review, both Mr. Fromm and Ms. Pope's billing records do contain vague entries such as "telephone conference with [person]," "draft correspondence [to person]," "review e-mail," and "legal research," without any identification of the subject matter of the conference, correspondence, e-mail, or research. *See* 2 Schwartz & Kirklin, Section 1983 Litigation § 4.14, at 222 ("The subject matter of the activity must be indicated; entries like 'conference with Jones,' 'telephone call to Smith,' 'letter to client,' or 'research' will not suffice."). *See, e.g.*, *Tennessee Gas Pipeline v. 104 Acres of Land*, 32 F.3d 632, 634 (1st Cir. 1994) (in case involving fee request pursuant to 42 U.S.C. § 4654, affirming district court's reduction of fees by 30% because, *inter alia*, time entries had descriptions such as "confer with co-counsel," "confer with client," "review materials," "review documents," and "legal research" without any indication of subject matter involved; this made it "impossible for the court to gage whether the task performed was warranted . . . [and] to determine if the time factor allocated was appropriate or excessive"), *superseded by statute on other grounds*, *Cohen v. Brown Univ.*, R.I. C.A. No. 92-197, N.H. C.A. No. 99-485-B, 2003 U.S. Dist. LEXIS 12512 (D.R.I. Mar. 31, 2003); *Gonzalez v. Town of Stratford*, 830 F. Supp. 111, 114 (D. Conn. 1992) (reducing fee award by 10% because "some of the entries are too vague to enable the court to consider whether the time was reasonably spent" -- *e.g.*, some time entries simply said that an attorney performed "research" or had a "telephone conference" without specifying the issue researched or the subject of the telephone conference). Moreover, there

is not always a context from which the Court would be able to infer what the subject matter of the conference, correspondence, e-mail, or research was.

Accordingly, the Court shall make a 5% reduction from Mr. Fromm's hours as well as a 5% reduction from Ms. Pope's hours because of the vague time entries. The Court finds that a reduction of some kind is necessary because, without more specificity, the Court could not determine whether the task performed was warranted or determine if the time factor allocated was appropriate or excessive. Also, without more specificity, the Court could not ensure that the task performed was related to the instant case rather than the 11 other lawsuits involving NP and the City.[5] Notably, for at least part of the billing time period, Ms. Pope failed to maintain separate billing records for this lawsuit specifically. Ms. Pope admits this in her reply declaration. *See* Pope Reply Decl. ¶ 8 ("I kept separate records [starting] from the beginning of the year 2003.").

The Court, however, shall not make a larger reduction because, at least in some instances, the Court could hazard a guess as to subject matter based on a time entry taken as a whole. In addition, Ms. Pope and Mr. Fromm's billing records were not infected with vague entries in all respects, just in the ways identified above. *See Harper v. City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000) ("[W]hen a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage. Whichever option the district court chooses, it is required to 'provide a concise but clear explanation of its reasons for the fee award' that is sufficient to permit appellate review.").

In taking the 5% reduction, the Court shall use the hours that were incurred, for the most part, *after* July 15, 2002. The use of this benchmark is described in Part II.B.1., *infra* (discussing exclusion of hours incurred primarily *before* July 15, 2002). This will ensure that there is no double counting of hours against NP.

---

[5] NP was involved in 11 other lawsuits in addition to this one (8 against the City, 2 against the City as the real party in interest, and 1 against the representatives of the California Coastal Commission). *See* Opp'n at 3; Siegel Decl. ¶ 4.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

After July 15, 2002, Ms. Pope spent 2,832.50 hours on this litigation (*i.e.*, 3,239.30 - 406.80 = 2,382.50). Five percent of 2,832.50 is 141.60 (*i.e.*, 2,832.50 x 5% ≈ 141.60). This leaves Ms. Pope with **3,097.70 hours** (*i.e.*, 3,239.30 - 141.60 = 3,097.70).

After July 15, 2002, Mr. Fromm spent 3,065.85 hours on this litigation (*i.e.*, 3,660.60 - 594.75 = 3,065.85). Five percent of 3,065.85 is 153.30 (*i.e.*, 3,065.85 x 5% ≈ 153.30). This leaves Mr. Fromm with **3,507.30 hours** (*i.e.*, 3,660.60 - 153.30 = 3,507.30).

c. Noncompensable Hours

As noted above, even if the hours claimed by a fee applicant are properly documented, the fee applicant must still demonstrate that there has been the exercise of billing judgment. Before discussing billing judgment, however, the Court must first consider the City's argument that some of the hours claimed by NP are not even compensable under § 1988. According to the City, the following are hours for which NP cannot be compensated: (1) fees billed prior to the supplemental complaint which first alleged the Condition 13(b) claim; (2) fees billed on unrelated litigation (as opposed to unrelated claims); and (3) fees billed by Mr. Fromm as a member or principal of NP. *See* Schratz Decl. ¶ 17(A) at 13-17. At the hearing on the motion for attorney's fees, the Court also discussed cure costs claimed by NP.

i. Fees Billed Prior to Supplemental Complaint

The City argues first that all fees billed prior to the supplemental complaint -- which first raised the Condition 13(b) claim -- should be heavily reduced. *See* Opp'n at 5, 17-18; Schratz Decl. ¶ 17(A)(1) at 13-14. More specifically, according to the City, fees incurred prior to July 18, 2003, the day the supplemental complaint was filed, should be disallowed by 90%.

While the City's position cannot be fully credited, the Court does find that a reduction of some hours is warranted given the timeline in this case, wherein the only issue on which NP prevailed was raised late in the litigation. However, this reduction is more appropriately taken as a downward adjustment to the lodestar for limited success because it is based on NP's having prevailed on only one claim out of those asserted in its original, amended, and supplemental complaints. *See* Part II.B.3., *infra*. As discussed below, because Condition 13(b) did not even come

into existence until shortly before July 15, 2002, the Court shall exclude all fees incurred prior to that time.[6]

ii. Fees Billed on Unrelated Litigation

While the Court shall not discuss until later the reduction of fees because of NP's limited success in *this* litigation, it shall discuss here the City's contention that there should be a reduction of fees because NP's attorneys included on their billing records time spent on *unrelated* litigation.

As noted above, for at least part of the billing time period, Ms. Pope failed to maintain separate billing records for this lawsuit specifically. The Court finds that, although Ms. Pope did make some effort to cross out from her billing records time entries related to other litigation, she did not successfully exclude all of that time. As best as the Court can determine, the following time entries involve unrelated litigation and therefore should be excluded:

| JAQUELYNN POPE[7] | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 7/13/02 | 1.00 | | *Draft corresp. re: Commissioner Tan "Street Scene" request* |
| 7/15/02 | 1.00 | | *Receipt & review State Court Demurrer to First Amended Complaint* |
| 7/23/02 | 10.00 | | JAMS Mediation w/City of Pacifica in Street Case |

[6] In the sections that follow, the Court does not consider fees incurred at or about July 15, 2002, and prior thereto because the Court excludes all such hours as part of the analysis of limited success as discussed below.

[7] The Court largely relies upon the unblocking of time entries done by Mr. Schratz. Unblocking by Mr. Schratz is reflected by the use of italics. Where the Court has done its own or additional unblocking, such is reflected by the use of underlining.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 7/25/02 | 2.00 | | *Draft response to Curtis Appeal*[8] |
| 7/27/02 | 3.00 | | Re[c]eipt & review City's Replies re: Motion to Strike, Demurrer to Writs; draft objection, etc.[9] |
| 8/3/02 | 1.50 | | *Draft response to Curtis Appeal of EIR* |
| 8/4/02 | 1.50 | | Draft response to Curtis appeal |
| 8/5/02 | 0.20 | | *Tel. conf. w/T. Reid re: response to Curtis appeal* |
| 8/5/02 | 2.50 | | *[D]raft response to appeal* |
| 8/6/02 | 3.00 | | *[C]omplete response re: EIR, Draft response to Curtis appeal re: permits* |
| 8/7/02 | 2.00 | | *Receipt & revise opposition to appeals K. Fromm* |
| 8/8/02 | 1.00 [counting only 0.50 only][10] | | *Rev. e-mails re sewer objections; revise corresp. re: 65589.5* |

[8] Mr. Curtis challenged the City's ultimate certification of the environmental impact report ("EIR"). This had nothing to do with the instant litigation, which involved, *inter alia*, claims by NP that the City violated NP's constitutional rights by requiring an EIR before its development application was deemed complete in violation of the California Environmental Quality Act ("CEQA") and by requiring a second brand new EIR after the application was deemed complete.

[9] In her reply declaration, Ms. Pope states that NP is willing to delete 1.50 hours. *See* Pope Reply Decl. ¶ 43. However, the entirety of the time entry seems related to the state court litigation; thus, there should be a reduction of all of the hours -- *i.e.*, 3.00 hours.

[10] In his unblocking, Mr. Schratz attributed 1.00 hours total to reviewing e-mails and revising correspondence. The Court has done additional unblocking and attributed 0.50 hours out of the 1.00 to revising e-mails. Therefore, the Court shall only "count" 0.50 hours instead of 1.00 as being subject to exclusion.

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 8/8/02 | 1.30 [counting only 0.60] | | *[T]el. confs. w/K. Fromm; B. Kalmbach; M. Kenyon; Tel. San Mateo court (x5)* |
| 8/14/02 | 1.50 | | *[R]eview demurrer to State Complaint, etc.* |
| 8/19/02 | 2.00 | | *Draft corrected Request for Judicial Notice*[11] |
| 8/20/02 | 1.60 | | *[R]eview K. Fromm correspondence re Fish & Bowl committee, Curtis, etc.* |
| 8/28/02 | 1.50 | | *Legal research re: Coastal Commission*[12] |
| 8/29/02 | 7.00 [counting only 3.50] | | *Draft Motion for Reconsideration, legal research re: Coastal Commission*[13] |
| 8/29/02 | 0.50 [counting only 0.20 only] | | *Tel. conf. w/K. Fromm; B. Kalmbach; attn to Quiet Title action* |

[11] NP did not file a request for judicial notice in this Court at or about this time. Thus, the Court finds that the request for judicial notice was for a different lawsuit and not compensable herein.

[12] In her reply declaration, Ms. Pope states that hours incurred at this time were related to the City's seeking the assistance of NP in responding to the Coastal Commission's assertion that it had appellate jurisdiction over the issuance of the coastal development permit to NP. *See* Pope Reply Decl. ¶ 30. NP cannot charge the City for this time. The Coastal Commission's actions here had nothing to do with the Condition 13(b) claim or the other claims asserted by NP *against the City* in the instant litigation. Also, in its findings of fact for the damages phase, the Court specifically stated that NP could not recover as part of its cure costs the fees it incurred with respect to the Coastal Commission litigation. *See* Damages FF ¶ 92.

[13] In her reply declaration, Ms. Pope states that NP is willing to deduct 2.00 hours from the *entire* time entry for August 29, 2002. *See* Pope Reply Decl. ¶ 46. The Court has done its own unblocking for the time entry.

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 9/5/02 | 5.50 [counting only 3.00] | | *[R]eview R. [sic] Fromm corresp.* ***Office conf. w/K. Fromm re administrative writ documents***[14] |
| 9/7/02 | 4.00 | | Draft correspondence to Coastal Commission re regulations etc. |
| 9/8/02 | 6.00 | | Continue draft of long correspondence to Coastal Commission re regulations, etc. |
| 9/9/02 | 2.00 | | *Draft correspondence to Shenfeld re discovery*[15] |
| 9/10/02 | 6.00 | | Corresp. Coastal Commission; legal research Coastal Commission; tel. confs. w/M. Kenyon; R. Kalmbach[16] |
| 10/2/02 | 7.50 | | *[Re]vise petition for writ of mandate/prohibition; etc.*[17] |

---

[14] In her reply declaration, Ms. Pope claims that "[t]he documents included in the administrative writ are also the documents that are the basis of the within lawsuit and the administrative writ documents were introduced as exhibits in the liability trial." Pope Reply Decl. ¶ 26. However, the fact that the same evidence may have been used for the litigation involving the administrative writ and the instant litigation does not mean that NP can get its fees for the former litigation by virtue of this litigation. The issue is what NP can recover as the prevailing party in *this* litigation.

[15] *See* Pope Reply Decl. ¶ 47 (stating that "NP will delete the remaining two hours" related to "the discovery correspondence regarding the Quiet Title action").

[16] *See* Pope Reply Decl. ¶ 48 ("This entry was overlooked when I was redacting the bills. NP will delete the 6.0 hours.").

[17] In her reply declaration, Ms. Pope states that NP will delete 6.00 out of 8.00 hours because of the work on unrelated litigation. *See* Pope Reply Decl. ¶ 44. The Court has done its own unblocking.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 10/23/02 | 9.00 [counting only 4.50] | | Complete draft Judge Chen letter briefs, receipt & review Coastal Commission opposition to writ[18] |
| 4/1/03 | 0.80 | | *Draft corresp. H. Gould re John Curtis* |
| 11/10/03 | 12.00 [counting only 5.00] | | Meetings with J. Tanner staff re: clearing and grubbing, App. at Council meeting[19] |
| **TOTAL** | **77.90** | | |

The Court also finds that, like Ms. Pope's billing records, Mr. Fromm's billing records also contain time spent on unrelated litigation. As best as the Court can determine:

| KEITH FROMM | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 7/29/02 | 8.00 [counting only 0.50] | | Reviewed letter from Siegel re: appeal of project approval, prepared settlement agreement draft. Research re: 65589.5j |
| 8/7/02 | 8.25 [counting only 4.25] | | Prepared opposition to Appeal of Permit Approvals. Revised J. Pope's appeal of EIR certification |
| 8/8/02 | 3.00 | | *[P]repared and reviewed responses by KMF and JCP to Curtis' appeal* |

[18] *See* Pope Reply Decl. ¶ 49 ("NP will delete 4.5 hours for this entry.").

[19] In its findings of fact for the damages phase of trial, the Court also determined that the cost of clearing and grubbing was not a proper cure cost. *See* Damages FF ¶ 91.

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 8/9/02 | 1.00 | | Reviewed court's ruling on City's Motion to Strike damages, prepared mm to RJK |
| 8/14/02 | 6.50 [counting only 6.30] | | Prepared letter to John Curtis, faxed to RJK and JCP for comments |
| 8/19/02 | 16.00 [counting only 4.00] | | Downloaded all articles from Fishnbowl.org from the web. They are located both in Myimages and Mydocuments. poffishnbowlnewsletters, evidence as to statements of city council members and Crabtree as to treatment of NP's project. Worked on preparing letter to Fishnbowl.org people to dissuade from pursuing appeals. Reviewed all of the fishnbowl.org newsletters, [r]evised letter to John Curtis. Telecon Roy Hills |
| 8/20/02 | 9.00 [counting only 2.00] | | Several revisions to letters to Fishnbowl and John Curtis, several telecons with Jaquelynn Pope. Reviewed expenses for project to compile info for initial disclosures, including potential witness list. Mailed letters to John Curtis and Fishnbowl people |

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 11/10/03 | 13.00 [counting only 5.00] | | *Attended Bowl project, met with police, met with Steve Brandvold, met with Joe Tanner, removed stop work order, attended and spoke at City Council meeting* |
| 1/15/04 | 3.00 [counting only 1.50] | | Prepared letter to Cecilia Quick re: amendment of conditions, prepared letter to Cecilia Quick re: procedure for vacating Edgemar Road, violation of equal protection |
| 1/23/04 | 5.00 | | Preparation of letter to City in response to proposed action to refuse to consider application to vacate Farallon. Reminded them of violation of equal protection and enclosed Olech case |
| 1/24/04 | 9.50 | | Preparation of letter in response to proposed refusal to consider application to vacate Farallon, both alone and with J Pope |
| 12/7/04 | 4.00 [counting only 1.00] | | Prepared Trial Brief and reviewed evidence. Reviewed joint letter to Judge Chen, reviewed and revised letter to Joel Jacobs re: sending letter to Judge Illston. Read deposition of Peter Imhof |
| **TOTAL** | **43.05** | | |

The City also asserts that some of the time entries related to settlement should be excluded or at least discounted because they are not related to the instant litigation. More specifically, the City

argues that time entries related to settlement in the July 2002 time period should be excluded in their entirety. *See* Siegel Decl. ¶ 30 (noting that Mr. Fromm refers to 8.00 hours expended on July 26, 2002, preparing a settlement agreement in the form of a stipulated judgment but that, "[t]o the best of my recollection, neither the City nor its counsel participated in any settlement discussions relative to this lawsuit in or around July 2002 which involved a proposed stipulation for judgment"). The City also argues that subsequent settlement discussions were global in nature and not limited solely to this lawsuit and, thus, there should be a discount of some sort. *See id.* ¶ 32.

In its reply brief, NP does not contest the City's assertion that the entries related to settlement in the July 2002 period are not related to the instant litigation and so the time shall be excluded.

| **JAQUELYNN POPE** | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 7/25/02 | 0.30 | | *Rev. e-mails re: Settlement etc.* |
| 7/25/02 | 0.80 | | *[R]eview Settlement Agreement* |
| 7/28/02 | 0.50 | | *Review K. Fromm draft stipulated Judgment* |
| 7/29/02 | 1.60 [counting only 0.80] | | Draft letter re: settlement; receipt & review e-mails |
| 7/30/02 | 1.50 | | *Revise letter re: settlement; revise stipulated judgment* |
| **TOTAL** | **3.90** | | |

| **KEITH FROMM** | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 7/26/02 | 8.00 | | Prepared form of settlement agreement in form of stipulated judgment |

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 7/29/02 | 8.00 [counting only 3.50] | | Reviewed letter from Siegel re: appeal of project approval, prepared settlement agreement draft. Research re: 65589.5j |
| 7/30/02 | 2.00 [counting only 1.00] | | Preparation of settlement draft, Research on 655895j Reviewed ruling on Motion to Dismiss, won on equal protection, failed to establish a protected property interest, discriminated against for an arbitrary reason |
| **TOTAL** | **12.50** | | |

As for subsequent settlement discussions, NP concedes that they were part of global settlement discussions, *see* Pope Reply Decl. ¶ 17, and therefore the Court shall take a percentage reduction. Although there were 11 other actions involving NP, the City, and/or the Coastal Commission in addition to the instant lawsuit, Ms. Pope claims that "this case and the Street lawsuit were, by far, the most important pieces of litigation which the parties sought to settle." *Id.* Accordingly, the Court shall limit the discount for the unrelated litigation to 50%.

| **JAQUELYNN POPE** | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 8/21/02 | 2.00 [counting only 1.00] | | *Review damages; review settlement agreement* |
| 8/22/02 | 7.00 | | Preparation and attendance at settlement conference at McDonough, Holland |
| 2/18/03 | 6.00 | | Draft Settlement conf. statement |

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 2/25/03 | 8.00 | | Preparation for and attendance at settlement conf. |
| 5/13/04 | 0.60 | | Tel confs. w/P. McMahon; clients re settlement conference |
| 5/19/04 | 0.20 | | *Receipt & review Judge Brazil Order re further settlement conf* |
| 5/31/04 | 1.00 | | Draft corresp. to Judge Brazil |
| 6/1/04 | 0.20 | | *Receipt & review order re settl[e]ment conf.* |
| 6/17/04 | 2.00 [counting only 0.50] | | Protective order; <u>Judge Brazil's order re settlement</u> |
| 7/8/04 | 9.00 | | Attendance at settlement conference w/Judge Brazil in Oakland, CA |
| 7/26/04 | 0.30 | | *Tel. conference P. McMahon re settlement offers* |
| **TOTAL** | **33.80** | | |
| | **33.80 x 50% = 16.90** | | |

| KEITH FROMM | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 8/22/02 | 10.00 [counting only 4.00] | | Flew to Oakland and <u>attended settlement meeting with Michelle Kenyon, Cecilia Quick, Kevin Siegel, Jaquelynn Pope, Bob Kalmbach</u>, returned at night |
| 2/25/03 | 6.00 | | *Attended settlement conference* |

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 12/8/03 | 4.00 | | Reviewing and revising statement re: Mediation re: conditions lawsuit, preparing materials for meeting with Joe Tanner re: settlement, tt [sic] Joe Tanner |
| 12/9/03 | 2.00 | | *[A]ttended meeting with Joe Tanner to discuss settlement* |
| 12/10/03 | 5.00 | | *Attended settlement conference with Cecilia Quick, Michelle Kenyon, Joe Tanner, Bob Kalmbach, Jaquelynn Pope* |
| 12/18/03 | 7.00 [counting only 3.00] | | *Prepared and revised letters to City re: deleting conditions, various conversations with Michelle, long conversation with Joe Tanner re: possible settlement scenarios* |
| 12/25/03 | 1.00 | | Researched City's Sneath Lane property to see if it could be used for settlement of judgment per Joe Tanner's suggestion |
| 2/3/04 | 5.50 | | Prepared summary of settlement proposal for Joe Tanner |
| 2/14/04 | 1.50 | | Prepared and revised pre-trial offer and demand |
| 7/7/04 | 4.00 | | *Attended settlement conference* |
| 8/6/04 | 0.25 | | Telephone call to Mark Armstrong re: status of settlement offer. Left message |

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 5/30/05 | 1.00 | | Teleconference with J. Pope re: settlement strategy |
| 6/3/05 | 1.00 | | *Memos to Kalmbach and Johnson re: conference and settlement issues* |
| 6/12/05 | 1.50 | | Conference and reviewed various emails re: settlement and settlement conference, with J Pope |
| 6/16/05 | 7.00 | | Conference with J. Pope, Kalmbach, Johnson, re: settlement of EQ lawsuit and global settlement with City |
| 8/8/05 | 1.50 | | Preparation of response to Pat McMahon's latest draft confidentiality agreement and telcon with J. Pope concerning same |
| **TOTAL** | **48.25** | | |
| | **48.25 x 50% ≈24.10** | | |

Excluding the hours above leaves Ms. Pope with **2,999.00 hours** (*i.e.*, 3,097.70 – 77.90 – 3.90 – 16.90 = 2,999.00).

Excluding the hours above leaves Mr. Fromm with **3,427.65** hours (*i.e.*, 3,507.30 – 43.05 – 12.50 – 24.10 = 3,427.65).

iii. <u>Fees Billed by Mr. Fromm as Member or Principal of NP</u>

Finally, the City argues that the Court should exclude the fees of Mr. Fromm because (1) as a member and principal of NP, he "lacked independent judgment to ensure that reason and rationality dictated the conduct of this litigation," Opp'n at 18; (2) the purpose of fee shifting under § 1988 is to protect disadvantaged persons who have been subjected to unlawful discrimination; and (3) he



United States District Court
For the Northern District of California

violated the advocate-witness rule. Alternatively, the City asks that the Court limit Mr. Fromm's time "to work performed by him *as an attorney*" and not as member or principal of NP. *Id.* at 19 (emphasis in original).

The Court is not persuaded by the City's first three arguments. To the extent the City's concern is Mr. Fromm's lack of independent judgment, the Court has taken such into account in determining what was a reasonable hourly rate for his services (which takes into consideration the lawyer's skill) and in determining what was a reasonable number of hours for the tasks he performed. Also, while one purpose of fee-shifting under § 1988 may be to provide access to the federal judicial system to disadvantaged persons, another purpose is to encourage the private enforcement of civil rights statutes. *See Green v. Torres*, 361 F.3d 96, 100 (2d Cir. 2004). Here, NP is a separate legal entity from Mr. Fromm. Mr. Fromm is not the sole owner of NP. NP was entitled to legal representation and may recover fees reasonably incurred in prevailing in this litigation. Finally, the City has not offered any authority demonstrating that a lawyer's violation of an ethical rule, if there was one here (the City did not previously raise this assertion), is grounds for denying the client statutory attorney's fees.

That being said, the Court does agree with the City that Mr. Fromm's hours should be limited to his work as an attorney and not as a member or principal of NP. In particular, hours spent by Mr. Fromm testifying as a deponent or witness at trial shall be excluded. (The fact that NP will not concede that these hours are improper demonstrates once again the lack of billing judgment.) The Court, however, shall not exclude hours spent by Mr. Fromm *preparing questions* for his trial testimony (see, for example, the time entry for February 4, 2005) because such a task likely involved his skill as an attorney conducting the litigation. Similarly, the Court shall not exclude hours spent by Mr. Fromm for attending Planning Commission meetings because it is not clear that this participation did not require his skill as an attorney in relation to this litigation. Accordingly, the following hours should be excluded from the fee award:

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

| KEITH FROMM | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 4/18/03 | 11.00 [counting only 8.00] | | *Prepared opposition for Motion to Compel, attended Oakland for my deposition* |
| 4/21/03 | 4.00 | | *Flew to Oakland to attend deposition of Keith Fromm at McDonnough [sic], Holland* |
| 4/22/03 | 8.00 [counting only 5.50] | | *[A]ttneded [sic] deposition of Keith Fromm at offices of McDonnough [sic], attended deposition of Robert Kalmbach at offices of McDonnough [sic]* |
| 7/28/03 | 8.00 [counting only 2.50] | | *Trial[;] conducted trial*[20] |
| 7/29/03 | 8.00 [counting only 2.50] | | *Trial[;] conducted trial*[21] |
| 2/7/05 | 8.00 [counting only 5.00] | | *Conducted trial*[22] |
| 2/8/05 | 8.00 [counting only 2.50] | | *Conducted trial*[23] |
| **TOTAL** | **30.00** | | |

The above has no effect on Ms. Pope's hours, which remain at **2,999.00 hours**.

Excluding the hours above leaves Mr. Fromm with **3,397.65** hours (*i.e.*, 3,427.65 – 30.00 = 3,397.65).

[20] On July 28, 2003, the only witnesses who testified were Maxine Gonsalves and Mr. Fromm.

[21] On July 29, 2003, the only witnesses who testified were Mr. Fromm and Harvey Lind.

[22] On February 7, 2005, the only witness who testified was Mr. Fromm.

[23] On February 8, 2005, the only witnesses who testified were Mr. Fromm and Jeff Costell.

United States District Court
For the Northern District of California

iv. Cure Costs

Finally, as part of the attorney's fees request, NP included time spent by its attorneys on trying to "cure" Condition 13(b). The City suggests that, contrary to the Court's findings of fact and conclusions of law at the damages phase, NP is not entitled to such. But the Court has already ruled on this issue. It is the law of the case. Moreover, on the merits, the Court is not persuaded by the City's argument. NP had an obligation to mitigate its damages and the City did obtain a benefit from the curing of Condition 13(b) -- it ensured that the damages would be assessed based on a temporary taking only as opposed to a permanent taking.

The City contends still that some of the purported cure costs claimed by NP after the end date of the constitutional injury – *i.e.*, after November 10, 2003 – should not be compensable. *See* Damages FF ¶ 90 (stating that attorney's fees incurred by NP after November 10, 2003, in obtaining satisfactory administrative completion of the cure arguably may be recovered – "[i]n that regard, issues of what constituted a complete administrative cure and whether NP fulfilled its duty to mitigate in obtaining that cure may inform the reasonableness of any fee assessed under § 1988"). But the City has not provided any substantive argument as to why; nor has it identified which specific hours should be eliminated.

That being said, the Court shall exclude some hours as obviously falling outside the realm of cure costs or at least reasonable cure costs. More specifically, the Court shall exclude hours related to efforts by Mr. Fromm to sell the development project in 2004. These hours should not be included because they have nothing to do with actually curing Condition 13(b). Moreover, these hours were largely incurred well past the temporary takings period, and it is not clear that Mr. Fromm was spending these hours acting in a capacity as a lawyer as opposed to a member and principal of NP.

| KEITH FROMM | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 1/8/04 | 4.50 | | *Conversation with Jim Pollart of Obrien Homes and Roy Hills re: possibility of selling project and getting assurances from City as to development of Fish lots* |
| 1/13/04 | 4.00 [counting only 2.00] | | Removal of 13(b) is an affirmative defense which was not pleaded. It would be retrying liability.. He said judicial estoppel, they could not remove the condition. Judge Chen said you have to mitigate damages. Want to have early trial and therefore early execution upon assets.<br><br>Failure to mitigate damages is an affirmative defense, it is not raised No time, no money and City has poisoned the project, a reasonable person know when to quit. Four to six months Marchetti exclusive right to negotiate. Marchetti thinks they can get 170 units approved. It would be worth a lot of money if that were the case. Research and conference with JCP |

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 2/2/04 | 3.50 | | Spoke to Jim Pollart today about buying the Bowl project. He said he was busy fighting his own battles with the City and was not eager to wade into any more messy situations. He was reticent to put money into a project . . . . |
| 5/24/04 | 9.00 | | Prepared and revised form of Purchase and Sale Agreement for Bowl project in order to mitigate damages and establish project value |
| 6/14/04 | 3.00 | | Prepared revised form of LOI, and conference with Bruce Bauer re: sale to Silverstone of Bowl project, to mitigate damages and est. value |
| 6/17/04 | 1.50 | | Spoke to John McMorrow re: various matters relating to purchase and sale of Bowl re: mitigation of damages |
| 6/18/04 | 1.50 | | Reviewed draft purchase agreement for Bowl from Silverstone |
| 6/21/04 | 2.50 | | Conversation with John McMorrow re: terms of purchase agreement, conversation with R. Kalmbach re: terms of purchase agreement for Bowl, for mitigation of damages |



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 6/22/04 | 2.00 | | Conference call with Marc Gottschalk, John McMorrow, Jeff Gilman re: terms of deal |
| 6/24/04 | 3.00 | | Prepared due diligence items and emailed and faxed them to Silverstone re: mitigation of damages[24] |
| 6/24/04 | 2.00 | | Telecon with R. Kalmbach re: his meeting today with Western Pacific, he indicated that because of the ill-will the City has shown in connection with the issuance of the Tentative Tract Map they are hesitant to purchase the project unless it is contingent upon the issuance of the Final Tract Map |
| 6/25/04 | 3.00 | | Prepared due diligence items for submittal to Buyer to mitigate damages |
| 6/27/04 | 9.00 [counting only 2.00] | | Assembling all Bowl environmental reports for trial and making copies and exhibit books. <u>Various emails and faxes to Silverstone re: due diligence to mitigate damages</u> |
| 6/28/04 | 10.00 | | Assembled and delivered documents for due diligence of Silverstone purchase, to mitigate damages and to prepare exhibits for Oct. trial |

[24] Faxing is also a clerical task.

United States District Court
For the Northern District of California

| DATE | HOURS | FEES | DESCRIPTION |
|---|---|---|---|
| 7/19/04 | 3.00 | | Meeting with Hearthstone, Jim Pugash re: sale of Bowl to mitigate damages |
| 7/22/04 | 3.00 | | Revised form of purchase agreement for Bowl, re: mit. of damages |
| 7/23/04 | 4.00 | | Revised purchase agreement for Bowl, re: mit. of damages |
| 7/27/04 | 3.50 [counting only 1.00] | | Revised purchase agreement for Bowl. Reviewed and revised letter to Joel Jacobs and Court re: Peter Douglas deposition. Conference call with Paul Talmage |
| 8/19/04 | 3.00 | | Conference call with Greg Wasserman, John McMorrow et. al. re: sales agreement |
| **TOTAL** | **63.50** | | |

The above has no effect on Ms. Pope's hours, which remain at **2,999.00 hours.**

Excluding the hours above leaves Mr. Fromm with **3,334.15 hours** (*i.e.*, 3,397.65 - 63.50 = 3,334.15).

d. Billing Judgment

Having excluded noncompensable hours from the hours claimed by NP, the Court now turns to the issue of billing judgment. The City contends that both Ms. Pope and Mr. Fromm failed to exercise billing judgment by, *inter alia*, (1) seeking fees for an unsuccessful motion (in particular, a motion to disqualify); (2) seeking fees for doing clerical work only; (3) seeking fees for travel time; (4) billing an excessive number of hours for the cross-motions for summary judgment; (5) billing an excessive number of hours for trial preparation; and (6) seeking fees for the attendance of two attorneys at depositions.

The Court does not find persuasive the City's argument with respect to the unsuccessful motion to disqualify. According to the City, the Court should reduce the hours spent by NP's attorneys on the motion to disqualify because, even though the Court granted the motion with respect to Sanford Skaggs and Daniel Curtin, "the balance of the motion was denied, including the disqualification of defendant's counsel." Schratz Decl. ¶ 17(E) at 25. However, "[i]n the Ninth Circuit, fees for an unsuccessful motion are not automatically excluded. Rather, an ultimately successful plaintiff should be compensated for steps along the path to victory, even if every step is not successful, where the motion constituted 'a method of pursuing her ultimately successful claims,' was a necessary stage of the case, or otherwise contributes to the plaintiff's ultimate success." *Freitag*, 2003 U.S. Dist. LEXIS 26579, at *18. Similarly, the Sixth Circuit has said that "the question is not whether a party prevailed on a particular motion" but "whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990). Given the above standard, the Court shall not reduce any hours spent on the motion to disqualify because it was not unreasonable for NP to seek to disqualify the City's experts and counsel for the City.

The Court, however, does conclude that NP's attorneys failed to exercise billing judgment in the remaining ways specified by the City. NP contends otherwise, arguing that the hours claimed must be reasonable because its attorneys spent "virtually the same amount of hours in this case as NP's attorneys." Reply at 1. The Court acknowledges that the hours spent by the attorneys for the opposing party is "a useful guide in evaluating the appropriateness of time claimed [by the plaintiff]." *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004). A "useful guide," however, is only just that. The Court has conducted a "systematic perusal of the actual billing entries" of NP's attorneys which confirms that the reason for high number of hours incurred is not "careful compliance with the attorneys' responsibilities" but rather inefficiency. *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1151 (9th Cir. 2001). At the same time, the Court recognizes that the City's attorneys did mount a vigorous defense to this case, and "[t]hose who elect a militant defense in the face of a statute allowing attorney's fees if they are defeated must take into

United States District Court
For the Northern District of California

account the time and effort they extract from their opponents."[25] *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (plurality opinion).

i. Clerical Tasks

The Supreme Court has noted that "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." *Missouri v. Jenkins*, 491 U.S. 274, 288 (1989). Clerical activities include time spent on filing and document organization. *See Keith*, 644 F. Supp. at 1315 (deducting 170.7 hours from a fee request for time spent on filing, document organization, and other "clerical matters"); *see also* 2 Schwartz & Kirklin, Section 1983 Litigation § 4.6, at 195 ("[A]ttorneys generally should receive no compensation for time spent on purely secretarial or other nonlegal services, such as serving or filing documents, photocopying documents, or making scheduling or travel arrangements, that are appropriately performed by messengers, secretaries, or clerks whose services ordinarily are part of a law office's overhead and are not billable to fee-paying clients.").

Based on the Court's review of the billing records, both Ms. Pope and Mr. Fromm charged NP for doing clerical work only. Ms. Pope, for instance, billed NP for, *inter alia*, filing papers, making the exhibit books, re-tabbing exhibits, and picking up documents. *See, e.g.*, Pope Reply Decl. ¶ 7 (indicating that she spent a fair amount of time making copies of exhibits and preparing the binders for the exhibits (five sets each), as well as causing two sets to be transported to the Court). Similarly, Mr. Fromm billed NP for, *inter alia*, filing papers, making the exhibit books, making copies, sending faxes, transmitting documents, and serving documents. *See, e.g.*, Fromm Decl. (time entry for October 31, 2004, reflecting that Mr. Fromm spent 6.00 hours on "sen[ding] more document production request transmissions to Pat McMahon [opposing counsel]"). In his reply declaration, Mr. Fromm protests that, in general, secretarial tasks such as sending faxes do not entail a large amount of time. *See* Fromm Reply Decl. ¶ 29. While this may be true, the secretarial tasks

---

[25] NP makes much of the fact that some 33 attorneys worked on behalf of the City. However, not all 33 were working on the case at the same time. Moreover, it is not uncommon for a case to have many different timekeepers but only a few with a substantial number of hours. This appears to have been such a case. *See* Pope Reply Decl., Ex. A.

United States District Court
For the Northern District of California

that Mr. Fromm did involved more than just sending faxes, and even small increments of time can add up.

ii. Travel Time

Both Ms. Pope and Mr. Fromm charged NP for their travel time, the most notable travel time consisting of trips from Los Angeles (where both Ms. Pope and Mr. Fromm are located) to the San Francisco Bay Area (where the Court, the City, and the property at issue are located). As a preliminary matter, the Court notes that, while there are many cases that discuss travel time by an attorney, the travel at issue in those cases is typically different from that in the instant case, involving for example, travel for an out-of-state deposition, *see Defenbaugh*, 2004 U.S. Dist. LEXIS 16256, at *34 (Spero, J.), or local travel. *See United States v. San Francisco*, 748 F. Supp. 1416, 1422 (N.D. Cal. 1990) (Patel, J.) (discussing "commuting to the office of co-counsel"). In such circumstances, travel time is usually deemed compensable and often at an attorney's full hourly rate. *See id.* ("Reasonable attorneys' fees include reasonable travel time compensated at the full hourly rate."). *But see MacDougal v. Catalyst Nightclub*, 58 F. Supp. 2d 1101, 1106-07 (N.D. Cal. 1999) (Jenkins, J.) (reducing the hourly rate for part of an attorney's travel time, from $325 to$ 195).

The travel at issue here is somewhat different because NP could have hired local counsel which would have eliminated or at least drastically reduced travel time (not to mention costs). Some courts have addressed this specific scenario. For example, as pointed out by the City, the Tenth Circuit has indicated that, "because there is no need to employ counsel from outside the area in most cases, . . . travel expenses for such counsel between their offices and the city in which the litigation is conducted should [not] be reimbursed" and "[d]eparture from this rule should be made in unusual cases only." *Ramos v. Lamm*, 713 F.2d 546, 559 (10th Cir. 1983), *overruled on other grounds by Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 483 U.S. 711 (1987). The Eleventh Circuit has taken a similar approach, stating that, because a party has "the right to retain more than one attorney, the exclusion of out-of-town counsel's travel time is proper only if it was unreasonable not to hire qualified local counsel." *Johnson v. University College of University of Alabama*, 706 F.2d 1205, 1208 (11th Cir. 1983). Thus, for instance, in *Marbled Murrelet v. Pacific Lumber Co.*, 163 F.R.D. 308 (N.D. Cal. 1995) (Bechtle, J.), the court concluded that it was

"perfectly reasonable for [the plaintiff in the case] to go outside of the San Francisco area to seek legal assistance" because it "demonstrated that it was unable to persuade any private law firm or nonprofit legal aid society in the San Francisco area to take on the risk of challenging [the defendant] in this lawsuit." *Id.* at 327.

Informed by the above case law, the Court concludes that it was not reasonable for NP to hire Ms. Pope, an attorney outside of the Bay Area, and charge the City for her travel time. While it may have been convenient for NP to have counsel in Los Angeles, as that is where NP is located, the Court is situated in the Bay Area, the property at issue is located in the Bay Area, the fact witnesses largely reside in the Bay Area, and the underlying events took place in the Bay Area. It was highly inefficient to have counsel incur travel time from Southern California for every court appearance, meeting, and deposition in the Bay Area. Moreover, there is nothing to indicate that Ms. Pope was uniquely equipped to handle this case. There are highly qualified counsel in the Bay Area who could have represented NP on the constitutional issues asserted.

NP suggests that Ms. Pope was unique in the sense that she was willing to charge a lower rate than other attorneys. However, before retaining Ms. Pope, NP appears to have interviewed only "several land use lawyers in Los Angeles," Fromm Decl. ¶ 6, not any land use lawyers in the Bay Area, let alone any litigators in the Bay Area. Also, there is no evidence to demonstrate that counsel in the Bay Area would not also have been willing to charge below-market rates because of "the large amount of hours necessary for the litigation." Pope Decl. ¶ 4. Finally, as found above, Ms. Pope's rate of $240 for this case was not far off from, *e.g.*, Bay Area opposing counsel Michelle Kenyon's purported rate of $230.

That being said, the Court recognizes that NP cannot be blamed for the fact that in-house counsel, Mr. Fromm, is located in Los Angeles rather than the Bay Area. Accordingly, the Court concludes that at least the travel time of Ms. Pope, but not Mr. Fromm, should be excluded.[26]

---

[26] Unfortunately, determining the amount of travel time for Ms. Pope is difficult because, in general, she did not specifically list travel in her time entries. It becomes even more complicated because, based on the Court's review of her billing records, it appears that sometimes Ms. Pope charged for her travel time (even if a time entry did not specify travel), sometimes she charged for part of her travel time, and other times she did not charge at all for her travel time. Instances in which Ms. Pope clearly charged for her travel time include those time entries describing her attendance at a case

United States District Court
For the Northern District of California

iii. Cross-Motions for Summary Judgment

According to Mr. Schratz, the billing records reflect that NP's attorneys spent more than 600 hours in working on the cross-motions for summary judgment, which were heard by the Court in June 2003. Based on the Court's review of the billing records, the number of hours calculated by Mr. Schratz is reasonably accurate, and the Court agrees that this number of hours was excessive. The issues raised in the cross-motions were not complex and the briefs themselves were not lengthy (generally 25 pages or less).

The Court acknowledges that, in addition to the briefs, NP filed several declarations. However, the only declarations that seem to have involved any substantial amount of time were those of Mr. Fromm -- *e.g.*, his declaration in support of NP's motion for summary judgment, which was 64 pages in length; his reply declaration in support of the motion, which was 33 pages; and his declaration in opposition to the City's motion for summary judgment, which was 53 pages in length. Mr. Fromm's declarations, however, were hardly declarations in the sense of being evidence to support the legal arguments in NP's briefs. Instead, Mr. Fromm's declarations were largely legal arguments themselves and therefore were improper. The Court suspected then and continues to suspect today that this was done to get around the page limitations on briefs as established by the Civil Local Rules. (Notably, the Court denied the request for a page extension for the briefing on the motions for summary judgment.).

---

management or status conference. A case management or status conference typically lasts 30 minutes to an hour; Ms. Pope routinely charged 8.00 to 10.00 hours for an appearance. Therefore, implicitly, Ms. Pope must have been including travel time as part of the hours claimed.

The Court notes that, as a general matter, it seems that a one-way trip from Los Angeles to the Bay Area, or vice-versa, consisted of approximately 4.00 hours. This estimation is based on the billing records of Mr. Fromm, which indicate that travel from Los Angeles to the Bay Area, or vice-versa, took anywhere from 3.00 to 6.00 hours -- usually somewhere in the neighborhood of 4.00 hours.

For example, Mr. Fromm's time entry for August 13, 2002, provides: "Flew back from San Jose after appeal of approvals. [¶] 6.0 hours." His time entry for November 9, 2003, provides: "Flew to Oakland. [¶] 4.0 hours." His time entry for May 4, 2004, provides: "Flew to Oakland in preparation for status conference hearing before Judge Chen on May 5, 2004. [¶] 4.0 hours." His time entry for July 13, 2004, provides: "Flew to S.F. for conference with Judge Chen. [¶] 3.0 hours." His time entry for December 22, 2004, provides: "Flew back to L.A. [¶] 5.0 hours." His time entry for January 2, 2005, provides: "Flew back to S.F. in preparation for Carney's depo. [¶] 4.5 hours."

United States District Court
For the Northern District of California

The Court also recognizes that NP spent time on supplemental briefing related to the motions for summary judgment but such briefing was never requested by the Court. In fact, NP never even asked leave of the Court to file the supplemental briefing. Moreover, even after the Court specifically admonished the parties about filing documents without leave to do so after briefing was complete, NP still continued to do so, resulting in the Court's order of June 20, 2003, which struck materials filed by NP.

iv. Trial Preparation

According to Mr. Schratz, NP's attorneys spent more than 750 hours on trial preparation, *excluding* the time spent on specific filings such as joint pretrial statements, trial briefs, post-trial briefs, motions in limine, and exhibits. Based on the Court's review of the billing records, the number of hours calculated by Mr. Schratz is reasonably accurate, and the Court agrees that this number of hours was excessive. There was no reason for NP's attorneys to spend this amount of time given that the issues in the case were relatively straightforward and that this was a bench trial only. Perhaps most notably, together, Ms. Pope and Mr. Fromm spent more than 100 hours working on only the closing argument for the damages phase, which was limited to 40 minutes in length.

The Court acknowledges that the trial in this case consisted of a liability phase, which lasted 5 days, and a damages phase, which lasted 6 days (with the last day being reserved for closing arguments only, each 40 minutes in length). But given the relative simplicity of the case and the fact that the 750 hours of time was *in addition to* hours devoted to specific filings such as joint pretrial statements, trial briefs, and the like, there is little doubt that NP's attorneys spent an excessive amount of time on trial preparation. As a rough calculation, based on 10 days of trial and more than 750 hours of trial preparation (exclusive of specific filings), NP's attorneys spent approximately 75 hours preparing for each day of trial -- *i.e.*, each attorney worked approximately a week on each day of trial. This, quite simply, was not reasonable. *See Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1031 (3d Cir. 1996) (upholding district court's determination that 69.9 hours of trial preparation, an amount twice as long as the trial itself, was excessive and unreasonable even in light of the number of issues raised and the voluminous record); *Ogden v. Johnson*, No. C00-0034, 2002 U.S. Dist. LEXIS 17684, at *19 (N.D. Iowa Sept. 5, 2002)

United States District Court
For the Northern District of California

(concluding that 85 hours of trial preparation time was excessive in a case where 14 witnesses were called over a two-and-a-half-day trial); *Growchowski v. Ajet Constr. Corp.*, No. 97 Civ. 6269 (NRB), 2002 U.S. Dist. LEXIS 5031, at *11-12 (S.D.N.Y. Mar. 27, 2002) (holding that 306.1 hours for preparation of one-week trial was excessive given limited issues tried; awarding three weeks of partner time for preparation as reasonable); *Apple Corps. v. International Collection Society*, 25 F. Supp. 3d 480, 491 (D.N. J. 1998) (finding it excessive for senior partner to spend almost three times as long to prepare for hearing as having to attend it).

v. <u>Deposition Attendance</u>

Based on the Court's review of the billing records, it appears that Ms. Pope and Mr. Fromm both appeared for 21 depositions together (excluding the deposition of Mr. Fromm), with Mr. Fromm taking or defending all or the large majority of the depositions.[27] It also appears that there were an additional 6 depositions for which only Mr. Fromm appeared and not Ms. Pope (*i.e.*, Adrienne Tissier and Mike Pacelli (April 2, 2003); John Curtis (April 9, 2003); Christine Schneider (April 10, 2003); Thomas Reid (April 11, 2003); and Barbara Carr (April 28, 2003)). Ms. Pope's billing records did not reflect any attendance at these depositions. *See also* Pope Reply Decl. ¶ 18 (conceding that she was not present at the depositions of Mr. Reid, Ms. Schneider, and Mr. Curtis).

As a starting point, the Court notes that "[i]t is for the plaintiff to justify the presence of multiple attorneys for particular activities." 2 Schwartz & Kirklin, Section 1983 Litigation § 4.4, at 181. As noted by one court,

> a fee applicant is entitled to recover for the hours of multiple attorneys if he satisfies his burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multiple-lawyer litigation. But the fee applicant has the burden of showing that, and where there is an objection raising the point, it is not a make-believe burden.

---

[27] Those depositions were for the following persons: Jason Kliewer, Michael Crabtree (twice) Lee Diaz, Robert Kalmbach (twice), Peter DeJarnatt, James Vreeland (twice), David MacLellan, Peter Imhof, Sanford Skaggs, Cecilia Quick (twice), Jeff Costell, Jeffrey Wagner, William Abbott, Kevin Siegel, Michelle Kenyon, Walter Karney, and Steven Johnson.

United States District Court
For the Northern District of California

*ACLU v. Barnes*, 168 F.3d 423, 432 (11th Cir. 1999); *see also Ramos v. Lamm*, 713 F.2d 546, 554 n.4 (10th Cir. 1983) ("[W]e think that the presence of more than two lawyers during trial or the presence of more than one lawyer at depositions and hearings must be justified to the court.").

> The work of multiple attorneys on the same activity is more easily justified in difficult or complex cases that require a litigation team approach. It is also recognized that the use of multiple attorneys may be particularly appropriate in a "documents" case in order to "manage the logistics of handling a paper blizzard."

2 Schwartz & Kirklin, Section 1983 Litigation § 4.4, at 182.

NP defends the presence of Ms. Pope at the depositions along with Mr. Fromm in several ways. First, NP argues that it was necessary because of the deposition schedules. *See* Reply at 14 ("[T]he deposition schedules required that Pope be familiar with the testimony of the prior witness in order to prepare for the next witness and there was not time between witnesses to obtain and review a transcript."). The Court rejects this argument because, while there were some depositions that were sandwiched together, most of them were not. For example, Mr. Kliewer was deposed on March 21, 2003; the next deposition (of Mr. Crabtree) did not take place until five days later. The depositions of Ms. Tissier, Mr. Pacelli, Mr. Curtis, and Ms. Schneider followed (from April 2 to 11, 2003); however, these depositions were all taken by Mr. Fromm alone. After that, the next deposition (of Mr. Diaz) did not take place until April 17, 2003. The depositions of Mr. Kalmbach and Mr. DeJarnatt followed on April 22 and 23, 2003, respectively, and the deposition of Mr. Vreeland not until May 5, 2003. (In between these depositions, Mr. Fromm took the deposition of Ms. Carr without the assistance of Ms. Pope.) Subsequently, Mr. MacLellan and Mr. Crabtree were not deposed until July 23 and 24, 2003. The next deposition (of Mr. Vreeland) did not take place until a year later.

Second, NP argues that Ms. Pope's attendance must have been necessary because she "participated by passing written questions to [Mr.] Fromm and facilitated questioning by identifying relevant documents as to issues that arose in light of the witnesses' answers." Pope Reply Decl. ¶ 18. However, the Court does not find either fact particularly compelling. That Ms. Pope handed some written questions to Mr. Fromm during the depositions is not especially significant, especially when there is no evidence as to the extent of this kind of participation and the Court is not excluding

any hours in which Ms. Pope might have helped Mr. Fromm prepare for the deposition in advance. As for Ms. Pope's identification of relevant documents during the depositions, there should have been a relatively small number of key documents needed for any given deposition.

Third, NP asserts that Ms. Pope was needed at the depositions "to ensure that[,] in light of the voluminous documents in this case, comprising tens of thousands of pages, and the short time between depositions I would be able to provide input as to the strategy for the next deposition and to observe the witnesses at [sic] first hand." *Id.* However, as noted above, the deposition schedule was not as demanding as NP claims. Also, contrary to what NP asserts, this was not a document heavy case. Indeed, based on the Court's knowledge of this case, a large number of documents produced in this case were of marginal relevance only. Finally, it is hard to believe that Ms. Pope was necessary to assess a witness's credibility, especially when many of the depositions were videotaped.

The Court therefore concludes that NP has not sufficiently demonstrated that both Ms. Pope and Mr. Fromm were needed for 21 out of 27 depositions, *i.e.*, more than 75% of the depositions. *Compare Oberfelder v. City of Petaluma*, No. C-98-1470 MHP, 2002 U.S. Dist. LEXIS 8635, at *21 (N.D. Cal. Jan. 29, 2002) (Patel, J.) ("The court finds that the presence of two attorneys for plaintiff at four out of twenty four depositions is not unreasonable nor atypical."). There is nothing unique about this case or these depositions that would require attendance by two attorneys. Moreover, it was clear that one attorney was capable of taking or defending a deposition as demonstrated by the fact that Mr. Fromm took care of the depositions of Ms. Tissier, Mr. Pacelli, Mr. Curtis, Ms. Schneider, Mr. Reid, and Ms. Carr on his own. At the very least, one attorney was capable of taking or defending the depositions of less important witnesses such as Mr. Kliewer, Mr. DeJarnatt, Mr. Vreeland, and Mr. Imhof. Notably, Mr. Fromm was able to do Ms. Carr's deposition without the assistance of Ms. Pope; therefore, he should have been able to do the same with respect to Mr. DeJarnatt and Mr. Vreeland, both of whom were City Council members like Ms. Carr. Similarly, since Mr. Fromm was able to do the depositions of Ms. Tissier, Mr. Pacelli, Ms. Schneider, and Mr. Reid by himself, all of whom worked on the development permit application, he should have been able to do the same with Mr. Kliewer, who also worked on the application. Finally, there is no indication that Ms. Pope was needed in addition to Mr. Fromm for any given deposition because of

special competence or ability. *Compare United States v. 4,432 Mastercases of Cigarettes*, 322 F. Supp. 2d 1075, 1080 (C.D. Cal. 2004) ("[T]he government argues that Pollack's firm's hours should be reduced because his firm participated in three depositions in which Honig also participated. The Court finds that Pollack's presence at, and his firm's participation in, the depositions were reasonable, because Pollack and Honig have expertise in different areas of the law.").

The Court emphasizes here that it is not finding that it was duplicative for both Ms. Pope and Mr. Fromm to *prepare* for a deposition. Rather, the question it was necessary for both attorneys to *attend* the deposition. And, of course, where only one attorney was sufficient for a deposition, NP would have incurred the travel expense for only one attorney, as opposed to two.

vi. <u>Other Failures to Exercise Billing Judgment</u>

As discussed above, the City has identified a number of failures to exercise billing judgment by NP's attorneys. Based on the Court's review of the billing records, there are many other examples demonstrating additional failures to exercise billing judgment, including but not limited to (1) charging NP for the attendance of two attorneys at case management or status conferences, (2) billing an excessive number of hours for case management or status conference statements, (3) billing an excessive number of hours for working on trial exhibits; and (4) billing an excessive number of hours on the damages trial brief. *See Lucas v. White*, 63 F. Supp. 2d 1046, 1060 (N.D. Cal. 1999) (Henderson, J.) ("While defendants have not objected to the number of hours expended on the fees matter, the Court has an independent obligation to ensure that the fee award is reasonable.").

(a) <u>Case Management or Status Conference Attendance</u>

As noted above, the City legitimately questioned the billing judgment of NP's attorneys because they charged NP for the attendance of both lawyers at 21 out of 27 depositions. Similarly, it is problematic that NP's attorneys billed for the attendance of both Ms. Pope and Mr. Fromm at a majority of the case management and status conferences. For example, based on the Court's review of the billing records, both Ms. Pope and Mr. Fromm were present for the following conferences (not including the initial case management conference and the pretrial conferences): July 31, 2002;

November 19, 2003; January 21, 2004; June 16, 2004; July 14, 2004; August 25, 2004; November 10, 2004; and May 25, 2005.

In *Oberfelder*, Judge Patel rejected the defendants' argument that the appearance of two attorneys for the plaintiff at a case management conference was duplicative. She explained: "The court uses these conferences for more than the mere formality of setting dates; issues are discussed, the case shaped for pretrial and trial and concessions and agreements are made. Attorneys empowered to make decisions on behalf of their client or those with substantive contributions are needed at case management conferences." *Oberfelder*, 2002 U.S. Dist. LEXIS 8635, at *22. The Court agrees with Judge Patel that conferences before a court can involve more than just scheduling. However, in contrast to *Oberfelder*, in the instant case, there is more than just one conference at issue; instead, there are at least eight. Moreover, the conferences of concern to the Court do not consist of the initial case management conference or any of the pretrial conferences, rather, the conferences were largely nondispositive, held for the purpose of getting an update as to the status of the litigation or of moving the litigation along. In addition, the conferences were not conducted on the same day as a hearing on a motion in the case (which might justify the presence of more than one attorney).

Given the nondispositive nature of the conferences, the fact that Ms. Pope and Mr. Fromm were equally empowered to make substantive decisions on behalf of NP, and the fact that the two did not make distinct contributions to the conferences, the Court concludes that it was unnecessary for both attorneys to attend all of the case management and/or status conferences. Again, where only one attorney was sufficient for a conference, NP would have incurred the travel expense for only one attorney, as opposed to two.

(b) Case Management or Status Conference Statements

On a related matter, based on the Court's review of the billing records, NP's attorneys spent an excessive amount of time on case management conference statements. The Court clarifies that its concern here is not the time spent on the initial case management conference statement filed by the parties but rather the time spent on subsequent case management or status conference statements. The purpose of such a statement is to update the court as to how litigation is proceeding and to

inform the court if there are any issues that need to be addressed. For many of the statements, NP's attorneys did far more than this -- repeatedly using the statements to make motions for relief, to provide legal briefing, or to raise matters unrelated to the litigation (in particular, new "wrongdoings" by the City).

Examples where NP's attorneys spent an excessive amount of time on case management conference or status conference statements are as follows:

(1) For the conference in November 2003, NP's attorneys spent approximately 20 hours on a statement.

(2) For the conference in January 2004, NP's attorneys spent approximately 25 hours on a statement (including a supplement and a lengthy declaration on the parties' inability to file a joint statement).

(3) For the conference in May 2004, NP's attorneys spent almost 10 hours on a statement.

(4) For the conference in November 2004, NP's attorneys spent almost 20 hours on a statement.

While the Court would expect such hours to be incurred for a motion, such was not necessary for a mere statement.

(c) <u>Trial Exhibits</u>

Based on the Court's review of the billing records and its own knowledge of the history of this case, NP's attorneys were extremely inefficient with respect to their trial exhibits. For example, NP's lawyers engaged in overdesignation of exhibits, with NP lodging more than 100 exhibits for each phase of the trial -- and this does not even count the multiple subparts that many of the exhibits contained.[28] Given the limited scope of the trial, *i.e.*, whether Condition 13(b) was an equal protection violation and if so what were NP's damages, there was no need for NP to provide more than 200 exhibits. And in fact the vast majority of exhibits were only of marginal relevance.

NP's overdesignation of exhibits had at least two results, both of which necessitated the expenditure of more attorney time. First, the Court compelled the parties to meet and confer to, *inter*

[28] Notably, for the liability phase of the trial, NP's lawyers asked to lodge over 18,000 pages as exhibits. In the end, NP's attorneys did not appear to lodge all 18,000 pages but still provided a large number of documents as exhibits.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

*alia*, narrow down the number of exhibits or at least reach agreements about admissibility. The fact that NP withdrew a fair number of exhibits after these meetings demonstrates that there was indeed overdesignation. *See, e.g.*, Docket No. 432 (NP's notice of withdrawal of 40 trial exhibits). Second, even after NP withdrew some exhibits, a large number still remained, again, the majority of which were of only marginal relevance. But because NP did not withdraw more of these marginally relevant exhibits, it was necessary for the Court to require the City to make objections and NP to then make responses to the objections. This process resulted in a large expenditure of time by Mr. Fromm in particular for the damages phase.

In addition, NP's lawyers failed to exercise due care in their preparation of the exhibits, an impediment in both the liability and damages phase -- *e.g.*, failing to provide an exhibit list that complied with the Court's standing order (thus necessitating revisions), failing to "tab" exhibits properly (thus necessitating re-tabbing), providing the same exhibit two or three times, designating the entire administrative record one exhibit, and so forth. Significantly, the Court issued sanctions because of problems with NP's liability phase exhibits.

(d) <u>Trial Brief for Damages Phase</u>

Based on the Court's review of the billing records, NP's attorneys spent more than 125 hours on the trial brief for the damages phase of the trial. This was an excessive amount of time. The Court acknowledges that the large amount of time can be attributed in part to the length of the brief, which consisted of 123 pages. However, it was not reasonable for NP to file a trial brief of this length, especially when the purpose of a trial brief is simply to inform the Court of the major factual and legal issues to be resolved at trial. NP was well aware of this fact as demonstrated by its trial brief for the liability phase of the trial, which consisted of only 8 pages. For the damages phase of the trial, however, NP did far more than required or even desired by the Court -- essentially presenting the entirety of its case in written form.

(e) <u>Miscellany</u>

Finally, in addition to the above, there are various other examples that demonstrate a lack of billing judgment by NP's attorneys. For example:

United States District Court
For the Northern District of California

(1) Mr. Fromm billed NP for public relations work but the Ninth Circuit has stated that such work is compensable only if it contributes "directly and substantially" to the achievement of plaintiff's litigation goal and NP has made no demonstration of such. *See Davis v. City of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992); *see also Greater Los Angeles Council on Deafness v. Community Television of S. Cal.*, 813 F.2d 217, 221 (9th Cir. 1987) ("The court reasonably disallowed time spent on publicity, lobbying, and unrelated claims . . . .").

(2) For Ms. Pope's time entries, several reflect that she did not charge NP for the hours spent, and "[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley*, 461 U.S. at 434 (internal quotation marks omitted; emphasis in original).

(3) On January 16, 2004, both Ms. Pope and Mr. Fromm billed NP one-and-a-half to two hours each for sheer waiting time for a meeting with Ms. Quick, the City Attorney, even though nothing indicates that it was justified for them to expect an immediate meeting with her.

(4) At hearings before the Court, Ms. Pope and Mr. Fromm repeatedly wasted time disagreeing with one another and fighting to speak at the podium, leading the Court to issue an order requiring that only one counsel at a time make an argument at the podium.

(5) Throughout the litigation, NP's attorneys filed supplemental briefing even though not permitted by the Federal Civil Rules of Civil Procedure or the Civil Local Rules and without leave of the Court.

vii. Summary re Billing Judgment

For all of the above reasons, the Court finds that all of the hours claimed by NP's attorneys in their billing records are not reasonable because of a failure to exercise billing judgment. NP's attorneys included in their billing records (1) hours excessive in relationship to the task performed, (2) hours that were redundant or duplicative because of unnecessary time spent by multiple attorneys on the same task, and (3) hours that were otherwise unnecessary or inappropriate. *See Hensley*, 461 U.S. at 434.

In making an appropriate adjustment because of the lack of billing judgment, a court is not required to set forth an hour-by-hour analysis of the fee request and may instead reduce the award on

a percentage basis so long as there is a concise but clear explanation of the court's reasons for choosing a given percentage reduction. *See Gates v. Deukmejian*, 987 F.2d 1392, 1399-1400 (9th Cir. 1993). Because of the block billing by NP and the size of the fee application, an hour-by-hour analysis of the fee request in the instant case is difficult and impractical; thus, the Court shall instead reduce the award on a percentage basis. Taking into consideration the above problems, and estimating what an hour-by-hour analysis would yield, the Court concludes that a reduction of 30% is appropriate.

A smaller reduction is not appropriate given the numerous instances in which NP's attorneys failed to use billing judgment (not to mention the inordinate number of hours for each instance). It is especially telling that, from what the Court can divine, there was no attempt whatsoever by NP's lawyers to make any reduction in the hours claimed, with the limited exception of Ms. Pope's exclusion of some hours attributable to unrelated litigation. *See* 2 Schwartz & Kirklin, Section 1983 Litigation § 1983, at 174-75 (noting that "the plaintiff's elimination of a substantial number of hours from a fee application in the exercise of billing judgment tends to fortify the argument that the remaining hours were reasonably expended"). Moreover, a 30% reduction can hardly be said to be unfair to NP -- in fact, could be said to be generous to NP -- as demonstrated by the application of that percentage reduction to the examples identified above in which NP's attorneys failed to exercise billing judgment. For example, for the cross-motions for summary judgment for which NP's attorneys billed more than 600 hours, a 30% reduction would result in 420 hours, which is still a significant, indeed perhaps overly generous, number of hours for that task. For trial preparation (exclusive of specific filings) for which NP's attorneys billed more than 750 hours, a 30% reduction would result in 525 hours, which is also a substantial and possibly overly generous number of hours for that task.

On the other hand, a larger reduction is not appropriate given that this case was vigorously litigated and contested by the City, which contributed at least in part to the hours spent by both parties' counsel on this litigation.

With a 30% reduction, Ms. Pope's hours are **2,099.30** (*i.e.*, 2,999.00 x 70% = 2,099.30), and Mr. Fromm's **2,333.90** (*i.e.*, 3,334.15 x 70% ≈ 2,333.90).



United States District Court
For the Northern District of California

3. Total Lodestar

Based on an hourly rate of $240 and 2,099.30 hours, the lodestar for Ms. Pope's fees is $503,832.

Based on an hourly rate of $225 and 2,333.90 hours, the lodestar for Mr. Fromm's fees is $525,127.50.

B. Adjustment to Lodestar

The City argues next that, after excluding certain hours from those claimed by NP's attorneys as unreasonable, the Court should adjust the lodestar to account for NP's limited success.

In *Hensley*, the Supreme Court emphasized that a crucial consideration as to whether the lodestar should be adjusted is the level of success obtained by the plaintiff. *See Hensley*, 461 U.S. at 434. If the plaintiff succeeded on some claims but not others, and the unsuccessful claims are not related to the successful claims, then the court should exclude fees related to the unsuccessful claims. *See id.* at 434-35. If the unsuccessful and successful claims are related, then the court should look at "the significance of the overall relief obtained by the plaintiff." *Id.* at 435. If the plaintiff obtained excellent results, then it should be awarded a fully compensatory attorney's fee. *See id.* If the plaintiff had only partial or limited success, then a fully compensatory fee may be excessive. *See id.* at 436. For example, a reduced fee award would be appropriate if, even though the plaintiff achieved significant relief, it was still "limited in comparison to the scope of the litigation as a whole." *Id.* at 440. If the plaintiff achieved only partial or limited success, then the court may try "to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436-37.

1. Unrelated Claims -- Hours Incurred Prior to July 15, 2002

In the instant case, there is no dispute that NP prevailed on only one claim – *i.e.*, the Condition 13(b) claim – out of the many that it raised in its original, amended, and supplemental complaints. Thus, based on *Hensley*, the first question for the Court is to determine whether Condition 13(b) was related to the other claims raised by NP on which it did not prevail. In *Schwarz v. Secretary of Health & Human Services*, 73 F.3d 895 (9th Cir. 1995), the Ninth Circuit provided an extensive discussion on the issue of related versus unrelated claims.



United States District Court
For the Northern District of California

The court began by noting that, in *Hensley*, the Supreme Court indicated that "claims are unrelated if they are 'distinctly different claims for relief that are based on different facts and legal theories'" while "claims are related if they 'involve a common core of facts or [are] based on related legal theories.'" *Id.* at 902. However, these were general principles only: "*Hensley* also recognized that 'there is no certain method of determining when claims are "related" or "unrelated."'" *Id.* at 902-03. The Ninth Circuit then went on to say that, based on previous case law, the focus was "whether the unsuccessful and successful claims arose out of the same 'course of conduct.'" *Id.* at 903. If not, then the claims would be unrelated. *See id.*

The *Schwarz* court recognized that, in a few cases, it had added to the above test by asking not only whether the unsuccessful claims arose from the same core of facts as the successful claim but also whether it was likely that some of the work performed with respect to the unsuccessful claim also aided the work done on the merits of the successful claim. *See id.* However, in the most recent cases, the Ninth Circuit had applied the traditional test "without further adornment." *Id.*

Based on the above, the *Schwarz* court concluded that, in the case under consideration, the plaintiff's unsuccessful claims were not related to her sole successful claim. *See id.* First, the plaintiff's successful claim (sex discrimination) was based on a different legal theory from the unsuccessful claims (violation of the Indian Preference Act, race discrimination, and nepotism). *See id.* Second, the course of conduct as well as the relief sought "were entirely distinct and separate." *Id.* The successful claim concerned events that took place in Portland whereas the unsuccessful claims involved events that took place in Phoenix. *See id.* at 904. For similar reasons, the Ninth Circuit determined that the plaintiff's efforts expended on the unsuccessful claims did not contribute to her prevailing on the successful claim. *See id.* ("[E]xtensive discovery had been undertaken before transfer [of the case to Portland] but it didn't focus on the Portland claims, which took their form shortly before the case was transferred and viewed different people as the prime perpetrators of the wrongs alleged.").

In the instant case, the Court finds that NP's successful Condition 13(b) claim was not related to the claims on which it did not succeed. As discussed in Part I., *supra*, NP's unsuccessful claims against the City (*i.e.*, substantive due process claims and equal protection claims) were all based on

the City's handling and processing of NP's development permit application – all of which took place *before* the City Council hearing on July 15, 2002, at which time the permits were finally approved. In contrast, the Condition 13(b) claim was not based on the City's handling and processing of the permit application; rather, it was based on the permits that were actually approved *on* July 15, 2002. That is, the Condition 13(b) claim did not arise until on or shortly before July 15, 2002, because Condition 13(b) did not even exist until that time; it was one of the conditions of the permits that were approved on that date. *See* Liability FF ¶¶ 9-11, 13-15, 17 (noting that Condition 13(b) was not part of condition of approvals presented to City Council on July 1, 2002; that it was part of conditions of approval presented on July 15, 2002; and that parties stipulated to the fact that NP received a copy of the conditions of approval that included Condition 13(b) on or about July 14, 2002). Because the successful Condition 13(b) claim arose out of a different course of conduct from the unsuccessful claims, the claims are unrelated. *See also* 2 Schwartz & Kirklin, Section 1983 Litigation § 6.3, at 320 (noting that claims are unrelated "[i]f the events giving rise to the litigation are divisible into distinctly different time periods").

NP tries to argue otherwise, asserting that the unsuccessful claims contributed to its prevailing on the Condition 13(b) claim in two ways: (1) because the City imposed Condition 13(b) on NP out of hostility and the way that the City handled and processed NP's development permit application was evidence that the City had previously been hostile to NP; and (2) because the City would never even have approved the permits (for which Condition 13(b) was one of the conditions) unless NP had pressed forward with its unsuccessful claims related to the City's handling and processing of the permit application. The latter argument was raised for the first time at the hearing on the motion for attorney's fees. In any event, the Court does not find either argument persuasive.

Regarding the first argument, evidence of the City's prior hostility could have had some relevance with respect to the Condition 13(b) claim but it was at best collateral evidence. If Condition 13(b) had been the only claim pursued by NP, it is highly unlikely that NP's attorneys would have expended the time that they did on events prior to July 15, 2002. Furthermore, in this case, as in *Schwarz*, the extensive work undertaken by NP's attorneys before July 15, 2002, did not focus on Condition 13(b). *See Schwarz*, 73 F.3d at 904 (noting that "extensive discovery . . .



United States District Court
For the Northern District of California

undertaken before transfer [of the case to Portland] didn't focus on the [successful] Portland claims, which took their form shortly before the case was transferred and viewed different people as the prime perpetrators of the wrongs alleged").[29] Importantly, the focus of the analysis of Condition 13(b) was whether it constituted disparate treatment (as compared to other developers) and whether there was a rational justification for it. The Court found the Condition was not objectively justified. The Court did not find the Condition was motivated by subjective hostility.

As for the second argument, what motivated the City (other than an unconstitutional motive) to approve the permit is irrelevant; the challenge here was to the legality of the Condition the City ultimately imposed. To the extent NP contends its earlier litigation effort on its unsuccessful claims led the City to approve of NP's development permit application (albeit with Condition 13(b) as a hidden "poison pill"), and which in turn led to its successful challenge to Condition 13(b), a claim for fees is based on such a causal analysis is not only remote, it is barred by *Buckhannon Board & Care Home v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001). In *Buckhannon,* the Supreme Court specifically rejected the argument that a party could be deemed a prevailing party under Section 1983 if its lawsuit served as a catalyst in bringing about a voluntary change in the defendant's conduct.

Because the successful Condition 13(b) claim is unrelated to the claims on which NP did not prevail, the Court excludes all hours expended by NP's hours prior to July 15, 2002, *i.e.*, at or about the time that Condition 13(b) first came into existence.

| JAQUELYNN POPE | | |
|---|---|---|
| 12/10/01 Statement | 86.3 | |
| 1/16/02 Statement | 18.5 [not 18] | |

[29] Notably, the claims based on the processing and handling of NP's development permit application were largely focused on hostility on the part of Mr. Crabtree, who appears to have no input on Condition 13(b). *See* Liability FF ¶ 16 ("Mr. Diaz inserted the phrase 'jointly and severally' [into Condition 13(b)] at the direction of Mr. Siegel of the McDonough firm, outside litigation counsel for the City."); Liability FF ¶ 88(c) ("Both Mr. Diaz and Mr. Crabtree testified credibly that Mr. Crabtree did not have anything to do with the drafting of Condition 13(b) and did not review it substantively prior to the presentations to the Planning Commission and City Council.").



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| 2/10/02 Statement | 12.3 | |
| 3/13/02 Statement | 56 [not 56.52] | |
| 4/11/02 Statement | 54.6 [not 53.6] | |
| 5/10/02 Statement | 73 | |
| 6/19/02 Statement | 54.35 [not 54.85] | |
| 7/26/02 Statement | 51.75 | |
| **TOTAL** | **406.80** | |

| KEITH FROMM | | |
|---|---|---|
| As of 10/31/01 | 8 | |
| As of 11/26/01 | 21.25 | |
| As of 12/18/01 | 32 | |
| As of 1/31/02 | 23.5 [not 24.5] | |
| As of 2/28/02 | 56.5 | |
| As of 3/31/02 | 111.5 | |
| As of 4/28/02 | 188.5 | |
| As of 5/7/02 | 10 | |
| As of 6/28/02 | 113.5 | |
| As of 7/8/02 | 30 | |
| **TOTAL** | **594.75** | |

Excluding the above hours, Ms. Pope is left with **1,692.50 hours** (*i.e.*, 2,099.30 – 406.80 = 1,692.50), and Mr. Fromm with **1,739.15 hours** (*i.e.*, 2,333.90 – 594.75 = 1,739.15).

2. <u>Unrelated Claims -- Hours Incurred After July 15, 2002</u>

As for hours incurred after July 15, 2002, NP's attorneys spent time working on both the Condition 13(b) claim and the unsuccessful claims. Notably, however, the Court's summary judgment ruling of June 30, 2003, made clear that the only claim that would proceed to trial was the Condition 13(b) claim. Thus, after June 30, 2003, NP's attorneys for the most part litigated only the Condition 13(b) claim, the one exception being hours incurred in May and June 2005 when NP tried

United States District Court
For the Northern District of California

to resuscitate its substantive due process claims based on the Supreme Court's holding in *Lingle v. Chevron U.S.A. Inc.*, 125 S. Ct. 2074 (2005). In contrast, between July 15, 2002, and June 30, 2003, the majority of hours incurred were related to the unsuccessful claims and not Condition 13(b). The declaration of Kevin Siegel bears this out, *see, e.g.*, Siegel Decl. ¶¶ 11-21 & Exs. A-D (discussing depositions taken in spring 2003, which spent minimal time on Condition 13(b)), and NP has not provided evidence to the contrary. Indeed, the relative insignificance of Condition 13(b) to NP during this time period is reflected in NP's motion for summary judgment, which devoted less than a page to the issue of Condition 13(b).[30] *See also* Damages FF ¶ 46 ("Significantly, NP's own actions demonstrated that, for quite some time, it considered Condition 13(b) as having only a nuisance value. Until the spring of 2003 (*i.e.*, around the time summary judgment motions were filed), Condition 13(b) was not of special significance to NP. For example, NP did not do much to highlight to the City its concern over Condition 13(b) before the condition was formally imposed on August 12, 2002.").

In short, for approximately one year (from July 15, 2002, to June 30, 2003), NP's attorneys focused their efforts on the unsuccessful claims and, for approximately two years thereafter (from July 1, 2003, to the present), they focused their efforts on Condition 13(b). *See also* 2 Schwartz & Kirklin, Section 1983 Litigation § 6.3, at 320 (noting that claims are also unrelated "[i]f the several claims are litigated at distinctly separate stages of the suit").

[30] Similarly, in his declaration in support of NP's motion for summary judgment, Mr. Fromm spent only 6 out of 65 pages on Condition 13(b). Mr. Fromm's declaration also demonstrates that there was very limited discovery on Condition 13(b). *See, e.g.*, Fromm Decl. ISO NP's Mot. for Summary Judgment ¶¶ 178-84 (discussing two projects approved by the City that did not contain any condition like Condition 13(b); the deposition of Ms. Carr, who testified that she had never heard of a condition like Condition 13(b); and the deposition of Mr. Diaz, who testified that he had generated Condition 13(b) with the input of counsel).

United States District Court
For the Northern District of California

a. <u>Hours Incurred Between Approximately July 15, 2002, and June 30, 2003</u>

Given the above situation, the Court excludes 75% of the hours spent by NP's attorneys between approximately July 15, 2002, and June 30, 2003, to account for time spent on unrelated claims as opposed to the Condition 13(b) claim. *See Schwarz*, 73 F.3d at 904 (providing that a district court may take a percentage reduction to account for work spent on unsuccessful claims). Arguably, the Court could take a higher percentage reduction given the relative unimportance of Condition 13(b) to NP (playing virtually no express role relative to the other claims) until the Court's ruling denying the City summary judgment on the Condition 13(b) claim. However, the Court concludes that 75% is an appropriate percentage reduction since the condition was significant enough for NP to take some (albeit limited) discovery that ultimately could have had some relevance to the Condition 13(b) claim and that was included in its motion for summary judgment.

| JAQUELYNN POPE | | |
|---|---|---|
| 8/20/02 Statement | 74.7 | |
| 9/12/02 Statement | 108.00 [not 109.00] | |
| 10/11/02 Statement | 40.00 | |
| 12/10/02 Statement | 43.50 | |
| 5/1/03 Statement | 290.00 | |
| 6/1/03 Statement | 251.50 | |
| 8/2/03 Statement [from 6/2/03 to 6/30/03] | 70.50 | |
| **TOTAL** | **878.20** | |
| | **878.20 x 75% ≈658.70** | |

| KEITH FROMM | | |
|---|---|---|
| As of 7/31/02 [from 7/11/02 to 7/31/02] | 85.00 | |
| As of 8/30/02 | 131.50 [not 132.00] | |
| As of 9/26/02 | 40.00 | |
| As of 10/30/02 | 58.50 | |
| As of 11/22/02 | 32.00 | |

| | | |
|---|---|---|
| As of 12/4/02 | 1.00 | |
| As of 2/25/03 | 20.50 | |
| As of 3/31/03 | 125.00 [not 127.00] | |
| As of 4/29/03 | 288.00 [not 290.00] | |
| As of 5/31/03 | 263.00 [not 267.50] | |
| As of 6/16/03 | 71.00 | |
| **TOTAL** | **1,115.50** | |
| | **1,115.50 x 75% ≈ 836.60** | |

b. Hours Incurred After June 30, 2003

As for hours spent by NP's attorney's after June 30, 2003, the Court shall count all hours except for those related to the substantive due process claim that NP tried to resuscitate based on *Chevron*. Those hours are as follows.

| **JAQUELYNN POPE** | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 5/23/05 | 1.00 | | Review Chevron case |
| 5/26/05 | 8.00 | | LR re Chevron; substantive due proces; prep. applicatoin [sic] to extend time to appeal |
| 5/28/05 | 3.00 | | LR re procedure; remand from 9th Cir. etc. |
| 6/1/05 | 6.00 | | Draft application for indication re Chev[r]on issue |
| 6/2/05 | 2.00 | | Draft App. re Chevron; LR re remand |
| 6/3/05 | 2.50 | | Prep for and conference call w/Judge Chen |
| 6/12/05 | 6.00 | | Prep Brief Why Court Should Hear Chevron Issue |



United States District Court
For the Northern District of California

| | | | |
|---|---|---|---|
| 6/14/05 | 1.00 | | Receipt & review City's brief on Chevron issue |
| 8/6/05 | 1.50 | | Receipt and review of Court's order declining indication; review file |
| **TOTAL** | **31.00** | | |

| **KEITH FROMM** | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 5/31/05 | 1.50 | | Reviewed cases re: Armendariz and whether overturned by Chevron case |
| 6/1/05 | 1.00 [counting only 0.80] | | <u>Reviewed and revised Request for Indication of Interest in 60(b) Motion to Judge Chen.</u> Teleconference with J. Pope |
| 6/3/05 | 1.00 | | *Telephone conference with J. Chen, J. Pope and Pat McMahon* |
| 6/3/05 | 1.00 | | *Memos to Kalmbach and Johnson re: conference and settlement issues* |
| 6/12/05 | 2.00 | | Reviewed and revised brief on 60(b) motion |
| 6/13/05 | 1.00 | | Revised brief re: 60(b) motion |
| **TOTAL** | **7.30** | | |

c. <u>Summary</u>

Excluding the above hours, Ms. Pope is left with **1,002.80 hours** (*i.e.*, 1,692.50 – 658.70 – 31.00 = 1,064.80), and Mr. Fromm with **895.25 hours** (*i.e.*, 1,739.15 – 836.60 – 7.30 = 895.25). In calculating the adjusted lodestar, the Court arrives to the following conclusion:

United States District Court
For the Northern District of California

1,002.80 x $240 = $240,672.00 for Ms. Pope.

895.25 x $225 = $201,431.25 for Mr. Fromm.

Total = $442,103.25

3. Limited Success on Condition 13(b) Claim

Finally, the City argues that there should be a reduction in the hours claimed by NP because of its limited success on the Condition 13(b) claim, the one claim upon which it did prevail. The City points out that NP was awarded damages in the amount of $156,741.19 (including prejudgment interest but exclusive of attorney's fees). *See* Docket No. 493. Without prejudgment interest, the damages would have been approximately $124,000. *See* Opp'n at 14. According to the City, this must be considered limited success because NP had sought damages in the amount of $10.1 to $16.3 million (exclusive of both attorney's fees and prejudgment interest): "NP was awarded only "1.23% of the damages it sought under its temporary takings analysis and only .76% of the damages NP sought under its permanent takings analysis." Opp'n at 14.

As a preliminary matter, the Court acknowledges that NP sought only monetary damages for the constitutional violation by the City and that the small damages awarded compared to the amount sought arguably is relevant to the level of success achieved by NP. *See McGinnis v. Kentucky Fried Chick of Cal.*, 51 F.3d 805, 810 (9th Cir. 1994) (emphasizing that, "[w]here the relief sought and obtained is limited to money, the terms 'extent of success' and 'level of success' are euphemistic ways of referring to money"). But the award of $124,000 can hardly be said to be nominal damages.

Moreover, the Supreme Court has emphasized that fee awards need not "be proportionate to the amount of damages a civil rights plaintiff actually recovers." *City of Riverside v. Rivera*, 477 U.S. 561, 564-65 (1986) (plurality opinion). In *Riverside*, the Supreme Court affirmed a fee award of approximately $245,456.25 even though the actual damages award was only $33,350. In other words, the fee award was approximately seven times greater than the damages award. Therefore, the City's reliance on *McGinnis*, in which the Ninth Circuit stated that "no reasonable person would pay lawyers $148,000 to win $34,000" (and therefore directed the district court to reduce the fee award "so that it is commensurate with the extent of the plaintiff's success"), is not dispositive. *Id.*; *see also Corder v. Brown*, 25 F.3d 833, 837 (9th Cir. 1994) ( instructing district court to recalculate fee

United States District Court
For the Northern District of California

award, taking into consideration (1) the fact that the amount of damages awarded as compared to the amount of damages sought was minimal -- *i.e.*, $24,006 compared to $1 million -- and (2) the fact that the number of defendants found liable as compared to the number of defendants sued was insignificant -- *i.e.*, 3 defendants out of the 45 named in the complaint).

The only fact that gives the Court some pause is that NP sought with this case a permanent taking but the Court concluded that there had been in the end only a temporary taking. In *Hensley*, the Supreme Court discussed an Eighth Circuit case in which a fired schoolteacher sought reinstatement, lost wages, $25,000 in damages, and expungement of derogatory material from her employment record. *See Hensley*, 461 U.S. at 440 n.14. The schoolteacher recovered her lost wages and the requested expungement but not the reinstatement or damages. *See id.* The Supreme Court noted that the schoolteacher "had lost on the major issue of reinstatement" and so "obtained only a minor part of the relief she sought." *Id.* (internal quotation marks omitted). Consequently, it was within the trial court's decision to have made a limited fee award in light of the minor relief obtained. *See id.* Given this analysis in *Hensley*, one could argue that NP obtained only a minor part of the relief sought – *i.e.*, a temporary taking instead of a permanent taking – which would justify a downward adjustment to the lodestar.

However, a further reduction in the fee award is not appropriate on this basis. The gravamen of the complaint was the unconstitutional imposition of an unreasonable condition. NP proved the claim and obtained more than nominal monetary relief. The issue of permanent versus temporary takings pertained to the measure of damages not the type of relief sought as in the Eighth Circuit case.

Finally, the Court has already substantially reduced the lodestar. The adjusted lodestar of $442,103.25 is not disproportionate to the $124,000 in damages obtained.

C. <u>Work on Fee Application</u>

A § 1983 plaintiff may recover attorney's fees for time reasonably spent in pursuing a motion for attorney's fees. However, "[f]ee petition litigation should be treated as a 'separate entity subject to lodestar and *Hensley* reduction analysis.'" *Rode v. Dellarciprette*, 892 F.2d 1177, 1192 (3d Cir. 1990); *see also Public Interest Group of N.J., Inc. v. Windall*, 51 F.3d 1179, 1190 (3d Cir. 1995)

United States District Court
For the Northern District of California

(holding that request for fees-on-fees award should be analyzed separately from the request for fees for the merits litigation).

The Court addresses first what is the proper lodestar. In terms of a reasonable hourly rate, the Court finds that the rates used for the merits litigation are appropriate (*i.e.*, hourly rates of $240 for Ms. Pope and $225 for Mr. Fromm).

As for a reasonable number of hours, based on the Court's review of the billing records, Ms. Pope spent the following hours on the fee application (including the bill of costs).

| **JAQUELYNN POPE** | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 5/10/05 | 6.00 | | LR Attorney Fees; review files |
| 5/11/05 | 7.00 | | LR attorney fees; review files; etc. |
| 5/16/05 | 4.00 | | Prep. attorney fees motion |
| 5/17/05 | 6.00 | | Prep. attorney fees, review fees |
| 5/18/05 | 8.00 | | LR attorney fees; prep atty fees |
| 5/19/05 | 2.50 | | LR atty fees |
| 5/20/05 | 6.00 | | Review costs |
| 8/9/05 | 1.00 | | Stipulation and order to extend time to file attorneys fees |
| 9/1/05 | 3.00 | | Prepare declarations re attorneys fees; etc. |
| 9/4/05 | 6.50 | | Prepare points and authorities re attorneys' fees |
| 9/5/05 | 9.00 | | Prep. P&A's; memorandum of costs |
| **TOTAL** | **59.00** | | |

United States District Court
For the Northern District of California

In her reply declaration, Ms. Pope claims to have spent an additional 71.50 hours preparing the reply brief and other papers such as the motion to strike the Schratz declaration. *See* Pope Reply Decl. ¶ 51. Further, Ms. Pope asserts that she anticipates spending 24.00 more hours on reviewing the City's opposition to NP's motion to strike and preparing for, traveling to, and attending the hearing on the motion for attorney's fees. *See id.* Ms. Pope, however, provides no evidence such as contemporaneous billing records to support the claim for the additional 71.50 hours. Moreover, she provides no explanation as to how she determined that 24.00 more hours constituted a reasonable amount of time to review the City's opposition to the motion to strike and to prepare for, travel to, and attend the hearing. The Court, therefore, shall not award any of these fees, especially when NP was specifically warned that all briefing and accompanying submissions related to the motion for fees had to be provided by October 31, 2005. *See* Docket No. 551.

| **KEITH FROMM** | | | |
|---|---|---|---|
| **DATE** | **HOURS** | **FEES** | **DESCRIPTION** |
| 5/16/05 | 6.00 | | Prepared attorneys' fees motion and back up documentation |
| 5/17/05 | 4.00 | | Prepared Attorneys' fees motion and backup documentation |
| 5/18/05 | 8.00 | | Prepared Attorneys' fees motion and back up documentation |
| 5/24/05 | 3.50 | | Prepared motion for legal fees |
| 9/6/05 | 7.00 | | Prepared and revised Motion for Attorneys Fees |
| 9/7/05 | 10.00 | | Prepared and revised Motion for Attorneys fees, declarations etc. |
| **TOTAL** | **38.50** | | |

NP does not appear to make any claim for fees based on hours spent by Mr. Fromm on the reply brief and supporting declarations. Mr. Fromm's reply declaration also does not provide any accounting of hours.

Thus, *excluding* the hours claimed by Ms. Pope in her reply declaration, NP seeks 97.50 hours for time spent on the fee application -- *i.e.*, on the opening brief and supporting declarations only. The Court finds that this number of hours is excessive. The opening brief was only 15 pages and the declarations in support of the opening brief were only a few pages in length each. Moreover, it should not have taken a significant amount of time for NP's attorneys to print out their contemporaneous billing records, assemble them, and calculate the total number of hours. The Court finds that, under the circumstances, it should have taken no longer than 50.00 hours total to prepare the opening brief and supporting declarations. The Court shall therefore exclude 28.50 hours from Ms. Pope's time and 19.00 hours from Mr. Fromm's time (for a total of 47.50 hours), in rough proportion to their time spent on the task. This leaves Ms. Pope with 30.50 hours (*i.e.*, 59.00 – 28.50 = 30.50) and Mr. Fromm with 19.50 hours (*i.e.*, 38.50 – 19.00 = 19.50). The lodestar for the fee application is thus $11,707.50 ($7,320 for Ms. Pope and $4,387.50 for Mr. Fromm).

Having determined the lodestar, the Court now turns to whether there should be an adjustment to the lodestar under *Hensley*. *See Schwarz*, 73 F.3d at 909 (observing that fees-on-fees award must be adjusted to reflect partial success on underlying fee motion); *In re Burlington Northern, Inc.*, 832 F.2d 430, 434 (7th Cir. 1987) (holding that *Hensley* applies to a fees-on-fees award). While NP did seek some $1.9 million in fees related to substantive work on the case but receives only $442,103.25 in fees for the merits, the adjusted lodestar for fees work -- $11,707.50 -- is reasonable in light of the substantial fees obtained by virtue of the fee motion.

D. <u>Costs</u>

Finally, regarding costs, the Court notes that certain litigation expenses may be recovered as statutory costs pursuant to Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1920. *See also* Civ. L.R. 54-3 (providing more details about recoverable statutory costs). Other litigation expenses, however, are recoverable as part of attorney's fees. Section 1988 has been interpreted by courts to authorize the recovery of litigation expenses that exceed or are not included within statutory costs



United States District Court
For the Northern District of California

pursuant to § 1920. *See* 2 Schwartz & Kirklin, Section 1983 Litigation § 8.8, at 417-18. The Fourth Circuit has stated that the difference between the scope of costs taxable under Rule 54(d)/§ 1920 and under § 1988

> is due to the fact that "these two bodies of law . . . are grounded in antithetical policies." Rule 54(d) and § 1920 are premised on the traditional "American Rule" that each party to a lawsuit bear its own costs. Section 1988 was intended as an exception to the American Rule and is premised on the idea of fee shifting. Because meritorious civil rights plaintiffs are "private attorney generals" enforcing important congressional policies, § 1988 is intended to encourage them to bring suit by shifting the costs of litigation to defendants who have been found to be wrongdoers.

*Daly v. Hill*, 790 F.2d 1071, 1083 (4th Cir. 1986).

NP has filed a bill of costs (amended on October 3, 2005, *see* Docket No. 539) pursuant to Rule 54(d) and § 1920. In addition, in its motion for attorney's fees, NP also seeks compensation for certain litigation expenses as part of her attorney's fees. It appears that NP's fee motion includes at least some of the litigation expenses itemized on its amended bill of costs -- *i.e.*, there is some duplication. Accordingly, the Court hereby orders the parties to proceed as follows.

First, the Court shall not in the first instance rule on the bill of costs but rather shall direct the Clerk of the Court to tax costs pursuant to Rule 54(d) and § 1920. *See* 10-54 Moore's Fed. Prac. -- Civ. § 54.100[3] ("The initial responsibility for the taxing of costs is placed upon the clerk of the district court."). Once the Clerk of the Court tax costs, then either party may -- pursuant to Rule 54(d) -- ask that the decision be reviewed by the Court. Although Rule 54(d) provides that judicial review of the clerk's action may be obtained by serving a motion within five days of the Clerk's action, the Court shall modify the time schedule as follows: Each party shall have seven court days (upon receipt of the Clerk's decision) to file a motion asking for judicial review of the Clerk's action, after which the opposing party shall have seven court days to file an opposition. There shall be no reply brief.

In the meantime, to the extent NP seeks costs *beyond* the statutory costs permitted by Rule 54(d) and § 1920 -- *i.e.*, additional costs permitted under § 1988 -- the Court shall allow NP to file a motion asking for such costs. *In this motion, NP shall not ask for any costs already covered in its*

United States District Court
For the Northern District of California

*bill of costs in order to avoid duplication.* NP shall file such a motion by January 4, 2006; the City an opposition by January 11, 2006; and NP a reply by January 18, 2006.

The Court acknowledges that the parties have already made some arguments regarding costs in their briefing on the motion for attorney's fees but concludes that the above approach makes the most sense to ensure that there is no duplication of a cost award. The Court also notes that NP will *not* be entitled to fees for this additional work on costs under § 1988 because NP should have properly submitted a request for costs as part of attorney's fees that was *not* duplicative of its bill of costs. In other words, the confusion here is one of NP's making and therefore NP will not be rewarded for its inefficiency.

## III. CONCLUSION

In sum, NP is entitled to $442,103.25 in fees on the merits portion of this case, and $11,707.50 in fees for the fees work herein.

This order disposes of Docket No. 528.

IT IS SO ORDERED.

Dated: December 16, 2005

EDWARD M. CHEN
United States Magistrate Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

North Pacifica LLC,

Plaintiff,

v.

City of Pacifica et al,

Defendant.
_____________________________________/

Case Number: CV01-04823 EMC

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on December 16, 2005, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Amy DeVaudreuil
Goldfarb & Lipman LLP
1300 Clay Street, Ninth Floor
City Center Plaza
Oakland, CA 94612

Benjamin Louis Stock
McDonough Holland & Allen PC
1901 Harrison Street
9th Floor
Oakland, CA 94612

Cecilia Quick
City of Attorney City of Pacifica
170 Santa Maria Avenue
Pacifica, CA 94044

James T. Diamond
Goldfarb & Lipman LLP
1300 Clay Street
Ninth Floor
City Center Plaza
Oakland, CA 94612

Jaquelynn C. Pope
Warshaw & Pope
934 Hermosa Avenue
Suite 14
Hermosa Beach, CA 90254

Joel Samuel Jacobs
California Attorney General's Office
1515 Clay Street
Suite 2000
Oakland, CA 94612-0550

Keith Mitchell Fromm
KEITH FROMM, ATTORNEY
914 Westwood Boulevard
Suite 500
Los Angeles, CA 90024

Kevin Drake Siegel
McDonough Holland & Allen PC
1901 Harrison Street
9th Floor
Oakland, CA 94612

Lee Charles Rosenthal
Goldfarb & Lipman LLP
1300 Clay Street, Ninth Floor
City Center Plaza
Oakland, CA 94612

Mark D. Warshaw
Warshaw & Pope
934 Hermosa Avenue
Suite 14
Hermosa Beach, CA 9054

Mark L. Armstrong
Gagen McCoy McMahon & Armstrong
279 Front Street
P.O. Box 218
Danville, CA 94526-0218

Megan Holt Matthew
McDonough Holland & Allen PC
1901 Harrison Street
9th Floor
Oakland, CA 94612

Michelle Marchetta Kenyon F
McDonough Holland & Allen PC
1901 Harrison Street
9th Floor
Oakland, CA 94612

Natalie Elsa West
McDonough Holland & Allen PC
1901 Harrison Street
9th Floor
Oakland, CA 94612

Patrick Joseph McMahon
Gagen McCoy McMahon & Armstrong
279 Front Street
P.O. Box 218
Danville, CA 94526-0218

Dated: December 16, 2005

RICHARD W. WIEKING, CLERK

By: LENI DOYLE
Leni Doyle, Deputy Clerk

# EXHIBIT 2

1. **Courts That Have "Rejected" My Methodology.** As an initial matter, although there may be an expert who proves to be the exception to the rule, I know of no expert whose opinion is wholly accepted by courts 100 percent of the time. I am aware of approximately ten (28) cases[1] (out of the approximately 4,000 audits I have performed around the country) in which the courts have criticized aspects of my methodology or credentials.

2. The following is my analysis of those cases.

3. ***Zuegel v. Mountain View Police Department***, United States District Court, Northern District of California, San Jose Division, Case No. 17-cv-03249-BLF ("*Zuegel*"). *Zuegel* alleged Fourth Amendment violations were committed by the Mountain View Police Department. The jury found that certain violations were committed and awarded $3,000 in damages. Subsequently, Plaintiff's attorneys sought $864,486.90 in attorney's fees plus additional charges for preparing a reply brief to the motion for fees. Following my analysis, I concluded that Plaintiff's attorneys should be awarded no more than $77,627.65 in fees.

4. Plaintiff's counsel, Violet Grayson, requested fees at a rate of $675 per hour. Evaluating the information submitted in support of the fee motion and other rate information as well as the case documents, I recommended that she be compensated at no more than $525 per hour.

5. The *Zuegel* court rejected my recommended rate for Ms. Grayson. It cited *Curtin v. County of Orange*, which in turn cited *Lopez v. San Francisco Unified Sell.* [sic] *Dist.* for the proposition that "multiple courts" had held my methodology lacked legal and factual support. I note that despite the *Curtin* case's reference to "multiple courts," *Curtin* only cited to a single case: *Lopez*. Furthermore, while the *Lopez* court did reject parts of my opinion, the court did not cite to any other case or court that had rejected my opinions.

---

[1] (1) *Zuegel v. Mt. View Police Dep't.*; (2) *Curtin v. County of Orange*; (3) *Kalani v. Starbucks Corp.*; (4) *Lopez v. San Francisco Unified Sch. Dist.*; (5) *Amphastar Pharms. Inc. v. Aventis Pharma SA*; (6) *Velez v. Roche*; (7) *Wit v. United Behav. Health*; (8) *Mahtesian v. Snow*; (9) *Branham v. Snow*; (10) *Duran v. United States Bank Nat'l Ass'n.* One additional case he references is *Cruz v. Starbucks Corp.*, which was cited in *Kalani v. Starbucks Corp.*

6. The *Zuegel* court then cited to Judge Koh of the Northern District who rejected my opinion in *Kalani v. Starbucks* that solo practitioners should be paid less [than attorneys who work at large law firms] based on firm size alone because there was no Ninth Circuit authority for this holding.

7. First, I have *never* stated that law firm size *alone* should dictate an appropriate hourly rate. However, I have stated that law firm size does affect what an appropriate hourly rate may be.

8. In support of my opinion in *Zuegel* that smaller law firms typically do not charge rates that larger law firms can or do charge, I cited to seven cases out of the United States District Court for the Southern District of New York and one case out of the District Court for Kansas. I also referenced the 2016 Real Rate Report that confirmed law firm size has the largest impact on hourly rates. The Real Rate Report is an analysis of law firm rates based on invoice data published by Wolters Kluwer that has been cited with approval by courts nationwide, including in California. I also cited to a case out of the Central District of California (*Common Cause v. Jones* (C.D. Cal. 2002) 235 F.Supp.2d 1076, 1081-1082) as well as a Los Angeles Superior Court case (*Streisand v. Adelman*, Los Angeles Superior Court Case No. SC077 257 (ruling filed on May 10, 2004, at p. *4)) that both recognized that the size of a law firm could be taken into consideration when determining rates for lawyers.

9. As the Ninth Circuit has stated (quoting Carl Sagan and possibly others), "the absence of evidence is not evidence of absence." (*Altera Corp. v. Comm'r* (9th Cir. 2019) 926 F.3d 1061, 1099; see also *International Ass'n of Machinists Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Group* (9th Cir. 2004) 387 F.3d 1046, 1055; *AirWair International Ltd. v. Pull & Bear Espana SA* (N.D. Cal. July 12, 2021) 19-cv-07641-SI, at p. *1.) The lack of 9th Circuit authority for the proposition that firm size affects billing rates does not mean that firm size does not affect billing rates.

10. As referred to later in this report, the 2016 Real Rate Report stated law firm size *does* have an impact on hourly rates. Furthermore, earlier this year, in June 2022, LexisNexis

published the LexisNexis CounselLink® Enterprise Legal Management Trends Report ("LexisNexis Report"). The LexisNexis Report is based on data derived from over $49 billion in legal spending, more than 350,000 timekeepers, and more than 1.2 million matters. The key metrics were based on charges billed by outside counsel in 2021. The LexisNexis Report stated that: "The size of a law firm is highly correlated to the rates billed by its lawyers." (LexisNexis Report, p. 14.) Based on their analysis of $49 billion in legal spending, they found that the median partner rate at the largest (750+ attorneys) law firms was $895 while the median partner rate at the smallest law firms (<50) was $300. (*Id.*) Thus, the largest law firms were billing rates almost 300 percent (298 percent to be accurate) higher than the smallest law firms.

11. The lack of Ninth Circuit precedent does not establish that law firm size does not affect billing rates. The Real Rate Report and the LexisNexis Report establish that law firm size *does* affect billing rates.

12. The *Zuegel* court independently calculated Plaintiff's attorney's lodestar based upon an updated billing table (*Zuegel*, p. 15:12-13). The updated billing table requested an award of $952,222.50. (*Id.*) This was inclusive of a 1.1 multiplier. The court determined that they were requesting $882,545.80. (*Zuegel*, p. 20:3-8.) After analysis of various factors, the court eventually awarded $449,166.19 in fees, or a 49 percent reduction from the calculated lodestar.

13. Thus, although the *Zuegel* court made a broad, sweeping statement that "multiple courts had rejected my methodology" (quoting from *Curtin*), the only specific objection it had with my "methodology" related to law firm size affecting appropriate hourly rates, which I have addressed above.

14. ***Curtin v. County of Orange***, United States District Court, Central District of California, Case No. SACV16-00591-SVW-PLA ("*Curtin*"), 2018 U.S. Dist. LEXIS 233110. *Curtin* alleged violations of the United States Constitution were committed by the Orange County Sheriff's Department. Plaintiff prevailed on certain claims and her attorneys sought $1,044,055.00 in attorney's fees. Following my analysis, I concluded that Plaintiff's attorneys should be awarded no more than $480,840.40 in fees.

15. The *Curtin* court stated:

> Multiple courts, including the Ninth Circuit, have already held that his [i.e., my] methodology in calculating fees lacks legal and factual support. See e.g. *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 992-993 (N.D. Cal. 2005)

*Curtin*, *33.

16. However, despite claiming that multiple courts had criticized my methodology, the only case cited by *Curtin* was *Lopez*, a Northern District of California case that is discussed below.

17. The *Curtin* court stated that it had three concerns with my qualification as an expert under Federal Rule of Evidence 702. First, it stated that my opinions were not based on personal knowledge. Second, it stated that I was not qualified to opine on the reasonableness of attorney fees. Third, it stated that my opinions were not based on a reliable methodology but frequently relied on speculation. (*Curtin*, *34.)

18. Regarding the court's first concern, it stated:

> Regarding personal knowledge and a lack of foundation, Schratz does not have personal knowledge of the facts he asserts in his declaration. Schratz was not at the hearings where he disputes the number of plaintiffs' attorneys in attendance. Furthermore, Schratz makes broad sweeping generalizations about contingency fees as a whole, without providing [*35] and specific or factual support to show the contingency fee in the case at hand was problematic. Schratz Decl. ¶ 58.

*Curtin*, *34.

19. My understanding of FRE 702 is that expert testimony needs to be "based on sufficient facts or data." "Personal knowledge" is not mentioned or referred to anywhere in the Rule. As I state in virtually all my declarations, as part of the audit in *Curtin* I reviewed *all* the pleadings, deposition transcripts, trial transcripts, motions, and discovery. Although I was not at the various events to count the number of plaintiff's attorneys present, the court records, transcripts, and plaintiff's attorneys' billing records themselves provided the "facts and data" upon which I based my opinions.

20. With regard to the alleged "broad sweeping generalizations about contingency fees as a whole," I stated the following in the referenced paragraph (Schratz Decl. in *Curtin*, ¶ 58):

> This type of agreement [a fee-shifting contingency agreement] appears to reward liberal, if not actual excessive billing by the attorneys and other legal professionals: That is, the more they billed, the more fees they could claim under the fee petition, and the more the attorneys stand to recover.

21. I am unsure where the court found "broad sweeping generalizations" in this paragraph. There are only two opinions in this paragraph.: Attorneys may choose to engage in liberal billing practices; if they bill more, they can recover more. The fact is that in every single case I have audited involving this type of fee agreement, as far as I have been made aware, the plaintiff has *never* seen, let alone reviewed at any time, the attorney's invoices. Regular client review of attorney invoices serves an important function in seeking to ensure that billing records accurately reflect the work done. Without that regular review, improper or inaccurate billing can happen and not be flagged. The second statement, that if attorneys bill more they stand to recover more, is simply a truism.

22. I stated that attorneys *may* overbill, but two paragraphs later I also stated: "The auditor approaches all legal fee audits with the assumption that most attorneys do not intentionally inflate their bills." (Schratz Decl. in *Curtin*, ¶ 60.)

23. Regarding the court's second concern, it stated that I was not qualified to provide opinions on the reasonableness of attorneys' fees because I had no experience with the issues in the case and the reference cases I cited for the recommended rates were not from the Central District of California.

24. Returning to FRE 702, experience is one basis on which an expert may be qualified, but it is only one out of the five enumerated bases: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion …."

25. While it is true that I have never been involved in a *Monell* case as a practicing attorney or supervising attorney, the *Curtin* court nowhere addressed my knowledge, skill, training, or education as a legal fee expert. The court also did not acknowledge my experience as a legal fee auditor.

26. As for the recommended rates, my exhaustive search found only one case, which happened to be from the Eastern District of California, in which any of the Plaintiff's attorneys had been awarded fees by a Court. I used that case, adjusted for time and location, as the basis for the recommended rates in *Curtin* as the Eastern District court had already determined Plaintiff's attorney's reasonable rate rather than using a rate awarded to another attorney.

27. Regarding the court's final concern, it stated that my opinions were not based on a reliable methodology but frequently relied on speculation. The court did not cite to any specific methodology that it found to be unreliable so I do not know what the court was thinking when it made this statement. Furthermore, I have re-reviewed my declaration in *Curtin* and have not found a single instance where I *speculated* on an auditing issue. In certain instances, I made estimates or arrived at educated conclusions, but I do not, and did not, guess on any auditing issue.

28. ***Kalani v. Starbucks Corp.***, United States District Court, Northern District of California, San Jose Division, Case No. 13-CV-00734-LHK ("*Kalani*"), 2016 U.S. Dist. LEXIS 12445. *Kalani* was an ADA access case. The court granted injunctive relief and a statutory damage award of $4,000. Plaintiff's attorneys sought $135,931 in fees.

29. Unbeknownst to me, rather than file any actual opposition to the motion for fees, defense counsel simply "adopted" my declaration as the opposition and asked the court to accept my conclusions. As my declaration was not intended to be an opposition brief, it contained no legal arguments.

30. ***Lopez v. San Francisco Unified Sch. Dist.*** (N.D. Cal. 2005) 385 F. Supp. 2d 981. *Lopez* was a class action. The *Lopez* opinion is basically a precursor to the *Curtin* opinion,

making many of the same points related to FRE 702 as the later *Curtin* court made. I have the same response to those points here as I made in *Curtin.*

31. ***Amphastar Pharms. Inc. v. Aventis Pharma SA*** (C.D. Cal. Nov. 13, 2020) Case No. No. 5:09-cv-00023-SHK, 2020 U.S. Dist. LEXIS 251236. The *Amphastar court* rejected my argument on conferencing and there were some errors in specifically identifying certain types of billing entries among the over 8,400 entries in that case.

32. In my declaration in *Amphastar* while I identified conferencing entries and listed in an exhibit, I neglected to specify *how* I had identified them. I always endeavor to specify how searches are performed but in that instance I did not. As far as errors are concerned, there were over 8,400 billing entries and over $16 million in fees so despite my best efforts to manually double-check all entries that were identified by computerized searches and analysis, some errors were not caught. Those errors were minimal and I still stand by my overall analysis.

33. ***Velez v. Roche*** (N.D. Cal. Sep. 22, 2004) Case No. No. C-02-0337 EMC, 2004 U.S. Dist. LEXIS 29848. The *Velez* court rejected my argument on conferencing. The court made an independent determination that the number of hours of conferencing in the case was not unreasonable, despite my opinion to the contrary. However, the court rejected the plaintiff's wholesale opposition to my qualifications, stating, "The Court disagrees. Mr. Schratz's expert opinion on fee awards, including hourly rates, has sufficient foundation."

34. ***Wit v. United Behav. Health*** (N.D. Cal. 2022) 578 F. Supp. 3d 1060, 1081. The *Wit* court rejected my recommended hourly rates for certain personnel, rejected my conferencing argument, and rejected my argument regarding duplicative work.

35. As for the court's rejection of my opinion on hourly rates, the court's comment was specifically addressing the issue of appropriate rates for paralegals and litigation support personnel. I had noted that Plaintiff's attorneys had provided some, but insufficient, information in their moving papers as to the qualifications of the paralegals for whom they were seeking compensation. This opinion is what the court rejected. Plaintiff's attorney's initial declaration contained only three paragraphs identifying the paralegals and providing limited information

regarding them. Following receipt of my declaration, plaintiff's attorneys found it necessary to submit 19 additional paragraphs of new information in a reply declaration discussing the qualifications of their paralegals. My criticism was directed at their original filing, which I found to be lacking. Obviously, plaintiff's attorneys agreed that their original submittal was lacking in this aspect as they supplemented it in a reply. If plaintiff's attorneys had provided more complete information in their initial moving papers, I would not have criticized the lack of information regarding paralegal qualifications.

36. The court also noted that I had stated plaintiff's attorneys had not provided evidence that the rates sought were the rates billed to fee-paying clients when, in fact, they had. That was an error on my part in overlooking that phrase in the motion.

37. The court also found my evidence of reasonable paralegal rates to be unpersuasive. I only presented one data point on the recommended paralegal rates although I could and should have presented more reference cases to support my recommendation.

38. The court stated that it found my opinion on conferencing "unpersuasive." It did not object to or challenge my methodology in identifying conferencing, agreed with me that conferencing can become excessive, and even cited to three cases in which a court did reduce time for excessive conferencing where the amount of conferencing identified in those cases was similar to what I had found in Plaintiff's attorneys' billing records. However, the challenge was my alleged overcounting of the conferencing time. Plaintiff's attorneys, in their reply declaration, provided new information related to those billing entries that, if it had been presented initially, would have changed my analysis. With the reduced conferencing hours, the court did not find the amount of conferencing sufficient to warrant adjustment.

39. The court also chose not to follow my recommendation on duplicative work. My primary issue with duplication was multiple attendance at depositions by personnel who did not ask any questions or make any substantive comments during the depositions according to the transcripts. In their reply declaration, Plaintiff's attorneys provided additional information

regarding these depositions or deponents. Again, Plaintiff's attorneys had not provided that information when I prepared my opinion or my opinion on duplication might have changed.

40. ***Mahtesian v. Snow*** (N.D. Cal. Dec. 14, 2004) Case Nos. 03-5372 13MMC, 04-1306 MMC, 2004 U.S.Dist. LEXIS 25656. The *Mahtesian* court rejected my recommended rates and rejected my argument that the declaration in support of the fee motion was deficient. Both issues related to the requested rate.

41. My rate recommendation was based on the limited information Plaintiff had submitted in support of the fee motion. The court disagreed and found the information supplied to be sufficient.

42. ***Branham v. Snow*** (S.D. Ind. June 19, 2006) Case No. 1:01-cv-0152-JDT-WTL, 2006 U.S.Dist. LEXIS 42405. The *Branham* court rejected my recommended hourly rate.

43. In *Branham*, I referenced the fees that had recently been awarded in a similar Federal case out of Indiana to recommend a rate lower than what Plaintiff's attorney was requesting. The original fee motion was filed on January 17, 2006. I submitted my declaration based upon those moving papers. At a hearing held on May 2, 2006, the court ordered supplemental briefing of the motion. The court ultimately based its ruling on the motion, in part, on the supplemental information provided by the parties after May 2, 2006, well after my analysis had been performed. Certain information relevant to the issue of the reasonableness of the rate being requested was included in that supplemental briefing. If I had had access to that additional information in preparing my declaration, I might have arrived at a different opinion on the reasonableness of the requested rate.

44. ***Duran v. United States Bank Nat'l Ass'n***, Alameda County Superior Court Case No. 2001-035537, 2010 Cal. Super. LEXIS 1058. At issue was the trial court's order regarding fees following trial. The class action was appealed to the Court of Appeal although the court's ruling on attorney's fees was not part of the appeal. (*Duran v. U.S. Bank National Assn.* (2012) 203 Cal. App. 4th 212). The Court of Appeal called the court's "trial management plan … fatally

flawed," decertified the class, and reversed an order awarding certain expert witness fees to the plaintiffs. It also remanded certain claims to be re-evaluated by the trial court.

45. The Court of Appeal held that the judge's trial plan barred the defendant from introducing "manifestly relevant evidence," denied defendant's Due Process rights, and committed prejudicial errors. The Court of Appeal's opinion was subsequently depublished when the California Supreme Court accepted review of the Court of Appeal's decision but it was later affirmed by the Supreme Court's opinion. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1.)

46. I do not know why or how the judge found me to be partisan and non-independent. Without further information as to the court's reasoning, I cannot respond. I can only state that I had no bias in the case, no conflicts in the case, and I approached and conducted the audit the same way that I do all audits, whether I am retained by a law firm in support of its fee request or retained by an opposing party in opposition to the fee request.

47. ***Gober v. Ralph's Grocery Co.*** (Superior Court of California, County of San Diego 2007) Case No. N72142. I understand that the Court sustained plaintiff's objections to that portion of my declaration that stated there is a percentage allowable for attorney conferencing. The court also stated that I had included time entries that were not attorney conferencing under the category of "conferencing." Despite sustaining this discrete objection, the court agreed with my finding that there was excessive intra-office conferencing, but disagreed on the amount of such conferencing. Furthermore, "The Court adopts Mr. Schratz's recommendation of a 25% reduction in [Rosen Bien's fees for the preparation of the fee motion]." "The Court also adopts [Mr. Schratz's] recommendation that that Mr. Kay's fees for the instant motion be reduced by 25%."

48. ***California DUI Lawyers Assn et al. v California Dept. of Motor Vehicles*** (Superior Court of California, Los Angeles County 2022) Case No. BC553552. The issue of attorney's fees was fully briefed, argued, and decided by the trial court in a written opinion. I was not involved in that initial round of briefing. The case went up on appeal and, on remand, I opined that the number of hours billed should be reduced as well as the hourly rates for some or all of the

attorneys involved. A different Superior Court judge handled the motion for attorney's fees on remand and stated: "the court considered Schratz's opinion, he did not persuade the court to reduce Plaintiff's counsel's hours." The court chose not to accept my opinion on the number of hours billed, choosing to follow what the prior judge had already decided was the lodestar.

49. The court did not make any specific finding or comment on my rate recommendation, choosing rather to follow what the prior judge had awarded.

50. ***Bickley v. CenturyLink, Inc.***, Case No. CV 15-1014-JGB (ASX), 2016 WL 9046911 (C.D. Cal. Nov. 29, 2016). The court stated that I had provided no evidence in support of my proposed rates, and no evidence to support the rates I provided for smaller firms. "Defendant does not, for example, identify similarly-sized employment law firms whose attorneys charge the rates he recommends."

51. Despite extensive research, it is true that I was unable to locate any fee awards made to similarly-sized employment law firms in the Central District of California. My recommendations were based on other data but the court's issue was that I did not provide data for similarly-sized employment law firms.

52. ***Duffy v. City of Desert Hot Springs***, No. EDCV06385VBFOPX, 2008 WL 11429368 (C.D. Cal. Mar. 25, 2008). The Court's only expressed issue with my declaration in this case, as I understand, was my opinion that there is a difference in billing rates between small firms and large firms, citing to other courts that had questioned or rejected such a distinction. That was in 2008. As seen elsewhere in my declaration in this case, this distinction in billing rates between small firms and large firms is now being more readily recognized by courts and is backed up by major rate surveys.

53. ***Johnson v Sears*** (Superior Court of California, Sacramento County 2012) Case No. 34-2009-00054053-CU-WT-GDS. The court stated that it found my declaration to be "of minimal assistance." It also stated: "The declarations do identify certain areas of inquiry typically utilized by fee auditors. Too often however, the declarations adopt questionable or incorrect factual assumptions in an effort to support the reduction or disallowance of various amounts claimed."

However, the Court did not identify what it found questionable or incorrect in my declaration and I was not called upon to testify so I have no way to respond. The Court also found partisanship in my declaration, again without any further elaboration, so I cannot respond to this other than to state that whether I am retained to support fee motions or to oppose them, I utilize the same methodology and criteria and have been retained by both. I can also state that in my 42 years of performing approximately 3,600 audits I have only been accused of being partisan twice.

54. ***Bobol v. HP Pavilion Management*** (N.D. Cal. 2006) Case No. C-04-0082 (Order Granting Motion for Attorneys Fee, dated April 10, 2006). The court's issue with my declaration concerned recommended billing rates. The court stated that I did not factor the skill and reputation of the attorney or the nature of the work into my analysis. I do incorporate an attorney's skill into my opinion if it's a relevant factor based upon comments made by the court or by opposing counsel, however I'm not sure how to factor reputation into billing rates. Furthermore, simply because an attorney has a generally favorable reputation overall does not mean that that attorney performed at a level commensurate with that reputation in any particular case.

55. ***Brown v. City of Pittsburgh*** (W.D. Pennsylvania 2010) 2010 WL 2207935 (May 27, 2010). The court referred to my opinion multiple times, claiming that it was rejecting my opinions because I lacked experience with civil rights trials. Nevertheless, the court ultimately made many reductions to the requested lodestar consistent with several of my opinions.

56. ***Branham v. Snow*** (S.D. Ind. 2006) 2006 WL 1750443, Entry on Plaintiff's Motion for Reasonable Attorneys' Fees and Costs, dated June 19, 2006. The court found my testimony on attorney rates to be "somewhat arbitrary" and portions of my declaration to be "conclusory and argumentative." The court rejected my opinion on rates and block billing. As noted above, not all courts accept my opinions. In addition, since that time I have modified my declarations to address the issues noted by the court.

57. ***Campbell v. National Passenger R.R. Corp.*** (N.D. Cal. 2010) 718 F.Supp.2d 1093. The court rejected my proposed cuts to the attorneys' time for not prevailing on every

claim, and for the time they spent conferencing. Again, no expert's opinions are accepted by all courts every time.

58. ***Miller v. Vicorp Restaurants, Inc.*** (N.D. Cal. 2006) 2006 WL 212021. The court simply noted that it did not find my declaration to be helpful. I was not presented to testify in that case (other than through my declaration). Regardless of what the court wrote regarding my declaration, plaintiffs' attorneys sought fees of $907,676.03. The Court adjusted the hourly rates and hours billed and awarded fees of only $410,728.95.

59. ***Millar v. San Francisco Bay Area Rapid Transit*** (Superior Court of California, County of Alameda 2004) Case No. C830013-9, Order Awarding Plaintiff and His Counsel Reasonable Attorneys Fees, dated April 12, 2004. The Court found the foundations for my opinions defeated plaintiff's evidentiary objections, but found my opinions to be inadequately supported. As noted above, not all courts accept my opinions.

60. ***Oberfelder v. City of Petaluma*** (N.D. Cal. 2002) 2002 WL 472308. According to the Court, I used a "computer generator report" to erroneously object to "whole categories of work" without analyzing whether any particular item was "reasonably spent." The court misunderstood (or I insufficiently described) the computerized reports, but accepted my opinions on vagueness.

61. ***Oberfelder v. City of Petaluma*** (N.D. Cal. 2002) No. C-98-1470 MHP, 2002 WL 472308, aff'd sub nom. *Oberfelder v. Bertoli*, 67 F. App'x 408 (9th Cir. 2003)**.** The Court found the clerical tasks I identified and recommended adjusting were contained in block-billed entries and were essentially *de minimus*. The Court also found the long billing days in this case were reasonable. As noted above, not all courts accept my opinions.

62. ***Velez v. Wynne***, 220 F. App'x 512 (9th Cir. 2007). The only issue the Court had with my declaration was my use of a 2-year old survey in support of the hourly rates I recommended. At the time, despite extensive research, that was the only reference rates I could find.

63. ***Myles v. County of San Diego*** (Case No. 3:15-cv-01985-JAH-BLM, Doc 484, Sep. 29, 2023). Although the Court acknowledged that my opinion referenced my experience with rates charged by San Diego law firms and a fee survey conducted by Judge Anelleo, the Court stated that it was "not persuaded by [my] opinion [on reasonable rates] which is based on criteria the Court finds irrelevant, namely the size of the firm." However, one, my opinion was not solely based on the size of the law firm as the Court itself acknowledged. Two, a case involving the relevance of law firm size to rates is awaiting an opinion from the Ninth Circuit.

64. ***Mirabelli v. Olson*** (USDC SD Cal., Mar. 30, 2026) Case No. 3:23-cv-00768-BEN-VET. In it's order on the fee motion, the court stated: "[T]he court disregards the Schratz opinion because it lacks objectivity, as other courts have mentioned, and because it relies on a large firm / small firm distinction for allowable hourly rates—a distinction the Ninth Circuit Court of Appeals has recently rejected."

65. The court nowhere identified any lack of objectivity on my part and did not cite to any other courts that may have mentioned this. Furthermore, the opinion in the Ninth Circuit case referenced by the Court was filed on February 24, 2026. My declaration was signed and filed two days before that opinion was issued.

66. The above are the only cases of which I am currently aware that have criticized or explicitly rejected my opinions, in whole or in part, on legal fees. If I am made aware of any other such cases by opposing counsel or a court I will add to this discussion in future declarations.

# EXHIBIT 3

JIM SCHRATZ and ASSOCIATES

**JIM SCHRATZ**
*President*

- In *Department of Fair Employment and Housing v. United Dominion Realty* (Case Nos. 07CC12067, 02CC12069) the court accepted our audit findings stating, "In awarding fees in these amounts, the court has fully accepted the declaration of James P. Schratz in opposition to the motion, including all of his recommended reductions. The court finds his qualifications to be impressive. Likewise his reasoning as to why the fees sought are excessive is persuasive."

- Retained by investor Carl Icahn and other shareholders as special litigation counsel to review approximately $60 million in professional fees in *In re Tropicana Entertainment, LLC, et al*, Case No. 08-10856 (KJC) ("Tropicana") in the United States Bankruptcy Court for the District of Delaware.

- Retained by investor Carl Icahn and other shareholders to serve as special litigation counsel to review approximately $8 million in legal fees in In *re Adamar of New Jersey, Inc. and Manchester Mall, Inc.*, Case No. 09-20711 and 09-20716 in the United States Bankruptcy Court for the District of New Jersey.

- Appointed by District Court in Northern Mariana Islands to audit $22 million in legal fees in *The Estate of Larry Lee Hillblom*, one of the founders of DHL Express, whose estate was estimated to be worth $1 billion.

- Described by the American Bar Association Journal as a "major player in the field of legal fee audits."

- *In Victaulic Company v. American Home Assurance Company, et al.*, (Case No. RG12642929, Superior Court of the State of California for County of Alameda), I testified on behalf of an $8.3 million Brandt fee request by Victaulic's law firm Pillsbury Winthrop Shaw Pittman LLP, which is what the jury awarded.

- *In Lathrop & Gage v Kenney, (*Civil Action No. 07CC09697, In the Superior Court of California for the County of Orange), I testified at trial and assisted the law firm in recovering approximately $1 million in fees from the client.

- *In Gen. Charles E. Yeager, Victoria Yeager, Charles E. Yeager Revocable Living Trust, and General Chuck Yeager Foundation v. Don A. Lesser, The Lesser Law Group, and Does 1 through 20, inclusive,* Superior Court of California, County of Sacramento, Case No. 34-2011-00109638, I testified at trial and assisted the law firm in successfully seeking its fees from a former client.

- In *North Pacifica, LLC v. City of Pacifica*, United States District Court, Northern District of California, Case No. C-01-4823 EMC, I was retained by the defendant to audit plaintiff's request for $2,046,759.16 in fees and costs. In awarding plaintiffs only $453,810.75 in fees, Magistrate Judge Edward M. Chen cited my audit with approval with respect to various billing issues and noted:

> [B]ased on the information provided in the declaration, Mr. Schratz has demonstrated that he is qualified to opine about fee awards and that his methodology in evaluating the billing records of NP's attorneys in this case is reasonable and sufficiently reliable. For example, Mr. Schratz's approach to categorizing the nature of the work of the attorneys is reasonable and sufficiently reliable as is, overall, his approach to unblocking the block-billed time entries.

- Qualified as expert witness on issues involving reasonableness of attorneys' fees and proper claims handling procedures in state and federal court.

**PRIOR WORK HISTORY:**

- Vice President, Major Claims, Fireman's Fund Insurance Company
- Director, Corporate Litigation, Fireman's Fund Insurance Company
- Assistant General Counsel, Fireman's Fund Insurance Company
- Associate, Rosenblum, Fenolio, Parish, Jack & Bacigalupi, San Francisco
- Associate, Heller, Ehrman, White, & McAuliffe, San Francisco

**EDUCATION:**

University of San Francisco Law School, J.D., 1976, Editor-in-Chief, Law Review

University of Illinois, M.A. Political Science, 1972

State University of New York at Buffalo, B.A., 1969

- Taught at various law schools and universities in the Bay Area and lectured throughout the United States and in Europe.
- References furnished upon request.

**PUBLICATIONS:**

April 1991, "Managing Insurer, Insured Conflicts of Interest by Use of Independent Counsel," American Bar Association, Section of Litigation, Committee on Insurance, Mid-Year Meeting

June 1992, "Do The Right Thing," California Lawyer

June 1992, "Resolving the Cumis Quandary: Guidelines for Reasonable Fees," Insurance Litigation Reporter

October 1992, "The Alliance Lives," Underwriters Report

October 1992, "The Need For Legal Audits," Verdict

February 1993, "Cumis Counsel's Obligation To Provide Information To The Insurance Company," American Bar Association, Insurance Coverage Litigation Committee, Mid-Winter Meeting

Spring 1993, "The Other Side of the Cumis Coin: The Insurer's Ability To Select Associate Defense Counsel Under Civil Code, Section 2860 (f)" (with Jon R. Mower), Western State Law Review

July 1993, "Is Your Insurance Company Doing Enough To Fight Fraud?" Risk Management

July 1993, "Why We Lost The Battle Against Insurance Fraud," Claims

September 1993, "Customer Satisfaction - The Secret Weapon in Law Firm Marketing," Washington State Bar News

October 1993, "Tactical Defenses: An Insurance Company's Guide to Working with Cumis Counsel" (with Jon R. Mower), Claims

October 1993, "Fighting Insurance Fraud Takes Persistence," Missouri Agent

Spring 1994, "Legal Auditing Makes Sense," Legal Audit Review

September 1994, "Empowering Adjusters For Creative Solutions," Best's Review

February 1995, "How To Avoid A Fee Dispute With Your Client," American Bar Association, Insurance Coverage Litigation Committee (with Susan R. Brown)

February 1995, "Billing Guidelines and Fee Disputes," American Bar Association, Insurance Coverage Litigation Committee

April 1995, "Bad Faith for Legal Work? Your Insurer May Be Liable for Mishandling Its Lawyers," Claims Magazine

April 1995, "Is Your Company's Insurance Firm Guilty of Litigation Mismanagement?" The American Lawyer's Corporate Counsel Magazine

May 1995, "Billing Guidelines and Fee Disputes: A Case Law Review," Trial Diplomacy Journal, Volume 18, Number 3

July 1995, "How to Avoid Fee Disputes" (with Susan Brown), The Practical Litigator, Volume 6, Number 4

April 1996, "Take A Psychological Approach To Managing Legal Fees," Claims

May 1996, "Cross-Examining the Legal Auditor," The Practical Litigator, Volume 7, Number 3

August 1996, "Is your Insurance Company Liable for Bad Faith Litigation Management," Business Laws, Inc., Litigation Management

August 1996, "Is Your Company's Insurance Firm Guilty of Litigation Mismanagement," Business Laws, Inc.'s Law Department Management Adviser, Issue No. 149

Fall 1996, "Cross-Examining a Legal Auditor," American Journal of Trial Advocacy, Volume 20:1

November 1996, "Cross-Examining a Legal Auditor," Business Laws, Inc., Law Department Management Adviser, Issue No. 152

August 1997, "The Recovery of Legal Fees and the Use of A Legal Fee Auditor in Fee-Shifting Cases" (with Susan R. Brown), Business Laws, Inc., Law Department Management Adviser

September-October, 1997, "Recovering Legal Fees and using Legal Fee Auditors" (with Susan R. Brown), Trial Diplomacy Journal, Volume 20, Number 5

Winter 1997, "How to Avoid a Fee Dispute with Your Client," (with Susan R. Brown), American Bar Association The Brief, Vol. 26, No. 2

March, 1998, "How the Legal Auditor Can Help You in the Fee-Shifting Case" (with Susan R. Brown), The Practical Litigator, Volume 9, Number 2

March/April 1998, "Strategic Inflection Points in the Legal Profession," American Journal of Trial Advocacy

April 1998, "Controlling the Uncontrollable: When Insurers Must Pay Plaintiff's Legal Fees," Commercial Claims

July 1998, "Strategic Inflection Points in the Legal Profession," Business Laws, Inc., Law Department Management Adviser

Summer 1998, "I Told You to Fire Nicholas Farber -- A Psychological and Sociological Analysis of Why Attorneys Overbill," *Rutgers Law Review*, Vol 50; No. 4.

April 2001, "Winning an Attorney's Fee Petition," Rhode Island Bar Journal, Volume XLIX, Number 7

May 2001, "How To Win a Fee Petition," The Practical Litigator, Volume 12, Number 3

August 2001, "How To Win a Fee Petition," The Federal Lawyer, Volume 48, Number Seven

December 2001, “How To Win a Fee Petition: What the Plaintiff Should Avoid, What the Defendant Should Look For,” Business Laws, Inc., Law Department Management Adviser

April 2002, “How to Win a Fee Petition: What the Plaintiff Should Avoid, What the Defendant Should Look For,” Business Laws, Inc., Corporate Counsel’s Guide to Litigation Management

May 31, 2002, “Ballooning Costs – Avoiding Questionable Billing Practices Improves Chance of Recovering Fees,” Los Angeles Daily Journal, Dicta

December 14, 2010, “Winning a Fee Application in Hawaii,” Hawaii Bar Journal

# EXHIBIT 4

1. [ECF 9] ANSWER to Amended Complaint, by Defendants State of
2. 11-28-22-DStephensonDeposition_cond_N.pdf
3. 11-28-22-KStephensonDeposition_cond_N.pdf
4. 11-28-22-LStephensonDeposition_cond_N.pdf
5. 8-13-2021HUNT, M.D. Deposition Exhibits.pdf
6. ALL COMBINED EXHIBITS TO OMALU, M.D., BENNET 11-07-2023_FULL
7. Allison Hunt Depo_cond_N.pdf
8. Approved Reimbursable Expenses Rev 11-2025
9. Attachment #1 - SUPPLEMENT to NOTICE OF MOTION AND MOTION for Attorney Fees [268] filed by
10. Copy of Gary M. Vilke 10-06-2023_full.pdf
11. Copy of Richard Clark, M.D. 10-11-2023_full.pdf
12. Dane C. Norem 08-07-2023_cond.pdf
13. DARFUR_25-0459U_Pending
14. Deposition of Eric Leighton Condensed.pdf
15. Deposition of Eric Leighton Exhibits.pdf
16. Dr. Clark's Report in Stephenson.pdf (Attachment).pdf
17. Dr. Vilke Report in Stephenson.pdf (Attachment).pdf
18. EX 001 - WOHLGELERTNER, M.D., DANIEL 11-02-2023_FULL Deposition
19. EX 002 - WOHLGELERTNER, M.D., DANIEL 11-02-2023_FULL Deposition
20. Exhibit 2 022.Video.677.CHP Offcer McKee Dash Cam Video.012419.Vol 1.VOB
21. Fonzi Report.pdf.pdf
22. Gary M. Vilke 10-06-2023_cond.pdf
23. John S. Macgregor, M.D. 10-26-2023_cond.pdf
24. Mckee Transcript-CT.pdf
25. Michael Graham Expert Report.pdf
26. Michael Graham, M.D. 10-19-2023_cond.pdf
27. Michael Graham, M.D. 10-19-2023_full.pdf.pdf
28. OMALU, M.D., BENNET 11-07-2023_FULL DEPOSITION TRANSCRIPT.pdf
29. OMALU, M.D., BENNET 11-07-2023_mini.pdf
30. Popko, David Depo Transcript.03.30.22 -FULL(66479744.1).pdf
31. Richard Clark, M.D. 10-11-2023_cond.pdf
32. Robert Fonzi 11-10-2023_cond.pdf
33. Robert Fonzi 11-10-2023_full.pdf.pdf
34. STEPHENSON - FIRST AMENDED COMPLAINT 1 7 21 2 (003).pdf (Attachment)
35. Stephenson - Full Time Stamped Transcript - Deposition Of Office
36. Stephenson - Full Time Stamped Transcript - Deposition Of Officer
37. Stephenson - Full Transcript - Deposition Of Matt Borden Taken On
38. Stephenson - Full Transcript - Deposition Of Officer Shawn Casteel

**Stephenson ECF Filings**

39. Stephenson ECF Filings\[23] Notice of Appearance or Withdrawal of Counsel for attorney
40. Stephenson ECF Filings\[34] Ex Parte Application to Vacate [30].pdf
41. Stephenson ECF Filings\[34-1] Declaration of DB in Support of ExParte Application.pdf
42. Stephenson ECF Filings\[34-2] [Proposed] Order.pdf
43. Stephenson ECF Filings\[53] ECF.msg
44. Stephenson ECF Filings\[53] Parties' Joint Report Regarding Settlement Proceedings
45. Stephenson ECF Filings\[55] ECF.msg
46. Stephenson ECF Filings\[55] Plaintiffs' Notice of Appearance or Withdrawal of Counsel
47. Stephenson ECF Filings\[56] ECF.msg
48. Stephenson ECF Filings\[56] Plaintiffs' Notice of Appearance or Withdrawal of Counsel
49. Stephenson ECF Filings\[57] ECF.msg
50. Stephenson ECF Filings\[57] Parties' Stipulated Request for Partial Modification of Deadline
51. Stephenson ECF Filings\[57-1] Proposed Order
52. Stephenson ECF Filings\[61] ECF.msg
53. Stephenson ECF Filings\[61] Plaintiffs' Joint Stip to Continue Expert Witness Disclosure
54. Stephenson ECF Filings\[61-1] Dec of Copper Alison-Mayne ISO Joint Stip
55. Stephenson ECF Filings\[61-2] Proposed Order
56. Stephenson ECF Filings\[65] ECF.msg
57. Stephenson ECF Filings\[65] Plaintiffs' Oppo to Defendant McKee's MSJ
58. Stephenson ECF Filings\[65-1] Dec of Gregory Peacock
59. Stephenson ECF Filings\[65-2] Dec of Cooper Alison-Mayne ISO Opposition to McKee's MSJ.pdf
60. Stephenson ECF Filings\[65-3] Exhibit A.pdf
61. Stephenson ECF Filings\[65-4] Exhibit B.pdf
62. Stephenson ECF Filings\[65-5] Exhibit C.pdf
63. Stephenson ECF Filings\[65-6] Exhibit D.pdf
64. Stephenson ECF Filings\[65-7] Exhibit E.pdf
65. Stephenson ECF Filings\[65-8] Exhibit F.pdf
66. Stephenson ECF Filings\[65-9] Exhibit G.pdf
67. Stephenson ECF Filings\[65-10] Exhibit H.pdf
68. Stephenson ECF Filings\[65-11] Exhibit I.pdf
69. Stephenson ECF Filings\[65-12] Exhibit J.pdf
70. Stephenson ECF Filings\[66] ECF.msg
71. Stephenson ECF Filings\[66] Plaintiffs' Statement of Additional Facts
72. Stephenson ECF Filings\[67] ECF.msg
73. Stephenson ECF Filings\[67] Plaintiffs' Statement of Genuine Disputes
74. Stephenson ECF Filings\[68] ECF.msg
75. Stephenson ECF Filings\[68] Plaintiffs' Notice of Lodging - Exhibit C Video McKee MVARS,

76. Stephenson ECF Filings\[69] ECF.msg
77. Stephenson ECF Filings\[69] Plaintiffs' Notice of Errata re Exhibits Filed ISO Oppo to MSJ
78. Stephenson ECF Filings\[69-1] Exhibit A
79. Stephenson ECF Filings\[69-2] Exhibit B
80. Stephenson ECF Filings\[69-3] Exhibit D
81. Stephenson ECF Filings\[69-4] Exhibit G
82. Stephenson ECF Filings\[69-5] Exhibit I
83. Stephenson ECF Filings\[70] ECF.msg
84. Stephenson ECF Filings\[70] Plaintiffs' Joint Stipulation to Continue Expert Discovery
85. Stephenson ECF Filings\[70-1] Dec of C. Alison-Mayne ISO Joint Stip
86. Stephenson ECF Filings\[70-2] Proposed Order
87. Stephenson ECF Filings\[80] Pls Opp Supp Briefing on McKee MSJ.pdf
88. Stephenson ECF Filings\[81, 81-1] Joint STIPULATION to Extend Discovery Cut-Off Date to
89. Stephenson ECF Filings\[81] Joint STIPULATION to Extend Discovery Cut-Off Date to January
90. Stephenson ECF Filings\[83] JOINT REPORT of stating whether further mediation will be
91. Stephenson ECF Filings\[84] Notice of Withdrawal of Report[83] filed by Defendants Dane
92. Stephenson ECF Filings\[85] JOINT REPORT of REGARDING WHETHER FURTHER MEDIATION WILL BE
93. Stephenson ECF Filings\[91] - NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR
94. Stephenson ECF Filings\[94] RESPONSE to DEFENDANT MCKEES NOTICE OF SUPPLEMENTAL AUTHORITY
95. Stephenson ECF Filings\[95] Notice of Appearance or Withdrawal of Counsel.pdf
96. Stephenson ECF Filings\[97] NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by
97. Stephenson ECF Filings\[99] TRANSCRIPT ORDER re Court of Appeals case number 25 336, as to
98. Stephenson ECF Filings\[100] DESIGNATION of Record on Appeal by Defendant Jeffrey Joseph.pdf
99. Stephenson ECF Filings\[101] Joint Status Report.pdf
100. Stephenson ECF Filings\[103] NOTICE OF MOTION AND MOTION to Stay Case pending Resolution of
101. Stephenson ECF Filings\[104] NOTICE OF NON-OPPOSITION to NOTICE OF MOTION AND MOTION to Stay
102. Stephenson ECF Filings\[105] NOTICE OF MOTION AND MOTION to Dismiss WITH PREJUDICE ALL
103. Stephenson ECF Filings\[110] REPLY IN SUPPORT OF NOTICE OF MOTION AND MOTION to Dismiss WITH
104. Stephenson ECF Filings\[112] JOINT REPORT Rule 26(f) Discovery Plan Regarding Scheduling
105. Stephenson ECF Filings\[116] JOINT REPORT of Update Regarding Mediation filed by Plaintiffs
106. Stephenson ECF Filings\[120] Notice of Appearance - DAG Stephanie Vollmer.pdf
107. Stephenson ECF Filings\[122] PLAINTIFF's Memorandum of Contentions of Fact of Law.pdf
108. Stephenson ECF Filings\[126] PLAINTIFF MIL NO. 1 Exclude Evidence of Decedents Alleged
109. Stephenson ECF Filings\[126-1] DECLARATION in Support of PLAINTIFF MIL NO. 1 Exclude

110. Stephenson ECF Filings\[126-2] Proposed Order Granting Plaintiff's MIL No. 1.pdf
111. Stephenson ECF Filings\[127] PLAINTIFFS Proposed Voir Dire Questions.pdf
112. Stephenson ECF Filings\[130] Joint Agreed Upon Proposed Jury Instructions.pdf
113. Stephenson ECF Filings\[131] Joint Statement of the Case.pdf
114. Stephenson ECF Filings\[132] Joint Stipulation - Evidentiary Exclusions.pdf
115. Stephenson ECF Filings\[133] NOTICE OF LODGING Proposed Pretrial Conference Order - Copy.pdf
116. Stephenson ECF Filings\[134] JT DISPUTED PROPOSED JURY INSTRUCTIONS - Copy.pdf
117. Stephenson ECF Filings\[135] JOINT Wintess List.pdf
118. Stephenson ECF Filings\[136] JOINT Exhibit List.pdf
119. Stephenson ECF Filings\[137] NOTICE OF DISPUTED EXHIBITS - Joint Exhibit List.pdf
120. Stephenson ECF Filings\[138] PLAINTIFF'S Notice of Objection to Defendants' Late-Disclosed
121. Stephenson ECF Filings\[138-1] Declaration of Cooper ISO Notice of Objection.pdf
122. Stephenson ECF Filings\[139] Defendant's Response to Notice of Objection to Defendant's Late
123. Stephenson ECF Filings\[141] DEFENDANTS JT OPPOSITION TO PLAINTIFF'S MIL No. 1
124. Stephenson ECF Filings\[141-1] Dec of Stephanie Vollmer ISO Joint Oppo.pdf
125. Stephenson ECF Filings\[150] Joint Status Report.pdf
126. Stephenson ECF Filings\[154] PLAINTIFFS' Status Report.pdf
127. Stephenson ECF Filings\[155] Notice of  Uncommon Scientific Terms.pdf
128. Stephenson ECF Filings\[156] PLAINTIFFS Response to OSC RE Use of Demonstratives.pdf
129. Stephenson ECF Filings\[162] Notice of Lodgment of Deposition Transcripts.pdf
130. Stephenson ECF Filings\[167] Plaintiff's Notice of Lodgment of Deposition Transcripts.pdf
131. Stephenson ECF Filings\[168] JT REPORT RE Disputed Exhibits.pdf
132. Stephenson ECF Filings\[178] NOTICE OF MOTION AND MOTION to Strike Portions of Testimony of
133. Stephenson ECF Filings\[178-1] Proof of Service.pdf
134. Stephenson ECF Filings\[179] Notice of Motion and Motion for Judgment as a Matter of Law.pdf
135. Stephenson ECF Filings\[185] PLAINTIFFS Request 50a be Taken Under Submission.pdf
136. Stephenson ECF Filings\[185-1] [PROPOSED] Order Request for  Briefing on 50a Motion.pdf
137. Stephenson ECF Filings\[ECF 1] Notice of Removal Stephenson.pdf
138. Stephenson ECF Filings\[ECF 2] Civil Cover Sheet
139. Stephenson ECF Filings\[ECF 3] CERTIFICATE_of_Interested_Parties_filed_by_Defenda.pdf (Email
140. Stephenson ECF Filings\[ECF 9] ANSWER to Amended Complaint, by Defendants State of
141. Stephenson ECF Filings\[ECF 20] Stipulation for EOT for Defendant Jesus Gonzalez.pdf
142. Stephenson ECF Filings\[ECF 35] Notice of Motion to Withdraw.pdf
143. Stephenson ECF Filings\[ECF 35-1] Ps and As Motion to Withdraw.pdf
144. Stephenson ECF Filings\[ECF 35-2] Baxter Declaration.pdf
145. Stephenson ECF Filings\[ECF 40] Joint Status Report.pdf
146. Stephenson ECF Filings\[ECF 46] Parties Joint Report.pdf
147. Stephenson ECF Filings\81-1.pdf

148. Stephenson ECF Filings\Dkt 126-1 - Decl ISO Ps' MIL #1.pdf
149. Stephenson ECF Filings\Dkt 126-2 - Proposed Ordr re Ps' MIL #1.pdf
150. Stephenson ECF Filings\Dkt 129 - Ps' MIL #2.pdf
151. Stephenson ECF Filings\Dkt 129-1 - Decl ISO Ps' MIL #2.pdf
152. Stephenson ECF Filings\Dkt 129-2 - Proposed Order re Ps' MIL #2.pdf
153. Stephenson ECF Filings\Dkt 173 TRIAL BRIEF RE UNDISCLOSED AND IMPROPER WITNESSES.pdf
154. Stephenson ECF Filings\Dkt 176 DECLARATION of Donna M. Dean REGARDING UNAVAILABILITY OF
155. Stephenson ECF Filings\Dkt 177 DECLARATION of OF NATHAN SCHRAER.pdf
156. Stephenson ECF Filings\ECF [142] 6-54 Final - 8-18 Opposition to MIL 2 (Criminal History et
157. Stephenson ECF Filings\ECF [142-1] 6-58 Final - 8-18 Decl. ISO MIL 2 (Criminal History).pdf
158. Stephenson ECF Filings\ECF 13-1 Stephenson.pdf
159. Stephenson ECF Filings\ECF 13-2 Stephenson.pdf
160. Stephenson ECF Filings\ECF 88 - Ntc of Appearance or Withdrawal of Counsel.pdf
161. Stephenson ECF Filings\ECF 91 - Notice of Supplemental Authority.msg
162. Stephenson ECF Filings\ECF 123 8-4 Final Stephenson Memorandum of Contentions of Fact and
163. Stephenson ECF Filings\ECF 143 - Spec Int to Juryv2 (DD revdkF).pdf
164. Stephenson ECF Filings\ECF 150 Defendants' Joint Status Report Re Meet and Confer
165. Stephenson ECF Filings\ECF 150-1 Certificate of Service.pdf
166. Stephenson ECF Filings\NEF 34 - Ex Parte Application.msg
167. Stephenson ECF Filings\NEF 94 - Response.msg
168. Stephenson vs State of CA FINAL 09-09-25 TRIAL DAY 1 (REVISED).txt.txt
169. Stephenson vs State of CA FINAL 09-10-25 TRIAL DAY 2 (FINAL).txt.txt
170. Stephenson vs State of CA FINAL 09-11-25 TRIAL DAY 3.txt.txt
171. Stephenson vs State of CA FINAL 09-12-25 TRIAL DAY 4.txt.txt
172. Stephenson vs State of CA FINAL 09-15-25 TRIAL DAY 5.pdf
173. Stephenson vs State of CA FINAL 09-16-25 TRIAL DAY 6.txt.txt
174. Stephenson vs State of CA FINAL 09-18-25 TRIAL DAY 8.txt.txt
175. Stephenson, Devonte, et al. v. State of California DOCKET FEB 18 2026
176. Stephenson, Devonte, et al. v. State of California JSA DEC 2025 INV v2
177. Stephenson, Devonte, et al. v. State of California JSA DEC 2025 INV C.log
178. SUPPLEMENT to NOTICE OF MOTION AND MOTION for Attorney Fees [268] filed by Plaintiffs Devonte
179. WOHLGELERTNER, M.D., DANIEL 11-02-2023_FULL Deposition Transcript.pdf
180. WOHLGELERTNER, M.D., DANIEL 11-02-2023_mini.pdf
181. WOHLGELERTNER, M.D., DANIEL 11-06-2023_full.pdf
182. WOHLGELERTNER, M.D., DANIEL 11-06-2023_mini.pdf
183. bills\[268] Motion for Attorneys' Fees Pursuant to 42 U.S.C. 1988
184. bills\Bill of Costs
185. bills\Costs 1

186. bills\Costs 2
187. bills\Costs 3
188. bills\Costs 4
189. bills\Costs 5
190. bills\Costs 6
191. bills\Darci Gilbert
192. bills\DOCKET
193. bills\GALIPO
194. bills\GREG PEACOCK
195. bills\Nick lerman
196. bills\Santiago Laurel
197. bills\STEVEN A. LERMAN
198. bills\TIME RECORDS OF COOPER ALISON-MAYNE

# EXHIBIT 5

Page 1

**DANIEL HORSFORD et al., Plaintiffs and Appellants,**
**v.**
**THE BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY, Defendant and Respondent.**
**F051782**
**Court of Appeals of California, Fifth Appellate District**
**September 4, 2008**
**Not to be Published**

Appeal from a judgment of the Superior Court of Fresno County, No. 600186-1, Donald R. Franson, Jr., Judge.

Law Office of Dean B. Gordon, Dean B. Gordon; Murray & Associates, Lawrence D. Murray; Johnson & Beck, Mark D. Johnson; Law Offices of Richard M. Pearl and Richard M. Pearl for Plaintiffs and Appellants.

Murphy, Campbell, Guthrie & Alliston, George E. Murphy and Suzanne M. Nicholson for Defendant and Respondent.

**OPINION**

VARTABEDIAN, Acting P.J.

Header ends here.

This is an appeal from a judgment for attorney fees entered after remand on a previous appeal. We will conclude that in all respects but one the record shows that the trial court applied the correct legal standards in determining the amount to be awarded as attorney fees; as to those areas, appellants have not demonstrated that the court abused its discretion. In one important respect, however, the record does not permit us to determine whether the trial court applied the correct legal standard, and the resolution of that ambiguity has, potentially, a significant impact on the trial court's exercise of discretion. Accordingly, we conditionally reverse the judgment.

**Facts and Procedural History**

The facts concerning the underlying action are set forth in detail in *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359 (*Horsford*). In short, *Horsford* was an employment discrimination action brought under the California Fair Employment and Housing Act, Government Code section 12900 et seq. (hereafter FEHA). Appellants Daniel Horsford, Richard Snow, and Steven King were prevailing plaintiffs at the trial of that action and, as such, were eligible for an award of reasonable attorney fees. (See Gov. Code, § 12965, subd. (b).) As one of several issues in *Horsford,* we determined the trial court had applied the wrong standards in awarding fees. (*Horsford, supra,* at pp. 395-396.) We reversed that portion of the judgment and "remanded for further proceedings consistent with the views expressed in this opinion." (*Id.* at p. 402.)

On remand, appellants submitted a revised and augmented motion for attorney fees. Respondent opposed the motion, contending appellants' fee claims were grossly exaggerated and that the fee motion should be denied in its entirety, or that the fees at least should be substantially less than requested. Appellants submitted another revised request, acknowledging some errors in the first request and contending that other objections were unfounded.

The trial judge had recused himself during posttrial proceedings. On remand the matter was assigned to Judge Donald R. Franson, Jr., for consideration of the new fee motion. After full review of the record, and after hearings on the fee motion and a motion for new trial, the court entered a corrected fee award of $3,229,709.50. In doing so, the court reduced the fees from the requested amount of approximately $10.4 million.



fastcase Smarter legal research.

Appellants filed a timely notice of appeal. They contend the court failed to follow our directions on remand, denied counsel a reasonable hourly fee, impermissibly reduced the number of hours to be compensated, inadequately compensated for the risk associated with prosecuting this case, and failed to award the correct statutory interest on the fee award.

**Discussion**

***A. Standard for Award of Fees and Standard of Review on Appeal***

The overarching theme of appellants' opening and reply briefs is that this court, in *Horsford,* said that attorney fees awarded under FEHA should "fully compensate" the prevailing plaintiffs' attorneys for time spent on the case. (See *Horsford, supra,* 132 Cal.App.4th at p. 395, quoting from *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133.) The problem with appellants' argument is that "full compensation" does not mean "payment at the top permissible rate for all the hours counsel actually devoted to the case," which seems to us a fair restatement of appellants' proposed standard for "full compensation."

Instead, the goal of an FEHA attorney fee award is, in the ordinary case, to compensate counsel at a reasonable rate for hours reasonably spent on the case. (*Horsford, supra,* 132 Cal.App.4th at p. 394.) To accomplish this purpose, the statute and case law commit to the broad discretion of the trial court the determination of a reasonable billing rate and the number of hours reasonably spent on the case. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095; see *Horsford, supra,* at p. 394.) The resulting "lodestar" fee, that is, the number of hours times the hourly rate, may then be adjusted, in the discretion of the trial court, to achieve fair, market-rate compensation of prevailing counsel. (See *Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1137-1138; *Horsford, supra,* at p. 395.) The goal in the trial court is full compensation of counsel "at the fair market value for the particular action." (*Ketchum v. Moses, supra,* at p. 1132.)

On appeal, we review the trial court's fee award for abuse of discretion. If the trial court has applied the correct legal standards, we determine only whether the trial court's action "`falls within the permissible range of options set by the legal criteria.'" (*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 452.) In such circumstances, "[t]he only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.)[1]

***B. Reduction of Hours***

Appellants challenge the trial court's reduction of hours claimed by attorneys Lawrence Murray and Dean Gordon and reduction of hours claimed for support staff in Gordon's office. Apart from appellants' erroneous contention, addressed above, that counsel were entitled to full compensation for all hours spent on the case, appellants assert two primary objections to the court's determination of hours reasonably spent on the litigation. Cognizant of the broad scope of the trial court's discretion and the narrow scope of our review, we briefly address each of the contentions.

1. <u>Inadequate Explanation of Reductions</u>

Citing several federal court attorney fee decisions, appellants contend the trial court is not permitted to drastically reduce counsel's hours without providing sufficient details to permit counsel to respond to (i.e., contest) the award or to "discern what the court believes they should do differently when prosecuting discrimination cases in the future." Among the cases relied upon are *Ferland v. Conrad Credit Corp.* (9th Cir. 2001) 244 F.3d 1145,



fastcase Smarter legal research.

1151, and *Gates v. Deukmejian* (9th Cir. 1992) 987 F.2d 1392, 1399.

No California cases impose a similar obligation on the trial court. (See *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294 [no statement of decision required]; but see *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 622 [remanded for more detailed explanation of fee award where record made it unclear whether court had applied applicable legal standards].)

While the trial court is not required to provide a detailed accounting of its treatment of the hours claimed by plaintiffs' attorneys, it is equally true that greater, rather than less, specificity aids the appellate court in reviewing the trial court's fee award. In the present case, while the court explained its reductions of claimed hours in rather broad terms, the court's discussion for the most part is sufficiently focused to permit review of the award. The court expressly stated that it had reviewed all billing records, as well as the declaration filed in support of the fee claim. The court expressly enumerated those areas in which it found all hours noncompensable (recreating billing records, purely clerical functions, and redundant record review in summary judgment and appellate proceedings). And the court gave reasons for those areas in which it determined that counsels' time records failed to provide direct evidence of reasonable expenditure of time.

It is clear from the record that three factors were particularly important to the trial court in its evaluation of the hours claimed by counsel. First, most time records for work done prior to the original appeal were not contemporaneous records, but were reconstructed by counsel based on their calendars, their recollections, and their review of the pleadings and other documents in the case. As a result, the court was justified in rejecting these approximations when the entries seemed unjustified or implausible.[2] Second, where entries in the time records provided only a vague description of counsel's activities, particularly for large blocks of time, there was no basis to determine whether the time was reasonably spent and, therefore, compensable.[3] Third, there were numerous instances in which, after review of respondent's objections to the fee claim, appellants acknowledged that the time records were incorrect, either as a result of duplicate time entries or typographical errors in data entry. Not only was the trial court permitted to reject counsel's explanations for these errors as not credible (or merely as inaccurate, given the reconstructed nature of many of the records), the court was permitted to conclude that the errors undermined the credibility of time claims where entries otherwise seemed unjustified or implausible.[4]

As we stated in our earlier opinion in this case, "the verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous." (*Horsford, supra,* 132 Cal.App.4th at p. 396.) That does not mean that the time records are sacrosanct, however; it merely means the trial court must examine the records and use them as the basis for its lodestar determination where the records are found accurate and reliable.[5] (See *ibid.*) In the present case, the trial court expressly stated that it had done this, and that its determination of hours reasonably spent was based on the court's "extensive and careful review and analysis of the bills submitted by each of the plaintiffs' attorneys...."

In one important respect, however, the trial court's order on attorney fees, while sufficiently particularized, is, nevertheless, ambiguous, as respondent's counsel candidly acknowledged at oral argument. Thus, with respect to "block billing" of the type described in footnote 3, *ante,* the order says that such billing made it impossible to determine from the billing records whether the hours were spent reasonably and productively and were, therefore, "compensable." It appears vague



fastcase Smarter legal research.

block billing was a problem in numerous areas, including discovery, "consultation" among attorneys, trial preparation, trial, and appeal.

We cannot determine from the order what steps the court took after coming to this conclusion, however. If, on the one hand, the trial court *excluded* the entire block of time in each instance of block billing, the court would have erred. If, on the other hand, the court *adjusted* the hours claimed (for example, by determining the amount of time that reasonably could have been spent overall on the type of activity reflected in the block billing, such as "trial prep" (see fn. 3, *ante*)), the court's statement that it had done so would adequately reflect its exercise of discretion.

This case involved a fee claim based on almost 10,000 hours of attorney time; a rather significant amount of that time is recorded in the block-billing format. (About 4,300 hours were disallowed for various reasons.) In fairness to the parties and to the trial court, we believe we must conditionally reverse this matter for clarification of this issue by the trial court. If it turns out the trial court did adjust, and not exclude, the block-billing hours, we cannot conclude the amount of the fee award was an abuse of discretion even though we may have made a higher award if the matter was before us in the first instance. If it turns out the trial court excluded all block-billed hours whenever the court determined the billing record did not directly permit a reasonableness determination, then on remand the court must exercise its discretion to award reasonable fees for the activities reflected in the block billings.[6] Our disposition of this appeal reflects this conditional determination. Except to the extent just stated, we conclude the court's "Order on Motion for Statutory Attorneys' Fees" was sufficiently specific under California law.

2. No Reasonable Basis for Reductions

Appellants contend there is no "reasonable basis" in the record for the trial court's reduction of counsel's claims for hours dedicated to this case, including the hours of paralegal staff. As discussed generally in the previous section, we conclude the court's reasoning is supported by the record. We briefly discuss appellants' specific claims concerning the reasonable basis for the trial court's conclusions.

Appellants contend the trial court should be limited to those reductions proposed in respondent's points and authorities in opposition to the fee claim. No California cases support such a limitation. (Appellants rely on *Cunningham v. City of McKeesport* (3d Cir. 1986) 807 F.2d 49, 50, in which the defendants filed no opposition at all to the plaintiff's fee request.)

We find no basis to impose a duty on opposing parties to quantify each objection or to impose on the trial court a limitation on its exercise of discretion based on such quantification. One example will demonstrate our reasoning. In this case, one disputed area was whether appellants needed three attorneys every day at trial or in attendance at strategy meetings. An opposition claim raising this issue in general terms would be sufficient.[7] The trial court would be permitted to adjust a claim for this reason whether or not it was raised by the opposition, since the trial court may exercise its own judgment about the reasonable necessity of legal services. (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1137-1138.)

In the present case, respondent extensively objected to appellants' fee claim based both on quantified examples and on general categories. Respondent requested, inter alia, reduction of the claimed lodestar fee of $4.8 million by $1.1 million "for non-compensable billings" based on individually identified time-record entries. It then requested that the remaining lodestar amount be "reduced by an across-the-board

percentage of anywhere from one-half to two-thirds to reflect a `reasonable fee' for counsel had they managed this case with even a bare minimum of efficiency." We conclude the trial court appropriately considered the broader issues of inefficiency and duplication of effort by counsel.

Appellants find it "puzzling" that the trial court's reduction of allowable hours in most instances approximated the reductions proposed by respondent even though the court rejected "most" of respondent's criticisms as unfair. Viewed in context, there is no inconsistency in the trial court's conclusions.

The single most striking feature of respondent's trial court opposition to appellants' fee request is its intemperate tone. The opposition in various places accuses appellants' counsel of "shocking" "fraud" by "unscrupulous attorneys" who "seek to line their own pockets by artificially inflating their fee requests." Respondent concluded: "In the end, the egregiousness and sheer audacity of the fees claimed by plaintiffs' counsel warrants this court denying their fee request altogether" as a "sanction" for "their wildly inflated fee request."

While the trial court found that counsel's time records demonstrated "[e]xcessive billing, sometime flagrant," it rejected respondent's criticism of counsel's "numbers, efforts, veracity, and talent": "Some of the criticism is fair, most not." The court concluded: "Whatever the criticism, however, the fact remains that plaintiffs and their attorneys appeared for trial, day after day, and secured a very large jury award." The court was not required to ignore what it perceived as excessive time claims just because it rejected respondent's characterization of that excess as intentional or fraudulent.

***C. Reduction of Hourly Fee***

The trial court awarded appellants' counsel fees based on a lower hourly rate than counsel requested. Appellants contend their evidence supported higher hourly awards, respondent did not contest this evidence, and the trial court was required, as a matter of law under the circumstances, to award the hourly fee established by the evidence.

The hourly rates awarded by the trial court reflected a reasoned exercise of discretion. They were within the range of fees suggested by some of appellants' evidence. In addition, the court stated it was relying on its own knowledge of fees locally and in the San Francisco area (where Murray normally practiced) and on findings by the original trial judge. These were permissible factors upon which to base the hourly rates. (See *PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at p. 1096.)

Appellants contend, however, that where uncontradicted evidence establishes that counsel's claimed rates are reasonable, it is an abuse of discretion for the court to award a different hourly fee. We reject this premise as inconsistent with the overarching responsibility of the trial court to exercise its discretion in the award of a reasonable fee.

It is true, as appellants assert, that several Court of Appeal cases seem to support their proposed rule. (See *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 156; *Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)

In *Graciano,* the trial court set the hourly fee "solely on an unrelated local rule capping expert witness hourly fees, disregard[ing] unopposed declarations" in support of a higher hourly fee. (*Graciano v. Robinson Ford Sales, Inc., supra,* 144 Cal.App.4th at p. 155.) In light of the trial court's application of the wrong legal standard for determining the hourly rate, the *Graciano* court concluded that appellant's "unrebutted declarations established the prevailing rates in the region



fastcase Smarter legal research.

for attorneys with comparable skills and expertise, and her evidence compelled a finding that the requested hourly rates were within the reasonable rates for purposes of setting the base lodestar amount." (*Id.* at p. 156.) We believe this is dictum. The holding of the case was that the trial court's arbitrary reliance on the local expert witness rule was an abuse of discretion. (*Ibid.*)

In *Hadley v. Krepel, supra,* 167 Cal.App.3d at page 682, appellant, according to the court, contended the trial court "ignored *uncontradicted* evidence contained in the cost bill that [appellant's] actual fees and costs were both reasonable and necessary." The appellate court, while finding that the record did not demonstrate "passion or prejudice" on the part of the trial court, concluded: "[W]e suspect *something* was amiss. The only explanation we can divine for the meager award is the trial judge's unrealistic view of what constitutes a reasonable value for legal services. An award of attorney's fees and costs must be measured by the economics of the times." (*Id.* at pp. 686-687, original italics.)

In both of these cases, the appellate court remanded for reconsideration of the attorney fee award, in part, because the hourly fee award was far below prevailing reasonable rates. That is not the case in the matter before us. To the extent these cases stand for the proposition that the trial court is required to accept counsel's claimed hourly rates, we disagree.

The other case on which appellants primarily rely is *Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 783. That case is inapposite because the trial court had exercised its discretion to award fees, in essence, at the hourly rate requested by the prevailing party and the question on appeal was whether the award was too high. The appellate court found that "the hourly rates allowed by the trial court are within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work." (*Ibid.*) The case neither holds nor implies that the trial court *must* award fees at the hourly rate requested by the prevailing party.

Finally, we note that there was evidence submitted by appellants' counsel that supported the court's determination of the hourly rate, namely, counsel's statements that they charged, during a large portion of the time in question, the exact rate awarded by the trial court. Counsel argued that their hourly rate at the time of the initial fee motion, rather than the rate at the time services were rendered, should be used. The trial court, however, properly exercised its discretion to use the rates effective at the time services were rendered. Appellants have not shown that the trial court abused its discretion in setting the hourly rates upon which the lodestar was based.

***D. The Lodestar Multiplier***

As noted, the lodestar is computed by multiplying the reasonable number of hours spent by the prevailing parties' counsel, by the reasonable hourly rate for such services. However, "the lodestar figure may be increased by application of a fee enhancement, or reduced as appropriate, after the trial court has considered other factors concerning the lawsuit, including the contingent nature of the fee award." (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1134.) The goal of such adjustment is to ensure a fair and just award that effectuates the purposes of the statute under which the prevailing party has sued, in this case the FEHA. (*Horsford, supra,* 132 Cal.App.4th at p. 394.) That act depends heavily on private litigation for its enforcement, and such litigation is usually prosecuted by plaintiffs whose attorneys are paid only if the plaintiff prevails; the award of attorneys fees in such cases, as a general matter, should be adequate to encourage attorneys to undertake such



fastcase Smarter legal research.

litigation in potentially meritorious cases. (*Id.* at p. 395.)

In this case, the lower court awarded a "blended" multiplier of 1.5 for services performed by attorneys Murray, Gordon, Johnson, and Pearl through and including the first appeal. The court stated that it had considered the "contingency and delay" factors discussed in *Ketchum v. Moses, supra,* 24 Cal.4th at page 1134, and in our previous opinion. (See *Horsford, supra,* 132 Cal.App.4th at p. 400.) We interpret the court's use of the term "blended" multiplier to imply both that the court recognized some services were performed longer ago than others and that a different balancing of the factors may have been applicable to the trial and appellate phases.

Appellants contend the court abused its discretion in selecting the 1.5 multiplier because the court stated it had considered, as part of its exercise of discretion, that some of counsel's "bills have been clearly overstated, as defendant argues, and plaintiffs admitted to some. This has been taken into consideration by the court in determining an appropriate multiplier." They contend the court already had accounted for any such discrepancies in reducing the number of hours allowed in the lodestar calculation and that considering it again for multiplier purposes constitutes prohibited "double counting" of the deficiency. While recognizing that the trial court considered a range of factors in selecting the multiplier, appellants contend that, "[h]ad the Court not double-counted, it would have applied a significantly higher enhancement." They reach this conclusion by enumerating all of the aspects of the case that would lead to a higher multiplier.

We do not perceive any significant "double counting." In reducing the allowable hours, the trial court was attempting, based on all the available information, to reach totals of hours actually and reasonably spent on the case by each counsel. In selecting the multiplier, the court was engaged in a much more generalized evaluation of a fair compensatory award, without an attempt to quantify each of the various factors. (See *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1134.) Indeed, quantification at that stage would be virtually impossible, which is why the Supreme Court has emphasized the necessity for an objectively reasonable lodestar as a starting point in the fee determination. (See *ibid.*) In any event, consideration of counsel's billing practices as a "quality of representation" or related factor is conceptually different from reducing particular claimed hours as unreasonably spent. (See *Serrano v. Unruh* (1982) 32 Cal.3d 621, 635.) Appellants have not established an abuse of the trial court's discretion.

***E. Date of Commencement of Interest on Attorney Fee Award***

Appellants expressly disclaimed the "delay" factor in arguing for a lodestar multiplier in the trial court. They argued instead that they should receive statutory interest on counsel's trial-phase fees beginning on the original judgment date and on the appellate phase fees beginning when their entitlement to fees was adjudicated in the appellate opinion. We disagree.

It is clear the trial court did not determine, expressly or impliedly, that it would award interest on the fee award as part of its selection of a lodestar multiplier: At the hearing on appellants' motion for new trial on the attorney fee award, the court had already decided on the multiplier after the first hearing but treated the interest issue as undecided. It did not increase the multiplier after it determined that statutory interest commenced only on the date of its award of fees after remand from this court. Accordingly, we reject respondent's contention that the interest issue was subsumed in the multiplier determination.



fastcase Smarter legal research.

Nevertheless, it is clear under settled law that the trial court awarded interest from the correct date. There are two components of our determination.

First, an appeal can result in a partial reversal. Such a reversal has the same effect, as to the portion of the judgment reversed, as any other reversal. (See generally 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 774, 777, pp. 802, 805-806.) While a partial reversal is not always appropriate, in this case the contested judgment for attorney fees was severable and we treated it as severable in our disposition of the prior appeal. (See *id.* at § 202, p. 255; *Horsford, supra,* 132 Cal.App.4th at p. 402.) In fact, the attorney fee order had been the basis of a separate notice of appeal and later consolidated with the appeal on the merits. (See *id.* at p. 366.)

Second, under the rule of *Stockton Theatres, Inc. v. Palermo* (1961) 55 Cal.2d 439, 446, interest on a judgment after reversal on appeal accrues from the date of the new judgment; interest on a judgment modified on appeal, whether modified up or down, accrues from the date of the original, preappeal judgment. Appellants contend the disposition in the prior appeal was a modification of the judgment because their fundamental entitlement to attorney fees was not altered and a portion of the fee was not reversed. (See *Horsford, supra,* 132 Cal.App.4th at p. 396, fn. 10.) However, neither entitlement to fees nor the portion of fees not affected by the appeal was an issue on appeal; the issue was the amount of the award to appellants for attorney fees. The disposition was a reversal with directions, investing the trial court with the power and obligation to determine that matter de novo. The situation is no different than any other in which a party obtains on appeal the right to a new trial, either on all or some of the issues.

In some FEHA cases, the issue of commencement of postjudgment interest is relatively unimportant: as a personal injury cause of action, the FEHA claim accrues prejudgment interest from the date of the injury. (See *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976.) Where the defendant is a governmental entity, however, no prejudgment interest may be awarded. (Civ. Code, § 3291.) Thus, whether a plaintiff in such a case obtains a reversal on the merits or on some severable issue, the plaintiff is not compensated for the delay in payment for his or her injury.

The trial court was correct in rejecting appellants' interest claims in the present case.

**Disposition**

The order for attorney fees is conditionally reversed and is remanded for further proceedings. Upon remand, the trial court shall determine whether block-billing hours, as described above, were excluded from the fee award. If the court so determines, the court must permit the parties to make further submissions concerning the block-billing hours and, after hearing, the court shall enter a new order for attorney fees, having exercised its judicial discretion in adjusting the block-billing hours to reflect the reasonable compensation for the services in question. However, if the trial court determines that it did not exclude block-billing hours and that it already has exercised its discretion to adjust those hours, the trial court shall reinstate its previous order, which shall become the final order on attorney fees. Each party shall bear its own costs on appeal. The trial court shall award attorney fees on appeal to appellants if proceedings on remand result in an increase in the original order for fees.

WE CONCUR:

WISEMAN, J.

GOMES, J.

---------------



fastcase Smarter legal research.

Notes:

1. It often is stated in the cases that the basis for application of the abuse of discretion standard of review is the fact that the trial judge is particularly capable of evaluating the services provided in his or her own courtroom. In this case, the judge making the attorney fee order on remand was not the trial judge. Nevertheless, it has long been the law that a substitute judge in posttrial proceedings exercises the same discretion as the original judge. (See, e.g., *Churchill v. Flournoy* (1899) 127 Cal. 355, 362; *Kershner v. Morgali* (1957) 152 Cal.App.2d 884, 885.) Here, the court stated it had relied, in part, on the observations of the original trial judge contained in the earlier attorney fee proceeding.

2. This is not to say that contemporaneous time records are required as part of every attorney fee application; they are not. (See *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 270-272.) Still, the trial court is entitled to evaluate the records that are submitted and is not required to treat all records as equally informative or accurate. (See, e.g., *PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at p. 1096, fn. 4.)

3. For example, for July 22, 23 and 24, 2000, Murray claimed 10 hours, 10.5 hours, and 5 hours, respectively, for "trial prep — Shell." Similarly, on July 16 and 17, 2000, Gordon claimed 12 hours and 12.5 hours for "trial prep." While one can imagine this number of hours actually spent on trial preparation on a given day, it is, as the trial court concluded, not possible to determine from this type of "block billing" whether the hours were spent productively and reasonably.

4. The trial court cited an example in which an initial claim of 2.2 hours for preparation of a 12-line motion to exclude witnesses was reduced to .2 hours after respondent pointed out the unreasonableness of the initial claim. At the hearing on the motion for attorney fees, the court also referred to claims for two hours "or even longer" for "boilerplate" motions.

5. At the hearing on the attorney fee motion, the court stated: "I'm not accusing or even buying into the idea that any of you [appellants' counsel] are dishonest or doing anything. I truly believe reading the record that everybody put in the time that they say they did." Nothing in the trial court's statement implies its wholesale acceptance of the time claims. In fact, the court's next sentence was: "The question is, is it efficient, duplicative in that area?" Indeed, appellants' reply to respondent's objections acknowledged that *some* time entries were incorrect — i.e., that counsel did not "put in the time" originally claimed and, at the hearing on the motion, Murray acknowledged that some of the specific entries were approximations, although he said the overall time claims were accurate.

6. Given the magnitude of the present case, the court might find it useful to require respondents to submit a billing summary for discovery, trial preparation, trial, and the first appeal, redacted so the summary would not disclose privileged information. While the hours and hourly rates of opposing counsel would not be dispositive of plaintiffs' fee claims, such information could well help place plaintiffs' claims in some perspective. (See *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1251.) At the hearing in this case, Judge Franson posed the question whether respondent's failure to disclose this information, in itself, supported an inference that plaintiffs' original fee claim was not unduly high. The parties did not answer that question nor raise it on appeal. We do not decide the matter; we merely point out the possible usefulness of opposing party's legal bills in evaluating the number of hours plaintiffs' counsel say was reasonably required to litigate this case. (See generally Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar, 2d ed. 2007 Supp.) § 14.36, pp. 444.1-444.2.)



fastcase Smarter legal research.

7. As with a fee claimant's time records, objections to the fee claim might be more persuasive the more specific they are, but there is no requirement of specificity for objections to be legally sufficient to permit consideration by the trial court.

---------------

# EXHIBIT 6

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 8/4/2025 | Begin to print 4 copies of each deposition transcripts, tab and itemize boxes for trial. Deposition transcripts consist of: Allison Hunt, John MacGregor, Jeffrey McKee, Michael Graham, Dane Norem, Richard Clark, Robert Fonzi, Gary Vilke, Matt Borden, David Popko, Eric Leighton, Daniel Cisneros, Shawn Casteel, Bennet Omalu, Daniel Wohlgelertner (2 days), Devonte Stephenson, Keandre Stephenson, and Linden Stephenson | 2 | $250 | $500.00 |
| Darci Gilbert | 7/25/2025 | Begin trial preparation by contacting several previous deposition court reporter agencies to receive quotes to receive transcripts from prior depositions and create DropBox with all officer statements for Lynden & Associates transcription of statements. | 1 | $250 | $250.00 |
| Darci Gilbert | 4/1/2025 | Calendar meet and confer with counsel | 0.1 | $250 | $25.00 |
| Darci Gilbert | 7/29/2025 | Call and email Mr. Noble to set up a meeting with Mr. Galipo and Mr. Mayne to go over trial preparation. Calendar meeting | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/21/2025 | Case review meeting to discuss upcoming trial with Mr. Galipo and Mr. Mayne | 0.5 | $250 | $125.00 |
| Darci Gilbert | 9/4/2025 | Case review meeting with Mr. Galipo and Mr. Mayne to discuss trial | 0.5 | $250 | $125.00 |
| Darci Gilbert | 8/6/2025 | Case review meeting with Mr. Galipo and Mr. Mayne to discuss upcoming trial | 0.5 | $250 | $125.00 |
| Darci Gilbert | 8/14/2025 | Case Review meeting with Mr. Galipo and Mr. Mayne to discuss upcoming trial | 0.5 | $250 | $125.00 |
| Darci Gilbert | 7/29/2025 | Case Review with Mr. Galipo and Mr. Mayne to discuss upcoming trial | 0.5 | $250 | $125.00 |
| Darci Gilbert | 9/2/2025 | Continue to print 4 copies of deposition transcripts, witness statements, and trial documents. Assemble documents in binders, label and index documents and prepare boxes for trial | 2 | $250 | $500.00 |
| Darci Gilbert | 8/7/2025 | Continue to print 4 copies of each deposition transcript, tab, and itemize boxes for trial | 1 | $250 | $250.00 |
| Darci Gilbert | 8/5/2025 | Continue to print 4 copies of each deposition transcripts, officer/witness statements, autopsy report, expert reports, etc., tab, and itemize boxes for trial | 1 | $250 | $250.00 |
| Darci Gilbert | 8/22/2025 | Create binders for Final Pretrial Conference with Final Pretrial Conference documents, Motions in Limine filings, and Plaintiffs' exhibits for Mr. Galipo | 1.5 | $250 | $375.00 |
| Darci Gilbert | 10/15/2025 | Email co-counsel for their time spent and costs | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/8/2025 | Email from Ace Attorney Services re unable to serve subpoena on Dennis Stout | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/20/2025 | Emails and schedule phone call meeting with Dr. Wohlgelernter, Mr. Galipo, and Mr. Mayne for 8/21/25 at 4pm | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/26/2025 | Emails Mr. Sain, counsel for Mr. Borden re trial date and time Mr. Galipo anticipates calling him to testify | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/16/2025 | Emails to Mr. Mayne re Joint Disputed Jury Instructions, Joint Agreed Jury Instructions, and Verdict form | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/2/2025 | Emails with counsel re setting up call time for meeting, updating calendar | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/5/2025 | Emails with court reporter agency to receive certified deposition transcript of Eric Leighton | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/5/2025 | Emails with court reporter agency to receive certified deposition transcript of Matthew Borden | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/5/2025 | Emails with court reporter agency to receive certified deposition transcript of Jeffrey McKee | 0.2 | $250 | $50.00 |
| Darci Gilbert | 10/6/2025 | Emails with Court Reporter and office manager re Venmo payment information for transcripts requested | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/4/2025 | Emails with Dr. Omalu his deposition transcript for review before trial | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/26/2025 | Emails with Dr. Omalu's office re trial date and time Mr. Galipo anticipates calling him to testify | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/4/2025 | Emails with Dr. Wohlgelertner his deposition transcript to review before trial | 0.1 | $250 | $25.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 9/16/2025 | Emails with Mr. Mayne re deposition transcripts of Dr. Wohlgelernter | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/26/2025 | Emails with Mr. Noble re trial date and time Mr. Galipo anticipates calling him to testify | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/26/2025 | Emails with Mr. Wohlgelernter re trial date and time Mr. Galipo anticipates calling him to testify | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/4/2025 | Emails with Wendy from Dr. Omalu's office and set up a meeting time for Mr. Galipo and Mr. Mayne to discuss trial | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/9/2025 | File Notice of Lodging Deposition Transcripts, ECF Dkt. 167 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 3/10/2025 | File Reply to Motion to Dismiss, Receive NEF DKT 110 and download for file | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/6/2025 | Finalize printing 4 copies of all documents for trial, depositions, exhibit binders, witness statements, final pretrial conference documents, witness lists, autopsy report, expert initial reports, rebuttal reports, etc., organize, tab, label, boxes. Create binders for Mr. Galipo | 2 | $250 | $500.00 |
| Darci Gilbert | 8/13/2025 | Finalize two exhibit binders for court, label, index and tab binders, transfer audio/video exhibits on USB flash drive | 1 | $250 | $250.00 |
| Darci Gilbert | 7/29/2025 | Further emails regarding retrieving prior deposition transcripts and send court reporter agency proof of counsel | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/26/2025 | Meeting with Mr. Galipo to go over finalized order of witnesses to call at trial. | 0.5 | $250 | $125.00 |
| Darci Gilbert | 10/15/2025 | Prepare a template for Mr. Galipo's time spent and enter time in for Mr. Galipo | 1.5 | $250 | $375.00 |
| Darci Gilbert | 8/26/2025 | Prepare subpoena for Eric Leighton, email detailed instructions to Ace Attorney Service re witness fee, calculate mileage and amount for witness. | 0.5 | $250 | $125.00 |
| Darci Gilbert | 9/4/2025 | Prepare subpoena to Dennis Stout. Several emails with Ace Attorney Services re Subpoena to Dennis Stout | 0.3 | $250 | $75.00 |
| Darci Gilbert | 10/1/2025 | Prepare Table of Authorities for Plaintiffs Opposition to Motion for Judgment, and e-file Opposition, ECF, Dkt 200 | 1 | $250 | $250.00 |
| Darci Gilbert | 3/26/2026 | Prepare Table of Authorities to Opposition to 50b and 59 | 1 | $250 | $250.00 |
| Darci Gilbert | 3/25/2026 | Prepare to file and File ECF 248 – response to objection | 0.2 | $250 | $50.00 |
| Darci Gilbert | 4/1/2025 | Prepare to file and file Joint Report re mediation, ECF dkt, 116 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 3/17/2025 | Prepare to file and file Joint Report Rule 26(f) Discovery Plan re Scheduling Order, ECF Dkt 112 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 8/11/2025 | Prepare to file and File Joint Statement of Case, ECF Dkt. 131 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 5/5/2026 | Prepare to file and file Joint Status Report – ECF 253 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 6/1/2026 | Prepare to file and file Joint Status Report, ECF 256 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/4/2025 | Prepare to file and file Joint Status Report, ECF Dkt. 154 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 10/3/2025 | Prepare to file and file Joint Status Report, ECF Dkt. 206 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 10/6/2025 | Prepare to file and file Joint Stipulation to Dismiss Defendant McKee, submit proposed order, and download ECF, Dkt. 210 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 8/11/2025 | Prepare to file and file Joint Stipulation, ECF Dkt. 132 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 8/4/2025 | Prepare to file and file Memorandum of Contentions of Fact and Law, ECF Dkt. 122 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 10/6/2025 | Prepare to file and file Notice of Lodging of Competing Proposed Judgments, ECF, Dkt. 211 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/15/2025 | Prepare to file and file Notice of Objection, and Declaration to Defendants Late-Disclosed Exhibits and Witnesses, ECF Dkt. 138 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 9/4/2025 | Prepare to file and file Notice of Uncommon Spellings, ECF, Dkt. 155 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 3/27/2026 | Prepare to file and file Opposition, ecf 249 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/4/2025 | Prepare to file and file Plaintiffs' Demonstrative Exhibits, ECF, Dkt. 156 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/11/2025 | Prepare to file and file Plaintiffs' Motion in Limine 1, ECF Dkt. 126, and submit proposed order | 0.3 | $250 | $75.00 |
| Darci Gilbert | 8/11/2025 | Prepare to file and file Plaintiffs' Motion in Limine 2, ECF Dkt. 129, and submit proposed order | 0.3 | $250 | $75.00 |
| Darci Gilbert | 8/18/2025 | Prepare to file and file Plaintiffs' Opposition to Defendants' Joint Motion in Limine 1, ECF Dkt. 140 | 0.3 | $250 | $75.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 9/25/2025 | Prepare to file and file Plaintiffs' Request for Briefing Deadline or Deferred Disposition of Defendants Rule 50(A), ECF Dkt. 185 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 3/13/2026 | Prepare to file and file Proposed Judgment, ECF 245 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/11/2025 | Prepare to file and file Proposed Jury Instructions, agreed upon set, ECF Dkt. 130 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 8/11/2025 | Prepare to file and file Proposed Voir Dire, ECF Dkt. 127 | 0.3 | $250 | $75.00 |
| Darci Gilbert | 9/9/2025 | Prepare to file and file Status Report re Disputed Exhibits, ECF Dkt 168 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 4/27/2026 | Prepare two binders for hearing on Rule 50(a), proposed judgment, and documents relating to post-trial motions. | 1 | $250 | $250.00 |
| Darci Gilbert | 9/8/2025 | Prepared Plaintiffs' Notice of Lodgment of Deposition Transcripts, emailed to Mr. Mayne for approval to file | 0.3 | $250 | $75.00 |
| Darci Gilbert | 7/15/2026 | Prepared to file and file ECF 260- Joint Status Report | 0.2 | $250 | $50.00 |
| Darci Gilbert | 7/24/2026 | Prepared to file and file Reply to Objections – ECF 263 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/27/2025 | Print and prepare 4 exhibit binders for Mr. Galipo, Mr. Mayne, Defense counsel, label, and tab binders and transfer audio/video to USB flash drive | 2 | $250 | $500.00 |
| Darci Gilbert | 3/24/2025 | Receive and reviewed NEF, Dkt. 114, download minute order and calendar motions in limine and standing order deadlines | 0.5 | $250 | $125.00 |
| Darci Gilbert | 8/4/2025 | Receive and download NEFs Dkts. 121 and 123, defendants Memorandum of Contentions of Fact and Law | 0.1 | $250 | $25.00 |
| Darci Gilbert | 3/3/2025 | Receive and reviewed NEF, Dkt. 111, download minute order, and calendar deadlines | 0.2 | $250 | $50.00 |
| Darci Gilbert | 3/28/2025 | Receive, downloaded and reviewed NEF, Dkt. 115, Order on Motion to Dismiss | 0.1 | $250 | $25.00 |
| Darci Gilbert | 4/11/2025 | Receive, downloaded and reviewed ECF, Dkt. 119 re Ninth Circuit filing | 0.1 | $250 | $25.00 |
| Darci Gilbert | 4/2/2025 | Receive, downloaded and reviewed Order, NEF, Dkt. 117 re Joint Report and calendar status conference | 0.2 | $250 | $50.00 |
| Darci Gilbert | 4/4/2025 | Receive, downloaded and reviewed Order, NEF, Dkt. 118 and update calendar | 0.2 | $250 | $50.00 |
| Darci Gilbert | 3/26/2025 | Received and reviewed NEF, Dkt. 8, from Ninth Circuit, regarding streamlined request for extension. Download email and calendar deadlines | 0.2 | $250 | $50.00 |
| Darci Gilbert | 10/10/2025 | Received , reviewed and downloaded Reply in Support of Motion for Judgment, ECF, Dkt. 212 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Jury Note #1 for file, ECF Dkt 201 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Jury Note #2, for file, ECF Dkt 202 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Jury Note #3, for file, ECF Dkt. 203 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Jury Note #4, for file, ECF Dkt 204 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Jury Note #6, for file, ECF Dkt. 207 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Verdict Form for file, ECF Dkt. 209 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Jury Note #5, for file, ECF Dkt 205 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Received , reviewed and print to pdf email of Sealed Unredacted Jury Note #7, for File, ECF Dkt. 208 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 4/20/2026 | Received , reviewed, and downloaded Reply, ECF 251 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 7/16/2026 | Received , reviewed, downloaded and calendared ECF 261 – Min. Order re Joint Status Reports | 0.2 | $250 | $50.00 |
| Darci Gilbert | 4/6/2026 | Received , reviewed, downloaded and calendared Minute Entry re hearing date – ECF 250 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 7/13/2026 | Received , reviewed, downloaded and calendared new deadline – Order re Status Report, ECF 259 | 0.2 | $250 | $50.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 3/9/2026 | Received , reviewed, downloaded and calendared Order on Motion for Judgment, ECF no. 244 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 3/19/2026 | Received , reviewed, downloaded ECF 246 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 3/20/2026 | Received , reviewed, downloaded ECF 247 – Motion for Judgment, and calendar deadlines | 0.2 | $250 | $50.00 |
| Darci Gilbert | 5/6/2026 | Received , reviewed, downloaded ECF 254 – Order on Joint Status Report, calendar deadline | 0.2 | $250 | $50.00 |
| Darci Gilbert | 7/24/2026 | Received , reviewed, downloaded ECF 262 – State of Objections | 0.1 | $250 | $25.00 |
| Darci Gilbert | 11/18/2025 | Received , reviewed, downloaded ECF nos. 223-235 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 11/19/2025 | Received , reviewed, downloaded ECF nos. 236-243 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/28/2026 | Received , reviewed, downloaded Judgment – ECF 265 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/28/2026 | Received , reviewed, downloaded Order Overruling Defendants Objections – ECF 266 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/27/2026 | Received , reviewed, downloaded Order re Motion for Judgment – ECF 264 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 5/6/2026 | Received , reviewed, downloaded Order re Motion for Judgment – ECF 255, updated calendar | 0.2 | $250 | $50.00 |
| Darci Gilbert | 6/12/2026 | Received , reviewed, downloaded Order re Pendency of Judgment – ECF 257 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 11/17/2025 | Received , reviewed, downloaded to PDF ECF nos. 214-222 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 6/30/2026 | Received , reviewed, downloaded, and calendared Order re Joint Status report – ECF 258 | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/18/2025 | Received and downloaded Defendants' Response to Plaintiffs' Objections to Late-Disclosed Exhibits and Witnesses | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/4/2025 | Received and downloaded Final Pretrial Conference, ECF Dkt. 157 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/4/2025 | Received client interview prep for trial, printed 3 copies each for trial, saved to file | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/12/2025 | Received downloaded and reviewed Exhibit List, ECF Dkt. 136 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/2/2025 | Received invoice from Ace attorney services, update cost file, send payment out | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/14/2025 | Received invoices from Court reporter agencies, Lynden and Associates. Updated cost file | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/11/2025 | Received, downloaded and reviewed defendant's proposed Voir Dire questions, ECF Dkt. 125 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 5/30/2025 | Received, downloaded and reviewed ECF, Dkt. 120, Notice of Appearance/Withdraw | 0.1 | $250 | $25.00 |
| Darci Gilbert | 3/21/2025 | Received, downloaded and reviewed NEF, Dkt. 113, Scheduling Notice | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Redacted Jury Note 5, ECF Dkt. 194 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/22/2025 | Received, downloaded and reviewed Stipulation for Order for Use of Certified Copies of Deposition Transcripts at trial, ECF Dkt. 145 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/22/2025 | Received, downloaded and reviewed Amended Disputed Exhibit List, ECF Dkt. 148 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/22/2025 | Received, downloaded and reviewed Amended Joint Exhibit List, ECF Dkt 147 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/30/2025 | Received, downloaded and reviewed Confirmation of Exhibit Review and Authorization, ECF, Dkt. 198 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/19/2025 | Received, downloaded and reviewed Court's Statistical Correction, ECF Dkt. 144 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/15/2025 | Received, downloaded and reviewed Declaration of Donna Dean, ECF, Dkt. 176 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/15/2025 | Received, downloaded and reviewed Declaration of Kimberly Sullivan re Unavailability of Witness Shawn Casteel, ECF Dkt. 174 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/15/2025 | Received, downloaded and reviewed Declaration of Nathan Schraer, ECF Dkt. 177 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/17/2025 | Received, downloaded and reviewed Defendant's Motion for Joinder, ECF Dkt. 180 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/5/2025 | Received, downloaded and reviewed Defendant's Response re Status Report, ECF, Dkt. 160 | 0.1 | $250 | $25.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 9/8/2025 | Received, downloaded and reviewed Defendants Notice of Lodging Deposition Transcripts, ECF, Dkt. 162 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/2/2025 | Received, downloaded and reviewed defendants' demonstrative exhibits | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/18/2025 | Received, downloaded and reviewed Defendants' Joint Opposition to Plaintiffs' Motion in Limine 1, ECF Dkt. 142 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/5/2025 | Received, downloaded and reviewed Defendants' List of Witnesses to Testify Remotely, ECF Dkt. 159 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/17/2025 | Received, downloaded and reviewed Defendants' Motion for Judgment, ECF Dkt. 179, Emails with Mr. Mayne of copies of filing | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/11/2025 | Received, downloaded and reviewed defendants' motion in limine, ECF Dkt. 124 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/22/2025 | Received, downloaded and reviewed Joint Amended Exhibit List, ECF Dkt. 146 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/12/2025 | Received, downloaded and reviewed Joint Disputed Exhibits, ECF Dkt. 137 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/9/2025 | Received, downloaded and reviewed Joint Exhibit List, ECF Dkt. 166 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/29/2025 | Received, downloaded and reviewed Joint Status Report, ECF Dkt. 150 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/30/2025 | Received, downloaded and reviewed Jury Instructions, ECF, Dkt. 199 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed List of Exhibits and Witnesses, ECF Dkt. 187 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/18/2025 | Received, downloaded and reviewed Minute Order of Jury Trial Day 6, ECF Dkt. 183 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/18/2025 | Received, downloaded and reviewed Minute Order of Jury Trial Day 7, ECF Dkt. 184 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/25/2025 | Received, downloaded and reviewed Minute Order of Jury Trial Day 8, ECF Dkt. 186 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/18/2025 | Received, downloaded and reviewed Minute Order of Jury Trial, Day 5, ECF Dkt. 182 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/8/2025 | Received, downloaded and reviewed Minute Order re Motions in Limine, ECF Dkt. 165 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/11/2025 | Received, downloaded and reviewed Minutes of Jury Trial, Day 1, ECF Dkt. 169 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/11/2025 | Received, downloaded and reviewed Minutes of Jury Trial, Day 2, ECF Dkt. 170 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/12/2025 | Received, downloaded and reviewed Minutes of Jury Trial, Day 3, ECF Dkt. 171 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/12/2025 | Received, downloaded and reviewed Minutes of Jury Trial, Day 4, ECF Dkt. 172 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 3/28/2025 | Received, downloaded and reviewed NEF, Dkt. 114 and update calendar re status conference, motions in limine and jury trial | 0.2 | $250 | $50.00 |
| Darci Gilbert | 4/8/2025 | Received, downloaded and reviewed Ninth Circuit Court of Appeals Order dismissing appeal. Update calendar accordingly | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/17/2025 | Received, downloaded and reviewed Notice of Appearance/Withdrawal of Counsel, ECF Dkt. 181 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/15/2025 | Received, downloaded and reviewed Notice of Intention to Offer Excerpts from Deposition of Transcript of Shawn Casteel, ECF Dkt. 175 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/15/2025 | Received, downloaded and reviewed Notice of Motion to Strike Portions of Plaintiffs' Expert Witness Dr. Wohlgelernter Testimony, ECF Dkt. 178, email Mr. Galipo and Mr. Mayne copies | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/2/2025 | Received, downloaded and reviewed Objections to Plaintiffs' use of demonstrative exhibits, ECF Dkt. 152 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/2/2025 | Received, downloaded and reviewed Order Directing Counsel to File Updated Joint Report, ECF, Dkt. 151, updated calendar | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/5/2025 | Received, downloaded and reviewed Order re Defendants' Objection to Plaintiffs' Use of Demonstrative Exhibits, ECF, Dkt. 158 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/30/2025 | Received, downloaded and reviewed Order Setting Briefing Schedule, ECF Dkt. 197, calendared deadlines | 0.2 | $250 | $50.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 9/3/2025 | Received, downloaded and reviewed Order to Show Cause, ECF Dkt. 153, update Mr. Galipo, update the calendar | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/12/2025 | Received, downloaded and reviewed Proposed Jury Instructions, ECF Dkt. 134 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/18/2025 | Received, downloaded and reviewed Proposed Special Jury Verdict | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/11/2025 | Received, downloaded and reviewed Proposed Special Jury Verdict, ECF Dkt. 128 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Receipt for Release of Exhibits, ECF Dkt. 188 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Redacted Jury Note 1, ECF Dkt. 190 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Redacted Jury Note 2, ECF Dkt. 191 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Redacted Jury Note 3, ECF Dkt. 192 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Redacted Jury Note 4, ECF Dkt. 193 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Redacted Jury Note 6, ECF Dkt. 195 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Redacted Jury Note 7, ECF Dkt. 196 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/15/2025 | Received, downloaded and reviewed Trial Brief re Undisclosed and Improper Witnesses and Objections, ECF Dkt. 173 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/26/2025 | Received, downloaded and reviewed Verdict Form, ECF Dkt. 189 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/12/2025 | Received, downloaded and reviewed Witness List, ECF Dkt. 135 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/8/2025 | Received, downloaded and reviewed Order re Joint Statement of Exhibits, ECF Dkt. 164 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/8/2025 | Received, downloaded and reviewed Scheduling Notice Confirming Trial Time, ECF Dkt. 163 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 9/8/2025 | Received, downloaded and reviewed Defendant's Response to Order, ECF Dkt. 161 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/18/2025 | Received, downloaded and reviewed Defendants' Joint Opposition to Plaintiffs' Motion in Limine 1, ECF Dkt. 141 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/4/2025 | Received, downloaded, and reviewed NEF, Dkt. 121 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/12/2025 | Received, downloaded, and reviewed Notice of Lodging Proposed Pretrial Conference Order, and Pretrial Conference Order (filed by Cooper Mayne) | 0.1 | $250 | $25.00 |
| Darci Gilbert | 8/22/2025 | Received, downloaded, reviewed and calendared Scheduling Notice Changing Final Pretrial Conference time, ECF Dkt. 149 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/17/2025 | Received, reviewed and downloaded Order Dismissing McKee, ECF, Dkt. 213 for file | 0.2 | $250 | $50.00 |
| Darci Gilbert | 8/13/2025 | Received, reviewed and saved transcribed audio pertaining to officer and witness statements from Lynden and Associates. Printed 4 copies of each for trial box | 0.5 | $250 | $125.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 8/12/2025 | Research and locate 8 specific Exhibits for exhibit books and print for Mr. Galipo and Mr. Mayne to review.<br>Exhibits consist of:<br>1. International Association of Chiefs of Police, Excited Delirium Model Policy (Apr. 2017).<br>2. POLICE Magazine, How to Prevent Positional Asphyxia.<br>3. Steve Cole, Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe", Dec. 11, 2015, reprinted June 2, 2020.<br>4. U.S. Department of Justice, National Institute of Justice, Positional Asphyxia—Sudden Death (June 1995).<br>5. Ronald L. O'Halloran & Janice G. Frank, Asphyxial Death During Prone Restraint Revisited: A Report of 21 Cases, 21 Am. J. Forensic Med. & Pathology 39, 48 (2000).<br>6. Lawrence E. Heiskell, How to Prevent Positional Asphyxia, POLICE Magazine (Sept. 9, 2019).<br>7. San Diego Police Department, Final Report of the Custody Death Task Force (1992).<br>8. Consent Decree at 41, United States v. City of Ferguson, No. 4:16-cv-00180 (E.D. Mo. Apr. 19, 2016). | 1 | $250 | $250.00 |
| Darci Gilbert | 8/7/2025 | Review emails and calendar a call with defense counsel, set up zoom information and email counsel | 0.2 | $250 | $50.00 |
| Darci Gilbert | 7/29/2025 | Review emails and calendar meet and confer with counsel for 8.1.25 at 1:30pm | 0.2 | $250 | $50.00 |
| Darci Gilbert | 7/22/2025 | Review files received from co-counsel to determine which documents were previously received and saved to server | 1 | $250 | $250.00 |
| Darci Gilbert | 8/11/2025 | Review invoices from court reporter agencies re certified copies of deposition transcripts. Update costs file | 0.5 | $250 | $125.00 |
| Darci Gilbert | 7/28/2025 | Scan and save into server hundreds of photos (individually scanned) from clients to prepare photos for trial exhibits | 3 | $250 | $750.00 |
| Darci Gilbert | 10/13/2025 | Send a follow up email to court reporter requesting transcripts paid for on 10/6/25 | 0.1 | $250 | $25.00 |
| Darci Gilbert | 6/24/2025 | Send and respond to emails to Dr. Omalu, Dr. Wohlgelernter, and Mr. Noble updating them on the upcoming trial | 0.3 | $250 | $75.00 |
| Darci Gilbert | 7/15/2025 | Send emails to Dr. Omalu, Dr. Wohlgelernter, and Mr. Noble to set times with Mr. Galipo and Mr. Mayne to discuss upcoming trial and calendar meetings with each expert | 0.3 | $250 | $75.00 |
| Darci Gilbert | 7/2/2025 | Send emails to Mr. Noble re upcoming trial | 0.2 | $250 | $50.00 |
| Darci Gilbert | 7/28/2025 | Send follow up email re deposition transcripts requested | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/17/2025 | Send follow up email to co-counsel for their costs and time spent | 0.1 | $250 | $25.00 |
| Darci Gilbert | 10/3/2025 | Several emails with Court Report re payment information for transcripts requested during trial | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/8/2025 | Several emails with each of Plaintiffs' experts re trial schedule, setting up call times for Mr. Galipo to speak with each of them. | 0.2 | $250 | $50.00 |
| Darci Gilbert | 9/10/2025 | Several emails with Plaintiffs' experts re trial scheduled for the following day, times to be at trial | 0.2 | $250 | $50.00 |
| Darci Gilbert | 6/24/2025 | Spend a significant amount of time updating costs file, entering all current costs into excel spreadsheet | 1.5 | $250 | $375.00 |
| Darci Gilbert | 8/12/2025 | Start to print and assemble two copies of 29 trial exhibits to overnight to the Court no later than 8/13/25, pull binder, bate stamp exhibits, and index binders | 2.5 | $250 | $625.00 |
| Darci Gilbert | 10/15/2025 | Update all remaining costs to the file, and enter into excel spreadsheet | 0.5 | $250 | $125.00 |
| Darci Gilbert | 8/11/2025 | Update and add information in tables for disputed and agreed jury instructions | 1 | $250 | $250.00 |
| Darci Gilbert | 8/19/2025 | Update Costs file and make payment to court report agency for deposition transcript | 0.2 | $250 | $50.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Darci Gilbert | 9/5/2025 | Update costs file to add Ace invoice and copy costs | 0.2 | $250 | $50.00 |
| | | | **59.6** | | **$14,900.00** |
| | | | | | |
| | | | | | |
| **Timekeeper** | **Date** | **Description** | **Hours** | **Rate** | **Total** |
| Santiago Laurel | 10/9/2023 | Assembled Plaintiff's opposition to Defendants' Motion for Summary Judgment and exhibits for filing. Followed by Plaintiff's Statement of Material Facts and Statement of Genuine Facts. Prepared draft of notice of Manual filing for Exhibits C-D and burned to DVD. Downloaded ECF stamped copies and printed hard copy. Made arrangements to deliver copy with DVD. | 3.5 | $250 | $875.00 |
| Santiago Laurel | 9/20/2023 | Called Co-counsel's office. Spoke with Angela, trying to confirm and take inventory of the medical records. Drafted email included a Dropbox link to facilitate the transfer of records. Created Dropbox link, so that she could upload files. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 9/20/2023 | Called Parkview Community Hospital to confirm records request procedures. Prepared letter to Parkview Community Hospital. Submitted with our client's signed authorization and other required documents. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 10/17/2023 | Conferred with expert witness Dr. Dan to finalize and schedule the specific start time for his deposition; updated master firm calendar and notified internal handling attorneys of the confirmed schedule. Emailed Cooper to update. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 10/18/2023 | Conferred with expert witness Dr. Omalu's assistant Wendy to finalize and schedule his deposition. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 9/27/2023 | Contact court reporting agency to confirm and schedule reporter for 10/6/23, deposition of Gary Vilke, MD. Drafted email to request Zoom link, emailed link to all parties. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 10/9/2023 | Continued corresponding with OPC and experts to schedule depositions. Defense attorney canceled deposition, needing to reschedule. Emailed Experts to obtain dates for depositions. Prepared a table to facilitate communication and scheduling. | 1.5 | $250 | $375.00 |
| Santiago Laurel | 10/4/2024 | Converted to PDF and filed Response to Defendant McKee's Notice of Supplemental Authority in Support of his motion. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 8/4/2023 | Coordinated deposition and court reporter for the depositions of Dane Norem. Emailed Court Reporting agency. Updated calendar and emailed instructions for Deposition Zoom link. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 8/9/2023 | Coordinated expedited transcript of Norem for evidentiary review timeline. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 9/25/2023 | Discussed with attorney Mayne Defendant's disclosures. Scheduled a call with Dr. Omalu, who requested slides and was tasked with contacting the coroner's office to obtain slides. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 9/25/2023 | Drafted deposition notices for Robert Fonzi, Michael Graham, Gary Vilke, Richard Clark, and John Macgregor. Called court reporting agency to put a tentative hold for depo dates. Attorney finalized and confirmed service of notice. Prepared Proof of Service Declaration and served via email on all parties. Updated calendar with five depositions. | 1.5 | $250 | $375.00 |
| Santiago Laurel | 10/10/2023 | Drafted notice of Continuance of deposition of Expert Richard Clark. Updated calendar and contacted court reporting agency. Prepared Declaration of Service and served and saved notice. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 9/26/2023 | Email with Kimberly Sullivan re experts' availability, to coordinate and schedule expert depositions. | 0.1 | $250 | $25.00 |
| Santiago Laurel | 11/10/2023 | Emailed Co-Counsel to follow up on expert deposition invoices. Forwarded invoices. | 0.1 | $250 | $25.00 |
| Santiago Laurel | 1/25/2024 | Emailed dr. Wohlglernter re payment for his fees. Prepared FedEx envelope and provided him with tracking information. Saved copy of check and Fedex info. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/4/2023 | Emailed OPC Mr. Baxter re expert witness deposition availability; cross referenced and reconciled proposed deposition dates against availability on experts' and internal attorneys' calendars. | 0.5 | $250 | $125.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Santiago Laurel | 10/16/2023 | Emailed opposing counsel regarding the scheduling of the deposition of Dr. Wohlgelernter's and his fee requirements, before a deposition. Provided them with doctor's W-9 and fee schedule. | 0.15 | $250 | $37.50 |
| Santiago Laurel | 8/2/2023 | Finalized Joint Notice of Appearance for attorney Galipo and Mayne, for submission and ensured court compliance with PACER filing. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/6/2023 | Followed up with experts and defense counsel regarding deposition scheduling. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 8/21/2023 | Listened to audio telephone interview of Dennis Owen Stout and prepared notes and memo for Mr. Galipo. Contacted Lynden J. to obtain quote to transcribe interview. Prepared work order and submitted to Lynden J. to transcribe. Coordinated with Lynden J. to upload the audio file. | 1.75 | $250 | $437.50 |
| Santiago Laurel | 7/26/2023 | Open file and updated calendar with judge's deadlines and dates on scheduling order. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 10/10/2023 | Prepared and Amended Notice of Lodging. Renamed the exhibits and burned to DVD to deliver to court. | 2.5 | $250 | $625.00 |
| Santiago Laurel | 10/4/2023 | Prepared emails to Plaintiff's Experts re their availability to provide date to defendants. Followed up with calls to confirm receipt of emails. Received dates, confirmed dates on Mr. Galipo/Mayne's calendars. Drafted email to opposing counsel and provided dates for expert depos. Updated calendar with proposed dates. | 1 | $250 | $250.00 |
| Santiago Laurel | 9/20/2023 | Prepared fee agreement. Had a conference call with cocounsel, Gregory Peacock. Emailed to co-counsel and created Dropbox link to create a digital workspace to facilitate co-counsel collaboration on case evidence. | 1 | $250 | $250.00 |
| Santiago Laurel | 10/11/2023 | Prepared notice of Continuance of Deposition of Defense experts Fonzi, Graham, and MacGregor. Prepared Declaration of Service and confirmed service list and served on all parties. Updated calendar with new dates. Contacted court reporting agency to schedule court reporter. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 10/10/2023 | Prepared stipulation to Modify Scheduling order for filing. Filed with the court and submitted Proposed Order to Judge Kronstandt's chambers. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 7/28/2023 | Pulled videos and review videos with Mr. Galipo. Followed by drafting a timeline for Mr. Galipo. Played videos for Mr. Galipo multiple times. | 2.5 | $250 | $625.00 |
| Santiago Laurel | 9/27/2023 | Received additional medical records via fax from Parkview. Saved file to medical records folder. Forwarded records to attorney Mayne. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 9/20/2023 | Received additional records from co-counsel. Reviewed and saved to file. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 9/25/2023 | Received Defendant's Motion for Summary Judgment. Downloaded materials, calendared hearing, opposition, and reply dates. Per attorney Mayne, started reviewing and working on Separate Statement of Facts. | 1.75 | $250 | $437.50 |
| Santiago Laurel | 10/9/2023 | Received Defendants' Joint Notice of Deposition of Wohlgelernter's deposition. Contacted expert to advise of depo date. Updated calendar and saved notice to file. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/13/2023 | Received Deposition links. Updated calendars with links. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/17/2023 | Received Deposition links. Updated calendars with links. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 12/5/2023 | Received deposition transcript for Fonzi. Read and reviewed transcript. Saved to file made payment for transcript. Submitted check request to billing department. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 10/19/2023 | Received deposition transcript for Graham. Read and reviewed transcript. Saved to file made payment for transcript. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 1/17/2025 | Received Docketing Notice rea Appeal for 9th circuit. Updated Calendar re Courts Order and all relevant deadlines re Dkt. 98 | 0.5 | $250 | $125.00 |
| Santiago Laurel | 11/10/2023 | Received email from Mr. Roistacher requesting Statement of facts. Confirmed with attorney re updated version. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/18/2023 | Received email from opposing counsel, requesting new dates for Dr. Omalu. Reached out to Dr. Omalu's assistant. Obtained new dates and provided to opposing counsel. | 0.25 | $250 | $62.50 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Santiago Laurel | 9/22/2023 | Received email from opposing counsel, with their Expert Disclosures. Saved to file and reviewed reports and prepared memo for Mr. Galipo. Printed reports for Mr. Galipo and discussed items needed for our experts / rebuttal. | 1 | $250 | $250.00 |
| Santiago Laurel | 9/27/2023 | Received fax from Parkview Community Hospital with medical records. Reviewed additional medical records and highlighted treating physicians and professionals for Mr. Galipo's review for experts. | 1.25 | $250 | $312.50 |
| Santiago Laurel | 10/26/2023 | Received invoice for MacGregor's deposition. Submitted to our accounting department, saved to file and added to our costs. Arranged to deliver check to expert for his deposition. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/6/2023 | Received invoice for Vilke deposition fee. Saved to costs folder and submitted to our accounting department. Planned to have check delivered to expert. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/30/2023 | Received invoice for Wohlgelernter's deposition. Submitted to our accounting department, saved to file and added to our costs. Arranged to deliver check to expert for his deposition. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/5/2023 | Received invoice from Dr. Omalu. Submitted to accounting department and overnighted check via FedEx. Saved invoice, check, and added to our costs. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 9/21/2023 | Received invoice from Parkview Community Hospital Records request. Submitted to our accounting department. Saved check to costs and mailed check on 9/25/25. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 9/28/2023 | Received links and instructions for Expert depositions. Updated calendar and confirmed delivery of link to all parties on service list. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/12/2023 | Received notice of deposition of Experts Noble and Omalu. Updated calendar and contacted experts to provide them with dates. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 8/10/2023 | Received ORDER from Court re Docket 58. Saved Order and updated calendars with new dates, deadlines, and trial lists. Updated attorney case list and Mr. Galipo's trial calendar list. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 9/20/2023 | Received ORDER with new Court deadlines. Updated calendar and Mr. Galipo's list with new deadlines. Contacted experts to advise of new deadlines. See docket 63. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 8/30/2023 | Received transcript of the telephone interview of Stout from Lynden J. Reviewed transcript for evidentiary value, prepared annotated version for Mr. Galipo. Saved to file. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 8/7/2023 | Review Co-counsel's cost invoices. Prepared accounting for Mr. Galipo to review and confirm. Submitted payment request to accounting department. Input cost and mailed check. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 8/4/2023 | Review evidence, prepare memo for Mr. Galipo. Gather documents and evidence for the deposition of Norem. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 7/21/2023 | Review file and pull relevant evidence, transcripts, and interviews for Mr. Galipo to review. Pulled docket for his review and to identify pleadings needed for review. | 1 | $250 | $250.00 |
| Santiago Laurel | 10/5/2023 | Review First Amended Complaint. Print copy for attorney Mayne. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 7/17/2023 | Review information re new case. Download complaint and notice of removal. Reviewed case initiation documents and created attorney work file summarizing procedural posture based on judge's order to prepare for pending motions. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 9/25/2023 | Review Mr. Galipo's calendar availability. Confirmed dates with Mr. Galipo and scheduled depositions of experts Fonzi, Graham, Vilke, Clark, and MacGregor. Reviewed materials in preparation and provided to Mr. Galipo. Prepared deposition notice for all experts and served. Updated calendars with deposition dates. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 9/29/2023 | Review Mr. Vilke's report and documents and assembled evidence binder for Mr. Galipo, to review prior to deposition. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 9/14/2023 | Review stipulation to Modify Scheduling ORDER. Printed copy and made changes per Dale. Finalized for Court submission the final draft of stipulation with attorney Mayne's Declaration and Proposed ORDER. | 0.5 | $250 | $125.00 |

| Timekeeper | Date | Description | Hours | Rate | Total |
|---|---|---|---|---|---|
| Santiago Laurel | 10/10/2023 | Reviewed draft of Notice of Errata. Emailed attorney Mayne issues, made corrections. Updated exhibits and added Exhibit Placeholders. Filed and printed hard copies. | 0.5 | $250 | $125.00 |
| Santiago Laurel | 9/22/2023 | Reviewed email from attorney Mayne regarding our Rule 26 Expert Disclosures. Reviewed word format of document, converted to PDF. Proofread the report for accuracy. Reviewed report for required expert attachments including Reports, CV, Fee Schedule, and list of prior testimony. Separated documents and bookmarked, inserted placeholders for each exhibit for each expert. Merged everything, prepared declaration of service, drafted email and served on opposing counsel. | 2.75 | $250 | $687.50 |
| Santiago Laurel | 10/6/2023 | Reviewed email from attorney Mayne, pulled rebuttal reports. Per Mr. Mayne's instruction, compiled and organized rebuttal materials for expert disclosures, ensuring compliance with Rule 26 requirements. Prepared Declaration of Service and served on all parties. Saved to file. | 1.75 | $250 | $437.50 |
| Santiago Laurel | 10/6/2023 | Reviewed email with instructions from attorney Mayne regarding Motion for Summary Judgment opposition. Reviewed Plaintiffs' Statement of Facts and his Declaration to identify exhibits. Started working on locating video exhibits, trimming exhibits, and labeling. Reviewed the citation on PAMF to match exhibit name on declaration. Aligned the page numbers to correspond with the CM/ECF pagination for the exhibits. | 4.5 | $250 | $1,125.00 |
| Santiago Laurel | 10/5/2023 | Set up a conference call number and dial info for attorney Mayne to meet and confer with OPC. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 9/20/2023 | Spoke with Plaintiff's expert Dr. Omalu. Dr. Omalu request that we provide additional records from hospital. Reviewed file, and noticed we still needed records from Parkview. | 0.75 | $250 | $187.50 |
| Santiago Laurel | 9/7/2023 | Submitted check request to accounting department for the transcription of the audio interview of Stout. Saved and input to costs. Mailed check via USPS to Lynden J. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 9/25/2023 | Update calendar with Expert Rebuttal deadlines, see Docket 58. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/11/2023 | Updated Calendar pursuant to Court's new Deadlines, see docket 71. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 1/22/2025 | Updated Calendar re Courts Order re Dkt. 102 | 0.1 | $250 | $25.00 |
| Santiago Laurel | 12/8/2023 | Updated Calendar re Courts Order re Dkt. 81 | 0.1 | $250 | $25.00 |
| Santiago Laurel | 1/2/2025 | Updated Calendar re Courts Order re Dkt. 96 | 0.1 | $250 | $25.00 |
| Santiago Laurel | 1/24/2025 | Updated Calendar re Defendants' Motion to Stay. Calendared opposition, reply and other deadlines on attorneys' calendars. | 0.25 | $250 | $62.50 |
| Santiago Laurel | 10/19/2023 | Updated calendar with new date re MSJ per Courts order see Docket 73. | 0.1 | $250 | $25.00 |
| Santiago Laurel | 10/5/2023 | Updated calendar with proposed deposition dates. | 0.25 | $250 | $62.50 |
| | | | **52.75** | | **$13,187.50** |

# EXHIBIT 7

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Dale K. Galipo | 9/6/2025 | Conference on trial strategy | 1.2 | $1,500 | $1,800.00 | $900 | $1,080.00 | -$720.00 |
| Cooper Alison-Mayne | 8/8/2025 | Conference with co-counsel re: motions in limine on the officers' prior use-of-force history; email exchange with defense counsel re: same. | 0.7 | $700 | $490.00 | $350 | $245.00 | -$245.00 |
| Cooper Alison-Mayne | 9/6/2025 | Conference with Mr. Galipo re: trial approach with defendant McKee remaining in the case, following defense counsel Roistacher's response on plaintiffs' proposed dismissal condition. | 1.2 | $700 | $840.00 | $350 | $420.00 | -$420.00 |
| Cooper Alison-Mayne | 3/17/2026 | Conferred with co-counsel Greg Peacock re: the anticipated Rule 50(b) motion, the meet-and-confer schedule and the timeliness of plaintiffs' fee motion. | 0.5 | $700 | $350.00 | $350 | $175.00 | -$175.00 |
| Cooper Alison-Mayne | 1/6/2025 | Conferred with co-counsel Greg Peacock re: the court-ordered scheduling conferral; email exchange with defense counsel Lee Roistacher and David Klehm re: scheduling the meet and confer in advance of the joint status report. | 0.5 | $700 | $350.00 | $350 | $175.00 | -$175.00 |
| Cooper Alison-Mayne | 9/5/2025 | Conferred with Mr. Galipo and reduced to writing the conditions on which plaintiffs would dismiss defendant McKee. | 0.7 | $700 | $490.00 | $350 | $245.00 | -$245.00 |
| Cooper Alison-Mayne | 7/24/2023 | Convened and attended the four-way conference call with Dale Galipo, Nicholas Lerman and Greg Peacock at which the firm's role in the case was worked out; discussed next steps -- a new Rule 1.5.1 fee-division agreement, a revised retainer, and the tissue-sample stipulation request. | 1.1 | $700 | $770.00 | $350 | $385.00 | -$385.00 |
| Steven A. Lerman | 10/6/2025 | Disc. Re Proposed Judgments w/ CAM | 0.5 | $900 | $450.00 | $900 | $450.00 | $0.00 |
| Nichols Lerman | 11/14/2022 | Disc. Scheduling of Plaintiffs Depos w/ TB | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Nichols Lerman | 7/26/2023 | Disc. w/ CM coroner samples + stipulation | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Nichols Lerman | 10/24/2022 | Disc. w/ GP re Depo of Borden | 1 | $600 | $600.00 | $475 | $475.00 | -$125.00 |
| Nichols Lerman | 5/12/2023 | Disc. w/ GP re discovery / disclosures | 0.4 | $600 | $240.00 | $475 | $190.00 | -$50.00 |
| Nichols Lerman | 11/28/2022 | Disc. w/ GP re mediation | 1.5 | $600 | $900.00 | $475 | $712.50 | -$187.50 |
| Nichols Lerman | 1/7/2021 | Disc. w/ GP stipulation to amend complaint | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Nichols Lerman | 9/13/2025 | Discussion with CAM regarding filing of trial brief re undisclosed and improper witnesses | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Gregory Peacock | 9/7/2023 | Email communication with Cooper and Lee re stipulation | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 9/8/2023 | Email communication with Cooper and Lee re stipulation | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 8/10/2023 | Email communication with cooper and lerman office re transcriptions of audio and video; review save file order re modification to scheduling order | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 8/9/2023 | Email communication with cooper and lerman office re omalu; prepare and review file for omalu | 0.6 | $800 | $480.00 | $525 | $315.00 | -$165.00 |
| Gregory Peacock | 6/20/2025 | Email communication with Cooper re call with Lee | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 6/9/2023 | Email communication with Cooper re case status | 0.3 | $800 | $240.00 | $525 | $157.50 | -$82.50 |
| Gregory Peacock | 8/5/2023 | Email communication with Cooper re depo prep for norem; telephonic communication with Cooper re depo prep for Norem | 0.9 | $800 | $720.00 | $525 | $472.50 | -$247.50 |
| Gregory Peacock | 8/14/2025 | Email communication with Cooper re MIL | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 8/7/2025 | Email communication with Cooper re MIL and Mckee | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 8/5/2023 | Email communication with Cooper re norem depo; review file for depo prep | 0.8 | $800 | $640.00 | $525 | $420.00 | -$220.00 |
| Gregory Peacock | 8/12/2023 | Email communication with Cooper re omalu | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 6/27/2023 | Email communication with Cooper re status of the case | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 7/17/2023 | Email communication with Cooper re status of the case | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 9/14/2025 | Email communication with Cooper re trial transcripts; reviewed daily trial transcripts for trial prep | 4.4 | $800 | $3,520.00 | $525 | $2,310.00 | -$1,210.00 |
| Gregory Peacock | 8/6/2023 | Email communication with DGR re Norem depo; email communications with defense counsel re depo links | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 6/20/2023 | Email communication with DGR re plaintiff depo notices; email communication with lerman office re depo notices | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 8/2/2023 | Email communication with Lerman office and Cooper re case status; review save file Galipo appearance Email communication with baxter re scheduling call; telephonic communication with baxter re case status; email communications with defense counsel re stip to modify schedule; review stip to modify schedule; telephonic communication with Lerman office re stip; telephonic communication with cooper re stip | 0.7 | $800 | $560.00 | $525 | $367.50 | -$192.50 |
| Gregory Peacock | 8/4/2023 | Email communication with lerman office and cooper re norem deposition; review of case file for depo; email communication with DGR re norem depo | 0.8 | $800 | $640.00 | $525 | $420.00 | -$220.00 |
| Gregory Peacock | 8/14/2023 | Email communication with Lerman Office and Cooper re omalu schedule | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 10/24/2022 | Email communication with Lerman office re borden depo; review norem deposition notice; prepare for borden depo | 4.7 | $800 | $3,760.00 | $525 | $2,467.50 | -$1,292.50 |
| Gregory Peacock | 8/27/2025 | Email communication with Lerman office re client interviews; telephonic communications with Lerman office re client interviews | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 8/7/2020 | Email communication with Lerman Office re CMC | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 5/11/2020 | Email communication with Lerman Office re cmc and court call | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 3/18/2021 | Email communication with lerman office re cmc and service of process; email communication with Baxter re proof of service; telephonic communication with Lerman office re proof of service and service | 0.4 | $800 | $320.00 | $525 | $210.00 | -$110.00 |
| Gregory Peacock | 9/23/2020 | Email communication with Lerman Office re cmc; telephonic communication with Lerman office re cmc; review cmc statement | 0.5 | $800 | $400.00 | $525 | $262.50 | -$137.50 |
| Gregory Peacock | 7/10/2020 | Email communication with Lerman office re defendant discovery responses | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 3/29/2022 | Email communication with lerman office re depositions; email communications with defense counsel re depositions; telephonic communication with lerman's office re depositions | 0.5 | $800 | $400.00 | $525 | $262.50 | -$137.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 4/28/2021 | Email communication with Lerman office re discovery from state; telephonic communication with Lerman Office re discovery from state; reviewed discovery served by state | 0.7 | $800 | $560.00 | $525 | $367.50 | -$192.50 |
| Gregory Peacock | 10/25/2021 | Email communication with Lerman Office re discovery response; email communications with defense counsel re discovery responses; edit / prepare discovery responses; email communication with Chan re supplemental responses | 1.1 | $800 | $880.00 | $525 | $577.50 | -$302.50 |
| Gregory Peacock | 5/29/2020 | Email communication with Lerman Office re discovery responses; communication with clients; prepared discovery responses | 5.2 | $800 | $4,160.00 | $525 | $2,730.00 | -$1,430.00 |
| Gregory Peacock | 5/28/2020 | Email communication with Lerman Office re Discovery responses; communication with clients; prepared discovery responses | 4.1 | $800 | $3,280.00 | $525 | $2,152.50 | -$1,127.50 |
| Gregory Peacock | 6/5/2020 | Email communication with Lerman Office re Discovery Responses; review/edit discovery responses | 0.3 | $800 | $240.00 | $525 | $157.50 | -$82.50 |
| Gregory Peacock | 2/12/2021 | Email communication with Lerman Office re Notice of CMC | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 4/12/2021 | Email communication with Lerman Office re proof of service | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 3/4/2021 | Email communication with Lerman Office re proof of service; review proof of service | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 4/11/2021 | Email communication with Lerman Office re proof of service | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 4/14/2021 | Email communication with Lerman office re removal and County claims; review county claim denials | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 4/19/2021 | Email communication with Lerman Office re service of process; telephonic communication with Lerman's Office re service of process | 0.4 | $800 | $320.00 | $525 | $210.00 | -$110.00 |
| Gregory Peacock | 3/14/2021 | Email communication with Lerman Office re service of process; telephonic communication with Lerman office re service of process | 0.4 | $800 | $320.00 | $525 | $210.00 | -$110.00 |
| Gregory Peacock | 5/31/2019 | Email communication with Lerman office re sign up docs; Received/reviewed Signed Contracts from Lerman Office | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 7/26/2023 | Email communication with lerman office re subpoena to sheriff; review subpoena; email communication with lerman office and cooper re case file and 1.5.1. and contract | 0.3 | $800 | $240.00 | $525 | $157.50 | -$82.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 10/11/2021 | email communication with Lerman Office re discovery responses | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 4/14/2022 | Email communication with Lerman's office depositions of defendants; email communication with Baxter re scheduling call; telephonic communication with Baxter; telephonic communication with Lerman's office | 0.6 | $800 | $480.00 | $525 | $315.00 | -$165.00 |
| Gregory Peacock | 3/17/2020 | Email communication with Lerman's Office Re strike/demurrer hearing and tentative ruling; telephonic meeting with Lerman Office re hearing; prepared for hearing; review tentative ruling | 1.2 | $800 | $960.00 | $525 | $630.00 | -$330.00 |
| Gregory Peacock | 8/31/2023 | Email communications with Cooper and Lerman Office re Dr. Dan | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 9/1/2023 | Email communications with Cooper and Lerman Office re Dr. Dan | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 8/17/2023 | Email communications with Cooper and Lerman office re RFA's | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 9/3/2025 | Email communications with Cooper re client prep | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 7/28/2023 | Email communications with Cooper re norem depo dates; email communications with defense counsel re norem depo dates; telephonic communication with Lerman Office re norem depo | 0.4 | $800 | $320.00 | $525 | $210.00 | -$110.00 |
| Gregory Peacock | 8/11/2023 | Email communications with Cooper re omalu | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 10/1/2020 | Email communications with Lerman office and process server re cmc | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 4/28/2020 | Email communications with Lerman Office and Baxter re discovery extension | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 3/16/2021 | Email communications with Lerman Office re cmc and service of process; review cmc statement | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 10/28/2020 | Email communications with Lerman office re cmc and review minute order | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 1/11/2021 | Email communications with Lerman Office re cmc, first amended complaint and tsc; email communications with Baxter re first amended complaint; edits to first amended complaint; prep for tsc | 2.1 | $800 | $1,680.00 | $525 | $1,102.50 | -$577.50 |
| Gregory Peacock | 8/11/2020 | Email communications with Lerman office re CMC; review CMC statement | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 10/10/2019 | email communications with Lerman office Re Declarations Re Successors in Interest; Telephonic communications with Lerman Office Re declarations; reviewed signed declarations | 0.3 | $800 | $240.00 | $525 | $157.50 | -$82.50 |
| Gregory Peacock | 3/16/2020 | Email communications with Lerman Office re defendants' reply; telephonic communications with Lerman's Office re defendants' reply and filling errors re our opposition; review defendants' reply brief | 0.4 | $800 | $320.00 | $525 | $210.00 | -$110.00 |
| Gregory Peacock | 6/22/2020 | Email communications with Lerman Office re discovery responses; email with Baxter re extension | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 6/17/2020 | Email communications with Lerman Office re discovery responses; telephonic communications with Lerman Office re discovery responses; review edit discovery response | 0.7 | $800 | $560.00 | $525 | $367.50 | -$192.50 |
| Gregory Peacock | 11/19/2020 | Email communications with Lerman office re division of labor; telephonic communication with Lerman office re division of labor and organization of physical file | 0.7 | $800 | $560.00 | $525 | $367.50 | -$192.50 |
| Gregory Peacock | 1/7/2021 | Email communications with Lerman office re first amended complaint; email communications with baxter re first amended complaint; review and edit of first amended complaint; prepare stipulation and proposed order re filing of first amended complaint | 3.2 | $800 | $2,560.00 | $525 | $1,680.00 | -$880.00 |
| Gregory Peacock | 2/8/2021 | Email communications with Lerman Office re order on stip to motion and service of process; telephonic communication with Lerman office re order on stip and service of process; email communication with Baxter re order on stip to amend and service of process; telephonic communication with Baxter re service | 0.6 | $800 | $480.00 | $525 | $315.00 | -$165.00 |
| Gregory Peacock | 2/16/2021 | Email communications with Lerman Office re service of process; telephonic communications with Lerman office re Service of process | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 1/15/2021 | Email communications with Lerman Office re TSC calendaring | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 2/24/2020 | Email communications with Lerman Office Re Demurrer | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 5/6/2020 | Email communications with Lerman's Office re Discovery Responses | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 7/28/2021 | Email communications with lerman's office, CHP and County re initial disclosures | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Nichols Lerman | 1/11/2021 | Email DB re Court Call | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Cooper Alison-Mayne | 8/1/2023 | Email exchange with co-counsel re: filing of Dale Galipo's notice of appearance, the Rule 1.5.1 agreement, and the status of the PMK deposition notice. | 0.2 | $700 | $140.00 | $350 | $70.00 | -$70.00 |
| Nichols Lerman | 2/8/2021 | Email GP re service | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 4/4/2021 | Email w/ DB re CMC | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Cooper Alison-Mayne | 9/6/2023 | Followed up with Santiago Laurel on whether the Parkview Community Hospital record had been obtained, and what steps we need to take to obtain them. | 0.1 | $700 | $70.00 | $350 | $35.00 | -$35.00 |
| Nichols Lerman | 7/24/2023 | Four-way conference call w/ CAM, DKG and GP re the firm's role in the case | 1 | $600 | $600.00 | $475 | $475.00 | -$125.00 |
| Nichols Lerman | 2/11/2021 | Meeting w/ GP re case + service | 0.25 | $600 | $150.00 | $475 | $118.75 | -$31.25 |
| Steven A. Lerman | 2/11/2021 | Meeting w/ GP re case + service | 0.25 | $900 | $225.00 | $900 | $225.00 | $0.00 |
| Nichols Lerman | 5/21/2021 | Meeting w/ GP re COR meet and confer | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Nichols Lerman | 3/29/2022 | Meeting w/ GP re Deposition of Leighton | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Steven A. Lerman | 3/29/2022 | Meeting w/ GP re Deposition of Leighton | 0.5 | $900 | $450.00 | $900 | $450.00 | $0.00 |
| Nichols Lerman | 6/15/2021 | Meeting w/ GP re discovery production | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 1/25/2019 | Meeting w/ Peacock (GP) re case facts & partnership agreement | 0.9 | $600 | $540.00 | $475 | $427.50 | -$112.50 |
| Steven A. Lerman | 1/25/2019 | Meeting w/ Peacock (GP) re case facts & partnership agreement | 0.9 | $900 | $810.00 | $900 | $810.00 | $0.00 |
| Nichols Lerman | 9/30/2025 | Meeting with CAM and DKG regarding pending Defendant Motion, and Plaintiff's opposition | 1 | $600 | $600.00 | $475 | $475.00 | -$125.00 |
| Nichols Lerman | 9/22/2025 | Meeting with CAM regarding submission of statutory hours and appealable issues | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Gregory Peacock | 9/9/2025 | Meeting with Galipo and Cooper re trial prep | 2.1 | $800 | $1,680.00 | $525 | $1,102.50 | -$577.50 |
| Gregory Peacock | 9/10/2025 | Meeting with Galipo and Cooper re trial prep | 1.7 | $800 | $1,360.00 | $525 | $892.50 | -$467.50 |
| Gregory Peacock | 9/11/2025 | Meeting with Galipo and Cooper re trial prep | 2.2 | $800 | $1,760.00 | $525 | $1,155.00 | -$605.00 |
| Gregory Peacock | 9/12/2025 | Meeting with Galipo and Cooper re trial prep | 1.9 | $800 | $1,520.00 | $525 | $997.50 | -$522.50 |
| Gregory Peacock | 9/15/2025 | Meeting with Galipo and Cooper re trial prep | 2.1 | $800 | $1,680.00 | $525 | $1,102.50 | -$577.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 9/16/2025 | Meeting with Galipo and Cooper re trial prep | 2.2 | $800 | $1,760.00 | $525 | $1,155.00 | -$605.00 |
| Gregory Peacock | 9/17/2025 | Meeting with Galipo and Cooper re trial prep | 1.7 | $800 | $1,360.00 | $525 | $892.50 | -$467.50 |
| Nichols Lerman | 8/28/2025 | Meeting with GP and DG regarding trial strategy + client testimony | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Nichols Lerman | 8/27/2025 | Meeting with GP regarding client zoom preparation | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Gregory Peacock | 1/27/2019 | Meeting with Lerman Office re New Case | 0.9 | $800 | $720.00 | $525 | $472.50 | -$247.50 |
| Cooper Alison-Mayne | 8/27/2025 | Reviewed the two tranches of defense trial subpoenas and accounted for those witnesses in the trial plan; conferred with co-counsel re: defendants' proposed exhibit and witness stipulations. | 1.3 | $700 | $910.00 | $350 | $455.00 | -$455.00 |
| Nichols Lerman | 9/13/2022 | Sent email to CM re Matt Borden deposition | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 8/8/2023 | Strategy call with CAM, | 0.5 | $600 | $300.00 | $475 | $237.50 | -$62.50 |
| Cooper Alison-Mayne | 9/7/2025 | Sunday final trial preparation the day before trial: witness examination outlines, exhibit and transcript materials for the first two trial days. | 10 | $700 | $7,000.00 | $350 | $3,500.00 | -$3,500.00 |
| Nichols Lerman | 2/6/2020 | Telephone conf. w/ GP re Baxter email | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 5/18/2022 | Telephone conf. w/ GP re Baxter email | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 6/1/2021 | Telephone conf. w/ GP re Calendaring dates and rule 26 report | 0.4 | $600 | $240.00 | $475 | $190.00 | -$50.00 |
| Nichols Lerman | 7/17/2021 | Telephone conf. w/ GP re case status | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 4/14/2022 | Telephone conf. w/ GP re case status | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 11/10/2022 | Telephone conf. w/ GP re case status | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 12/13/2022 | Telephone conf. w/ GP re case status | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 5/1/2023 | Telephone conf. w/ GP re case status | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 10/10/2022 | Telephone conf. w/ GP re Casteel depo | 0.4 | $600 | $240.00 | $475 | $190.00 | -$50.00 |
| Nichols Lerman | 7/25/2019 | Telephone conf. w/ GP re Claim Rejections | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 8/21/2019 | Telephone conf. w/ GP re Claim Rejections and Calendaring | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 6/25/2019 | Telephone conf. w/ GP re Claims | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 6/8/2021 | Telephone conf. w/ GP re Clients' mother | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 9/23/2020 | Telephone conf. w/ GP re Cmc | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 4/4/2021 | Telephone conf. w/ GP re CMC | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Nichols Lerman | 5/11/2020 | Telephone conf. w/ GP re Cmc and court call | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 8/12/2020 | Telephone conf. w/ GP re CMC and future dates/possible removal | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 5/8/2020 | Telephone conf. w/ GP re Cmc statement | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 7/20/2020 | Telephone conf. w/ GP re Communications with Baxter and discovery responses | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 11/2/2019 | Telephone conf. w/ GP re Complaint | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 11/4/2019 | Telephone conf. w/ GP re Complaint | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 11/5/2019 | Telephone conf. w/ GP re Complaint and other filing documents | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 1/17/2020 | Telephone conf. w/ GP re Conformed Copies and Service | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 7/27/2021 | Telephone conf. w/ GP re Coroner depo | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 8/12/2021 | Telephone conf. w/ GP re Coroner depo | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 11/4/2021 | Telephone conf. w/ GP re Coroner transcript | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 2/1/2021 | Telephone conf. w/ GP re Court docket/stip to amend | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/26/2021 | Telephone conf. w/ GP re Court filings and removal | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 10/10/2019 | Telephone conf. w/ GP re Declarations | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 7/6/2020 | Telephone conf. w/ GP re Defendant discovery responses | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/16/2020 | Telephone conf. w/ GP re Defendants' reply and filling errors re our opposition | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 9/13/2022 | Telephone conf. w/ GP re Depo dates | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 9/7/2022 | Telephone conf. w/ GP re Depo notices | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 12/19/2022 | Telephone conf. w/ GP re Deposition dates of plaintiffs | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 12/8/2022 | Telephone conf. w/ GP re Depositions and conflict | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 7/9/2021 | Telephone conf. w/ GP re Disclosures | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 4/28/2021 | Telephone conf. w/ GP re Discovery from state | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 6/8/2020 | Telephone conf. w/ GP re Discovery responses | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 6/17/2020 | Telephone conf. w/ GP re Discovery responses | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 6/23/2020 | Telephone conf. w/ GP re Discovery responses | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 6/21/2021 | Telephone conf. w/ GP re Discovery responses | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 4/27/2020 | Telephone conf. w/ GP re Discovery responses and extension | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Nichols Lerman | 11/19/2020 | Telephone conf. w/ GP re Division of labor and organization of physical file | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/4/2019 | Telephone conf. w/ GP re Evidence Preservation letter | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 11/6/2019 | Telephone conf. w/ GP re Filing documents | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 12/9/2019 | Telephone conf. w/ GP re Filing documents and Service | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 12/18/2019 | Telephone conf. w/ GP re Filing Documents and Service | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 6/24/2021 | Telephone conf. w/ GP re Filing re unjoined party and court selection of mediator | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 7/24/2023 | Telephone conf. w/ GP re Galipo and preparing file for galipo | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 7/25/2023 | Telephone conf. w/ GP re Galipo appearance and 1.5.1 | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/17/2020 | Telephone conf. w/ GP re Hearing | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/5/2019 | Telephone conf. w/ GP re Initial Sign up documents | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 6/14/2021 | Telephone conf. w/ GP re Latonya | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 5/22/2023 | Telephone conf. w/ GP re Mckee depo date | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 5/29/2023 | Telephone conf. w/ GP re Mckee deposition | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 5/30/2023 | Telephone conf. w/ GP re Mckee deposition and plaintiffs' depositions | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 6/8/2022 | Telephone conf. w/ GP re Mediation | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 7/19/2023 | Telephone conf. w/ GP re Mediation | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 11/23/2022 | Telephone conf. w/ GP re Mediation and mediator's proposal | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 5/16/2023 | Telephone conf. w/ GP re Mediation and overall case status | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 5/8/2023 | Telephone conf. w/ GP re Mediation dates | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 11/29/2022 | Telephone conf. w/ GP re Mediator's proposal | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 11/30/2022 | Telephone conf. w/ GP re Mediator's proposal | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 1/6/2021 | Telephone conf. w/ GP re Meetings with defense counsel | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 2/26/2020 | Telephone conf. w/ GP re Motions and Oppositions | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 1/29/2019 | Telephone conf. w/ GP re New Case | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 7/28/2023 | Telephone conf. w/ GP re Norem depo | 0.3 | $600 | $180.00 | $475 | $142.50 | -$37.50 |
| Nichols Lerman | 3/2/2020 | Telephone conf. w/ GP re Oppositions | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/5/2020 | Telephone conf. w/ GP re Oppositions | 0.4 | $600 | $240.00 | $475 | $190.00 | -$50.00 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Nichols Lerman | 12/16/2022 | Telephone conf. w/ GP re Order and motion | 0.4 | $600 | $240.00 | $475 | $190.00 | -$50.00 |
| Nichols Lerman | 1/3/2025 | Telephone conf. w/ GP re Order on msj | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 9/9/2022 | Telephone conf. w/ GP re Order on stip to modify | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 3/14/2023 | Telephone conf. w/ GP re Plaintiff discovery responses | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 3/18/2021 | Telephone conf. w/ GP re Proof of service and service | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 1/19/2021 | Telephone conf. w/ GP re Riverside Claims | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 5/20/2021 | Telephone conf. w/ GP re Rule 26 meeting and discovery responses | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 2/16/2021 | Telephone conf. w/ GP re Service of process | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/12/2021 | Telephone conf. w/ GP re Service of process | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 3/14/2021 | Telephone conf. w/ GP re Service of process | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 4/19/2021 | Telephone conf. w/ GP re Service of process | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 8/2/2023 | Telephone conf. w/ GP re Stip | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 1/29/2021 | Telephone conf. w/ GP re Stip re first amended complaint | 0.2 | $600 | $120.00 | $475 | $95.00 | -$25.00 |
| Nichols Lerman | 9/16/2021 | Telephone conf. w/ GP re Third party depos | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 2/28/2022 | Telephone conf. w/ GP re Third party depos | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Nichols Lerman | 1/12/2021 | Telephone conf. w/ GP re TSC and calendaring | 0.1 | $600 | $60.00 | $475 | $47.50 | -$12.50 |
| Cooper Alison-Mayne | 8/29/2025 | Telephone conference with Mr. Galipo re: plaintiffs' position for the court-ordered joint status report; reported that position to all counsel and proposed short-form joint report language. | 0.5 | $700 | $350.00 | $350 | $175.00 | -$175.00 |
| Gregory Peacock | 4/4/2021 | Telephonic communication with Lerman Office re CMC; email communication with Lerman office and Baxter re CMC | 0.3 | $800 | $240.00 | $525 | $157.50 | -$82.50 |
| Gregory Peacock | 2/1/2021 | Telephonic communication with Lerman Office re court docket/stip to amend; review of court docket; email communication with Baxter re court docket/stip to amend | 0.5 | $800 | $400.00 | $525 | $262.50 | -$137.50 |
| Gregory Peacock | 5/30/2023 | Telephonic communication with lerman office re mckee deposition and plaintiffs' depositions; email communication with defense counsel mckee deposition; mckee deposition; email communication with defense counsel re plaintiff depositions | 5.3 | $800 | $4,240.00 | $525 | $2,782.50 | -$1,457.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 5/29/2023 | Telephonic communication with Lerman office re mckee deposition; prepare for mckee deposition | 4.4 | $800 | $3,520.00 | $525 | $2,310.00 | -$1,210.00 |
| Gregory Peacock | 5/16/2023 | Telephonic communication with lerman office re mediation and overall case status; email communication with DGR re decedent health records; email communications re stip to modify scheduling order | 0.8 | $800 | $640.00 | $525 | $420.00 | -$220.00 |
| Gregory Peacock | 11/29/2022 | Telephonic communication with Lerman office re mediator's proposal; email communication with Lerman office re mediator's proposal | 0.5 | $800 | $400.00 | $525 | $262.50 | -$137.50 |
| Gregory Peacock | 3/28/2022 | Telephonic communication with Lerman Office re deposition prep | 0.8 | $800 | $640.00 | $525 | $420.00 | -$220.00 |
| Gregory Peacock | 10/10/2022 | Telephonic communication with lerman's office re casteel depo | 0.4 | $800 | $320.00 | $525 | $210.00 | -$110.00 |
| Gregory Peacock | 9/8/2025 | Telephonic communication with Lerman's office re coordinating client attendance at trial; email communication with Lerman office re client attendance at trial | 0.6 | $800 | $480.00 | $525 | $315.00 | -$165.00 |
| Gregory Peacock | 5/15/2023 | Telephonic communication with lerman's office re discovery responses; prepare discovery responses to mckee; email communication to defense counsel re discovery responses | 2.9 | $800 | $2,320.00 | $525 | $1,522.50 | -$797.50 |
| Gregory Peacock | 8/21/2019 | Telephonic Communications with Lerman Office re Claim Rejections and Calendaring; email communications with Lerman Office Re Claim Rejections | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 11/5/2019 | Telephonic communications with Lerman Office Re Complaint and other filing documents; email communications with Lerman Office Re Complaint; prepared Complaint | 0.4 | $800 | $320.00 | $525 | $210.00 | -$110.00 |
| Gregory Peacock | 1/17/2020 | Telephonic Communications with Lerman Office re Conformed Copies and Service; email communications with Lerman Office re Conformed Copies | 0.2 | $800 | $160.00 | $525 | $105.00 | -$55.00 |
| Gregory Peacock | 4/27/2020 | Telephonic communications with Lerman Office re discovery responses and extension; email communication with lerman's office and Baxter re discovery responses and extension | 0.3 | $800 | $240.00 | $525 | $157.50 | -$82.50 |
| Gregory Peacock | 11/6/2019 | Telephonic Communications with Lerman Office re Filing documents | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 12/18/2019 | Telephonic Communications with Lerman Office Re Filing Documents and Service | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Gregory Peacock | 3/5/2020 | Telephonic Communications with Lerman Office Re Oppositions; email communications with Lerman Office re oppositions; prepare motion oppositions | 3.3 | $800 | $2,640.00 | $525 | $1,732.50 | -$907.50 |
| Gregory Peacock | 1/19/2021 | Telephonic communications with Lerman Office re Riverside Claims; prepared Riverside claims; email communications with Lerman Office Re claims | 1.9 | $800 | $1,520.00 | $525 | $997.50 | -$522.50 |
| Gregory Peacock | 12/9/2019 | Telephonic Communications with Lerman Office re Filing documents and Service | 0.1 | $800 | $80.00 | $525 | $52.50 | -$27.50 |
| Gregory Peacock | 6/23/2020 | Telephonic communications with Lerman's Office re discovery responses; review/edit/prepare discovery responses | 0.6 | $800 | $480.00 | $525 | $315.00 | -$165.00 |
| Gregory Peacock | 1/29/2019 | Telephonic meeting with Lerman Office Re New Case | 0.3 | $800 | $240.00 | $525 | $157.50 | -$82.50 |
| Dale K. Galipo | 9/2/2025 | Zoom with all counsel | 0.4 | $1,500 | $600.00 | $900 | $360.00 | -$240.00 |
| | | | **127.1** | | **$96,245.00** | | **$63,921.25** | **-$32,323.75** |

# EXHIBIT 8

Neutral
As of: January 26, 2018 1:30 AM Z

# Munoz v. Cal. Bus. Bureau, Inc.

United States District Court for the Eastern District of California

July 14, 2017, Decided; July 14, 2017, Filed

Case No. 1:15-cv-1345-BAM

**Reporter**
2017 U.S. Dist. LEXIS 109855 *; 2017 WL 3009210

GEORGE MUNOZ, Plaintiff, v. CALIFORNIA BUSINESS BUREAU, Inc., Defendant.

**Prior History:** *Munoz v. Cal. Bus. Bureau, Inc., 2016 U.S. Dist. LEXIS 151495 (E.D. Cal., Nov. 1, 2016)*

## Core Terms

expended, hourly rate, costs, attorneys, attorney's fees, billing, statutory damages, cases, duplicative, awarding, consumer, attend, per hour, depositions, prevailing, time spent, declarations, Practices, litigating, maximum, records, rates, summary judgment, Collection, violations, reminders, meetings, parties, reply

**Counsel:** **[*1]** For George R. Munoz, Plaintiff: Jessica Rene' King Dorman, Robert Lyman Hyde, LEAD ATTORNEYS, Crosby Scott Connolly, Hyde & Swigart, San Diego, CA.

For California Business Bureau, Inc., Defendant: Franklin J Love, LEAD ATTORNEY, Franklin J. Love, Covina, CA.

**Judges:** Barbara A. McAuliffe, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Barbara A. McAuliffe

## Opinion

**ORDER REGARDING PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEY FEES AND COSTS**

(Doc. 29)

**I. INTRODUCTION**

Plaintiff George Munoz ("Plaintiff") brings the instant action against Defendant California Business Bureau, Inc. ("Defendant") alleging claims under the *Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.*, and *California's Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code § 1788 et seq.* On November 11, 2016, the Court granted summary judgment in favor of Plaintiff on his FDCPA and RFDCPA claims, but instructed the parties to address the issue of damages and attorney's fees in a separate motion. (Docs. 25, 27).[1] The parties are presently before the Court on Plaintiff's motion for statutory damages, attorney's fees, and costs. (Doc. 29). Defendant opposes the motion. (Doc. 31). The Court deemed the matter suitable for decision without oral argument pursuant to *Local Rule 230(g)*, and took the matter **[*2]** under submission. (Doc. 35). Having considered the moving, opposition, reply papers, and the entire file, the Court hereby GRANTS IN PART AND DENIES IN PART Plaintiff's motion for the reasons stated below.[2]

---

[1] Pursuant to ***28 U.S.C. § 636(c)(1)***, the parties consented to have a United States Magistrate Judge conduct all further proceedings in this case, including trial and entry of final judgment. (Docs. 4, 8).

[2] The Court assumes the parties' familiarity with the factual background of this case, which has been set forth in greater detail in

## II. DISCUSSION

In the instant motion Plaintiff seeks an award of $81,773.40, consisting of: (1) maximum statutory damages under the FDCPA and RFDCPA in the amount of $2,000; (2) attorney's fees in the amount of $77,853.50;[3] and (3) costs in the amount of $1,919.90. In response, Defendant contends that Plaintiff is not entitled to an award of statutory damages under the FDCPA and/or the RFDCPA because there has been no showing that Defendant had a knowing intent to violate the statutes. In addition, Defendant challenges the reasonableness of Plaintiff's attorney's fees request.

### A. Statutory Damages

If a debt collector fails to comply with any provision of the FDCPA, a plaintiff may recover statutory damages not to exceed $1,000. *15 U.S.C. § 1692k(a)(2)(A)*. In determining the amount of liability, the court must consider, among other relevant factors, "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." **[*3]** *15 U.S.C. § 1692k(b)(1)*. Under the RFDCPA, any debt collector who willfully and knowingly violates the RFDCPA with respect to any debtor is also liable to the debtor for a penalty in such amount as the court may allow, which shall be no less than one hundred dollars ($100) nor greater than one thousand dollars ($1,000). *Cal. Civ. Code §§ 1788.30(a)* and *(b)*.

In granting summary judgment for the Plaintiff, the Court found that Defendant violated the FDCPA and RFDCPA when, following a settlement agreement between the parties in a related state court action, Defendant sent Plaintiff two separate payment reminders stating the remaining balance owed by Plaintiff on his debt obligation. (Doc. 25). The Court found that Defendant's payment reminders violated the Acts in two ways. First, Defendant erred by contacting Plaintiff despite knowledge that he was represented by an attorney; a violation of section *15 U.S.C. § 1692c(a)(2)* and its state law counterpart. Second, in viewing Defendant's payment reminders under "the least sophisticated consumer standard," the letters misrepresented Plaintiff's debt obligation by stating an amount owed in excess of negotiated settlement amount; a violation of *15 U.S.C. § 1692e*.

These violations of the FDCPA and RFDCPA warrant an award of statutory damages, **[*4]** although not in the amounts Plaintiff seeks. While Defendant contacted Plaintiff twice, in writing, regarding the settled debt, this contact was not sufficiently frequent or egregious to suggest that Defendant's letters were intended to intimidate or harass Plaintiff. Rather, the Court found that Defendant's misconduct was largely based on its mistaken belief that Plaintiff was no longer represented by counsel once the settlement agreement was signed. As for Defendant's monthly balance reminders, the representation that Plaintiff owed more than the agreed upon settlement amount was willfully and knowingly misleading, however, Plaintiff received only two of these payment reminders over a two-month period. This conduct is therefore less serious than other harassing and threatening conduct that violates the FDCPA and RFDCPA. *See* *Esget v. TCM Fin. Servs. LLC, 2014 U.S. Dist. LEXIS 8583, 2014 WL 258837, at *5, 7 (E.D. Cal. Jan. 23, 2014)* (awarding maximum statutory damages where defendant "repeatedly" contacted plaintiff's place of work in an attempt to collect an alleged debt, including contacting plaintiff's supervisor and disclosing the alleged debt, and made false threats, including a threat to file a lawsuit and garnish plaintiff's wages); *Mulvihill v. St. Amant & Assocs., 2014 U.S. Dist. LEXIS 57422, 2014 WL 1665229, at *2 (E.D. Cal. Apr. 24, 2014)* (finding nearly 20 calls, even after plaintiff **[*5]** instructed defendant to stop calling

---

the Court's summary judgment Order. (Doc. 25).

[3] This sum includes Plaintiff's initial fee request of $70,919.00 for 187.2 hours of time expended plus an additional sum of $6,934.50 for 20.1 hours expended since the filing of the underlying fee motion. (Docs. 29-1 at 27; 33 at 7).

him, warranted maximum statutory penalty).

Given the nature and extent of Defendant's noncompliance with the FDCPA and RFDCPA, Plaintiff has failed to show that a maximum statutory damage award is warranted for these two violations. However, because Defendant sent two letters that ran afoul of the Acts, the Court finds that an award of $250 per letter be awarded under the FDCPA and the RFDCPA. *See* Davis v. Hollins L., 25 F. Supp. 3d 1292 (E.D. Cal. 2014) (awarding $250 for a one-time violation under the FDCPA); Mejia v. Marauder Corp., 2007 U.S. Dist. LEXIS 21313, 2007 WL 806486, at *11 (N.D. Cal. 2007) (concluding that $250 in statutory damages was appropriate where there was only a single collection letter and the violations of the FDCPA were not frequent or persistent). Accordingly, the Court awards Plaintiff $500 in damages under the FDCPA and $500 under the RFDCPA for a total of $1,000 in statutory damages.

**B. Attorney's Fees**

The Fair Debt Collection Practices Act allows a plaintiff to recover "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1692k(a)(3); Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008). A similar award is also available under the RFDCPA. Klein v. Law Offices of D. Scott Carruthers, 2015 U.S. Dist. LEXIS 75269, 2015 WL 3626946, at *2 (N.D. Cal. June 10, 2015) (citing Cal. Civil Code § 1788.30(c)).

The Court calculates an attorney's fees award using the "lodestar" method. Camacho, 523 F.3d at 978. Under the lodestar method, "a district court must start by determining **[*6]** how many hours were reasonably expended on the litigation, and then multiply those hours by the prevailing local rate for an attorney of the skill required to perform the litigation." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008). The fee applicant bears the burden of documenting the appropriate hours expended in the litigation. Klein, 2015 U.S. Dist. LEXIS 75269, 2015 WL 3626946 at *2 (*citing* Hensley v. Eckerhart, 461 U.S. 424, 433-34, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)). The Court may reduce the award "[w]here the documentation of hours is inadequate," and may "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 433. The Court has "'a great deal of discretion in determining the reasonableness of the fee." Camacho, 523 F.3d at 978 (*quoting* Gates v. Deukmejian, 987 F.2d 1392, 1398 (9th Cir. 1992)).

**1. Plaintiff's Position**

Plaintiff contends that he is the prevailing party in this litigation and therefore entitled to an award of reasonable attorney's fees. As mentioned, Plaintiff requests $77,853.50 in attorney's fees comprised of 207.3 hours of attorney time at hourly rates ranging from $295 per hour to $545 per hour for three attorneys: Crosby Connolly, Jessica Dorman, and Robert Hyde. (Docs. 29-11, 33-3).

To support these rates, Plaintiff's counsel directs the Court to several cases where they have been awarded hourly rates between $295 and $375 per hour based on expertise and experience.[4] Specifically, Mr. Connolly **[*7]** states that he has been engaged with consumer protection litigation for four years. *See* Declaration of Crosby S. Connolly ("Connolly Decl."), (Doc. 29-2). He also recently attended the National Association of Consumer Advocates conference which is an event that provides extensive training on consumer rights litigation, including the Fair Debt Collection Practices Act. Connolly Decl. at ¶ 23. Practicing for

[4] Mr. Connolly has been approved by the Eastern District of California at an hourly rate of $295. *See* Lyon v. Bergstrom Law, Ltd., Case No. 1:16-cv-00401-DAD-SKO, 2016 U.S. Dist. LEXIS 152148, 2016 WL 6522746 (E.D. Cal. Nov. 2, 2016). Jessica Dorman has recently been approved by the Los Angeles County Superior Court in an FDCPA class action at an hourly rate of $375 in *Scheuerman v. Vitamin Shoppe*, Case No. BC592773. (Doc. 33-2, Ex. D). Mr. Hyde does not direct the Court to any cases where he was awarded an hourly rate of $545 per hour.

four years, Ms. Dorman states that her extensive experience practicing FDCPA law justifies her requested $345 rate. *See* Declaration of Jessica R. K. Dorman ("Dorman Decl."), (Doc. 29-4). Finally, Mr. Hyde, a founding partner of the prevailing law firm Hyde & Swigart, was admitted to practice in 2003 and he has practiced consumer law for over thirteen years. *See* Declaration of Robert L. Hyde ("Hyde Decl."), (Doc. 29-3). Plaintiff's counsel also introduces the declarations of consumer protection attorneys Stephen Recordon and Clinton Rooney, as well as the 2013-2014 United States Consumer Law Attorney Fee Survey Report, by Ronald L. Burdge to support their respective rates. (Doc. 29-9, Exh. B).

In support of the hours expended, **[*8]** Plaintiff attaches itemized billing records which contain descriptions of the activities performed by Plaintiff's counsel and the time expended. (Docs. 29-9). The billing records reflect that Mr. Connolly expended 82.1 hours, Ms. Dorman expended 52.9 hours, and Mr. Hyde expended 52.2 hours during the course of this litigation. *Id.* Additionally, Ms. Dorman seeks supplemental fees for an additional 20.1 hours spent since the filing of the underlying fee motion. (Doc. 33-3 at 8).

Plaintiff asserts that both the number of hours expended and the respective hourly rates are reasonable based on counsels' qualifications and experience. Plaintiff further contends that he is entitled to an award of costs in the amount of $1,919.90 for out of pocket expenses occurred in bringing this action.

### 2. Defendant's Position

Defendant raises one primary objection to Plaintiff's billing records. Defendant contends that the hours and fees claimed by Plaintiff's counsel are unreasonable because the decision to staff three attorneys on this "comparatively simple area of law" resulted in excessive conferencing and duplicative efforts. (Doc. 31 at 6). As an example of overstaffing, Defendant argues that "Jessica **[*9]** Dorman and Crosby Connolly attended the depositions, but yet Crosby Connolly did nothing but watch." (Doc. 31 at 6). Defendant also asserts that time spent by the three attorneys consulting with each other resulted in duplicative work. As a result, Defendant argues that the Court should discount all the hours expended by Ms. Dorman and Mr. Hyde and only award compensation based on the 82.1 hours expended by lead attorney Mr. Connolly.

In reference to Plaintiff's counsels' proposed hourly rates, Defendant argues that the Court should not credit the declarations submitted by outside attorneys Stephen Recordon and Clinton Rooney as lacking merit to support Plaintiff's counsels' hourly rates.

As a final matter, Defendant does not appear to challenge the amount requested in costs.

### 3. Reasonable Hourly Rate

Having considered the moving papers, arguments and relevant lodestar factors, the Court finds that the requested amount of attorneys' fees should be reduced. The primary basis for such a reduction is the Court's determination that counsels' requested hourly rates are unreasonable because the evidence submitted by Plaintiff does not justify an hourly rate between $295-$545.

A reasonable hourly **[*10]** rate is not defined by reference to the rates actually charged by the prevailing party." *Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986)*. Rather, reasonable fees must be calculated based on the prevailing market rates charged by "attorneys in the relevant community engaged in 'equally complex Federal litigation.'" *Van Skike v. Dir., Off. of Workers' Comp. Programs, 557 F.3d 1041, 1046 (9th Cir. 2009)*.

Here, Plaintiff cites one case in the Eastern District approving Mr. Connolly's $295 hourly rate—a case awarding Mr. Connolly $1,475.00 in discovery

sanctions (5.0 hours) for prevailing on a discovery motion. *Lyon v. Bergstrom Law, Ltd., No. 1:16cv0401DAD-SKO, 2016 U.S. Dist. LEXIS 152148, 2016 WL 6522746, at *1 (E.D. Cal. Nov. 2, 2016)*. None of the other cases cited by Plaintiff granting a fee request in excess of $295 per hour are from the Eastern District. In other words, each case counsel has previously been granted a rate in excess of $295 reflects the prevailing rates of other communities, not the Eastern District.

The Court similarly is not persuaded by Plaintiff's reference to the United States Consumer Law Attorney Fee Survey Report, nor the declarations of Stephen Recordon or Clinton Rooney. These exhibits do not demonstrate that Mr. Recordon, Mr. Rooney, Plaintiff's counsel, or any other FDCPA practitioner in the Eastern District has been awarded an hourly rate over $295.

To the contrary, **[*11]** the Court's review of some of the most recent attorney fee awards in FDCPA cases indicate that the most common hourly rate awarded to Plaintiff's counsel in FDCPA cases is $250 with a maximum of $300-$315 for the most experienced attorneys. *See, e.g.*, *Miranda v. Law Office of D. Scott Carruthers, No. 1:10-CV-01487-BAM, 2012 U.S. Dist. LEXIS 2866, 2012 WL 78236, at *7 (E.D. Cal. Jan. 10, 2012)* ("The Court's review of some of the most recent attorney fee awards in FDCPA cases indicate[s] that the most common hourly rate awarded to plaintiff's counsel in FDCPA cases is $250."); *Alonso v. Blackstone Fin. Group. LLC, 2014 U.S. Dist. LEXIS 24677 (E.D. Cal. Feb. 25, 2014)* (average rate awarded in FDCPA cases is $250 per hour but awarding $300 per hour to attorney with 35 years of experience); *Valero v. Bryant, LaFayette and Associates, LLC, 2011 U.S. Dist. LEXIS 40578, 2011 WL 1438436 (E.D. Cal. 2011)* ($250); *Brablec v. Paul Coleman & Associates, P.C., 2010 U.S. Dist. LEXIS 4500, 2010 WL 235062 (E.D. Cal., 2010)* ($250); *Hartung v. J.D. Byrider, Inc., 2009 U.S. Dist. LEXIS 54415, 2009 WL 1876690 (E.D. Cal., 2009)* ($250).

According to counsels' declarations, Mr. Connolly and Ms. Dorman have approximately four years of experience, and Mr. Hyde thirteen years of experience all devoted primarily to consumer protection litigation. Counsels' proposed rates are therefore well outside the prevailing market rates for attorneys with comparable experience in Fresno. As addressed above, courts in the Eastern District repeatedly have found $250 per hour to be a reasonable rate for attorneys with less than fifteen years of experience bringing actions under the FDCPA. Further, while **[*12]** the Court accepts that Plaintiff's attorneys have specialized experience in consumer protection litigation, this case did not involve complicated legal or factual issues. Indeed, the present case was relatively simple and not an exceptional case meriting a higher fee. While the Court has identified cases in which FDCPA practitioners were awarded $300-$315 hourly rates, *see e.g.*, *Costa v. National Action Financial Services, 2008 U.S. Dist. LEXIS 35339, 2008 WL 1925235 (E.D. Cal., 2008)* ($315); *Johnson v. JP Morgan Chase Bank, N.A., 2010 U.S. Dist. LEXIS 133096, 2010 WL 4977648 (E.D. Cal., 2010)* ($300), those awards are outliers reserved for those FDCPA practitioners with the highest degree of skill, experience and reputation.

Thus, in light of counsels' comparatively shorter experience and the minimal complexity of this case, there is nothing to justify awarding or exceeding the maximum hourly rate found to be reasonable in non-class action FDCPA cases in this district. Considering these factors, rate determinations for similarly skilled and experienced counsel in other cases in this forum, and this Court's own knowledge of the local value of legal services comparable to those rendered here, a reasonable hourly rate for Mr. Connolly, Ms. Dorman, and Mr. Hyde is $250 per hour, respectively.

**4. Hours Reasonably Expended**

With regard to the time and labor required, the Court has reviewed the billing **[*13]** records

submitted by Plaintiff's counsel and finds that, with two exceptions, the number of hours expended to be reasonable. First, a review of counsels' billing records reveals that counsel billed over 10 attorney hours for interoffice conversations between all three attorneys to discuss case status or strategy. While it is reasonable to spend some time coordinating legal resources, it is not reasonable to double or triple-bill a client for internal meetings, many of which appear to be for partner, Mr. Hyde, to provide instructions to his junior associates, Mr. Connolly and Ms. Dorman. *See* *Gauchat-Hargis v. Forest River, Inc., No. 2:11-cv-02737-KJM-EFB, 2013 U.S. Dist. LEXIS 128508, 2013 WL 4828594, (E.D. Cal. Sep. 6, 2013)* (finding it unreasonable for partners and associates to collectively "triple-bill" a client for attending internal meetings).

For example, on June 16, 2016, Mr. Connolly and Ms. Dorman each billed .4 hours to "speak with Robert Hyde" about "opposing counsel's summary judgment letter." (Doc. 29-8, Exh. A at 4). Mr. Hyde billed a slightly longer .6 hours for that same meeting ostensibly in preparation to provide Mr. Connolly and Ms. Dorman further instruction at the meeting. Given the triple-billing here for these kinds of internal communications, the Court **[*14]** agrees with Defendant that such charges are excessive. *See* *Chalmers, 796 F.2d at 1211* (The court may reduce those hours where a case is overstaffed and hours are duplicated and where the hours expended are deemed to be excessive). Thus, while the billing of 3.3 hours to conduct strategy meetings by Mr. Hyde was reasonable, the additional duplicative billing to attend those meetings was not. Accordingly, the Court will deduct the 3.3 hours each spent by Ms. Dorman and Mr. Connolly to attend meetings with co-counsel for a total reduction of 6.6 hours.

Second, the Court has reviewed Plaintiff's request for fees-on-fees[5] and finds the requested award excessive. Along with the work performed on the merits of this case, Plaintiff billed approximately 32.8 hours for preparing and drafting the underlying fee motion and reply (24 hours to draft the motion and 8.8 hours for the reply). (Doc. 29-8 at Ex. A at 9-10; Doc. 33-3, Ex. E at 3). Plaintiff is entitled to recover attorney's fees for time reasonably expended on a motion for attorney fees and costs, however, an inflated request for a "fees-on-fees" award may be reduced to an amount deemed reasonable by the awarding court. *See* *Brown v. Sullivan, 916 F.2d 492, 497 (9th Cir.1990)*; *Jadwin v. County of Kern, 767 F.Supp.2d 1069, 1140 (E.D. Cal. 2011)* (denying attorney's motion for "fees-on-fees" **[*15]** due to lack of a reasonable basis for such an award).

Defendant does not contend that any specific time entry relating to attorney's fees is excessive however; an independent review of the billing records reveals that the time spent pursuing fees is disproportionate to the time spent litigating the merits of this case. For comparison, whereas Ms. Dorman dedicated 32.8 hours in pursuit of fees in this matter, counsel expended approximately 36.4 hours drafting the summary judgment motion and reply. (Doc. 29-8 at Ex. A at 9-10; Doc. 33-3, Ex. E at 3). While Courts in the Ninth Circuit reject the notion that an automatic reduction in fees is warranted where the time spent on litigating fees begins to approach the time spent litigating the case's merit, the Court must still determine the reasonable number of hours expended in light of the issues and tasks involved. *See* *Golden Gate Audobon Soc'y, Inc. v. United States Army Corps of Eng'rs, 732 F. Supp. 1014, 1021-22 (N.D. Cal. 1989)*.

Here, while the time expended on litigating the summary judgment and fees was similar, the fee motion is far less complex. Indeed, the issues raised in the fee motion are not novel or difficult—a fact further demonstrated by Defendant's meager six-page opposition to the fee motion. (Doc. 31). Further, the fee motion and supporting **[*16]** documents contained a high degree of duplication and a large amount of boilerplate. Thus, because the motion was not particularly complicated, it does

[5] Fees for time spent litigating the fees motions.

not warrant essentially the same amount of effort expended on the motion for summary judgment. As a result, the Court finds the fees sought on the fee motion to be excessive. Accordingly, the Court reduces the time spent by Ms. Dorman preparing and drafting the fee motion and reply by 10 hours.

Finally, although Defendant challenges the duplicative attendance of Ms. Dorman and Mr. Connolly at the deposition, having two attorneys present at a deposition is not necessarily duplicative, especially if the deponent is a key witness. *PSM Holding Corp. v. Nat'l Farm Fin. Corp., 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010)* ("[D]ivision of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings."). Although the Ninth Circuit has instructed courts to "examine with skepticism claims that several lawyers were needed to perform a task," it has also emphasized that staffing multiple lawyers on a single task is not by itself evidence of excessive billing. *Democratic Party of Wash. State v. Reed, 388 F.3d 1281, 1286 (9th Cir. 2004)*; *see also* *Moreno, 534 F.3d at 1113* (emphasizing that "[f]indings of duplicative work should not just become a shortcut for reducing a fee award without identifying **[*17]** just why the requested fee was excessive").

Here, the record reflects that on March 15, 2016, Mr. Connolly and Ms. Dorman billed 8.1 hours each to "travel and attend" the depositions of two of Defendant's employees. (Doc. 29-8, Exh. A at 4). The Court is familiar with the issues in the case and finds that in light of the significance of the testimony of Defendant's employees, it was reasonable for both Ms. Dorman and Mr. Connolly to attend these depositions. *PSM Holding Corp., 743 F. Supp. 2d at 1157*. Further, it is not duplicative to have a second attorney serve as a sounding board or be present to assure that valuable testimony is obtained during the limited time allotted in a deposition. *See* *Moreno, 534 F.3d at 1112* ("By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker"). The Court, therefore, does not reduce Plaintiff's requested fee based on duplicative attendance at the depositions.

Having considered all the relevant factors, the Court finds that of the requested 207.3 hours, 190.7 hours of attorney time was reasonably expended in litigating this case. This reflects a deduction of 3.3 hours of Mr. **[*18]** Connolly's requested 82.1 hours for duplicative interoffice conferences and a 13.3 hour deduction of Ms. Dorman's 73 hours for 3.3 hours of similar interoffice conferences and 10 hours of excessive work on the fee application. Given these deductions, the Court will award counsel a total fee award of $47,675.00.

**C. Costs**

Plaintiff seeks $1,919.90 in costs and has submitted a statement of itemized costs in support of his request. (Doc. 29-8). Plaintiff seeks reimbursement for filing fees, travel costs, service fees, and court reporter fees. (Doc. 29-8). Defendant has not challenged any item of costs. Having reviewed Plaintiff's statement of costs, the Court finds that the costs Plaintiff seeks to recover were reasonably incurred and recoverable. *See* *Garcia v. Resurgent Capital Services, L.P., 2012 U.S. Dist. LEXIS 123889, 2012 WL 3778852, at *12 (N.D. Cal. 2012)* ("in FDCPA cases, 'expenses that are generally charged to paying clients may be awarded, even though they are not normally taxable as costs.'"). Accordingly, Plaintiff's motion for costs in the amount of $1,919.90 is GRANTED.

**III. CONCLUSION**

Based on the foregoing, Plaintiff's motion for an award of statutory damages, attorney's fees, and costs is GRANTED IN PART AND DENIED IN PART. Plaintiff is awarded a total amount of $50,594.90, comprised **[*19]** of $500 in statutory damages under the FDCPA; $500 in statutory

damages under the RFDCPA; $47,675.00 in reasonable attorneys' fees; and $1,919.90 in costs.

The Clerk shall enter judgment and close the case file.

IT IS SO ORDERED.

Dated: **July 14, 2017**

**/s/** Barbara A. McAuliffe

UNITED STATES MAGISTRATE JUDGE

---

End of Document

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

KEVIN H. SCOTT and JACQUIE L. SCOTT,

Plaintiffs,

v.

JAYCO INC.,

Defendant.

Case No.: 1:19-cv-0315 JLT

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR ATTORNEY FEES AND COSTS

(Doc. 70)

The Scotts are California residents who purchased a new RV in Iowa. After a short time, they discovered the RV suffered from various defects and required repairs. Plaintiffs sought to hold Jayco, Inc. liable for damages and injunctive relief under California's Unfair Competition Act and Consumer Legal Remedies Act, and under federal law with the Magnuson-Moss Warranty Act. The parties have settled the underlying claims and agreed Jayco shall pay attorney fees and costs in an amount to be determined by the Court. (*See* Doc. 70-3.)

Plaintiffs now seek an award of attorney fees in the amount of $170,385.75 and costs in the amount of $1,509.13. (Doc. 71 at 15.) Jayco opposes the motion, asserting the fees requested are excessive. (Doc. 72.) The Court found the matter suitable for decision without oral argument, and the motion was taken under submission pursuant to Local Rule 230(g). For the reasons set forth below, Plaintiffs' motion is **GRANTED** in part, with fees in the modified amount of **$67,634.35** and costs in the modified amount of **$400.00**.

**I. Background**

In December 2016, "Plaintiffs purchased a new 2017 Jayco Seneca RV" online through RV One Superstores. (Doc. 1 at 4; *see also* Doc. 11-4 at 1-2.) On December 30, 2016, Mr. Scott travelled to Des Moines, Iowa and signed the purchase contract for the RV. (*See* Doc 11-4 at 2, ¶ 3.) Plaintiffs assert that after purchasing the RV, they discovered it suffered from numerous defects and repeatedly sought repairs. (Doc. 1 at 5-13.) Plaintiffs assert the they suffered "ongoing and recurring problems with fit and finish, and a myriad of mechanical issues." (*Id.* at 12, ¶ 23.) According to Plaintiffs, Jayco "had multiple repair attempts on the RV, through its Dealer, and … refused and or failed to remedy, fix or remediate the serious issues." (*Id.*, ¶ 24.)

On June 22, 2018, Plaintiff initiated this action by filing a complaint asserting the following causes of action: (1) breach of an express warranty in violation of the Song-Beverly Consumer Warranty Act; (2) breach of an implied warranty in violation of the Song-Beverly Consumer Warranty Act; (3) unlawful, unfair, and fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200; (4) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; and (5) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301. (*See generally* Doc. 1.) However, the parties stipulated that Plaintiffs' claims under the Song-Beverly Act be dismissed with prejudice on September 10, 2021. (Doc. 10.)

On July 15, 2021, the parties informed the Court that they had reached a settlement in the action. (Doc. 64.) They agreed on the substantive settlement terms, including that Plaintiffs would file a motion for fees and costs, which they have now done (Docs. 70, 71.)

**II. Legal Standards**

In general, "[t]he starting point for determining a reasonable fee is the 'lodestar' figure, which is the number of hours reasonably expended multiplied by a reasonable hourly rate." *Gates v. Deukmejian*, 987 F.2d 1390 (9th Cir. 1992); *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008); *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 489 (2016) (a lodestar involves "multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate").

When the parties are unable to "settle the amount of a fee," "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly

rates." *Hensley v. Eckerhart*, 461 U.S. at 424, 437 (1983). Thus, the burden of proof is on fee applicants. *Id.*; *see also Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007). Any party opposing the fee request must make specific objections to the hours expended. *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1993); *see also Premier Med. Mgmt. Sys. v. Cal. Ins. Guarantee Assoc.*, 163 Cal. App. 4th at 550, 564 (2008) ("[g]eneral arguments that fees claimed are excessive, duplicative, or unrelated do not suffice"). Thus, the burden shifts to opposing party to demonstrate the hours spent are duplicative or excessive. *See id.; see also Gorman v. Tassajara Dev. Corp.*, 178 Cal. App. 4th 44, 101 (2009) ("[t]he party opposing the fee award can be expected to identify the particular charges it considers objectionable").

Courts are given discretion when calculating a fee award. *Hensley,* 416 U.S. at 437. However, the Supreme Court explained "it remains important ... for the district court to provide a concise but clear explanation of its reasons for the fee award." *Id*. Thus, the Court should provide sufficient information on how it arrived at the total of compensable hours for which fees were awarded to allow for meaningful appellate review. *Cunningham v. County of Los Angeles*, 879 F.2d 481, 485 (9th Cir. 1988) ("Courts need not attempt to portray the discretionary analyses that leads to their numerical conclusions as elaborate mathematical equations, but they must provide sufficient insight into their exercises of discretion to enable [the appellate court] to discharge our reviewing function").

## <u>III. Discussion and Analysis</u>

Pursuant to the terms of the settlement agreement, "Jayco agrees to pay Plaintiff's (sic) attorney's fees and costs in an amount to be determined by the Court, by way of noticed motion, to have been reasonably incurred by Plaintiffs in the commencement and prosecution of this action." (Doc. 70-3 at 6, ¶ 1(b), emphasis omitted.) Thus, there is no dispute that Plaintiffs are entitled to fees in the action. Rather, Jayco challenges the number of hours "reasonably incurred" and the hourly rates sought by counsel and the administrative professionals. (*See generally* Doc. 72.)

Plaintiffs seek an award of "$106,090.55 in fees, plus an additional $7,5000 for bringing this Motion, reviewing Jayco's Opposition to Plaintiffs' Motion, drafting Plaintiffs' Reply, preparing and attending any relating hearing, preparing any needed filings to satisfy the order, for time to wrap up the settlement and ultimately collect any amount awarded by this Court." (Doc. 71 at 6.) Plaintiffs request

multiplier to enhance the lodestar in the amount of 1.5, for the total amount of $170,385.75. (*Id.* at 6, 15.) Finally, Plaintiffs seek costs and expenses in the amount of $1,509.13. (*Id.*)

**A. Hours expended**

A fee applicant must provide records documenting the tasks completed and the amount of time spent. *Hensley*, 461 U.S. at 424 (1983); *see also Ketchum v. Moses*, 24 Cal.4th 1122, 1132 (2001) (party must provide records sufficient for the court to "carefully review … [the] hours expended" to determine whether the time reported was reasonable). "Where the documentation of hours in inadequate, the district court may reduce hours accordingly." *Hensley*, 461 U.S. at 433; *see also Ketchum*, 24 Cal.4th at 1131-32.

Plaintiffs seek fees for 270.3 hours of work in the action, plus anticipated time for future work on this motion.[1] (Doc. 70-1 at 12-13; Doc. 71 at 7-8, 15.) This time includes work by attorneys Jon Jacobs, Terry Baker, Chad David, Rene Dupart, Jon Feeley, Elana Midda, and Nicolas, Dillavou; as well as paralegals Lisa Tyler, Gabriela Torres, Kimberly Riley, Kayla Goettman, Cindy Lewandowski, and Shaina Cateldge. (*Id*.) Jayco contends the time reported reflects overstaffing of the work with "transient timekeepers." (Doc. 72 at 3, 7-9.) In addition, Jayco objects the hours reported includes "numerous clerical entries, which should be considered as overhead" and "impossibly vague billing entries" that should be excluded from the fee award. (*Id.* at 3-4, 9-12.) Finally, Jayco argues the time sheets reflect overbilling with tasks that should not take six minutes to complete. (*Id.* at 12.)

1. Exhibits in opposition

Jayco enlisted James Schratz to "provide an audit and opinion regarding the reasonableness of the attorneys' fees requested" by Plaintiffs. (*See* Doc. 72-1 at 1, ¶ 1.) According to Mr. Schratz, he "reviewed Plaintiffs' Fee Motion and accompanying declarations and exhibits in support thereof, including billing records covering the time period from February 9, 2018 through August 27, 2021," as well as "various pleading and written discovery provided by Jayco, Inc.'s counsel." (*Id.* at 14, ¶ 46.) Based upon his review, Jayco compiled billing entries that were challenged for overstaffing with

[1] Although the table in the motion indicates a total of 230.7 hours, this appears to be a clerical error. (*See* Doc. 71 at 8.) Rather, Mr. Jacobs reports: "The Law Offices of Jon Jacobs has spent 230.7 hours on this matter." (*See* Doc. 70-5 at 4.) In addition, Mr. Baker billed 39.6 hours prior to joining as co-counsel with the firm of Mr. Jacobs. (*See id.*; Doc. 70-4 at 7-8.) These hours are reflected in the billing records and the table in the motion, and when combined total 270.3 hours.

"transient timekeepers" in "Exhibit 8," clerical tasks in "Exhibit 11," and vague billing entries in "Exhibit 12."

Significantly, whether fees should be awarded—and the reasonableness of the fees requested—are matters of law for the Court to decide. *See Hensley*, 416 U.S. at 437. Thus, the Court declines to simply adopt the opinions of Mr. Schratz related to the reasonableness of the fees requested by Plaintiffs' counsel. The Court has reviewed each exhibit, as discussed below, and used the exhibits to identify the more than 400 billing entries challenged by Jayco in support of the assertion that the hours billed by Plaintiffs' counsel should be reduced for overstaffing, clerical tasks, and vagueness.[2]

2. Overstaffing

Jayco observes that while Plaintiffs' counsel "professes expertise in consumer warrant law," the firm "collectively staffed this matter with 13 different timekeepers consisting of 7 attorneys and 6 paralegals." (Doc. 72 at 7.) Jayco contends "at least 9 of the 13 timekeepers are transient or excessive timekeepers that each billed less than 20 hours for the entire case," for which Plaintiffs requested fees in the amount of $15,569.50. (*Id.*) In addition, Jayco observes that six individuals "billed less than 3 hours, with 3 of those timekeepers billing less than a half hour total." (*Id.*) Jayco compiled the challenged billing entries for these individuals in "Exhibit 8." (*See id.* at 8; Doc. 72-3 at 125-129.)

According to Jayco, "in staffing cases, counsel is required to exercise 'billing judgment', which means exercising judgment to adjust or write down fees and/or expenses incurred when the fees would be excessive, duplicative, or unnecessary." (Doc. 72 at 8, citing *Hensley v. Eckerhart*, 103 S.Ct. 1933 (1983).) Jayco notes the Supreme Court explained:

> Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here."

(*Id.* at 8-9, quoting *Hensley*, *103* S.Ct. at 1939-40.) Based upon the limited tasks performed, Jayco

[2] Due to the significant number of entries challenged, the Court declines to list each and every billing entry challenged by Jayco in its exhibits. However, the Court categorized the billing entries below, to identify which categories of tasks were not compensable—particularly with clerical tasks— and which of the challenged entries are not stricken from the fee award.

contends the time of attorneys Jon Jacobs, Elena Midda, Rene Dupart, Jon Feely, and Nicolas Dillavou should be deducted from the fee award. (*Id.* at 7-8.) For the same reason, Jayco contends the Court should deduct the time of the following administrative professionals: Gabriela Torres, Kimberly Riley, Cindy Lewandowski, and Shaina Cateldge. (*Id.*)

Plaintiffs contend the number of timekeepers on the action "would only be relevant had the billing been duplicative with multiple timekeepers performing the same task." (Doc. 73 at 2.) According to Plaintiffs, "[t]he Law Offices of Jon Jacobs was retained by Plaintiffs in March of 2018, and multiple attorneys and paralegals left the law firm over the course of this case." (*Id.*) Plaintiffs explain: "During the pendency of the lawsuit, timekeeper Rene Dupart, Jon Feely, Shaina Catley, Kimberly Riley, Gabriela Torres, and Elana Midda all left the law firm." (*Id.* at 5.) Plaintiffs argue that a review of the billing records indicates "it is clear that the case was primarily handled by attorneys Rene Dupart and Terry Baker, then Chad David and Terry Baker upon Mr. Dupart's departure from the law firm." (*Id.* at 3.) Further, Plaintiffs assert: "There was not one billing entry related to any attorney catching up on the facts of the case or performing duplicative tasks." (*Id.* at 2-3.)

Importantly, the Ninth Circuit has "recognized that 'the participation of more than one attorney does not necessarily constitute an unnecessary duplication of effort.'" *McGrath v. County of Nevada*, 67 F.3d 248, 256 (1995) (quoting *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989)). The Ninth Circuit recently determined a district court erred in striking all hours billed by several attorneys on the grounds that "the case was overstaffed." *Fernandez v. Torres*, 2021 U.S. App. LEXIS 30145 at *1-2, 2021 WL 4690940, at *1 (9th Cir. Oct. 7, 2021). In *Fernandez*, five attorneys billed for work on an action, and the district court "ignored the time billed by three of Fernandez's five attorneys." *Id.* The Ninth Circuit concluded "[t]he district court abused its discretion," because the identified attorneys "performed at least <u>some</u> necessary work, such as drafting a joint Rule 26 report and a settlement agreement." *Id.* (emphasis in original). The Ninth Circuit explained: "To the extent that overstaffing resulted in inefficiencies, the district court should reduce the fee award in proportion to those inefficiencies, rather than through a 'shortcut'" in striking all actions. *Id.*, citing *Moreno v. City of Sacramento*, 534 F.3d 1106, 1113 (9th Cir. 2008).

As in *Fernandez*, the number of attorneys on the action suggests that the firm overstaffed the

matter. However, the Court declines to strike time billed on these grounds. *See Fernandez*, 2021 U.S. App. LEXIS 30145 at *1-2, 2021 WL 4690940, at *1. Rather, the Court will review the challenged billing records in "Exhibit 8" to determine whether "overstaffing resulted in inefficiencies," and whether unnecessary time or duplicative tasks were included in the billing records.

*a. Time reported by Jon Jacobs*

Notably, contrary to Plaintiffs' assertion, challenged entries from Jon Jacobs indicate an effort to "catch[] up on the facts of the case." Mr. Jacobs was the first to review the action on March 2, 2018, when he conducted an "intake review." (Doc. 70-5 at 43.) He then billed for further review and assigning the case on March 9, 2018. (*Id.*) Presumably, review had to occur for his law firm to determine whether to take the action and identify the attorney(s) who would work on the action. Thus, the Court declines to strike these hours. However, the billing records do not include any other entries from Mr. Jacobs for more than three years. (*See id.* at 9-43.)

On July 14, 2021, Mr. Jacobs billed 0.4 hours for reviewing the file to determine the authorized amount and determine where the sales contract was signed. (Doc. 70-5 at 9.) If Mr. Jacobs worked on the action consistently, it would not be necessary to review the file to determine where the contract was signed. (*See* Doc. 11-4 at 2; Doc. 19 at 1-2.) Further, Chad David drafted a confidential settlement conference statement a week before—which was provided to the Court on July 9, 2021—and the parties were already actively engaged in settlement discussions when Mr. Jacobs reviewed the file. (*See id.* at 9-10.) Thus, Mr. Jacobs' file review on July 14, 2021 was unnecessary to the action, and 0.4 hour will be deducted from his time.

Finally, Mr. Jacobs billed 0.2 hour for his review of the file in advance of preparing the fees motion and a memo on August 16, 2021. (Doc. 70-5 at 7.) Importantly, the record indicates that Mr. Jacobs was involved with the preparation of the motion for fees now pending before the Court, as he executed a declaration in support of the motion. (*Id.* at 1-5.) Therefore, the Court is unable to find this review related to the motion for fees was unnecessary, and declines to deduct this challenged time.

*b. Time billed by Jon Feely*

Jayco objects to the 0.2 hour billed by Jon Feely in this action. (Doc. 72 at 7.) Mr. Feely billed the 0.20 hour for "Choice of Law" on May 14, 2019. (Doc. 70-5 at 32.) Curiously, this entry is the

*only* one for Mr. Feeley, and the only work entered for the entirety of the month of May 2019. (*See id.* at 31-32.) Further, Terry Baker began to research the "choice of law" issue—or "controlling law," as counsel used the terms interchangeably in the billing records—in February 2019. (Doc. 70-4 at 7; *see also* Doc. 70-5 at 21-24.) Mr. Baker continued to research the issue, prepared the motion to establish controlling law, reviewed the opposition, prepared the reply brief, attended the hearing, and communicated with the client regarding the Court's ruling. (Doc. 70-5 at 21-24.) In total, Mr. Baker billed approximately 36 hours related to that motion, through March 2020. (*See id.*; Doc. 70-4 at 7.) Because there is no indication in the billing records that Mr. Feely offered any assistance to Mr. Baker with the preparation of the motion—particularly where Mr. Baker did not bill for any work on the issue between February 2019 and January 2020—it appears work by Mr. Feely was duplicative of the efforts of Mr. Baker. Therefore, the 0.2 hour will be deducted from the fee award.

*c. Time billed by Nicolas Dillavou*

On June 22, 2021, Mr. Dillavou billed 0.3 hour for a "[p]hone call with [Chad David] re status of case, settlement, and next steps." (Doc. 70-5 at 14.) Jayco asserts this time should not be awarded, noting it was the only work completed by Mr. Dillavou on the action. (Doc. 72 at 7; *see also* Doc. 72-3 at 128.)

Notably, Mr. David also billed 0.3 hour for a call with Mr. Dillavou "re legal strategy" on June 22, 2021. (Doc. 70-5 at 14.) In general, two attorneys cannot bill for communicating with each other, as such time is duplicative and unnecessary. *In re Mullins*, 84 F.3d 459, 467, 318 U.S. App. D.C. 19 (D.C. Cir. 1996); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099 (D. Haw. 2010). As this Court previously observed, "many courts ... reduced fee awards for time spent in 'interoffice conferences' or other internal communications." *Gauchat-Hargis v. Forest River, Inc.*, 2013 WL 4828594 at *3 (E.D. Cal. Sept. 9, 2013) citing, *e.g., Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1194 (S.D. Cal. 2003); *see also United States v. One 2008 Toyota Rav 4 Sports Util. Vehicle*, 2012 WL 5272281 at *9 (C.D. Cal. Oct. 18, 2012) ("[w]hen attorneys hold a telephone or personal conference, good 'billing judgment' mandates that only one attorney should bill that conference to the client, not both attorneys" [citation omitted]); *Coles v. City of Oakland*, 2007 WL 39304, at *10 (N.D. Cal. Jan. 4, 2007) (observing that billing for communications between attorneys may be a sign of overstaffing, warranting

a reduction in hours billed). Because Mr. David has billed for the same conference, the Court finds the billing by Mr. Dillavou was duplicative and unnecessary. Therefore, the 0.3 hour will be deducted from the Court's lodestar calculation.

*d. Time billed by Elena Midda*

On March 13, 2018, Ms. Midda billed 2.0 hours for her review of the initial file documents and preparation of a notice and demand. (Doc. 70-5 at 43.) On March 21, 2018, she billed for her review of Jayco's response. (*Id.*) Jayco object to the entries from Ms. Midda, asserting she is a "transient timekeeper" and the 2.2 hours she billed for these tasks should not be included in the fee award. (Doc. 72 at 7-8; Doc. 72-3 at 126.)

Notably, the billing records indicate that while the action was originally assigned by the firm to Ms. Midda for work, the assignment changed to Rene Dupart in May 2018. (*Id.* at 43.) Plaintiffs also report Ms. Midda left the firm during the pendency of this action, although it is unclear when her departure occurred. (*See* Doc. 73 at 5.) Jayco does not assert the work performed by Ms. Midda prior to the reassignment or her departure was not relevant or unnecessary to the matter. (*See* Doc. 72 at 7-9.) Further, there is no indication her work was duplicative of other attorneys. Accordingly, the Court declines to deduct the challenged time for Ms. Midda from the lodestar.

*e. Time billed by Rene Dupart*

Jayco contends Plaintiffs should not receive any fees for the time billed by Mr. Dupart. (Doc. 72 at 7-9.) Again, however, Jayco does not address the substance of the work performed by the attorney. (*Id.*) Mr. Dupart billed 19.7 hours for tasks that included: communicating with Plaintiffs and opposing counsel; drafting the complaint (Doc. 1) drafting the Joint Scheduling Report filed on September 13, 2018 (Doc. 8); attending the conference via telephone on September 20, 2018; and drafting the opposition to the motion to change venue filed October 18, 2018 (Doc. 16). (*See* Doc. 70-5 at 35-43; *see also* Doc. 72-3 at 128.) It is indisputable that such tasks were necessary and relevant to the litigation. Because no other attorney billed for drafting the identified pleadings, it does not appear there was duplicative billing to warrant a deduction. Consequently, the Court declines Jayco's request to strike the 19.7 hours billed by Mr. Dupart from the fee award.

///

*f. Challenged time billed by paralegals*

On the grounds that several paralegals were also "transient timekeepers," Jayco objects to the 12.8 hours billed by Gabriela Torres, the 5.4 hours billed by Kimberly Riley, the 0.2 hour billed by Cindy Lewandowski, and the 2.4 hours billed by Shaina Cateldge. (Doc. 72 at 7-9.) Review of the records for each of the individuals does not reveal duplicative tasks. Therefore, the Court declines to deduct this time based upon Jayco's objection to "the high number" of individuals who worked on the action and limited number of tasks completed. *See Fernandez*, 2021 U.S. App. LEXIS 30145 at *1-2, 2021 WL 4690940, at *1. Review of the records for each of the individuals does not reveal any duplicative efforts among the paralegals. To the extent Jayco also argues to the time billed by Gabriela Torres and Kimberley Riley should not be awarded because the tasks performed were clerical in nature (Doc. 72 at 8), such objections are addressed below.

3. Clerical tasks

The Supreme Court determined that "purely clerical or secretarial tasks should not be billed at a paralegal or [lawyer's] rate, regardless of who performs them." *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989). As a result, courts have approved of elimination of clerical tasks from fee awards. *See, e.g., Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *see also Marquez v. Harper Sch. Dist.*, 546 F. App'x 659, 660 (9th Cir. 2013) ("[t]he district court was within its discretion" when it declined to award fees for clerical tasks); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 985 (4th Cir. 1997) (approving the deduction of hours spent on secretarial tasks from the lodestar calculation). Such tasks may include: "creating indexes for a binder; filing emails, memoranda, and other correspondence; updating the case calendar with new dates; copying, scanning, and faxing documents; and filing or serving documents." *Moore v. Chase, Inc.*, 2016 (E.D. Cal. July 7, 2016), citing *Prison Legal News v. Schwarzenegger*, 561 F.Supp.2d 1095, 1102 (N.D. Cal. 2008).

Jayco argues counsel billed more than 60 hours in "clerical tasks such as uploading and saving documents, calendaring, intra-office coordinating and scheduling, and e-filing documents," and prepared "Exhibit 11" as table of 256 challenged billing entries.[3] (Doc. 72 at 10; Doc. 72-3 at 153-67.)

[3] Again, the Court relies on the exhibit only to determine the challenged entries, which were then identified in Plaintiffs' original billing records.

In addition, Jayco asserts paralegals it previously identified as "transient timekeepers" performed clerical tasks. (*Id.* at 8-9.) Specifically, Jayco contends that "Gabriel[a] Torres billed a total of 12.8 hours consisting of 14 entries for clerical work with the most hours billed in round numbers (2 entries for 2 hours and 1 entry for 6 hours) totaling 10 hours for reviewing the file and preparing discovery shells." (*Id.*) Jayco also asserts, "Kimberly Riley billed a total of 5.4 hours consisting of 22 entries for clerical work such as calendaring, uploading documents, and client communication." (*Id.*)

In reply, Plaintiffs argue "many of the indicated billing entries offered by Defendant as Exhibit 11 of their Opposition do not fall under clerical tasks." (Doc. 73 at 5.) According to Plaintiffs, "A review of the billing entries show that many of the tasks complained of are fully recoverable." (*Id.*) However, Plaintiffs do not offer the Court any assistance by identifying which billed tasks they believe to be "fully recoverable," or which tasks Plaintiffs indirectly concede are not recoverable. (*See id.*)

*a. Updating and reviewing the firm's file*

Previously, this Court determined that organizing and updating files appeared to be clerical work. *L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 899 (E.D. Cal. 2009). Thus, the Court declined to award fees where the applicant "tendered no evidence that these are tasks that required the skill of a paralegal." *Id.* Approximately 30 billing entries challenged by Jayco as clerical involve updates and reviews of the firm's file by Kimberly Riley, Gabriela Torres, Lisa Tyler, and Kayla Goettman. (*See, e.g.,* Doc. 72-3 at 127-28, 157-59, 161-63, 165-66.)

For example, Ms. Tyler billed 0.2 hours to indicate in the system that the "attorney assignment [changed]" from Rene Dupart to Elana Midda on May 25, 2018; and billed an additional 0.2 hour to indicate the attorney assignment changed back to Mr. Dupart on May 31, 2018. (Doc. 70-5 at 43.) Ms. Tyler billed 2.8 hours for updates to the firm's file that included, but were not limited to: meeting dates; tasks for the deadline sheet; and information concerning the parties, assigned judges, and contact information of opposing counsel "for easy access." (*See id.* at 8, 31.) Likewise, Ms. Goettman billed 0.8 hour for updates with party information, "case details," and "case numbers" for the Eastern District of California and Northern District of Indiana. (*See, e.g. id.* at 33, 36, 41-42.) Ms. Goettman also billed 0.8 hour for reviewing the file to confirm the "case is in [the] Eastern District," document filing, and the prior demand for a jury trial. (*Id.* at 20-21.) Similarly, Ms. Riley billed 0.9 hour for file

review in an effort to locate a letter, which she was unable to find. (Doc. 70-5 at 25.) Ms. Riley also billed 0.4 hour to upload documents to the file such as an email from Plaintiffs and a "conformed copy of stipulation." (*Id.* at 25-26.) Ms. Torres billed 1.3 hours for file updates that were requested when Mr. David and Ms. Tyler were away from the office, reviewing the file, and organizing documents. (*Id.* at 22-23, 27-28, 31.)

Plaintiffs do not argue these file updates or reviews "required the skill of a paralegal," or present any evidence that would support such a conclusion. Based upon the Court's review of the challenged records, 7.8 hours will be deducted from the lodestar, which includes 3.6 hours for Lisa Tyler, 1.6 hours for Kayla Goettman, 1.3 hours for Kimberly Riley, and 1.3 hours for Gabriela Torres.

*b. Document retrieval and saving*

Courts have declined to award fees for "retrieving electronic court documents or copying" due to the clerical nature of the tasks. *Jones v. Metropolitan Life Ins. Co.*, 845 F. Supp. 2d 1016, 1027 (N.D. Cal. 2012); *Schmidt v. City of Modesto*, 2018 WL 6593362, at *9 (E.D. Cal. Dec. 18, 2018) (indicating clerical work included downloading, saving, and printing documents); *T.B. v. San Diego Unified Sch. Dist.*, 2017 U.S. Dist. LEXIS 218434, at *97 (S.D. Cal. Oct 2, 2017) ("scanning and saving" documents is clerical work). Thus, to the extent the billing records include such tasks, fees for such tasks should not be awarded.

As Jayco argues, the billing records from Plaintiffs' counsel include many entries related to document retrieval from the docket, printing copies, and saving numerous documents to the firm's file. For example, Kayla Goettman billed 0.2 hour to "[d]ownload/retrieve Docket No. 2 [the Summons]; upload to case file" and another 0.2 hour to "[d]ownload/retrieve Docket No. 3 [the New Case Documents]; upload to case file" on June 22, 2018. (Doc. 70-6 at 42; Doc. 72-3 at 154.) On June 28, 2018, Ms. Gotteman billed 0.2 hour to scan a copy of the complaint with supporting documents and "upload to the case file." (*Id.* at 41.) On July 17, 2018, she billed 0.2 hour to "Retrieve Docket No. 4; upload to the case file." (*Id.* at 43.) Similarly, in October 2018, Lisa Tyler billed 0.4 hour to upload and save Documents 14 and 15. (*Id.* at 37.) Ms. Tyler also billed 0.3 hour to print documents for Rene Dupart and "put [them] on his chair" with a "pad, pen and business cards" prior to a hearing. (*Id.* at 35.) Ms. Riley also billed for 0.4 saving documents to the firm's file, such a copy of the signed

mediation agreement. (*Id.* at 27.)

Though these are only a handful of examples, throughout the duration of the action, paralegals billed for document retrieval from the Court's docket and save copies, with more than 30 billing entries for document retrieval and uploading to the firm's file. (*See generally* Doc. 70-5 at 5-43; *see also* Doc. 72-3 at 154-167.) However, tasks such as saving, scanning, and printing documents should be included in the firm's overhead, and fees will not be awarded. *Jones,* 845 F. Supp. 2d at 1027. Accordingly, based upon the Court's review of the billing records, 8.4 hours will be deducted from the requested fee award, which includes 4.4 hours for Lisa Tyler, 3.6 hours for Kayla Goettman, and 0.4 hour for Kimberly Riley.

*c. Document finalizing and filing*

"Finalizing" a document generally refers to the preparation of documents for filing and service after an attorney has drafted the document. Courts throughout the Ninth Circuit determined the "finalizing" of a document is a clerical task for which fees should not be awarded. *See, e.g., Moores v. Berryhill*, 2017 WL 4386050, at *3 (E.D. Cal. Oct. 3, 2017) (declining to award fees for finalizing a complaint as clerical work); *United States v. Haw. Student Suites,* 2021 WL 3134925, at *10 (D. Haw. May 28, 2021) ("Finalizing a document" is a "clerical task[]" for which time is not compensable); *Velu v. Aristotle Air Conditioning & Heating, LLC*, 2021 WL 4122297, at *2 (D. Az. Sept. 9, 2021); (declining to include time billed for finalizing and filing a document in the court's calculation of fees).

Further, the Ninth Circuit indicated "filing, transcript, and document organization time was clerical in nature and should have been subsumed in firm overhead." *See Nadarajah*, 569 F.3d at 921. *see also Garcia v. Colvin*, 2013 WL 5347494, at *7 (E.D. Cal. Sept. 23, 2013) (observing the "document emailing and e-filing constitutes clerical or secretarial work and should not be awarded as these activities should be considered overhead costs," and explaining "filing documents is a clerical task, regardless of whether counsel has delegated the authority to his paralegal to access his CM/ECF account"); *United States v. One 2008 Toyota Rav 4 Sports Utility Vehicle*, 2012 WL 5272281, at *12 (C.D. Cal. Oct. 18, 2012) (declining to award fees for time spent e-filing documents with the court).

As indicated by Jayco in "Exhibit 11," the billing records include many entries for finalizing documents and e-filing with the Court. For example, Kayla Gottman billed 0.8 hour for e-filing the

Summons, and finalizing and e-filing the Joint Scheduling Report. (Doc. 70-5 at 39-40; Doc. 72-3 at 154-55.) Lisa Tyler billed 0.9 hour to related to finalizing the complaint and coversheet, e-filing, and upload the documents to the firm's case file. (Doc. 70-5 at 42; Doc. 72-3 at 154.) Additionally, Ms. Tyler billed for finalizing and e-filing other documents including, but not limited to, a stipulation to dismiss, the motion regarding controlling law, and a notice of appearance. (*See, e.g.* Doc. 70-5 at 15, 38.) For example, she billed 1.1 to talk to Mr. Baker about what needed to be done to finalize the documents for the motion controlling law and then "made [the documents] pretty for filing." (*Id.* at 24.) Therefore, based upon the Court's review of the challenged billing records and the entries for "finalizing" and e-filing documents, 3.2 hours will be deducted from the lodestar calculation, which includes 0.8 hour for Kayla Goettman and 2.4 hours for Lisa Tyler.

*d. Document revision by paralegals*

In several billing entries challenged by Jayco, Lisa Tyler billed for reviewing and revising documents previously drafted by attorneys prior to saving the document to the firm's system or e-filing with the Court. For example, after attorney Rene Dupart spent 4.0 hours drafting the complaint in the action, Ms. Tyler billed 0.5 hour for the following: "[r]eview revise complaint, and uploaded and saved to Merus." (Doc. 70-5 at 43; *see also* Doc. 72-3 at 154.) After Mr. Dupart spent 1.0 hour drafting a stipulation to dismiss on September 24, 2018, Ms. Tyler billed 0.2 hour to "[r]eview revise stip to dismiss" and upload the document to the system. (*Id.* at 38; *see also* Doc. 72-3 at 156.) Again, in October 2018, Mr. Dupart spent 10 hours drafting the opposition to the motion to change venue after which Ms. Tyler billed 0.8 hour for the following: "Review revise oppo. Review court's website for judge's info. Prepared GOS label for delivery of judge's copy. Uploaded and saved docs to merus. Uploaded and saved conformed copy." (*Id.* at 37; Doc. 72-3 at 157.) Similarly, after Mr. Baker worked more than 15.00 hours on a reply to the motion to establish controlling law and supporting documents, Ms. Tyler billed 1.3 hours to: "Review revise finalize Reply to oppo, TB decl and RJN. Uploaded/saved docs to file. Updated calendar. Efiled with the court. Uploaded and saved conformed copies to file." (*See* Doc. 70-5 at 22-23; Doc 72-3 at 161.)

To the extent Ms. Tyler reviewed and revised documents, her work was duplicative of the efforts performed by attorneys on the complaint, stipulation, opposition to the motion, and reply to the

motion. In addition, courts have determined proofreading is clerical when the review of work completed by counsel. Further, it is indisputable that the tasks identified in the billing entries—including uploading documents, preparation of mailing labels, calendaring, and e-filing— are clerical tasks that should not be included in the lodestar calculation, as they do not require the skill of a paralegal. *See, e.g., Nadarajah*, 569 F.3d at 921; *Smith v. A Check Am.*, 2017 U.S. Dist. LEXIS 143717, at *26 (C.D. Cal. July 18, 2017) (identifying "proofreading, making copies, uploading data to a server, formatting documents, and managing databases" as clerical tasks); *Garcia*, 2013 WL 5347494, at *7. Therefore, 2.8 hours will be deducted from the requested fee award for Ms. Tyler.

*e. Calendaring*

Repeatedly, this Court and others in the Ninth Circuit indicated calendaring deadlines is a clerical task that should not being included in a fee award. *See, e.g., Hill v. Comm'r of Soc. Sec.*, 428 F. Supp. 3d 253, 265 (E.D. Cal. 2019) (observing clerical staff could "easily" complete "calendaring of court dates" and reducing the fee award); *Campbell v. AMTRAK*, 718 F.Supp.2d 1093, 1105 (N.D. Cal. 2010) (deducting calendaring as clerical work from the awarded fees); *Doran v. Vicorp Rests., Inc.*, 407 F.Supp.2d 1120, 1125 (C.D. Cal. 2005) (noting "calendaring court dates" is clerical and reducing the fee award); *T.B.*, 2017 U.S. Dist. LEXIS 218434, at *97 ("calendaring [an] event is clerical").

As Jayco indicated in its exhibit of challenged billing, Kayla Goettman and Lisa Tyler billed for calendaring deadlines and their review of documents for calendaring. (*See generally* Doc. 72-3 at 154-56, 158-64, 166-67.) For example, after the Court issued the new case documents on June 22, 2018 (Doc. 3), Ms. Goettman billed 0.3 hour to review and add the scheduling conference and joint scheduling report deadlines to the firm's calendar. (Doc. 70-5 at 42.) The following week, Ms. Tyler billed 0.2 hour for calendaring the deadline for Jayco's answer. (*Id.* at 41.) On August 22, 2018, Ms. Goettsman billed 0.3 hour to again "Review Docket No. 3; update calendar." (*Id.*) The following month, she billed 0.4 hour to update the firm's calendar with the initial disclosure due date and the scheduling conference date. (*Id.* at 39.) On April 3, 2019, Ms. Gottesman billed 0.4 hour for calendaring discovery deadlines—before the Court issued its scheduling order—and proposed dates in the firm's calendar. (*Id.* at 32.) Once the order was issued on April 9, 2019 (Doc. 45), Ms. Gottesman billed another 1.0 hour for calendaring the deadlines ordered by the Court. (*Id.*) In November 2019,

Kimberly Riley billed for calendaring the deposition dates, and Ms. Gottesman billed for updating the calendar with amended dates. (*Id.* at 26.)

In total, there are more than 35 challenged entries related to calendaring or updating dates—such a discovery deadlines, the date of the vehicle inspection, deposition dates, or other unidentified events—and the paralegals billed a minimum of 0.2 hour for the task each time. (*See, e.g.*, Doc. 70-5 at 16-17, 22-23, 27-28, 32-33, 37-39, 42-42.) Because the tasks are clearly clerical, the time will be deducted from the lodestar calculation. *See Hill*, 428 F.Supp.3d at 265; *Campbell*, 718 F.Supp.2d at 1105. Based upon the Court's review of the billing entries related to calendaring, 9.2 hours will be deducted from the lodestar calculation, which includes 5.1 hours for Kayla Goettman, 3.9 hours for Lisa Tyler, and 0.2 Hour for Kimberly Riley.

*f. Clerical internal communications*

Billing entries challenged by Jayco include communications within the firm, whether to another paralegal or to counsel. (*See generally* Doc. 72-3 at 154-167.) Courts decline to award fees for staff emailing documents. *See Schmidt v. City of Modesto*, 2018 WL 6593362, at *9 (E.D. Cal. Dec. 18, 2018) (declining to award fees for emailing documents, noting emailing was a clerical task rather than a paralegal task); *LaToya A. v. S.F. Unified Sch. Dist.*, 2016 WL 344558, at *9 (N.D. Cal. Jan. 28, 2016) (forwarding documents to attorneys is "purely clerical work"). In addition, courts have disapproved of two individuals billing for communicating with each other, as such time is duplicative and unnecessary. *In re Mullins*, 84 F.3d 459, 467 (D.C. Cir. 1996); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099 (D. Haw. 2010). Consequently, "many courts have ... reduced fee awards for time spent in 'interoffice conferences' or other internal communications." *Gauchat-Hargis v. Forest River, Inc.*, 2013 WL 4828594 at *3 (E.D. Cal. Sept. 9, 2013), citing *Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1194 (S.D. Cal. 2003) (reducing the fee award where the attorneys "billed an inordinate amount of time for interoffice conferences").

In "Exhibit 8" and "Exhibit 11," Jayco objects to more than 80 entries—each billed for a minimum of 0.2 hour—related to emails, chats, and telephone conferences between the paralegals and counsel. (*See generally* Doc. 72-3 at 154-67.) Again, though the Court declines to identify each of the internal communications given the significant number, challenged entries related to forwarding emails

or documents to others working on the action. (*See, e.g.*, *id.* at 154, 155, 157, 158, 165, 167.) For example, Ms. Tyler billed for forwarding emails on April 11, 2020; September 22, 2020; November 3, 2020; and July 9, 2021. (*See, e.g.*, Doc. 70-5 at 10, 18, 21.) Shaina Cateldge billed 0.2 for forwarding documents to others, including Ms. Tyler. (*Id.* at 32.) In addition, Ms. Goettman and Ms. Tyler billed for emailing documents and attachments including, but not limited to: the executed summons, a draft of the initial disclosures, the joint discovery plan, the court's conference notice, an invoice from JAMS, court orders, and settlement breakdown. (*See, e.g.*, Doc. 70-5 at 7, 19, 27, 32, 33, 41.) Likewise, Terry Baker billed 0.2 hour for receiving a transcript and forwarding the document to Ms. Goettman. (Doc. 70-4 at 7.) Given the clerical nature of these tasks, the requested fee award will be reduced for the forwarding of emails and documents. *See Schmidt*, 2018 WL 6593362, at *9.

The paralegals also repeatedly billed for communications with others working on the case, including telephonic conversations, electronic chats, texting, and emailing. (*See generally* Doc. 70-5 at 7-43.) For example, Ms. Tyler and Ms. Goettman each billed 0.2 hour on April 15, 2019, for emailing one another regarding completing calendaring in the firm's system. (Doc. 70-5 at 32.) Ms. Tyler regularly billed for emailing counsel reminders of upcoming deadlines and actions needed. (*See, e.g.*, *id.* at 7, 9-11, 13, 16, 32, 43.) Ms. Tyler also billed for communications with counsel "regarding who the case is assigned to;" a hearing location; and document and task status, such as changing the attorney assignment in the firm's system, filing the summons, and "calendaring the settlement conference." (*See, e.g.*, *id.* at 7, 14, 34-36, 41.) Further, Ms. Cateldge billed 0.2 hour for each of the electronic chats in which she simply notified Ms. Tyler and Mr. Dupart of Plaintiffs' phone calls. (*Id.* at 35-36, 39.) Similarly, Ms. Goettman billed for chat and text messages that included date confirmation. (*See, e.g.*, Doc. 70-5 at 17-18.) In addition, Ms. Goettman billed 1.0 hour for communications with co-counsel, such as emails with Terry Baker related to the motion to reset the scheduling conference, his pro hac vice application, and forwarding documents on December 5, 2018.[4] (*Id.* at 32.)

Due to the clerical nature of internal communications among those working on the action—as well as the significant number of entries related to the interoffice communication by the paralegals—

---

[4] Notably, Mr. Baker also billed for the email exchange on December 5, 2018. (Doc. 70-4 at 6.) Thus, this time for Ms. Goettman is also duplicative in nature. *See In re Mullins*, 84 F.3d at 467; *Robinson*, 717 F. Supp. 2d at 1099.

the requested fee award should be reduced. *See In re Mullins*, 84 F.3d at 467; *Gauchat-Hargis*, 2013 WL 4828594 at *3; *Mogck v. Unum Life Ins. Co. of Am*., 289 F.Supp.2d at 1194. Accordingly, based upon the Court's review of the challenged billing records, 19.5 hours will be deducted from the lodestar calculation, which includes: 0.2 hour for Terry Baker, 11.7 hours for Lisa Tyler, 6.4 hours for Kayla Goettman, 0.6 hour for Shaina Cateldge, 0.2 hour for Kimberly Riley, and 0.4 hour for Gabriela Torres.

*g. Docket review*

Entries to which Jayco objects include docket reviews by Lisa Tyler and Kayla Goettman. (Doc. 72-3 at 157, 162.) Specifically, on October 31, 2018, Ms. Tyler billed 0.2 hour for reviewing the "court website to see if any tentative issued" prior to the hearing on the motion for change of venue, and noted she "didn't see anything." (Doc. 70-5 at 36.) Ms. Goettman also billed 0.2 hour to review the docket to determine whether any hearings were continued on April 13, 2020. (*Id.* at 21.) Reviewing the docket is a clerical task, for which this Court has declined to award fees. *See, e.g., Moore v. Chase, Inc.*, 2016 U.S. Dist. LEXIS 88293, at *12 (E.D. Cal. July 7, 2016). Therefore, 0.4 hour will be deducted from the lodestar, including 0.2 hour for Lisa Tyler and 0.2 hour for Kayla Goettman.

*h. Scheduling*

Jayco identifies and challenges 16 billing entries related to scheduling depositions, and the vehicle inspection. (*See* Doc. 72-3 at 160-161; Doc. 72-3 at 126.) In September 2019, Ms. Tyler billed 0.2 hour for contacting Plaintiffs regarding scheduling a vehicle inspection, while Ms. Torres billed 0.3 hour for contacting opposing counsel to confirm the vehicle inspection date. (*Id.* at 128, 160; Doc. 70-5 at 28.) In addition, Ms. Tyler billed at total of 2.4 hours between December 2019 and March 2020 for emails to Plaintiffs and opposing counsel related to scheduling Plaintiffs' deposition dates. (*Id.* at 160-161; *see also* Doc. 70-5 at 22-25.) Kimberly Riley also billed 0.4 hours related to confirming the deposition dates. (Doc. 72-3 at 126; Doc. 70-5 at 26.)

Courts in the Ninth Circuit have repeatedly indicated that communication related to scheduling, even with a client, is a non-compensable clerical task. *See, e.g., Soler v. County of San Diego*, 2021 WL 2515236, at *10 (S.D. Cal. June 18, 2021) (identifying "time spent scheduling depositions… [as] clerical tasks non-compensable at any billing rate"); *Brown v. Cascade Mgmt., Inc.*, 2018 WL 4207097, at *5, 14 (D. Or. Sept. 4, 2018) (emails with the client regarding "deposition scheduling" were deduced

from the fee award); *Schrum v. Burlington N. Santa Fe. Ry. Co.*, 2008 WL 2278137, at *12 (D. Az. May 29, 2018) (identifying "scheduling depositions" as "tasks which the court deems clerical or secretarial, and hence not compensable as part of the attorneys' fee award"). Likewise, the Court finds communications regarding scheduling a vehicle inspection are clerical in nature. Thus, given the clerical nature of the challenged entries related to scheduling, the lodestar will be reduced by 2.6 hours for Lisa Tyler, 0.4 hour for Kimberly Riley, and 0.3 hour for Gabriela Torres.

*i. Communications with clients*

"A lawyer has an ethical responsibility to communicate with a client." *Clendon v. Astrue*, 570. F.Supp. 2d 1164, 1667 (D. Az. 2008). Nevertheless, as one district court observed, "some client communications may be considered clerical or ministerial, such as merely informing the client that a document has been filed or what a hearing date is, [while] others that are more substantive are part of an attorney's duties, and therefore billable." *See James v. City & County of Honolulu*, 2014 WL 6908313, at *10 (D.Haw. Dec. 8, 2014) (internal quotation marks omitted).

Billing entries challenged by Jayco include non-clerical communications with Plaintiffs, related to questions or case issues. By way of example, on October 4, 2018, Ms. Tyler noted she received a voicemail from Plaintiffs "regarding whether or not he should move forward with fixing the damage to his unit, while at the dealership," and billed 0.6 hour for several communications related to the phone call. (Doc. 70-5 at 37.) The Court declines to deduct the challenged time for these ongoing communications with Plaintiffs. Similarly, the Court declines to find communications with Plaintiffs regarding discovery requests and verifications and addressing the settlement agreement were purely clerical in nature.

On the other hand, eight challenged entries indisputably include clerical communications. (*See* Doc. 72-3 at 127, 154, 151, 146-45.) Ms. Riley billed 0.4 hour related to forwarding a document for signature and the needed signature from Plaintiff. (Doc. 70-5 at 27.) In addition, emailing Plaintiff simply to "confirm[] receipt of documents" was a clerical task, and the 0.2 hour billed by Ms. Tyler will be deducted. (Doc. 70-5 at 42.) Similarly, Ms. Tyler billed 0.2 hour to email Plaintiffs a declaration for signature and 0.2 hour "confirming receipt" once Plaintiffs responded on January 24, 2020. (*Id.* at 23.) Ms. Tyler also billed 0.6 hour for communications with Plaintiffs regarding the

settlement conference date and appearances. (*Id.* at 11-13) Given the clerical nature of the tasks related to scheduling, sending documents, and confirming receipt, the time billed should be omitted from the lodestar. *See, e.g. Schmidt*, 2018 WL 6593362, at *9 (emailing documents is a clerical task); *Soler*, 2021 WL 2515236, at *10 (identifying scheduling as clerical work). Thus, based upon the Court's review of the challenged billing records related to client communications, the lodestar calculation will be reduced by 0.4 hour for Kimberly Riley and 1.2 hours for Lisa Tyler.

*j. Communications with opposing counsel*

Jayco challenges two entries in "Exhibit 8" and two billing entries in "Exhibit 11" that indicate emailed communication with opposing counsel, objecting the time should not be awarded as "clerical" in nature. (*See* Doc. 72 at 9-10; Doc. 72-3 at 128.)

Specifically, Kimberly Riley billed 0.4 hour for two emails attaching document production to opposing counsel on October 13, 2019. (Doc. 70-5 at 27.) Chad David billed 0.2 hour to send the settlement agreement to Defendant's counsel on August 6, 2021. (Doc. 72-3 at 166.) Because Plaintiffs and counsel had previously executed the agreement[5], it appears Mr. David was only required to forward the document to opposing counsel. As discussed above, mailing and forwarding documents is deemed clerical work that is included in a firm's overhead costs. *See Schmidt*, 2018 WL 6593362 at *9; *see also Chavez v. Stomp*, 2014 WL 12796784, at *5 (N.M.D.C. Feb. 27, 2014) (delivering documents to opposing counsel is a clerical task for which billing at an attorney's rate "is not consistent with the obligation to exercise billing judgment"). In addition, Mr. David billed 0.2 hour for communications related to "payment instructions" for opposing counsel. (*Id.*) However, emailing payment instructions was clerical, work as it did not require any legal work or analysis of the information. Accordingly, 0.4 hour is deducted from the lodestar for Kimberley Riley and 0.4 hour is deducted for Chad David.

*k. Communications with the Court and JAMS*

This Court and others declined to award fees for communicating with the Court—such emailing or calling courtroom deputy—due to the clerical nature of the task. *See, e.g., Miller v. Schmidt*, 2017

[5] Plaintiffs executed the settlement agreement on August 3, 2021; and Mr. David executed the agreement on August 5, 2021. (Doc. 70-3 at 11.)

WL 633892, at *7 (E.D. Cal. Feb. 15, 2017) (agreeing with the party opposing the fee request that "communicating with the Court staff and court reports is purely clerical work" and excluding the time billed for communications with the courtroom deputies from a fee award); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099-1100 (D. Haw. 2010) ("communication with court staff, scheduling, and corresponding regarding deadlines, are clerical and not compensable [tasks]"); *Comcast of Illinois X v. Kwak*, 2010 WL 3781768, at *6 (D. Nev. Sept. 20, 2010) (declining to award fees for "ministerial tasks such as contacting court staff for scheduling reasons or noting due dates").

Ms. Tyler billed 0.2 hour on several occasions for contacting the court, both by email or phone call. For example, on September 14, 2018, Ms. Tyler billed 0.2 hour for her "[e]mail to court regarding appearing telephonically" and another 0.2 hour for her "response to [the] clerk confirming Plaintiff can appear telephonically." (Doc. 70-5 at 39.) On November 21, 2018, Ms. Tyler billed 0.2 hour for emailing the court clerk regarding the status of an order, and 0.2 hour for leaving a voicemail regarding the status with a request for a return call. (*Id.* at 34.) She billed another 0.3 hour for contacting the court with status requests on November 26, 2018. (*Id.*) Ms. Tyler billed 0.2 hour for review of "court emails" on April 5, 2019. (*Id.* at 32.) Further, between June 30 and July 9, 2021, Ms. Tyler billed 1.9 for contacts regarding the conference, availability, inquiring whether only Kevin Scott could appear during the conference, confirming the date, and Zoom information. (*Id.* at 10-13.) Given the clerical nature of these communications, 3.2 hours shall be deducted from the lodestar for Ms. Tyler. *See Miller*, 2017 WL 633892, at *7; *Robinson*, 717 F. Supp. 2d at 1099-1100.

In addition, Cindy Lewandowski billed 0.2 hour for forwarding an email from the Court that informed the parties there would be no jury trials in April 2021, and asking Mr. Baker to respond as soon as possible for calendaring purposes. (Doc. 70-5 at 17.) Given the communications concerned scheduling, 0.2 hour will be deducted from the fee award for Ms. Lewandowski.

Likewise, given the quasi-judicial nature of JAMS, and communications between Plaintiffs' counsel and the mediation organization—and actions related thereto—appear clerical. Ms. Goettman billed 0.2 for her review of the "mediation confirmation from JAMS and confirm[ing] details on [the] calendar." (Doc. 72-3 at 160; Doc. 70-5 at 26.) She also billed 0.2 hour to "[r]eview the JAMS deposit request form" and "update [the] costs in the case file." (*Id.* at 160; Doc. 70-5 at 25.) Ms. Riley billed

0.2 hour for her receipt of an email from JAMS and saving it to the firm's system. (*Id.* at 126; Doc. 70-5 at 27.) There is nothing suggesting review of the mediation confirmation, confirming the date, or noting the cost in the firm's file requires the work of a paralegal. Thus, the 0.4 hour billed by Ms. Goettman and the 0.2 hour billed by Ms. Riley related to communications from JAMS will also be omitted from the fee award.

*l. Document preparation and mailing*

On July 9, 2018, Ms. Goettman billed 0.3 hour to "[f]ill out Summons & attach proof of return receipt from the certified mailing; upload to the case files." (Doc. 72-3 at 154; Doc. 70-5 at 42.) It is unclear what Ms. Goettman filled out, as the Summons was issued by the Court on June 22, 2018. (Doc. 2.) Regardless, the Ninth Circuit identified "preparing and serving summons" as "purely clerical tasks." *Neil v. Comm'r of Soc. Sec.*, 495 F. App'x 845, 847 (9th Cir. 2012). In addition, tasks related to mailing and drafting a certificate of service are clerical. *Acosta v. Martinez*, 2020 WL 1026890 at *10 (E.D. Cal. Mar. 2, 2020) ("drafting certificates of service… and sending documents" are clerical tasks). Therefore, this time billed by Ms. Goetteman will be deducted.

Ms. Tyler billed 0.2 hour to complete a form declining consent to magistrate judge jurisdiction and e-file it on August 22, 2018. (Doc. 70-5 at 40; Doc. 72-3 at 155.) The Court's consent form is a single-page, check-the-box document could not take more than moments to complete. Previously, this Court noted that "completing and filing a consent to proceed before a magistrate judge form" is work that may be "completed by experienced support staff," but allowed minimal billed time, considering the documents should be review by a counsel. *Kirk*, 244 F.Supp.3d at 1084. On the other hand, e-filing the form, as discussed above, is clerical work. *Nadarajah*, 569 F.3d at 921. Thus, the Court will deduct 0.1 for Ms. Tyler for the e-filing. *See Calderon v. Astrue*, 2010 WL 4295583 at *5 (E.D. Cal. Oct. 22, 2010) (permitting only 0.1 hour for completion of the form regarding magistrate judge jurisdiction). Likewise, the Court will deduct the challenged 0.2 hour billed by Ms. Tyler to draft the certificate of service for Plaintiff's initial disclosures and 0.2 hour for generating a mailing label due to the clerical nature of the work. (Doc. 72-3 at 155, 157, Doc. 70-5 at 33, 39.)

Conversely, the preparation of representation agreements and declarations is not *purely* clerical work, as it is appropriate for paralegals and counsel to prepare such agreements. The Court declines to

deduct the challenged billed time related to preparation of these documents. Based upon the Court's review of the challenged entries related to document preparation, 0.8 hour will be deducted from the lodestar calculation, which includes 0.3 hour for Kayla Goettman and 0.5 hour for Lisa Tyler.

*m. Discovery*

Jayco objects to the time billed by Gabriela Torres related to discovery and preparation of "discovery shells," including an entry for 6.0 hours, asserting it was clerical work. (Doc. 72 at 8.) However, the Court declines to assume the identified tasks were purely clerical in nature. Indeed, the challenged billing entries indicates the work completed by Ms. Torres included preparing "rough responses" to the written discovery requests from Jayco, including responses interrogatories and requests for production of documents. (*See* Doc. 70-5 at 30.) Because this work is not purely clerical, the lodestar will not be reduced. *See, e.g., Chloe SAS v. Sawabeh Information Servs. Co.*, 2015 WL 12763541, at *26 (C.D. Cal. June 22, 2015) (hours billed by professional staff for collecting and reviewing discovery was not clerical, and were "substantive case-related tasks"); *Triplett v. N.C. Dept' of Pub. Safety*, 2017 WL 3840422, at *11 (W.D.N.C. Aug. 31, 2017) (declining to reduce a fee award for billing entries challenged to which the defendant objected as clerical because"[t]he drafting and editing of discovery requests and answers… is far from a clerical task and is a task appropriate delegated to a paralegal").

*n. Tasks related to admission*

Jayco objects to the time billed by Ms. Tyler for her "[r]eview [of] Indiana Northern district for admission requirements," which she then printed for Mr. Dupart. (Doc. 72-3 at 157.) In addition, Jayco objects to the time billed by Mr. Baker for contacting Ohio attorney services regarding a certificate of good standing as clerical. (*Id.* at 158.) Previously, the Ninth Circuit indicated tasks related to "attorney admission" are clerical in nature. *See Nadarajah*, 569 F.3d at 921 (reducing the requested fee award for the time award billed by a paralegal related to counsel's admission). Based upon the clerical nature of the tasks concerning Mr. Dupart's admission to the Northern Indiana District Court, the 0.2 hour billed by Lisa Tyler and 0.2 hour billed by Terry Baker will be deducted from the lodestar calculation.

///

*o. Mixed entries with block-billed tasks*

As explained by one district court, "[b]lock billing, which bundles tasks in a block of time, makes it extremely difficult for a court to evaluate the reasonableness of the number of hours expended." *Aranda v. Astrue*, 2011 U.S. Dist. LEXIS 63667, at *13 (D. Ore. June 8, 2011); *see also Welch v. Metro. Life Ins. Co*., 480 F.3d 942, 948 (9th Cir. 2007) ("block billing makes it more difficult to determine how much time was spent on particular activities"). In addition, a court may reduce a fee award when "documentation of hours is inadequate." *Hensley*, 461 U.S. at 433. Accordingly, the Ninth Circuit has explained that, where time is billed in "blocks," the Court may "simply reduce[] the fee to a reasonable amount." *Fischer v. SJB-P.D. Inc*., 214 F.3d 1115, 1121 (9th Cir. 2000); *see also Welch*, 480 F.3d at 948 ("We do not quarrel with the district court's authority to reduce hours that are billed in block format.").

Although the Court addressed several block-billed entries above that included only clerical tasks, there were also many challenged entries that involved legal research. As identified below, Ms. Goettman and Ms. Tyler billed for performing legal research—including reviewing local rules and the Federal Rules—which is not clerical work. *See Nechitaylo v. Wedum Family Ltd. P'ship*, 2015 WL 8479627, at *2 (E.D. Cal. Dec. 10, 2015) (finding "tasks involving legal research" were not clerical); *Chloe SAS*, 2015 WL 12763541, at *26 (fees billed by staff who assisted counsel "performing legal research" were recoverable). Thus, to the extent the billed records below involve legal research, such time is compensable.

| DATE | BILLER | TASK | TIME |
|---|---|---|---|
| 6/28/18 | KG | Review FRCP 4 re service of the Summons and Complaint; the rule states that we can follow state rules regarding service. Print Docket No. 1-4 and give all to SJ in addition to Jayco's registered agent information for certified mailing to D today | 0.6 |
| 9/27/18 | LT | Review local rule re motion deadlines and saved to Merus. Calendared motion and deadlines. Uploaded and saved motion docs to file. Print hard copy for RD, and noted d/l to file oppo on docs. Also printed rules for him, and summary of calendar of events with upcoming deadlines, etc. Put on his chair for review. | 0.7 |
| 4/1/21 | LT | Review TB's email regarding dates for matter. Check file, and saw trial date and pre-trial needed to be calendared, with related deadlines. Email response to TB and updated him dates needed to be added. Review file for docs, and emails from the court, to figure out dates to be calendared, and for related deadlines to be saved…. | 1.5 |

| | | | |
|---|---|---|---|
| | | Review order #45. Review local rules. Updated notes, calendar and d/l sheet, and saved notes to file. | |
| 6/4/21 | LT | Review local forms for appearance/withdrawal for eastern, and there weren't any. Found Central, but that won't work. Kept trying to find forms. Found general one for appearance and drafted for CD review. Went ahead and revised a withdrawal on pleading, that way if CD wants to mess with language, he can. Uploaded/saved docs to file, and updated chat. | 0.6 |
| 6/21/21 | LT | Link court email and saved Doc#61 to file. Review order signed by court. Review local rule re settlement conference. Review doc #45. Review dept. rules. Updated notes, calendar, and d/l sheet. | 0.6 |

Where, as here, the billing records present time in blocks, the Court may "simply reduce[] the fee to a reasonable amount." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000); *see also Welch*, 480 F.3d at 948 ("We do not quarrel with the district court's authority to reduce hours that are billed in block format"). Because the firm billed in a minimum of 0.2 hour increments—as discussed further below—the Court will deduct 0.2 hour from each of the above entries to reflect the inclusion of clerical tasks, such as printing, uploading. and saving documents; file reviews and updates; calendaring deadlines; and internal communications about clerical matters. This results in a reduction of the lodestar by 0.2 hour for Ms. Goettman and 0.8 hour for Ms. Tyler.

<u>4. Vague entries and overbilling</u>

Jayco asserts that it "identified a number of entries in … counsel's records that are vague and lack sufficient specificity about what was done to justify the time and fees billed." (Doc. 72 at 11.) As discussed above, counsel has a burden to document the hours expended, and do so in "in a manner that will enable a reviewing court to identify distinct claims." *Hensley*, 461 U.S. at 437. The Court may reduce hours to offset the "poorly documented" billing. *Fischer v. SJN-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000); *see also Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008) (finding district courts have broad discretion to reduce the number of hours included in the fee award where the billing records are vague, insufficiently descriptive, or inflated).

This Court and others in the Ninth Circuit have reduced fee awards where the billing entries were too vague to conduct "a meaningful review" or determine whether the time expended was reasonable. *See, e.g., McCarthy v. R.J. Reynolds Tobacco Co.*, 2011 WL 4928623, at *4 (E.D. Cal. Oct. 17, 2011) (reducing time for a fee award where "most of the entries refer only generally to 'legal

research' and 'conversations with [co-counsel]' without identifying the subject of the research or conversations"); *Nolan v. City of Los Angeles*, 2014 WL 12564127, at *7 (C.D. Cal. Feb. 10, 2014) (criticizing "entries that merely indicate that an email was sent or that a phone call was made without describing in any way the reason for or topic of the particular correspondence" and reducing the lodestar); *Davis v. Prison Health Serv*., 2012 WL 4462520, at *11 (N.D. Cal. Sept. 25, 2012) (concluding billing entries were "too vague to enable the Court to assess the reasonableness of the time claimed" when there were "scores of time entries such as 'review e-mail from opposing counsel,' 'review e-mail chain,' and 'draft e-mail' without any further detail provided").

Jayco contends the billing records the billing records of Plaintiffs' counsel also are vague, warranting a reduction in fees. (Doc. 72 at 10-12.) Specifically, Jayco asserts:

> Plaintiff counsel's billing contains numerous entries that say "E-mail client", "E-mail opc", or "E-mail exchange with...", without providing any details as to the substance of the communication. There are also entries that are devoid of any information as to what tasks were specifically performed such as a description on 8/21/19 that is simply "Scott v. Jayco" for .5 hours. The vagueness of these and other similarly deficient billing entries makes it impossible for the Court to assess whether the time claimed by Plaintiffs' counsel was reasonably expended.

(*Id.* at 12.) Jayco compiled 99 billing entries it asserts should be stricken as vague in "Exhibit 12," totaling 27.9 hours. (*See id.*; *see also* Doc. 169-71.) In addition, Jayco contends "there are numerous examples of billing entries that typical would be billed at .1 even though 6 minutes is more than what it would take to complete a task," such as calling Plaintiffs and leaving voice messages and calendaring deadlines. (*Id.* at 12.) Thus, Jayco "requests a 75% reduction due to the considerable vague nature of the excessive billing entries in Exhibit 12 where the lack of specificity severely interferes." (*Id.*)

In response, Plaintiffs argue that "many of the entries are sufficiently specific" in Exhibit 12. (Doc. 73 at 6.) For example, Plaintiffs observe: "Billing entries such as "Email D" or "Email OPC" are well known to mean email Defendant and email Opposing Counsel." (*Id.*) Plaintiffs contend: "All correspondence with opposing counsel is recoverable billing. Further specificity of the entries is not necessary when Defense counsel has records of the emails received that correspond to the billing entries." (*Id.*) Plaintiffs also assert "any further specificity on the billing entries more than 'email opc' or 'spoke with client' would lead to issues concerning attorney-client privilege and the attorney

work product doctrine." (*Id.*) Finally, Plaintiffs observe that "defense counsel makes no arguments that any of the alleged vague billing entries did not in fact occur as they also have records of the communications that were billed for." (*Id.*) Therefore, Plaintiffs "request[] that no billing entries be disallowed due to being vague." (*Id.*)

Significantly, Jayco's presentation of the challenged billing entries in Exhibit 12—pulling the entries out of the chronological order from the original billing records and reorganizing them into alphabetical order of the identified tasks—gives the appearance that the billing records are more vague than, in fact, they are. Review of the challenged entries in the context of the original billing records provides clarity as to many of the topics of communications with Plaintiffs and opposing counsel. For example, Jayco challenges three entries that state "Email D" on September 13, 2018 as vague. (Doc. 72-3 at 169.) However, the billing records clearly indicate Plaintiffs' counsel and Defendant's counsel were engaged in ongoing communications that day related to preparation of and revisions to the Joint Scheduling Report (*See* Doc. 70-5 at 39-40.) Similarly, Jayco challenges 12 entries related to communications between July 13 and July 15, 2021, including calls, voice messages, and emails to Plaintiffs and opposing counsel. (Doc. 72-3 at 169-71.) Other entries with these in the billing records show the challenged entries were a portion of ongoing communications regarding settlement, prior to the parties notifying the Court that the action settled on July 15, 2021. (*See* Doc. 70-5 at 9-10; *see also* Doc. 64 [indicating the parties informed the Court on July 15 that a settlement was reached, and vacating the settlement conference for July 16].) A simple review of the original billing records also easily reveals the topics of ongoing communications challenged in Exhibit 12 including, but not limited to: emails with opposing counsel regarding the motion to transfer venue, discussion regarding the parties' stipulation to transfer the action back to the Eastern District, preparation prior to a settlement conference, and email exchanges with Plaintiffs concerning availability. (*E.g., compare* Doc. 72-3 at 169-171 *with* Doc. 70-4 at 7, Doc. 70-5 at 9, 13-14, 19-20.) Consequently, the Court declines to find the billing records are poorly documented or too vague to evaluate.

On the other hand, the Court notes that counsel and the professional staff billed a minimum of 0.2 hour for each task. This is comparable to the quarter-hour billing repeatedly criticized by the courts, because it inflates the time billed on the matter. *See e.g., Welch v. Metro Life Ins. Co.,* 480 F.3d

942, 949 (9th Cir. 2007) (affirming a reduction after finding the billing practice inflated the time recorded); *Robinson v. Plourde,* 717 F. Supp. 2d 1092, 1100-01 (D. Haw. 2010) (applying a 20% reduction for billing with a minimum of 0.25 hour); *Prudential Ins. Co. v. Am. v. Remington,* 2014 WL 294989 at *4 (E.D. Cal. Jan. 24, 2014) (also applying a 20% reduction where counsel billed a minimum of 15 minutes and in 15-minute increments).

In *Welch*, the district court "imposed a 20 percent across-the-board reduction on [the] requested hours" because the law firm "billed in quarter-hour increments." *Welch,* 480 F.3d at 948. The court concluded the "practice of billing by the quarter-hour resulted in a request for excessive hours . . . because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time." *Id.* The Ninth Circuit also reviewed the time sheets and noted: "Our own review of the time sheet confirms that it is replete with quarter-hour or half-hour charges for the drafting of letters, telephone calls and intraoffice conferences." *Id*. Therefore, the Court affirmed the reduction for quarter-hour billing. *Id.*

The thorough review of counsel's billing records strongly suggests the 0.2 hour minimum resulted in overbilling. Counsel and professional staff billed 12 minutes on numerous occasions for voices messages, reviewing minute orders, more than 50 emails[6]. (*See e.g.*, Doc. 70-5 at 6; Doc. 70-5 at 8-9, 13-15, 20, 22.) Notably, Plaintiffs do not disavow a practice of billing a 0.2 hour minimum or otherwise address Jayco's arguments concerning how the practice results in overbilling in the reply. In *Remington,* this Court observe that "15-minute billing for reading the three-sentence Minute Order, which should have been read in 30 seconds or less time, obviously inflated the time spent performing that task, and causes concern that other unverifiable tasks likely took a fraction of the time billed to complete." *Remington*, 2014 WL 294989 at *4. Similarly, billing 12 minutes for noting a minute order to the file (*see, e.g.* Doc. 70-5 at 36) suggests the reported time was inflated significantly by the 0.2 hour billing minimum on other tasks such as reviewing emails, leaving a telephone message, and telephone conferences with Plaintiffs and co-counsel. *See id; Welch*, 480 F.3d at 948-49. Therefore, the remaining time reported by counsel is reduced by 15% for purposes of the lodestar calculation.

[6] This excludes intraoffice emails addressed above.

5. Unsupported and "anticipated" time

Plaintiffs contend, "It is well established that Plaintiffs are entitled to fees for bringing in this motion to enforce their right to attorney fees." (Doc. 71 at 14, citing *Serrano v. Unruh*, 32 Cal.3d 621, 637-639 (1982); *State v. Mayer*, 174 Cal.App.3d 1061, 1075 (1986).) Therefore, Plaintiffs seek "an additional $7,500 for bringing [the] Motion, reviewing Jayco's Opposition to Plaintiffs' Motion, drafting Plaintiffs' Reply, preparing and attending any related hearing, preparing any needed filings to satisfy the order, for time to wrap up the settlement and ultimately collect any amount awarded by this Court." (*Id.* at 6.)

Importantly, Plaintiffs failed to provide any evidence with the Reply related to the time actually spent preparing the motion, reviewing the opposition, and drafting the brief. In addition, the motion was taken under submission without oral arguments. (Doc. 74.) The Court declines to speculate as to the actual time spent by counsel in preparation of the instant motion and the reply, as it is the fee applicant's burden to present evidence to support the fee request. *See Hensley*, 461 U.S. at 424; *Welch*, 480 F.3d at 945-46. Accordingly, the Court declines to bolster the lodestar with the monetary amount requested.

**B. Hourly rates**

The Supreme Court determined attorney fees are to be calculated with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *see also PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1096 (2000) ("[t]he reasonable hourly rate is that prevailing in the community for similar work"). The fee applicant has the burden to establish the rates are reasonable within the community, and meets this burden by "produc[ing] satisfactory evidence—in addition to counsel's own declarations—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11. For example, the Court may refer to "[a]ffidavits of the plaintiffs' attorney and other attorneys regarding fees in the community" and rates paid in other cases. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th

Cir. 2008). Thus, when a case is filed in this Court, the Eastern District of California "is the appropriate forum to establish the lodestar hourly rate." *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011); *see also Gordillo v. Ford Motor Co.*, 2014 WL 2801243 (E.D. Cal. June 19, 2014). The court may apply "rates from outside the forum… 'if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case.'" *Barjon v. Dalton*, 132 F.3d 496 (9th Cir. 1997) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).

1. Rates for counsel

Although the Law Offices of Jon Jacobs is currently located in Temecula, California—which is within the Central District of California—the law office was headquartered near Sacramento when the complaint was filed. (*See* Doc. 1 at 1; Doc. 73 at 4.) Thus, the Court finds, for purposes of this motion, that counsel were "local" to the Eastern District, such that the Court need not determine whether rates outside the form are applicable. Rather, the Court must evaluate whether the hourly rates requested are reasonable for the Eastern District of California.[7]

The attorneys on this action seek hourly rates ranging from $350 to $650. (Doc. 71 at 7-8.) Specifically, Mr. Jacobs seeks the hourly rate of $495 for the 2.2 hours of work he completed in 2018 and the rate of $550 for his 0.6 hour of work in 2021. (*See* Doc. 71 at 8; Doc. 70-4 at 7, 9, 43.) Mr. Baker reports his "hourly rate started at $525, and increased to $650 per hour…[i]n March of 2020." (Doc. 70-4 at 3, Baker Decl. ¶ 12.) In addition, Plaintiffs seek $495 per hour for work completed by Rene Dupart, who was admitted to the California State Bar in 2013, and Elana Midda, who was admitted to the bar in December 2004.[8] (Doc. 70-5 at 4, Jacobs Decl. ¶ 19.) In addition, they seek $175 per hour for work completed by Chad David while he was a law clerk, and $350 per hour for work completed after his admission to the Bar in November 2019. (Doc. 70-3 at 2, David Decl. ¶¶ 7-

[7] With the Eastern District, the Sacramento Division and Fresno Division award comparable rates. *See Fitzgerald v. Law Office of Curtis O. Barnes*, 2013 WL 1627740, n.5 (E.D. Cal. Apr. 15, 2013) (observing that "[c]ases from this Court's Sacramento Division largely mirror the rate determinations from the Fresno Division").

[8] Plaintiff did not provide any information regarding when Elana Midda began practicing law. However, the Court "may take judicial notice of the State Bar of California's website regarding attorneys' dates of admission to the Bar." *Davis v. Hollins Law*, 25 F.Supp.3d 1292, 1298 n. 5 (2014). Thus, the Court takes judicial notice of the admission date of Elana Midda as December 2004, as represented on the website of the State Bar of California. *See id.*; Fed. R. Evid. 201(b).

8; Doc. 71 at 7-8.)

Jayco objects to the hourly rates sought by Plaintiffs' counsel "are unreasonable compared to what small litigation firms bill and should be adjusted accordingly." (Doc. 72 at 4.) According to Jayco, "there is no indication in any of the moving papers that the rates being sought here by Plaintiffs' counsel are their usual and customary rates and that their clients routinely pay these rates or that any court has awarded them these rates." (*Id.*, emphasis omitted.) Jayco observes: "Mr. Jacob's Declaration and Mr. Baker's Declaration both lack any sort of information to identify which cases, if any, they have been awarded the requested hourly rates or the outcome of court rulings on prior fee motions." (*Id.* at 5.) Further, Jayco notes that in *Flores v. FCA US LLC*, "this Court granted in part an attorneys' fees motion and reduced a fee request," finding reasonable hourly rates for "in the Eastern District of California's Fresno Division … generally rang[e] from $250 to $400 for attorneys." (*Id.* at 5-6, citing *Flores*, 2019 U.S. Dist. LEXIS 203497 (E.D. Cal. Nov. 19, 2019).)

In reply, Plaintiffs' contend "the *Flores* case is readily distinguishable to the case at hand both factually and in regards to the basis of the attorney fees sought." (Doc. 73 at 4.) Plaintiffs observe: "Flores involved a Dodge RAM passenger vehicle that was purchased in California and contained a known defect," and "[f]rom all records available, it appears *Flores* was a 'simple' lemon law case." (*Id.*, citing *Flores*, 2019 U.S. Dist. LEXIS 203597, at *4.) In addition, Plaintiffs contend, "[i]n August of 2020, the Eastern District of California found that Mr. Jacobs' and Mr. Baker's hourly rate for lodestar purposes to be $505 per hour." (*Id.* at 3, citing *Seebach v. BMW of N. Am., LLC*, 2020 U.S. Dist. LEXIS 152330 at *9, 2020 WL 4923664 at *3 (E.D. Cal. Aug. 21, 2020).) Plaintiffs assert, "In *Seebach*, the Court also confirmed the rates of attorney Ryan Gomez of $300 and $350 per hour who has the same level of experience as attorney Chad David at the time." (*Id.* at 3-4.)

Previously, the Court observed: "A recent comprehensive analysis of attorney's fees in this district found the following hourly rates to be reasonable: $450 for partners with at least 20 years of experience; $400 for partners with between 10 and 20 years of experience; and $250 for associates with between four and 10 years of experience." *Price Simms Holdings v. Candle3*, 2021 WL 1884995, at *2 (E.D. Cal. May 11, 2021), citing *Firstsource Sols. USA, LLC v. Tulare Reg'l Med. Ctr.*, 2019 WL 2725336, at *8 (E.D. Cal. June 28, 2019); *but see Acosta v. Perez*, 2021 WL 3910543, at *12 (E.D. Cal.

Sept. 1, 2021) ("District Judge Anthony W. Ishii … surveyed prevailing rates in this district and found that reasonable hourly rates … are between $175 and $380, depending on the attorney's experience and expertise, with $300 being the upper range for attorneys with 10 years or less experience"). However, as Plaintiffs assert, this Court recently awarded higher hourly rates to counsel in *Seebach*.

In *Seebach*, the plaintiffs were also represented by Jon Jacobs and Terry Baker in a lemon law action filed originally in December 2017. *See id.*, 2020 WL 4923664 at *2-3. The parties reached a settlement, but "could not agree on a reasonable attorneys' fee amount" and filed a motion for fees. *Id.* at *1. Counsel requested hourly "rates ranging from $350 to $650 per hour for work performed on the case," including $650 per hour for Mr. Baker and $550 per hour for Mr. Jacobs, $400 for an attorney "with roughly one year of experience," and $300 to $350 per hour for an attorney "with roughly 4 years of experience." *Id.* at *3. The Court noted opined the "requested rates [were] not reasonable for lodestar purposes." *Id.* Given the experience of Mr. Jacobs and Mr. Baker—which each had "roughly 20 years of experience"—the Court reduced their hourly rate to $505, noting it was taking into account state court judgments cited by Mr. Baker in which he was awarded $475 to $505 per hour in similar actions. *Id.* In addition, the Court reduced the hourly rate of Mr. Walker to $200 to reflect that he had "one year and two months of experience litigating." *Id.*

Based upon the Court's prior surveys of hourly rates awarded in this district, Plaintiffs fail to demonstrate the reasonableness of the rates requested by counsel, and the hourly rates must be adjusted to rates that are reasonable in this forum to calculate the lodestar. *See Seebach,* 2020 WL 4923664, at *3. John Jacobs seeks the rate of $495 per hour for his work completed in 2018, and $550 for his work completed in 2021. (*See* Doc. 71 at 8.) As previously noted, Mr. Jacobs has practiced law for more than 20 years. This Court found the reasonable rate for attorneys in the Eastern Division was "$450 for partners with at least 20 years of experience." *See Price Simms Holdings*, 2021 WL 1884995 at *2, citing *Firstsource Sols. USA, LLC*, 2019 WL 2725336 at *8 (E.D. Cal. June 28, 2019); *see also Eagle Sys. & Servs. v. Int'l Assoc. of Machinists,* 2017 WL 1213373 at *3 (E.D. Cal. Mar. 31, 2017) (finding the rate of $450 was acceptable in this district "for partners with 20 to 35 years of experience"). Therefore, the hourly rate for work completed by Mr. Jacobs in 2018 will be reduced to the rate of $450. In addition, his hourly rate for work completed in 2021 will be reduced to $505, to

align with the hourly rate previously approved as reasonable for Mr. Jacobs by this Court. *See Seebach*, 2020 WL 4923664, at *3. Likewise, the hourly rates requested by Mr. Baker will be reduced to $505 to mirror the fees awarded in *Seebach* and the state court judgments previously reviewed by the Court. *See id.*

The requested hourly rate of $495 for Elana Midda and Rene Dupart must also be reduced to be reasonable for this forum. The rate for Ms. Midda, who was admitted to practice in 2004 and had approximately 14 years of experience when she worked on the action, will be reduced to $350 per hour. *See In re Taco Bell Wage & Hour Actions*, 222 F. Supp. 3d 813, 839 (E.D. Cal. 2016) (noting courts in the Eastern District have awarded attorneys "with less than fifteen years of experience … $250.00 to $350.00 per hour"); *see also Estrada v. iYogi, Inc.*, 2016 WL 310279, at *6 (E.D. Cal. Jan. 26, 2016) (approving $400 requested rate for attorneys with as much as 19 years of experience). Similarly, the hourly rate will be reduced to $250 for Mr. Dupart, who had been admitted to the bar for approximately five years when he worked on the action in 2018. *See Perkins v. City of Modesto*, 2020 WL 4547325, at *2 (E.D. Cal. Aug. 5, 2020) (finding "$250 per hour to be a reasonable rate" for an attorney who "had been licensed for fewer than seven years" when the fees were incurred); *Lowery v. Account Outsourcing Group, LLC*, 2018 WL 3769430 at *2 (E.D. Cal. Aug. 9, 2018) (finding the requested rate of $250 was appropriate for a lawyer who had been "a consumer protection attorney" for three years); *Mike Murphy's Enters., v. Fineline Indus*, 2018 WL 1871412, at *3 (E.D. Cal. Apr. 19, 2018) (case awarding the hourly rate of $250 for an attorney who had been practicing for seven years); *see also Seebach*, 2020 WL 4923664, at *3 (noting that for an attorney with 4 years of experience, $300 was "within the reasonable range for the Sacramento market," though it is unclear what year(s) these fees were incurred).

Finally, the hourly rates for Chad David, who was admitted to the bar in November 2019 exceed those awarded in this forum. When Mr. David began working on the action, he was a law clerk with the firm. Although the Court approved the requested rate of $175 in *Seebach*, the Court noted this rate was "for a *certified* law clerk." *Seebach*, 2020 WL 4923664 at *3 (emphasis added). Here, there is no evidence that Mr. David completed the process to become a certified law clerk with the California bar. Thus, the Court finds the hourly rate should be reduced to $125 for his work prior to admission to the

bar. *Compare Lowery v. Account Outsourcing Group, LLC*, 2018 WL 3769430 at *2 (E.D. Cal. Aug. 9, 2018) (awarding the hourly rate of $125 to a law clerk) *with Seebach*, 2020 WL 4923664 at *3 (awarding the rate of $175 for a certified law clerk). Further, as of the filing of the reply to this motion, Mr. David had been practicing law for only two years. The requested hourly rate for Mr. David once he was admitted to the bar is reduced to $200, to be within the reasonable range for the Eastern District. *See Seebach*, 2020 WL 4923664, at *3 (reducing the requested hourly rate of $400 to $200 for an attorney who had less than two years of practicing law).

2. <u>Paralegals</u>

Plaintiffs seek an hourly rate of $150 for each of the paralegals on the action. (Doc. 71 at 7-8.) Mr. Baker reports that he has "charged $150 per hour for paralegal time for at least seven years" and "received that amount in nearly every settlement with every major vehicle, motor home, RV, and boat manufacturer." (Doc. 70-5 at 3, Jacobs Decl. ¶ 12.) In addition, Mr. Baker stated he "obtained that rate in a fee motion in Sacramento County." (*Id.*, citing *Brown v. FCA US LLC*, Case No. 34-2016-00202429.) Jayco objects to the rate and requests it be reduced to $115. (Doc. 72 at 6.)

Notably, Plaintiffs' counsel report—without identifying any supporting evidence or documentation—"the contingency fee agreement signed by the Plaintiffs specifically provides for the billing of paralegal time at $150.00 an hour." (Doc. 71 at 13.) However, Mr. Scott reports that the "Letter of Engagement" he signed with the Law Offices of Jon Jacobs made it "clear" that Plaintiff "would not pay a penny out of [his] pocket for their legal services or costs." (Doc. 71-1 at 1-2, ¶ 5.) Thus, it is not clear whether Plaintiffs agreed they would pay $150 per hour for paralegals' work on the action, or if they simply acknowledged this was the hourly rate typically billed by the firm. Regardless, any agreement between Plaintiffs and counsel is not dispositive of the issue of whether fees requested are reasonable. Instead, the Court has an obligation to determine whether a proposed hourly rate is reasonable for the forum. *See Gates*, 987 F.2d 1390; *Moreno v*, 534 F.3d at 1111.

Paralegal rates within the Eastern District range between $75 to approximately $150.00, depending on experience. *Schmidt v. City of Modesto*, 2018 WL 6593362, at *6 (E.D. Cal. Dec. 14, 2018) ("the reasonable rate of compensation for a paralegal would be between $75.00 to $150.00 per hour depending on experience"); *see also Phillips 66 Co. v. Cal. Pride*, 2017 WL 2875736, at *15

(E.D. Cal. July 6, 2017) (identifying the same range of hourly rates); *Trujillo v. Singh*, 2017 WL 1831941 at *3 (E.D. Cal. May 8, 2017) (finding requested hourly rates of $95-115 were reasonable within the Eastern District). Although the requested rate is within the range approved by this district, Plaintiffs' counsel fails to provide any information regarding the levels of education or experience for the paralegals. The Court is unable to assume, as counsel would have it, that the hourly rate awarded in prior actions was to the same paralegals, or to individuals with the same level of experience. Without such information, Plaintiffs fail to show an hourly rate at the highest end of the spectrum is appropriate. *See, e.g,, Freshko Produce Servs. v. ILA Prods*, 2021 WL 4033176, at *4 (E.D. Cal. Sept. 2, 2021) (approving $150 per hour as reasonable "for a paralegal with more than 30 years of experience" for purposes of calculating the lodestar).

When counsel has failed to provide information related to the experience of paralegals, the Court has reduced the requested fee award to the lower end of the hourly rate range. *See, e.g., Englert v. City of Merced*, 2020 WL 2215749, at *13 (E.D. Cal. May 7, 2020) (rejecting the requested rate of $125 to $150 per hour for the paralegals and reducing them to $75 when the plaintiffs "provided no information on the experience of the paralegals"); *Freshko Produce Servs. v. Write on Mktg.*, 2019 WL 3798491 at *3 (E.D. Cal. Aug. 13, 2019) (finding the proposed hourly rate of $150 was not reasonable because counsel "fail[ed] to identify the education and experience of [the] paralegal to justify the upper rate of $150," and adjusting the hourly rate to $100); *Mora v. Cal W. Ag Servs., Inc*., 2019 WL 2084725, at *9 (E.D. Cal. May 13, 2019) (applying adjusted rate for paralegals of $100 per hour where counsel failed to identify the experience of the paralegals). Because counsel has not provided any information regarding the education and experience of *any* of the paralegals who worked on this action, the hourly rate for each paralegal will be reduced to $100. *See Freshko Produce*, 2019 WL 3798491 at *3; *Mora*, 2019 WL 2084725, at *9.

Based upon the Court's prior surveys of the attorney fees awarded in the Eastern District and the Court's own knowledge, these hourly rates are reasonable for the tasks completed by counsel and the professional staff in this action. *See Roach*, 2017 WL 5070264 at *9; *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates).

**C. Lodestar Calculation**

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida* , 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Laffitte v. Robert Half Int'l*, 1 Cal. 5th 480, 489 (2016). With the time and rate adjustments set forth above, the lodestar in this action is **$67,634.35**:

| LEGAL PROFESSSIONAL | HOURS | RATE | LODESTAR |
|---|---|---|---|
| Jon Jacobs (2018) | 1.87 | $450 | $841.50 |
| Jon Jacobs (2021) | 0.17 | $505 | $85.85 |
| Terry Baker | 109.10 | $505 | $55,095.50 |
| Chad David (as a law clerk) | 0.34 | $125 | $42.50 |
| Chad David (after admission) | 21.34 | $200 | $4,268.00 |
| Rene Dupart | 16.75 | $250 | $4,187.50 |
| Jon Feely | 0 | N/A | N/A |
| Elana Midda | 1.87 | $350 | $654.50 |
| Nicolas Dillavou | 0 | N/A | N/A |
| Lisa Tyler | 7.65 | $100 | $765.00 |
| Gabriela Torres | 9.18 | $100 | $918.00 |
| Kimberly Riley | 1.81 | $100 | $181.00 |
| Kayla Goettman | 3.91 | $100 | $391.00 |
| Cindy Lewandowski | 0 | N/A | N/A |
| Shaina Cateldge | 2.04 | $100 | $204.00 |
| | | | |
| **TOTAL** | | | **$67,634.35** |

**D. Application of a multiplier**

Plaintiffs request that the lodestar figure be enhanced by a multiplier of 1.5. (Doc. 71 at 9.) Once a court has calculated the lodestar, "it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Laffitte,* 1 Cal.5th at 504 (citation omitted); *see also Ketchum v. Moses*, 24 Cal.4th 1122, 1132 (2001) (indicating the court may adjust the fee award considering "the following factors: (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award"). The party seeking a lodestar enhancement bears a "heavy" burden to overcome the "strong presumption" that the lodestar is reasonable. *Stewart v. Gates*, 987 F.2d 1450, 1453 (9th Cir. 1993).

Plaintiffs contend, "This case calls for a multiplier to enhance the lodestar fee amount." (Doc. 71 at 9.) According to Plaintiffs, "Lemon Law litigation is a specialized field that involves complex interplay between state and federal consumer statutes and the Uniform Commercial Code as interpreted by state and federal courts." (*Id.*) In addition, Plaintiffs assert this case was "especially complex" with novel issues raised "at multiple times during the lawsuit." (*Id.* at 10.) Plaintiffs observe:

> [T]he facts of this case involve a motor home purchased in Iowa by residents of California with a warranty provision that litigation be prosecuted in Indiana. As evidenced by this Court's ruling on Plaintiff's Motion for Order Establishing the Controlling Law, complex issues of law arose with little case precedent to guide Plaintiffs' claims. Specifically, here, this case was transferred to the Northern District of Indiana and subsequently transferred back to this venue upon discovery of Defendants utilizing improper evidence to support their transfer of venue. Attorney Terry Baker was required to be admitted *pro hac vice* to prosecute this case in Indiana.

(*Id.*) As a result, Plaintiffs contend they "had to overcome procedural hurdles prior to litigating this case on the merits." (*Id.*)

Further, Plaintiffs argue the skill counsel displayed also supports application of a multiplier. (Doc. 71 at 10.) They contend counsel's "overall skill … is evidenced by the claim's survival through litigation and the outcome achieved in Plaintiffs." (*Id.*) Plaintiffs report:

> In over 20 years of practicing exclusively in the field of Lemon Law, Jon Jacobs has handled approximately 2,000 Lemon Law cases. Last year alone, the Law Offices of Jon Jacobs handled over 300 Lemon Law cases. Jacobs Decl. ¶ 4.
>
> Similarly, Terry Baker has over 20 years of litigation and trial experience working for multiple law firms specializing in consumer warranty protection. He alone has successfully taken over 25 cases to trial and has handled over 100 Lemon Law cases during the pendency of this current action. Baker Decl.

(*Id.*) Plaintiffs assert "they spent more than 200 hours on this matter, with an additional 25 hours anticipated to close out this case," and that "[u]ntil this case is fully resolved, Plaintiffs' counsel is unable to allow another case to take its' (sic) place." (*Id.* at 11.)

Finally, Plaintiffs argue the contingency fee contract between Plaintiffs and counsel supports the application of a multiplier. (Doc. 71 at 11-12.) Plaintiffs assert, "counsel prosecuted this case on a contingency fee basis and advanced *all* of the costs of litigation." (*Id.* at 11, emphasis in original.) According to Plaintiffs, the application of a fee multiplier also "encourage[s] competent counsel to protect consumers on a contingency fee basis." (*Id.* at 12, emphasis omitted.) Plaintiffs assert, "[w]ithout full compensation for successful cases, experienced and competent counsel will be deterred

from accepting consumer cases." (*Id.*)

Jayco opposes the request for a multiplier, asserting that "Plaintiff's counsel lists the factors that support such a determination, but fails to demonstrate why such an entitlement is justified on the instant facts." (Doc. 72 at 13.) Jayco contends that while "Plaintiffs' counsel repeatedly refers to the excellent result achieved …, Plaintiffs settled their claims for a diminished value payment of $42,500.00 – not a repurchase or replacement of their motor home." (*Id.*) According to Jayco, it "always argued that Plaintiffs' damages must only be calculated as a 'diminished value' recovery," while Plaintiffs "refused to acknowledge that Song-Beverly repurchase remedies were unavailable until the eve of trial." (*Id.*) In addition, Jayco contends "Plaintiffs' Counsel were clearly not precluded from taking on any work as a consequence of their work in this case," as a review of the hours billed reveals that "Counsel billed less than 10 hours per month in this matter for 27 of the 40 months of the litigation between February 2018 and August 2021." (*Id.* at 14.) Jayco observes that "[t]he most hours billed for any month was 21 hours in February 2020." (*Id.*) Thus, Jayco contends "Counsel could have accepted other cases, assuming such cases were available." (*Id.*)

Significantly, it does not appear counsel faced truly novel and complex issues of law in this action, contrary to their assertions. Indeed, the only substantive motions filed with the Court related to a motion to change venue and motion to resolve the parties' dispute related to the controlling law. (*See* Docs. 11, 49.) Despite the representations of counsel, the level of skill and experience of Mr. Jacobs and Mr. Baker were not particularly reflected in the prosecution of this action. Counsel was not required to face significant factual disputes or dispositive motions in this action, such as a motion to dismiss, motion to strike, or motion for summary judgment. Indeed, of the 230.7 hours originally billed by the Law Offices of Jon Jacobs, approximately 40% of the hours were billed by paralegals and 10% by an attorney who was licensed to practice during the pendency of this action. (*See* Doc. 71 at 7-8.) Thus, the Court finds the issues presented and skill required do not support the application of a multiplier. *See, e.g., Steel v. GMC,* 912 F. Supp. 724, 746 (N.J. Dist. 1995) ("the issues in lemon law litigation are not complex and do not require a significant amount of legal analysis or novel pleading"); *Ketchum*, 24 Cal. 4th at 1138 (explaining that "[a] more difficult legal question typically requires more attorney hours").

Furthermore, there is no evidence that the nature of the litigation precluded other employment by counsel. To the contrary, Plaintiffs' counsel expended a total of fewer than 275 hours of work on this action over the course of three years. Indeed, Plaintiffs' counsel admits that "[l]ast year alone, the Law Offices of Jon Jacobs handled over 300 Lemon Law cases" and Mr. Baker "handled over 100 [other] Lemon Law cases during the pendency of this current action." (Doc. 71 at 10.) Finally, the Court finds the contingent nature of the fee award is outweighed by the other factors, particularly in this action where the disputed facts and issues were minimal. *See Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1217 (2008) (enhancement for contingent risk is appropriate where "[t]he claims and defenses . . . raised a significant number of complex legal issues of first impression, and class counsel took a substantial risk that it would not prevail on these issues and thus would not recover a full fee"). Accordingly, the Court finds the lodestar amount of **$67,634.35** is reasonable for the work completed and results achieved, and declines to award a multiplier.

**E. Costs to be Awarded**

Plaintiff requests costs and expenses in the amount of $1,509.13, as reflected in their "Bill of Costs." (Doc. 71 at 6; Doc. 70-5 at 106-08.) In general, an award of costs in federal district court is governed by Federal Rule of Civil Procedure 54(d) and not applicable state law. *See Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1022 (9th Cir. 2003) (citing *In re Merrill Lynch Relocation Mgmt., Inc.*, 812 F.2d 1116, 1120 n. 2 (9th Cir. 1987)). This is because "federal courts sitting in diversity apply state substantive law and federal procedural law." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). Thus, federal procedural law governs a request for an award of costs.

Rule 54 of the Federal Rules of Civil Procedure provides that costs "should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). This "creates a presumption in favor of awarding costs to the prevailing party, but the district court may refuse to award costs within its discretion." *Champion Produce*, 342 F.3d at 1022. "[A] district court need not give affirmative reasons for awarding costs; instead, it need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003). For example, costs may be declined in light of "a losing party's limited financial resources" or

where there has been "misconduct by the prevailing party." *Champion Produce*, 342 F.3d at 1022.

The Supreme Court explained that 28 U.S.C. § 1920 "defines the term 'costs' as used in Rule 54(d)." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441 (1987). Costs that may be taxed under 28 U.S.C. § 1920 include:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Section 1920 imposes "rigid controls on cost-shifting in federal courts," and "federal courts are bound by the limitations set out in." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444-45 (1987). Generally, the court may not award costs under Rule 54(d) not authorized by statute or court rule. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 301 (2006). Thus, "costs almost always amount to less than the successful litigant's total expenses in connection with a lawsuit." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012) (citation omitted).

1. Filing fee

Section 1920 specifically provides that a prevailing party may recover costs for fees to the court clerk. 28 U.S.C. § 1920(1). *See also Carr v. Tadin, Inc.*, 51 F.Supp.3d 970, 985 (S.D. Cal. 2014) ("the filing fee is recoverable as a fee of the clerk"). Therefore, Plaintiffs are entitled to recover the $400 filing fee.

2. Mediation fees

Plaintiffs seeks $987.50 for "[m]ediation fees paid to JAMS." (Doc. 70-5 at 108.) However, "nothing in 28 U.S.C. § 1920 provides for the costs of a mediator." *Sea Coast Foods, Inc. v. Lu-Mar Lobster & Shrimp, Inc.* 260 F.3d 1054, 1061 (9th Cir. 2001); *see also Cook Children's Med. Ctr. v. New England PPO Plan of Gen. Consol. Mgmt., Inc.*, 491 F.3d 266, 277 (5th Cir. 2007) (mediation fees are not taxable costs because Section 1920 does not expressly permit their recovery). Plaintiffs are therefore not entitled to recover mediation fees pursuant to Section 1920.

3. Certificate of good standing

Finally, Plaintiffs seek $121.63 for obtaining a certificate of good standing from the State Bar of California. (Doc. 70-5 at 108.) However, courts have determined costs related to a *pro hac vice* application are not recoverable under Section 1920. *See Kalitta Air L.L.C. v. Central Texas Airborne System, Inc.*, 741 F.3d 955 (9th Cir. 2013) (finding Section 1920 does not provide for recovery of costs expended on *pro hac vice* applications); *see also Eagle Ins. Co. v. Johnson*, 982 F. Supp. 1456, 1459 (M.D. Ala. 1997), *aff'd*, 162 F.3d 98 (11th Cir. 1998) (finding no statute authorizes compensation for certificate of good standing or *pro hac vice* filing fees).

## IV. Conclusion and Order

Based upon the foregoing, the Court **ORDERS**:

1. Plaintiff's motion for fees is **GRANTED** in the modified amount of $**67,634.35**; and
2. Plaintiff's motion for costs is **GRANTED** in the amount of $**400.00**.

IT IS SO ORDERED.

Dated: **December 18, 2021** **/s/ Jennifer L. Thurston**
CHIEF UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 10

Case No. 12-cv-03936-JST
UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

# Lemmons v. Ace Hardware Corp.

## Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

Decided February 1st, 2015

JON S. TIGAR United States District Judge

## ORDER GRANTING IN PART MOTION FOR ATTORNEY FEES

Re: Dkt. No. 122

Before the Court is Plaintiff's motion for attorney fees, litigation expenses, and costs totaling $272,912 in this action for discrimination on the basis of disability relating to the Berkeley Ace Hardware store located in Berkeley, CA.

## I. BACKGROUND

### A. Factual Background

Plaintiff Portia Lemmons brought this action against Defendants Ace Hardware Corporation ("Ace"), Berkeley Hardware, Inc., and EQR-Acheson Commons Limited Partnership ("EQR") for claims arising out of Defendants' purported denial of access to disabled persons at the Berkeley Ace Hardware store in Berkeley, California ("the store"). Complaint, ECF No. 1. Lemmons has lived with cerebral palsy since birth and claimed that she had encountered numerous barriers that prevented her from fully accessing the store during the course of visits over the last several years. ECF No. 107 at 2-4.

Ace and Berkeley Hardware have a franchising agreement that permits Berkeley Hardware to operate the store while using the "Ace" name. Id. at 1. EQR owns the building in which the *2 store is located and leases it to Berkeley Hardware. Id. Defendants insist that EQR plans to tear down the building that houses the store in the near future and that the store plans to relocate to a new space. ECF No. 130 at 7. As of the date of this order, the store remains in operation in the EQR building. ECF No. 122 at 4.

### B. Procedural History

The Defendants entered into a court-enforceable settlement agreement with Lemmons. The parties did not reach any agreement as to damages or attorney's fees. Id.

The parties subsequently brought cross-motions for summary judgment. ECF No. 64, 80. The Court granted summary judgment in favor of Plaintiff that the Defendants Berkeley Hardware and EQR-Acheson Commons Limited Partnership ("EQR") were liable for $52,000 in damages under the Unruh Act for the "difficulties, discomfort, or embarrassment" she suffered during her visits to the store. ECF No. 107 at 21-22. Lemmons had agreed to limit her recovery to the statutory minimum of $4,000 per visit to the store. Id. at 22. The Court found Lemmons could not recover for her California Disabled Persons Act claim because she had already recovered under the Unruh Act and plaintiffs are not permitted to recover under both statutes. Id. at 25-26.

The Court granted summary judgment in favor of Defendant Ace Hardware, concluding that Ace could not be held liable as an "operator" under the ADA because

Ace, as a franchisor, lacked "specific control" over the store. Id. at 11-12.

**C. Jurisdiction**

The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

## II. LEGAL STANDARD

Recognizing the "need for private lawsuits to enforce disabled access," California disability laws and the Americans with Disabilities Act both provide for fee shifting to successful plaintiffs. Blackwell v. Foley, 724 F. Supp. 2d 1068 at 1075 (N.D. Cal 2010). "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any *3 action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." Cal. Civ. Proc. Code § 1021.5. California Civil Code § 55 also provides that the prevailing party in an action for injunctive relief under California's disability laws "shall be entitled to recover reasonable attorney's fees."

"California courts, like their federal counterparts, utilize the lodestar (or 'touchstone') approach to determine a proper fee award to a prevailing plaintiff in a civil rights law suit." Muniz v. United Parcel Serv., Inc., 738 F.3d 214, 222 (9th Cir. 2013). Under the lodestar, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). Courts "should exclude from this initial fee calculation hours that were not reasonably expended." Id. at 434 (internal quotation and citation omitted). "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Id. If "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Id. at 436.

## III. ANALYSIS

**A. Hourly Rate**

Plaintiff's request that the "reasonable hourly rate[s]" used by the Court for calculating the lodestar in this case should be as follows: "Paul L. Rein, $645; Celia McGuinness, $550; Catherine 'Cat' Caballo, $475; senior paralegal Aaron Clefton, $190; paralegal Emily O'Donohoe, *4 $155, and paralegal Holly Jaramillo, $135." ECF No. 122 at 12. In support of their proposed hourly rates, Plaintiff's counsel point to their "education, experience, and expertise in disability rights law," declarations provided by other attorneys practicing in the field, and other decisions in this District awarding similar hourly rates for attorneys practicing in the Rein Law Office. Although Defendants take issue with the reasonableness of the hours expended by Plaintiff's counsel on the litigation, they do not appear to contest the proposed hourly rates. Nonetheless, the Court will satisfy itself that Plaintiff's proposed hourly rate is reasonable before moving on to evaluate the reasonableness of the hours expended.

When determining a reasonable hourly rate for a lawyer's service, "the lodestar looks to the prevailing market rates in the relevant community." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551 (2010) (internal quotations and citations omitted). "The burden is on the fee applicant to produce satisfactory evi-

dence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984).

Rein has forty-five years of litigation experience, including forty years of disability representation, during which time he worked on many cases that achieved substantial victories for disabled plaintiffs. Cabalo has thirteen years of practice as a litigator who has practiced with the Rein firm in the field of disability law for the last five years. McGuinness has twenty-four years of litigation experience and has practiced with the Rein firm for the past six years. Plaintiff's counsel has provided charts documenting orders by courts in this District, which have calculated fees for other attorneys and paralegals with similar amounts of litigation experience using hourly rates similar to or greater than those requested here. ECF No. 122 at 18-20. This evidence is not disputed.

Furthermore, Plaintiff's counsel has shown that other judges in this District have approved *5 payments to these same lawyers using hourly rates either identical to or similar to the rates currently sought. Earlier this year, Judge Seeborg noted that, in the prior fifteen months, Rein's $645 per hour rate had been approved by "four different judges in this district . . . in light of Rein's skill, reputation, and extensive experience." Rodriguez v. Barrita, Inc., No. 09-04057-RS, 2014 WL 2967925 at *2 (N.D. Cal July 1, 2014) (citing Hernandez v. Grullense, No. 12-cv-03257-WHO, 2014 WL 1724356 at *5 (N.D. Cal. April 30, 2014), Moralez v. Whole Foods Mkt., Inc., No. 12-01072-CRB, 2013 WL 3967639 at *4 (N.D. Cal. July 31, 2013); Cruz v. Starbucks Corp., No. 10-01868-JCS, 2013 WL 2447862 at *5 (N.D. Cal. June 5, 2013); Delson v. CYCT Mgmt. Grp., Inc., No. 11-03781-MEJ, 2013 WL 1819265 at *5 (N.D. Cal. Apr. 30, 2013)).

Judge Seeborg also approved compensating Cabalo at an hourly rate of $425 per hour in that litigation. Rodriguez, 2014 WL 2967925 at *2. Although Cabalo requests $475 per hour in the current motion, the Court concludes that an increase is appropriate. Cabalo acted as lead attorney in this matter. The charts provided by Plaintiff's counsel indicate that, in the last several years, other judges in this District have approved hourly rates within this range for plaintiffs' attorneys with a similar amount of litigation experience. ECF No. 122 at 19. Finally, as already noted, Cabalo's hourly rate is unopposed by Defendant.

Judge Breyer has previously approved a rate of $495 per hour for McGuinness, who now seeks an hourly rate of $550. Moralez, 2013 WL 3967639 at *3. The Court finds the $550 hourly rate now sought by McGuinness is reasonable, in light of the rates approved by other judges in this District over the last several years for plaintiffs' attorneys with similar amounts of litigation experience. ECF No. 122 at 19-20. McGuiness's requested rate is also unopposed.

Lastly, the Court finds the hourly rates requested for the work done by the firm's paralegals are reasonable. Judge Breyer has previously approved compensating Clefton at a rate of $175 an hour, noting that two other judges in the District had compensated Clefton at that rate. In early 2013, Judge James reasoned that the $175 rate was an appropriate adjustment from the *6 $165 hourly rate courts had approved for Clefton in 2010 and 2011. Delson, 2013 WL 1819265 at *5 (N.D. Cal. Apr. 30, 2013). The Court finds that the $190 rate is appropriate for Clefton, given his extensive experience, the rates approved for other paralegals by courts in this District, and the fact that his requested hourly rate is unopposed. ECF No. 122 at 20. The Court similarly concludes that the hourly rate requested for the work of the firm's other two paralegals is appropriate given the prevailing rates in the community. Id.

The Court finds that Plaintiff's counsel has established that the lodestar should be calculated using the hourly rates they have requested.

**B. Hours Reasonably Expended**

Defendants principally contest the reasonableness of the number of hours billed by Plaintiff's counsel. Defendants contend that Plaintiff's counsel: 1) billed excessively for internal meetings and conferences; 2) billed excessively on particular motions; 3) billed for an ultimately unsuccessful claim against Ace Hardware; and 4) billed for services performed on behalf of deceased plaintiff Bertha Johnson. Defendants ask that the Court cut Plaintiff's requested fees by half "across the board" in light of the "excessive and redundant billing." ECF No. 130 at 11.

**1) Entries for Meetings**

Defendants argue that Plaintiff's counsel billed an unreasonable number of internal meetings, comprising in Defendants' calculation a total of $39,048.00 in fees over 259 separate entries. Defendants have compiled the hours billed for such meetings into a single spreadsheet, submitted as Exhibit H to their opposition. ECF No. 130-8. Additionally, Defendants note that many of these meetings were of short duration, such as .1 hour or .2 hour increments--six or twelve minutes. The practice of billing for many short meetings has been criticized by other judges in this District as having the effect of potentially inflating a fees award. See, e.g. Hernandez, 2014 WL 1724356, at *8-9; Cruz v. Int'l Collection Corp., No. 08-00991-JF (RS), 2010 WL 2509988, at *4 (N.D. Cal. June 17, 2010).

*7 Although the Court has approved the substantial hourly rates requested by Plaintiff's counsel, it has done so based on the attorneys' experience and expertise in disability litigation. This same expertise undercuts the reasonableness of some of their hours. "One of the trade-offs of being an expert in a specific filed of law is the expectation that tasks will be completed with greater efficiency because the knowledge base and resources have already been well-established." Delson v. CYCT Mgmt. Grp., Inc., No. C 11-03781 MEJ, 2013 WL 1819265, at *8 (N.D. Cal. Apr. 30, 2013). The Court knows that co-counsel sometimes need to strategize. But lawyers who are experts in the field of disability litigation, working at a small firm that exclusively handles that kind of work, should not need to bill 259 separate entries for strategizing. "The Ninth Circuit has approved of reductions in fees for unnecessary and duplicative intra-office conferences," and other courts in this District have "previously been critical of excessive conferencing by Rein Law." Hernandez, 2014 WL 1724356 at *10. Compounding these concerns is that some entries lack any specificity, such as "Meet w/ co-co re: pending issues" or "Strategize w/ staff re current case issues," which make such review more difficult and cause the Court some concern. ECF No. 130-8 at 3, 5.

Because the Court finds that Defendants' criticisms of the excessive nature of Plaintiff's counsel's billing for internal meetings are valid, it will exercise its discretion to reduce the $39,048.00 that Defendants characterize as having been billed for time spent on internal meetings by 50%, awarding $19,524.00 for these entries.

**2) Summary Judgment Motions**

Defendants contend that Plaintiff's counsel billed an excessive number of hours on motions practice, including the summary judgment proceedings, administrative motions, and the current motion for fees. Defendants first object to the 102.8 hours they have classified as having been billed for the summary judgment proceedings, ECF No. 130-7, claiming that many of the arguments made is Plaintiff's opposition to Defendants' cross-motion overlap with arguments *8 made in Plaintiff's affirmative motion. The Court agrees the time billed for these motions was substantial. But Defendants' themselves created some of these costs by filing affirmative motions for summary judgments on

claims where summary judgment was ultimately granted against them.

The Court also notes that Plaintiff's well-drafted and ultimately-successful summary judgment motion resulted in a lower total amount of fees by bringing the litigation to an end without the need for a trial. Any concerns the Court might have regarding the amount of time Plaintiff's counsel have billed for that motion are counterbalanced by this fact. In the same vein, the Court notes that Plaintiff also compromised on certain issues of injunctive relief and agreed to limit her damages claim, decisions that also prevented the need for a trial and lowered the amount of fees. The Court finds these hours were reasonably expended.

**3) Fee Motions**

Defendants object to the number of hours Plaintiff's counsel spent preparing the present attorney's fees motion. Defendants note that the motion is "nearly identical" to a motion the Rein firm submitted in Gerardo Hernandez v. Taqueria El Grullense, 12-cv-3257-WHO. Defendants include the fees motion from that case as Exhibit L. ECF No. 130-12. Defendants also call the Court's attention to the fee decision issued in Hernandez, wherein Judge Orrick observed that "Judges in this District have, on several occasions, criticized the fees sought by Rein Law for work on re-purposed fees motions," and deducted $6,276 of the $16,474 requested relating to this briefing. 2014 WL 1724356, at *13 (collecting cases). The Court has compared the motion filed in Hernandez and the opening brief filed herein and finds many sections regarding the statutes and public policies at issue do overlap substantially. The opening brief does not appear to have required substantial time to draft in light of Rein Law's ability to use a template motion. The Court will therefore award just 2 of the 10.4 hours Caballo has sought to bill on the opening motion for attorney's fees. The Court will therefore reduce the lodestar figure by $3,990 for time spent on preparing the initial fees motion.

*9 **4) Administrative Motions**

Defendants' also point to $6,018.50 requested for time Plaintiff's counsel spent preparing a motion to seek a continuance of defendants' motion for summary judgment from the Court and related declarations. ECF No. 130-10. That number is indeed substantial, but the motion was important to Plaintiff's litigation strategy. Moreover, Defendants opposed the motion and the Court ultimately granted it. ECF No. 72.

When the motions for summary judgment were submitted to the Court several months later, after which time the Plaintiff had been able to conduct further discovery, the Court ruled largely in Plaintiff's favor. ECF No. 107. Defendants' criticism that this motion should have been routine for the Rein Law attorneys, and therefore should have taken less time, is not well taken. Defendants increased Plaintiff's counsel's costs by refusing to stipulate to a continuance, see ECF Nos. 68, 69, and should not be heard now to complain about those costs. The Court finds that time spent by lawyers and paralegals on this motion was reasonably expended.

On the other hand, the Court notes that Paul Rein billed 4 hours strategizing and preparing an opposition to Defendant Berkeley Hardware's motion to amend their answer to include a statute of limitations defense. ECF No. 45. The Court ultimately granted Defendant's motion to amend over this objection, as discovery had not yet begun and the trial date was almost a year in the future. ECF No. 58. The Court will deduct the four hours Rein seeks to bill for preparing this motion from its fees award, finding that this time was not reasonably expended. An administrative motion of this kind need not have been drafted by a lawyer of Rein's experience, charging Rein's substantial hourly rate. "With four decades of experience in this area, Rein is an authority on ADA litigation. But in light of that specialized knowledge and his commensurately high billing rate, Rein should reasonably limit his involvement to matters requiring his level

of skill." Hernandez, 2014 WL 1724356 at *8. Furthermore, a lawyer of Rein's experience and expertise should have recognized that it would be difficult at best to defeat a motion to amend an answer *10 when discovery had not yet even started and trial was almost a year away, and simply stipulated to permit the amendment. The Court will therefore reduce the lodestar figure by $2,580 for time spent on this opposition.

**5) Ace Hardware**

Defendants argue that time Plaintiffs spent pursuing claims against Ace Hardware should be deducted from Plaintiff's fees, because the Court ultimately granted summary judgment in favor of Ace Hardware, concluding that, as a franchisor, Ace lacked operational control over the store. Defendants claim that law was clear at the outset of the litigation that "a franchisor or licensor that does not control the day to day operations of the franchisee or licensee is not liable under the ADA." ECF No. 130 at 13 (citing Neff v. Am. Dairy Queen Corp., 58 F.3d 1063, 1066 (5th Cir. 1995) and Lentini v. California Ctr. for the Arts, Escondido, 370 F.3d 837, 849 (9th Cir. 2004)). In light of this backdrop, Defendants contend that this claim thus should not have been brought against Ace, because Defendants' counsel told Plaintiff's counsel at the outset of the litigation that Ace had no right or obligation to operate the store.

"California law requires a trial court to adjust a lodestar award to account for time spent exclusively on an unsuccessful claim." Muniz v. United Parcel Serv., Inc., 738 F.3d 214, 224 (9th Cir. 2013). "[T]he court must find that the time deducted did not aid in proving the successful claims." Id., 738 F.3d at 224. The Court agrees with Defendants that time spent by Plaintiff's counsel on claims against Ace Hardware exclusively should not be included in the fees award. The Court ruled in favor of Ace on the issue of damages at summary judgment, as the Court concluded that Lentini and Neff dictated that Ace was not liable as it lacked day to day operational control over the store. Although Plaintiff claims that the injunctive settlement reached with EQR states that Plaintiff is the prevailing party as to all Defendants, nothing agreed to in the settlement required Ace to take any action. See ECF No. 57. Therefore, the Court concludes that Plaintiff's claims against Ace were unsuccessful and time spent exclusively on those claim should be *11 deducted from the fees award.

Defendants have identified $13,713.50 in entries that they contend reflect time spent exclusively on claims against Ace Hardware. ECF No. 130-6. The Court does not agree with Defendants' characterization of all of the entries. For instance, Defendants have included time entries by McGuinness and Cabalo on April 3, 4, 7, and 8 relating to drafting a discovery letter brief that pertained to Plaintiff's claims against all three Defendants, located at ECF No. 74. The Court will not deduct these hours, as they include time spent on successful claims. Additionally, Defendants characterize entries made by Cabalo on May 12, 14, 16, and 19 as pertaining to the claims against Ace. These entries relate to a further discovery letter brief, located at ECF No. 79, and the discovery issues discussed in that brief did not involve Ace Hardware at all, but only involved Plaintiff's claims against Berkeley Hardware and EQR - on which Plaintiff prevailed. The Court will likewise not deduct these hours from the lodestar figure.

Defendants additionally ask the Court to consider that some of the time billed on summary judgment briefing was spent on drafting sections pertaining to the claims against Ace and to reduce the summary judgment fees accordingly. Plaintiff's affirmative motion did not pertain specifically to its claim against Ace and was successful, so therefore does not represent time spent exclusively on pursuing the unsuccessful claims. During summary judgment, Plaintiff opposed the portion of Defendants' motion that sought summary judgment in favor of Ace. Ace prevailed. It appears that Plaintiff's counsel billed 18.8 on its opposition to Defendants' motion. In light of this, the Court will subtract 4 hours

of Cabalo's time spent drafting the opposition, to reflect the amount of time spent on opposing summary judgment as to the claims against Ace.

The Court will therefore deduct from the award of fees $10,378.50 of the $13,713.50 that Defendants have characterized as time Plaintiff's counsel spent pursuing claims against Ace Hardware. ECF 130-6. The Court will also deduct an additional $1,900 for time spent opposing the portions of Defendants' motion for summary judgment relating to Ace.

*12 **7) Bertha Johnson**

Defendants also argue the Court should further reduce the fees award due to the time Plaintiff's counsel spent performing work on behalf of co-Plaintiff Bertha Johnson, who passed away during the course of the litigation. This does not provide a basis for further reducing the fees awarded to Plaintiff's counsel. The Rein declaration specifically addresses this issue, stating that "[a]ll work done on this case prior to Ms. Johnson's death was done on behalf of both plaintiffs, and no work was done, or time kept separately, for decedent Johnson." ECF No. 123 at 1 n.1. The Court credits this, as Johnson's claims were identical to Lemmons' and involved the same store location.

**8) Conclusion**

Defendants have identified some billing items which give the Court pause, particularly a large number of internal strategic meetings and an excessive amount of time spent on some items in motions practice. Nonetheless, the Court does not agree with all of Defendants' criticisms of the billing and does not find that Defendants' proposed 50% across the board slashing of the requested fees is justified. Plaintiff's counsel have thoroughly documented how they spent their time and have secured a victory for the Plaintiff and other disabled individuals seeking to access the store.

The Court will reduce the amount of hours Plaintiff's counsel spent billing internal strategic meetings by 50% in light of the excessive number of such meetings. The Court will also subtract from the hours requested 8.4 hours billed by Caballo in preparing the attorney's fees motion, 4 hours spent by Rein in preparing an opposition to Defendant Berkeley Hardware's motion for leave to amend its answer, and $10,378.50 in time spent pursuing claims against Ace Hardware. The Court therefore awards Plaintiff's counsel $218,237.5 of the $256,610 they have requested.

*13 **C. Degree of Success**

In addition to their claims regarding excessive billing, Defendants also ask the Court to reduce the fees due to Plaintiff's "limited success in light of the scope of the litigation." ECF No. 130 at 9-11, 17. In considering whether to reduce a fees award due to the limited success of a litigation, a district court "must deduct from the lodestar hours spent exclusively on unrelated unsuccessful claims; and second, the court must evaluate the remaining hours to determine if they were reasonably necessary to achieve the result obtained." Muniz, 738 F.3d at 224. The Court does not agree with Defendants' characterizations of the outcome of the litigation.

As a result of the injunctive settlement reached in this case, the store has become substantially more accessible to the disabled population. Specifically, the store created van-accessible parking and signage, provided bells for disabled customers to ring for assistance at a services counter, and removed barriers that had previously prevented wheelchairs from turning around aisles and obstructed elevator doors. ECF No. 131 at 2. The store also agreed to provide on its main floor a catalogue of items found on other floors that disabled customers could consult before attempting to access those floors. Id. Additionally, the settlement secured a number of changes to employee training at the store regarding assisting disabled customers. Id.

The Court also granted Plaintiff summary judgment for liability and damages against EQR and Berkeley Hardware, over the Defendants' cross-motions for

summary judgment. ECF No. 107. The Court awarded Plaintiff $52,000 in damages. Id. The Court denied Defendants' motion for reconsideration. ECF No. 114. Given the number of defenses raised by Defendants' and Defendants' own summary judgment motion, Plaintiff's victory at summary judgment was hard-fought and the damages achieved for Plaintiff provided a substantial compensation for the "difficulties, discomfort, or embarrassment" she experienced upon visiting the store.

Defendants insinuate throughout their briefing that the fact that EQR intends to tear down the building in the near future somehow renders this litigation inappropriate or undermines the *14 value of the results achieved by Plaintiff. Defendants also claim that the litigation was potentially unnecessary, as Plaintiff never requested alterations to the premises before filing her complaint and may have been able to obtain them without bringing suit. The Court is not persuaded by these arguments (which are somewhat in tension with each other). Plaintiff was not required to request changes prior to bringing suit. Defendants' continued insistence that the allegedly-impending closure of the store somehow absolves them from making the premises accessible to disabled individuals indicates that Plaintiff would have been unlikely to persuade them to make the alterations without this litigation. Indeed, the parties did not reach an injunctive settlement agreement until almost a year after the complaint was filed and Plaintiff compromised on several of her initial requests.

"The reason for the fee-shifting provisions of both the ADA and California law is to motivate plaintiffs' attorneys to advocate for full and equal access for the disabled to public accommodations." Blackwell, 724 F. Supp. 2d at 1076. The store remains open in the EQR building to this day and Plaintiff's lawsuit achieved an injunctive settlement which has ensured a greater degree of access for disabled people to the public accommodation. This is the exact outcome the laws governing disabled individual's ability to access to public accommodations are intended to encourage.

**D. Plaintiff's Costs**

Plaintiff requests an award of costs in the amount of $16,302. The costs are well-documented and the request is unopposed. The Court will grant the request in full.

## *15 IV. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's request for attorney's fees in part, and award $218,237.50. The Court also grants the Plaintiff's award of costs in the amount of $16,302. The total amount awarded by this order is $234,539.50.

**IT IS SO ORDERED**. Dated: February 1, 2015

/s/_________

JON S. TIGAR

United States District Judge

# EXHIBIT 11

| Attorney | Date | Description | Hours | Rate | Total | Adjusted Rate | Adjusted Total | Difference |
|---|---|---|---|---|---|---|---|---|
| Dale K. Galipo | 7/21/2023 | Review case materials | 4.2 | $1,500 | $6,300.00 | $1,400 | $5,880.00 | -$420.00 |
| Dale K. Galipo | 7/22/2023 | Review case materials | 3.8 | $1,500 | $5,700.00 | $1,400 | $5,320.00 | -$380.00 |
| Dale K. Galipo | 7/29/2023 | Review case materials | 3.5 | $1,500 | $5,250.00 | $1,400 | $4,900.00 | -$350.00 |
| Dale K. Galipo | 8/1/2023 | Review case materials | 2.7 | $1,500 | $4,050.00 | $1,400 | $3,780.00 | -$270.00 |
| Dale K. Galipo | 8/2/2023 | Review case materials | 3.3 | $1,500 | $4,950.00 | $1,400 | $4,620.00 | -$330.00 |
| Dale K. Galipo | 9/15/2023 | Review expert reports – Case Materials | 2.1 | $1,500 | $3,150.00 | $1,400 | $2,940.00 | -$210.00 |
| Dale K. Galipo | 9/16/2023 | Review expert reports – Case Materials | 1.4 | $1,500 | $2,100.00 | $1,400 | $1,960.00 | -$140.00 |
| Dale K. Galipo | 9/17/2023 | Review expert reports – Case Materials | 3.3 | $1,500 | $4,950.00 | $1,400 | $4,620.00 | -$330.00 |
| Dale K. Galipo | 9/23/2023 | Review expert reports – Case Materials | 2.7 | $1,500 | $4,050.00 | $1,400 | $3,780.00 | -$270.00 |
| Dale K. Galipo | 9/24/2023 | Review expert reports – Case Materials | 2 | $1,500 | $3,000.00 | $1,400 | $2,800.00 | -$200.00 |
| Dale K. Galipo | 7/12/2025 | Review expert reports – related case materials | 4.7 | $1,500 | $7,050.00 | $1,400 | $6,580.00 | -$470.00 |
| Dale K. Galipo | 8/30/2025 | Trial preparation *(opening statement - Dane Norem – Jeffrey McKee Examination) | 12.5 | $1,500 | $18,750.00 | $1,400 | $17,500.00 | -$1,250.00 |
| Dale K. Galipo | 8/31/2025 | Trial preparation * (Matt Borden - Eric Leighton - Dennis Stout) | 13.5 | $1,500 | $20,250.00 | $1,400 | $18,900.00 | -$1,350.00 |
| Dale K. Galipo | 9/1/2025 | Trial preparation * (Dr. Hunt - Dr. Clark - Dr. Graham - Norem) | 12.7 | $1,500 | $19,050.00 | $1,400 | $17,780.00 | -$1,270.00 |
| Dale K. Galipo | 9/2/2025 | Trial preparation * (McKee) | 3.3 | $1,500 | $4,950.00 | $1,400 | $4,620.00 | -$330.00 |
| Dale K. Galipo | 9/3/2025 | Trial preparation * (Dr. Clark – Dr. Vilke – Norem - McKee) | 14.1 | $1,500 | $21,150.00 | $1,400 | $19,740.00 | -$1,410.00 |
| Dale K. Galipo | 9/4/2025 | Trial preparation * (opening, Noble – Dr. Omalu – Dr. Wohlgelernter) | 12.9 | $1,500 | $19,350.00 | $1,400 | $18,060.00 | -$1,290.00 |
| Dale K. Galipo | 9/5/2025 | Trial preparation * (opening/closing, Dane Norem and Jeffrey McKee) - Experts | 11.7 | $1,500 | $17,550.00 | $1,400 | $16,380.00 | -$1,170.00 |
| Dale K. Galipo | 9/6/2025 | Trial preparation * (opening/closing, Dane Norem and Jeffrey McKee) – Experts | 12.3 | $1,500 | $18,450.00 | $1,400 | $17,220.00 | -$1,230.00 |
| Dale K. Galipo | 9/7/2025 | Trial preparation *(opening, witnesses, experts, examinations ) | 13.3 | $1,500 | $19,950.00 | $1,400 | $18,620.00 | -$1,330.00 |
| Dale K. Galipo | 9/8/2025 | Trial preparation *(opening, witnesses and expert examinations) | 14.7 | $1,500 | $22,050.00 | $1,400 | $20,580.00 | -$1,470.00 |
| Dale K. Galipo | 9/9/2025 | Trial - Trial preparation * | 16.5 | $1,500 | $24,750.00 | $1,400 | $23,100.00 | -$1,650.00 |
| Dale K. Galipo | 9/10/2025 | Trial – Trial preparation * | 16 | $1,500 | $24,000.00 | $1,400 | $22,400.00 | -$1,600.00 |
| Dale K. Galipo | 9/11/2025 | Trial – Trial preparation * | 15.8 | $1,500 | $23,700.00 | $1,400 | $22,120.00 | -$1,580.00 |
| Dale K. Galipo | 9/12/2025 | Trial – Trial preparation * | 16.2 | $1,500 | $24,300.00 | $1,400 | $22,680.00 | -$1,620.00 |
| Dale K. Galipo | 9/13/2025 | Trial preparation * | 13 | $1,500 | $19,500.00 | $1,400 | $18,200.00 | -$1,300.00 |
| Dale K. Galipo | 9/14/2025 | Trial preparation * | 13.2 | $1,500 | $19,800.00 | $1,400 | $18,480.00 | -$1,320.00 |

| **Attorney** | **Date** | **Description** | **Hours** | **Rate** | **Total** | **Adjusted Rate** | **Adjusted Total** | **Difference** |
|---|---|---|---|---|---|---|---|---|
| Dale K. Galipo | 9/15/2025 | Trial – Trial preparation * | 15.9 | $1,500 | $23,850.00 | $1,400 | $22,260.00 | -$1,590.00 |
| Dale K. Galipo | 9/16/2025 | Trial – Trial preparation * | 16.1 | $1,500 | $24,150.00 | $1,400 | $22,540.00 | -$1,610.00 |
| Dale K. Galipo | 9/17/2025 | Trial – Trial Preparation * | 14 | $1,500 | $21,000.00 | $1,400 | $19,600.00 | -$1,400.00 |
| | | | **291.4** | | **$437,100.00** | | **$407,960.00** | **-$29,140.00** |

# EXHIBIT 12

# ARBITRATION ADVISORY

# 2016-02

# ANALYSIS OF POTENTIAL BILL PADDING AND OTHER BILLING ISSUES

## Replaces and Supersedes Arbitration Advisory 2003-01

## March 25, 2016

Points of view or opinions expressed in this document are those of the Committee on Mandatory Fee Arbitration. They have not been adopted or endorsed by the State Bar's Board of Trustees and do not constitute the official position or policy of the State Bar of California.

### QUESTION PRESENTED

When a lawyer's fee bill overstates the amount of time spent for work performed, it is called "bill padding." If a client alleges that a lawyer's bills are not accurate or truthful, how can an arbitrator assess the evidence, including the fee bills, for possible bill padding? This advisory explores the question of how an arbitrator may assess the evidence to identify bill padding.[1]

### INTRODUCTION

Most hourly fee bills are a collection of time entries itemizing work performed in the privacy of a lawyer's office. Therefore, it is difficult to verify the accuracy of the time entries. Accordingly, arbitrators should do at least four things:

A. Evaluate the process by which the fee bill was prepared and the specificity of the time entries;
B. Evaluate the staffing used on the matter;
C. Evaluate the work performed against the time billed, and
D. Look for certain patterns in the descriptions of the work performed, including the time entries.

### DISCUSSION

[1] Rules and observations about determining reasonable attorney's fees in general are addressed in other Arbitration Advisories. This advisory focuses on a subset of that topic: when too much time is alleged to have been recorded for the individual units of work performed. In the event that an arbitrator encounters bill padding, he/she may refer to our other arbitration advisories for assistance in determining an appropriate charge under the circumstances.

**A. Evaluate the process by which the fee bill was prepared and the specificity of the time entries**

In order to understand the likely areas to look for bill padding, it is useful to consider the historical background of professional fees charged by a lawyer [*See* American Bar Association Commission on Billable Hours Report (August, 2002), referred to hereinafter as "ABA Report" (See http://www.abanet.org)]. Prior to the 1960s, the majority of lawyers billed clients in flat sums or fixed amounts - often at the conclusion of the matter. This required some estimating and discretion on the part of the lawyer. A lawyer's fee bill often read something like this:

"Fee for services rendered, $ 750.00."

Clients sometimes paid their bills six months or a year after receipt of the fee bill, which reflected services performed long before the fee bill was even sent.

In Gisbrecht v. Barnhart, 535 U.S. 789 (2002), the Supreme Court wrote:

> ". . . . An American Bar Association (ABA) report, published in 1958, observed that attorneys' earnings had failed to keep pace with the rate of inflation; the report urged attorneys to record the hours spent on each case in order to ensure that fees ultimately charged afforded reasonable compensation for counsels' efforts. (*citation omitted).*
>
> Hourly records initially provided only an internal accounting check. See Honest Hour 19. The fees actually charged might be determined under any number of methods: the annual retainer, the fee-for-service method, the "eyeball" method under which the attorney estimated an annual fee for regular clients, or the contingent-fee method, recognized by this Court in Stanton v. Embrey, 93 U. S. 548, 556 (1877), and formally approved by the ABA in 1908. See Honest Hour [W. Ross, The Honest Hour: The Ethics of Time-Based Billing by Attorneys (1996),13-19]. As it became standard accounting practice to record hours spent on a client's matter, attorneys increasingly realized that billing by hours devoted to a case was administratively convenient; moreover, as an objective measure of a lawyer's labor, hourly billing was readily impartable to the client. Id., at 18. By the early 1970's, the practice of hourly billing had become widespread. *See id*., at 19, 21."

**1. Evaluate the process by which the fee bill was prepared**

In the now-standard chronological fee bill used by lawyers, almost all time is (or should be) itemized by day and by timekeeper. If a lawyer or other timekeeper does several things in one day on a particular matter then he or she must decide how to best describe this work and how much time to record for that work. An arbitrator's review of fee bills should include an assessment of the method and timing used to prepare the bills in order to form an understanding regarding the accuracy of the data shown by the fee bills.

Some lawyers still use word processing programs to generate fee bills. Others use specialized billing software programs. Many billing software programs in use today have a timer feature that allows the user to input "start" and "stop" commands for one or more matters. The billing software program then automatically calculates the elapsed time for each task in the same manner as a stopwatch. If the evidence at the arbitration reveals that lawyers properly utilized the timer feature that is a factor tending toward accuracy.

While it is almost universally acknowledged that contemporaneous records are the best practice, many times the press of business is such that a day or two (or more) passes without the lawyer recording his/her time. Sometimes a month may pass without any entries. In rare cases, a year or more may pass before a lawyer goes through his/her case file and attempts to re-create what transpired in the case since its inception. It is generally at the point when a fee bill needs to be generated that the lawyer is faced with the need to reconstruct what happened a day or two or a month ago (or a year ago) with great precision. If the lawyer is able to prepare the fee bills using information from notes he/she made contemporaneous with the tasks actually performed, that is a factor tending towards accuracy. But if the reconstruction is done by the lawyer going through his or her file and then ascribing a time entry to each e-mail, letter, document and calendar entry in the file, then it is much less likely that the time entries are truly accurate. While the corresponding fee bills may appear to be very precise, with exact times noted for each specific and itemized activity, the appearance of accuracy may be deceptive and the time recorded should be assessed by the arbitrator. Under such circumstances, it may be appropriate to put the burden of providing evidence/facts to support the accuracy of the time entries onto the lawyer.

The arbitrator should also examine who recorded the entries and created the fee bills. The original time entries are generally recorded by the lawyer or other person who performed the task. However, in some firms, a support person, such as a secretary, paralegal, or billing clerk, records the time entries ultimately charged to the client. Variations for this practice abound. In some firms, lawyers hand-write their entries on paper and some other person inputs them in the billing software. In other firms, a billing clerk may go through the case file on a periodic basis and record a time entry for every scrap of paper in that file. For instance, if the file contains a letter from opposing counsel, the billing clerk may charge the client an agreed-upon minimum charge irrespective of whether the lawyer actually reviewed that letter and how long it took. Suffice it to say, the arbitrator may consider evidence of who actually recorded the time entries [and when they were recorded] to assess the accuracy of the corresponding fee bills.

It is customary for larger law firms to have a draft of the fee bill, commonly referred to as a "pre-bill," reviewed by the partner or lawyer in charge of billing on the matter. The billing partner may not have actually worked on the file, but is otherwise in control of the relationship with the client. If pre-bills are utilized, the billing partner should scrutinize and edit the time entries in the "pre-bills" to ensure that they are accurate. The recorded time entries may be increased or decreased in an exercise called "billing judgment" by the billing partner. However, any evidence that the pre-bills were adjusted upwards should be examined carefully, as it may indicate that the client is being charged more time than actually expended by his/her lawyer. Absent clearly defined and explained terms in the written fee agreement allowing such upward adjustments, the increased time may be evidence of bill padding. For example,

increasing a time entry to a contractually agreed-upon minimum charge may be appropriate, as would an increase to reflect time inadvertently omitted by the lawyer. On the other hand, increasing a time charge for the sake of inflating the fee bill is not. If an arbitrator encounters such circumstances, the lawyer should bear the burden to clarify and substantiate such increased time entries.

The pre-bills may not be carefully reviewed by the billing partner for a number of reasons, including the fact that most billing partners are very busy and do not have or want to allocate the time to check each pre-bill carefully, the entries may be for a lawyer who is not readily available, or the billing partner may have a huge stack of pre-bills to go through and only a short time to do so since the firm wants to "get the bills out". Consequently, arbitrators should consider facts and evidence concerning the pre-bill process, including whether the lawyer(s) that actually worked on the matter also verified the accuracy of the fee bills, and whether the pre-bill process increased or decreased the accuracy and transparency of the fee bills ultimately delivered to the client for payment.

**2. Evaluate the specificity of the time entries**

Many lawyers no longer physically handwrite what they do on paper time-sheets but contemporaneously input a description of their tasks directly into their computers. These types of entries can usually be identified because they are often longer and more detailed. For example, if a fee bill reads: "meeting with client to discuss the elements of the separate statement of facts and the source of evidence for each element (1.8); research new opinion on the presumptions and burden of proof under Festo and progeny (2.5)" [Example 1], this is likely (but not necessarily) something directly inputted into the billing software program by the lawyer. On the other hand, the briefer description for the same work of: "meeting with client re MSJ and research burden of proof (4.3)" [Example 2] is probably something initially written in longhand and then later inputted into the billing software program.

Arbitrators should be aware that regardless of the method of time keeping or billing used, it is not the format of the fee bill but the information provided which is important. Accordingly, the arbitrator's primary focus should be on analyzing those facts that tend to demonstrate the accuracy, or inaccuracy, of the information contained in the fee bills. When examining the fee bills it is very important to remember that in the vast majority of cases each time entry in a fee bill is merely an estimate of how much time was required for the task performed that is being described in a summary fashion. Therefore, the longer the time period between when the task was performed and the corresponding time entry is recorded, the greater the probability that the time entry may lack accuracy.

If, in Example 1 above, the client is certain that the meeting required only 30 minutes (with no travel time), then perhaps one could question the entry of 1.8 hours. But how can one prove that the time for, say, a specific letter was really 12 minutes rather than 30?[2] If the time is

[2] It is just about impossible to be certain that any one single time entry is wrong or faked or padded. "The 'perfect crime' [is the] padding of bills…" [William G. Ross, The Honest Hour: The Ethics of Time Based Billing by Attorneys (1996)].

block-billed and one does not even know how much time is being claimed for the letter, then what? In such cases, look at the totality of the evidence.

## B. Evaluate the staffing used on the matter

The staffing of a legal matter by a lawyer presents the potential for bill padding that an arbitrator may consider. The main staffing issues that should be assessed include:
(1) Did multiple lawyers work on the same task simultaneously? and (2) Was the task performed by the proper lawyer?

### 1. Did multiple lawyers work on the same task simultaneously?

A recurring complaint by clients concerns charges for tasks involving more than one lawyer, paralegal, or support staff from the same firm at the same time. This typically occurs when a client is charged for multiple lawyers attending a court hearing or deposition, or where two or more lawyers participate in a meeting or telephone call. Generally, the determination of whether the matter was overstaffed is a question of fact the arbitrator must resolve. In a mandatory fee arbitration it is appropriate to place the burden of proof on the lawyer to demonstrate that the disputed matters/tasks were properly staffed and not attempts to inflate time charged to a client.

Issues that may affect this factual determination may include the complexity or significance of the case, the litigious nature of the parties, the amount in controversy, client consultation in advance, the client's awareness and lack of objection, or any other fact tending to demonstrate whether it was appropriate for more than one lawyer or support staff to participate in a disputed task.

In some firms, newly admitted lawyers sometimes accompany their supervising lawyer to depositions or court hearings for training purposes. In most instances, the client should not be charged solely for training time.

It is also generally accepted that the more timekeepers on a case, the higher the bill will be. Pay particular attention to time recorded by newer associates who record time on the matter only briefly, such as one or two months, particularly if accompanied by entries reflecting the associate recorded "get up to speed" activities, such as "review file." Such entries by a transient biller may not be an appropriate charge/expense to impose on a client.

### 2. Was the task performed by the proper lawyer/person?

In some cases, a client may complain that some necessary task was performed by a senior lawyer charging a much higher hourly rate, when it could have been completed by a cheaper associate or support staff. For instance, in a commercial real estate lease dispute, the firm's main real estate partner, charging $700.00-plus per hour, personally drives to the commercial site to deliver the keys to the complaining landlord. Even assuming that it was necessary for a licensed lawyer to deliver the keys, the issue becomes why it was done by the most expensive lawyer in the firm. Was it because some circumstance actually required that specific high-priced lawyer to undertake that task, or was it an inadvertent or intentional attempt to pad the client's bill. The

client may also challenge delegation of tasks to inexperienced lawyers/staff with resulting inefficiencies. In examining such complaints, arbitrators should consider all of the circumstances relevant to the issue, as well as the custom in the community and the terms of the written fee agreement.

**C. Evaluate some or all of the work produced against the hours claimed**

Arbitrators may consider evidence and facts concerning the actual tasks/work performed by the lawyer, including an analysis of the major items of work performed. How many hours were recorded for this work? How many timekeepers were involved? What did they do? Did they duplicate each other's work? Was some of this "training" time for new lawyers? [3]

Major tasks. It may be appropriate for an arbitrator to review and assess the fee bills to determine how much cumulative time was recorded by the lawyer [or lawyers] to complete a major task. Major tasks may include specific motions, appellate briefs, and transactional documents. An arbitrator may need to quantify the cumulative time first. This task will require the arbitrator to go through the fee bills and essentially group separate billing entries. For example, an arbitrator may have to group all of the entries that refer to the preparation of a specific document, like a demurrer. The arbitrator would then cumulate all of the billing entries referring to or concerning the demurrer, including the review of the complaint and file, conducting legal research, telephone conferences and other communications regarding the demurrer or the sufficiency of the complaint, and then the time entries for the drafting, revising and finalizing and filing the demurrer.

Once the cumulative time to complete a major task is obtained, then the arbitrator may look at the actual work product [or demurrer in foregoing example] to see if the time falls into a range that appears reasonable. This can be hard to do without some experience in the particular legal area involved. But, in the above example, if the fee bills reveal that a lawyer recorded 25-plus hours to research, draft, and file the demurrer, the arbitrator should review the actual demurrer to determine if the time recorded is reasonable. If the evidence reveals that the demurrer is a four page boilerplate document attacking the sufficiency of a fraud claim lacking specificity, then the arbitrator may put the burden on the lawyer to explain why it took so long to prepare such a simple document. On the other hand, if the evidence reveals a 20-page masterpiece artfully advocating novel concepts of law, then that may be evidence tending towards accuracy and reasonableness.

While a times-by-task assessment can be hard to assemble, sometimes the fee bills themselves will have guides to that information within them if the lawyer or law firm utilizes

---

[3] Arbitrators may also consider whether the client was given an estimate or a budget. An "estimate" is not binding. On the other hand, a budget typically involves a more detailed forecast and is supposed to be reasonably accurate (subject to disclosed caveats and assumptions). Moreover, a budget should be revised if circumstances change and the client should be promptly notified of the revision(s). Accordingly, if an estimate or budget was given, it may be reviewed to determine whether the disputed tasks were contemplated and explained to the client.

task-based billing codes like the "Uniform Task-Based Management System" published by the American Bar Association (ABA Task Codes).[4] Task-based billing codes are in fairly wide use but are not standard and there is some debate over their usefulness. For example, one may know that certain hours were recorded for "L240 - Motions For Judgment" but not how many hours were shown for a specific Motion for Summary Adjudication. Where such codes are not used, the arbitrator may wish to ask the lawyer to provide evidence of the cumulative time expended on major tasks. For instance, in Example 1 on page 4, Section A(2) *supra*, assuming that the lawyer utilized the ABA Task Codes, the time billed for meeting with the client to prepare the statement of facts would show the codes "L240" / "A106" in or right after the descriptions of the activities and the totals for these things would (or could) appear on the bill. Once the ABA Task Codes key is in hand, this will help to break down the time and fees into broad tasks, which may be useful information. Once it is known that a motion for summary judgment required many hours of several timekeepers' time, an arbitrator can then come to a conclusion or ask for an explanation of whether or not the time spent on this particular task is reasonable.

Documents. There often is a good deal of time shown for "reviewing documents" ("L320 - Document Production") in many litigation matters. First, ascertain how many document pages were produced or reviewed. This is sometimes stated in terms of "boxes" which is a standard file storage box normally holding anywhere from 2,000 to 3,500 pages of documents, depending on how tightly the documents are packed. Some courts and commentators mention 2,500 as the average number of pages per box. Assess how many timekeepers reviewed the documents and how long it took. Were summaries of the document reviews created? Were relevant documents culled? Were relevant documents scanned and tagged? If the foregoing tasks were not done, did it then result in multiple lawyers having to review the same documents? Arbitrators must assess all evidence and facts regarding whether the lawyer's document review was efficient and judicious rather than inadvertent or intentional bill padding.

Also, the propriety of tasks must be considered within the context performed. For instance, it may be entirely reasonable for a lawyer to charge a client eight-plus hours to carefully review a 100-page prospectus in a federal securities case involving claims of securities fraud and misrepresentation. On the other hand, it may not be appropriate for a lawyer to charge a client eight-plus hours to review the same 100-page prospectus if the claims in the subject lawsuit are unrelated to the contents of the prospectus [like the wrongful termination of a broker or analyst involved in the securities offering].

Lastly, the arbitrator may consider evidence or facts concerning the timeliness of the client's objection or complaint concerning any fee bill, including when and if the client objected or made inquiries upon receiving the now contested fee bill, and whether the fee agreement

[4] The ABA Task Codes assign litigation time within five groups: case assessment, pre-trial, discovery, trial and appeal. There are also 11 optional Activities Codes (such as "A106 - Communication (with client)" which may be used within each of the five groups in the Litigation Code Set. The various ABA Task Codes may be accessed at www.americanbar.org/groups/litigation/resources/uniform_task_based_management_system.html

contained an agreement that the client would reasonably or promptly notify the lawyer if there were questions or objections to the fee bills or time entries.

**D. Consider the format and content of the fee bills**

**1. High minimum increments**

Many fee agreements state that the lawyer shall bill in minimum increments of .10 hour [or six minutes]. When properly disclosed to a client, such a term may provide support or justify charging that client at least .10 hour for any single task irrespective of how long the task took. Consequently, if the lawyer participates in a phone call regarding the case with opposing counsel that lasts less than two or three minutes, pursuant to the terms of the written fee agreement, the lawyer may be justified in billing .10 hour.

On the other hand, some lawyers still bill in minimum increments of .25 hours or greater. Consequently, they may charge .25 hours for any compensable task, irrespective of how long the task actually takes. Assume that such a lawyer charges $300/hour. Assume further that on any given day, that lawyer completes at least four separate compensable tasks, each task taking less than 3 minutes each to complete. Billing in increments of .25 hours means that the client would be billed $300 for the four tasks [4 x .25 hours x $300/hour = $300]. However, in this example, the client is being charged $300 for less than 12 minutes of actual work, essentially requiring the client to pay an effective hourly rate greater than $1,500.

Courts and fee arbitrators view high incremental charges with suspicion as they may constitute an unreasonable or unconscionable fee, particularly where application of high incremental charges results in overstating the fees owed by a client. *Your Bill: A Behind the Scene look at a Legal Audit*, Mekler Bulger Tilson Marick & Pearson Legal Audit Group, 1, 2 (March 2007) (high incremental charges artificially inflate fees). Relevant factors an arbitrator may consider in this regard include the terms of the written fee agreement, the frequency with which apparent minimum billing entries appeared on the bills, and whether there is evidence that the lawyer was judicious in not employing the high minimum billing entries for brief activities either by (1) not recording such activities, (2) aggregating them with other related activities, or (3) "no charged" the entry.

**2. Billing all tasks separately**

Like high minimum increments, billing every task separately may artificially inflate time entries. For example, it does not take more than a few seconds to read most routine documents or correspondence. If a lawyer reads a group of documents or correspondence in a minute or two and then records a minimum time entry for each such document/correspondence, this may artificially increase the time billed to the client.

**3. Large whole number time entries**

If the bills show time entries in whole numbers, especially large time entries such as 8.0, 9.0, or 10.0, these are probably estimates rather than actual time spent and should be scrutinized,

[except where the event involved trial, mediation, day-long deposition, or other inherently extended activity].

**4. Block billing**

Block billing is the practice of assigning one time charge to multiple separate tasks. An extreme example would be a fee bill mailed to a client at the end of the case with a single entry for 200 hours for "work on case" without identifying, among other things, the various individual tasks performed, who performed them, and when. A more subtle example would be a 3.6 hour charge for "review client's e-mail, retrieve file, call with DR re same, and prepare/send reply." In the foregoing example, a client would be unable to determine how much time any one of the listed tasks actually took. More importantly, this type of block billing is prone to hide accountability and prevents a client from discerning which of the listed tasks are compensable and which are not. For instance, in the foregoing example, what if the lawyer [charging $300/hour] decided to personally make a 3-hour drive to and from an off-site storage facility to retrieve the file rather than sending his secretary [whom he pays $15/hour]? In such an instance, the itemized tasks actually took the lawyer 3.6 hours to complete, but in most instances, the 3 hours the lawyer spent retrieving the file may not be compensable. By utilizing block-billing, the client's [and arbitrator's] ability to assess the accuracy [and propriety] of the 3.6 hour charge is impeded.

Block billing may also inadvertently or intentionally inflate the actual time a lawyer takes to complete the listed tasks. For example, if a lawyer bills a client 8.0 hours on a given day to "prepare for trial," that block of time would most likely include, among other things, time for coffee and restroom breaks, personal calls and non-compensable administrative/managerial tasks. Since block billing has the potential of, among other things, camouflaging non-compensable tasks, many judges, fee arbitrators, and commentators regard its persistent and egregious use with suspicion, and some consider the practice a violation of Business and Profession Code §6148(b).

The basic rule is that courts [and arbitrators] have wide discretion to require additional evidence to support the accuracy of block-billed entries. In a mandatory fee arbitration, it is the lawyer's burden to provide such additional support, which may include testimony and documentary evidence. After consideration of such additional support, or lack thereof, arbitrators may assign a reasonable percentage to the block billed entries, disregard them altogether, or determine that other evidence is sufficient to substantiate the hours aside from the block billed entries. The court in *Heritage Pacific Financial v. Monroy*, (2013) 215 Cal.App.4th 972, 1010 held "trial courts retain discretion to penalize block billing when the practice prevents them from discerning which tasks are compensable and which are not." Previously, the court in *Bell v. Vista Unified School Dist*., (2001) 82 Cal.App.4th 672, 689, held that "the trial court should exercise its discretion in assigning a reasonable percentage to the entries, or simply cast them aside" if counsel "cannot further define his billing entries …." In a much harsher tone, the court in *Christian Research Institute v. Alnor*, (2008) 165 Cal.App.4th 1315, 1329 held:

> Similarly, counsel may not submit a plethora of noncompensable, vague, block-billed attorney time entries and expect particularized, individual deletions as the

> only consequence. The trial court could reasonably conclude counsel made no effort to prune the fee request to comply with the law. Counsel erred grievously by attempting to transfer that responsibility onto the trial court. The trial court could reasonably conclude counsel's disregard for the law undercut the credibility of their fee request and, as officers of the court, warranted a severe reaction.

If a lawyer uses block-billing, it may be appropriate for the arbitrator to place on the lawyer the burden of proving that all of the time entries that were block billed are actually compensable and appropriate.

In our prior version of this arbitration advisory titled "Detecting Attorney Bill Padding" (Arbitration Advisory 2003-01)(January 29, 2003), at section C 4 on page 7, the State Bar's Committee on Mandatory Fee Arbitration ["Committee"] opined that block billing "hides accountability and may increase time by 10% to 30%." However, the arbitrator's discretion is not limited to the 10% to 30% range. Rather, as noted above, an arbitrator may consider all evidence to determine the propriety of any block billed entry and may conclude, upon due consideration of all such evidence, that the entire time billed is appropriate or some portion is not.

**5. Standardized work descriptions and lack of detail**

If an arbitrator encounters the exact same phrases used again and again in the fee bills, it is likely that some routine has set in. This may allow some "down time" to find its way into the fee bills. An entry such as "review documents produced by opposition, 7.5 hours" is typical.

Furthermore, generalized time entries such as "research issues", "review file", "attention to file", "discovery", "prepare for trial", "trial prep", and other similar general statements are not specific enough to let the client know what was done. If a lawyer uses such non-specific task descriptions, it may be appropriate for the arbitrator to place on the lawyer the burden of clarifying what was actually done to assess whether the generalized time entries are actually compensable and appropriate.

**6. Wrong times**

Sometimes a client knows that a specific task took less time than was billed. For example, a lawyer charges four hours to attend a deposition in his office, but the corresponding deposition transcript confirms that the deposition started at 10 am and finished at 11 am. A fee bill may charge a client for the lawyer attending an in-person meeting with the client in his Los Angeles office, but the client was out of the country on that day. The lawyer may charge an hour to prepare a letter to the client, but cannot produce the letter at the arbitration. In each instance, the arbitrator should examine all of the evidence presented by the parties to determine whether the disputed task was actually performed and if so, that it took the time recorded in the fee bills. Demonstrably false or inaccurate entries, unless explained, may justify the arbitrator viewing with distrust other disputed billings or time entries.

**7. Timeliness of invoices**

As noted above, if too much time has elapsed between the disputed task and generating the fee bill, the times shown might be estimates or best guesses of the time involved. On the other hand, it is possible that the timekeeper recorded his or her time contemporaneously but did not generate the fee bill for some reason. The lawyer should clarify why the fee bills were not timely delivered. The arbitrator may also examine the fee agreement to determine if the lawyer committed to delivering periodic billing, and other factors such as (1) whether delayed billing came during a period of substantial activity, (2) whether the fee bill was a surprise to the client, (3) whether the claimed fee exceeds estimates or budgets, and (4) whether there were legitimate reasons that prevented the lawyer from timely delivering a fee bill to the client.

**8. Experts and outside investigators**

Lawyers sometimes retain expert witnesses, consultants, investigators and other third-party professionals to assist a client. These third-party professionals typically forward their bills to the lawyer for payment. Sometimes the lawyer pays such third party bills directly and then subsequently sends the client an invoice for the advanced costs. Other times, the lawyer forwards the third party bill directly to the client for payment. Whatever the process used, it is imperative that such third party bills state what was done with adequate detail to allow a client to decipher what was done and how much is being charged. If the lawyer advanced payment for such third party bills, representations and proof that these charges were actually paid should also be produced.

**9. Overhead items**

A lawyer's hourly fee should include consideration for overhead items like rent, support staff wages, telephone service, internet fees, office supplies, library charges, seminars, continuing legal education charges, malpractice insurance and a whole host of expenses a lawyer will incur every day to keep his/her practice operating. Consideration for such expenses explains why lawyers in located in urban cities, like downtown Los Angeles and San Francisco, may generally charge higher hourly rates than their colleagues who rent much less expensive office space in the suburbs and outlying farming communities. Since overhead expenses are a cost of doing business, and should be reflected in the professionals' hourly rates, they should not be passed on to the client unless the client has clearly agreed otherwise in the fee agreement. (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*, (December 6, 1993).

**10. Ministerial, administrative and secretarial tasks**

As noted above, a lawyer's hourly fee should include consideration for support staff wages. Accordingly, it may be inappropriate to allow a lawyer to also charge a client his/her hourly rate for doing secretarial work. For instance, the vast majority of lawyers are able to prepare judicial form interrogatories in less than 5-10 minutes. Their assistants or secretaries then prepare the actual hard document, prepare and attach the proof of service, generate the

stamped envelope and then serves it on the opposing party. Typically, the only service the client should be charged for is the lawyer's 5-10 minutes to determine what boxes to check off on the form interrogatories. But arbitrators will inevitably encounter situations where the lawyer also charges the client the time spent preparing the proof of service and mailing. It is not uncommon to encounter fee bills that charge clients up to an hour for a simple task like preparing and serving form interrogatories. Arbitrators will also encounter situations where lawyers personally type their own correspondence, motions and other documents. This is typically not a problem, unless of course, the lawyer can only type 10-20 word a minute. In such circumstances, the arbitrator should consider the lawyer's typing proficiency, whether support staff is available for such tasks, and whether the hourly fee agreed-upon by the client includes consideration of support staff wages.

Also, operating a law practice requires substantial efforts on the part of the lawyers wholly unrelated to representing clients. This includes dozens of administrative, managerial, and ministerial tasks lawyers must perform every day. In the vast majority of cases, it is inappropriate to seek to charge a client for such non-legal tasks.

**11. Paralegals**

The use of paralegals and unlicensed legal assistants is wide-spread and completely appropriate if disclosed to the client. Guideline 8 of the 2004 update of the ABA Model Guidelines for the Utilization of Paralegal Services states that: "A lawyer may include a charge for the work performed by a paralegal in setting a charge and/or billing for legal services." Courts have addressed and accepted the theory that paralegal fees are appropriately billed and recovered by lawyers under various prevailing party attorney fee recovery statutes. *Missouri v. Jenkins* (1989) 491 U.S. 274; *Richlin Security Service Co. v. Chertoff* (2008) 553 U.S. 571; and *Guinn v. Dotson* (1994) 23 Cal. App. 4th 262. In California, paralegal fees are only compensable if in total compliance with Business and Profession Code §6450. This requires that the paralegal actually qualifies as a paralegal and the type of work/tasks he/she purports to perform is compensable.

Surprisingly, many lawyers do not realize that some tasks performed by a paralegal are not compensable. The test to determine whether a task performed by a paralegal is compensable is not predicated on the person that performs it, but rather on the nature of the task itself. Business and Profession Code §6450 (a) states:

> (a) "Paralegal" means a person who holds himself or herself out to be a paralegal, who is qualified by education, training, or work experience, who either contracts with or is employed by an attorney, law firm, corporation, governmental agency, or other entity, and **who performs substantial legal work under the direction and supervision of an active member of the State Bar of California**, as defined in Section 6060, or an attorney practicing law in the federal courts of this state, that has been specifically delegated by the attorney to him or her. **Tasks performed by a paralegal include, but are not limited to, case planning, development, and management; legal research; interviewing clients; fact gathering and retrieving information; drafting and analyzing legal**

> **documents; collecting, compiling, and utilizing technical information to make an independent decision and recommendation to the supervising attorney; and representing clients before a state or federal administrative agency if that representation is permitted by statute, court rule, or administrative rule or regulation**.

(Emphasis added).

Furthermore, Business and Profession Code §6454 states that the "terms "paralegal," "legal assistant," "attorney assistant," "freelance paralegal," "independent paralegal," and "contract paralegal" are synonymous for purposes of this chapter. Consequently, billing a client for a paralegal or legal assistant's ministerial, administrative, or secretarial duties may be improper, particularly if not disclosed in the fee agreement and explained to the client. However, even if the lawyer disclosed the use of a paralegal or unlicensed legal assistant for ministerial, administrative or secretarial tasks in the fee agreement, the arbitrator may assess whether the consequent fees agreed upon were unconscionable at the time the fee agreement was entered into pursuant to Rule 4-200 of the Rules of Professional Conduct.

Lastly, it is imperative to remember that it is improper for a paralegal to establish the fees charged to the client for the paralegal's services. Business and Professions Code §6450 (b)(8). This prohibition may prove to be a minefield for lawyers utilizing their paralegals to act as calendar clerks, office managers, supervisors or administrators who control and prepare the lawyer's/firm's fee bills.

**12. Canned Briefs-Recycled Work**

Even newly admitted lawyers have access to a library or cache of canned briefs and template documents they may utilize in their practice. These include, but are not limited to, canned or standardized pleadings, motions, discovery requests, and transactional documents like trusts and leases. These canned or standardized documents may have been created by the lawyer or some third source. The issue becomes whether it is appropriate for the lawyer to bill a client any premium for the creation of the original document, or may the lawyer only bill for the revisions made to the canned or standardized document.

As a threshold matter, the ABA long ago opined that:

> In addressing the hypothetical regarding...recycled work product, it is helpful to consider these questions, not from the perspective of what a client could be forced to pay, but rather from the perspective of what the lawyer actually earned.... A lawyer who is able to reuse old work product has not re-earned the hours previously billed and compensated when the work product was first generated. Rather than looking to profit from ... the luck of being asked the identical question twice, the lawyer who has agreed to bill solely on the basis of time spent is obliged to pass the benefits of these economies on to the client. The practice of billing several clients for the same time or work product, since it results in the

> earning of an unreasonable fee, therefore is contrary to the mandate of the Model Rules. Model Rule 1.5.

(American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*, (December 6, 1993); *See also Ethics and Time-Based Billing*, Michael Downey, Law Practice Today, ABA Law Practice Management Section, (January 2006) (Over-billing occurs when "billing the client who received the recycled work product time already billed to another client when that work product was originally created."); *See also, The Moral Compass of the American Lawyer*, Richard Zitrin and Carol Langford, (1999 Ballantine Books)(examples of cases in which lawyers were prosecuted and convicted of bill padding practices including billing multiple clients simultaneously and for recycled work product).

Similarly, the authors of the well-regarded Rutter Guide, caution:

> Attorneys who prepare standardized documents for clients (e.g., wills, partnership agreements) often keep forms of those documents on their computers to use as "templates" that can be revised and customized to suit each client. Absent clear disclosure to the client, attorneys billing on an hourly basis cannot properly add additional hours to a client's bill when revising such an "in-house" form to reflect the time spent preparing the original (template) form. [Orange County Bar Ass'n Form.Opn. 99–001]

*California Practice Guide: Professional Responsibility*, Paul W. Vapnek, Mark L. Tuft, Ellen R. Peck and Justice Howard B. Wiener (Ret.), Chapter 5. Attorney Fees And Fee Agreements, Paragraph 5-945 (2012).

Given the foregoing, in the event a lawyer seeks to charge a client a "premium" for the use of recycled work, the arbitrator should determine if that "premium" was properly stated and disclosed in the written fee agreement. (State Bar of California Committee on Mandatory Fee Arbitration, Arbitration Advisory 1998-03, *Determination of a "Reasonable" Fee*, pages 15-16 (Updated March 20, 2015). If it is not, it may be evidence of bill padding.

**13. Billing multiple clients for the same time**

An arbitrator may encounter situations where the lawyer simultaneously worked on matters of several clients. For example, a lawyer charges two clients the full five hours it took him to attend two court hearings for the two separate clients on the same morning in the same court. The issue is whether each client can be properly billed for the full five hours. Generally, billing multiple clients for the same time raises questions of potential impropriety. The answer typically depends on whether the terms of the fee agreements actually disclosed and explained the manner of billing to the all of the affected clients and the fee agreements of every affected client is fair and reasonable. (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*, (December 6, 1993); State Bar of California Standing Committee on Professional Responsibility and Conduct, Formal Opinion No. 1996-147).

Therefore, if a lawyer seeks to bill the same time to more than one client simultaneously, that arrangement must be fair, reasonable, fully disclosed in the written fee agreements of all affected clients, and fully explained to each client. If it is not, then it may be evidence of bill padding. Additionally, the arbitrator must ensure that, irrespective of how much time the lawyer ultimately bills to any one client for such a collective task, the resulting fees are not unconscionable pursuant to Rule 4-200 of the Rules of Professional Conduct.

**14. Ghost Billing**

"Ghost billing" occurs when a lawyer bills for work or task(s) performed by another person. Variations abound. For example, a paralegal or associate prepares a motion, but the partner in charge bills the time as his/her own. Or a non-employee contract attorney attends a status conference, but the lawyer of record bills the time as his/her own. Ghost billing should be scrutinized as it may constitute (1) a deceptive practice, (2) a violation of Business and Professions Code Section 6148(b), (3) bill padding, and (4) an attempt to collect an unconscionable fee or cost in violation of Rule 4-200 of the Rules of Professional Conduct.

**15. Contract Attorneys**

Another recurring complaint in fee disputes concerns charges for the use of contract attorneys. Lawyers use contract attorneys for a myriad of purposes, including court appearances, conducting legal research, drafting motions or appeals briefs, etc. The resulting complaints typically concern how much the client is ultimately charged for these tasks. The ABA has opined that, if properly disclosed, it is appropriate for the lawyer to mark-up the cost [or add a profit] for work performed by contract attorneys. (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility Formal Opinion 00-420, Surcharge to client for use of a contract attorney (November 29, 2000)). However, disputes result when a lawyer chooses to use a "contract attorney" and then bills for the work performed as a fee at the lawyer's hourly rate, when, in fact, the lawyer is paying the contract attorney a lesser rate.[5]

Anticipated use of contract attorneys should be addressed in the written fee agreement. The written fee agreement should state whether the contract lawyer is billed out as a cost or their time is charged as a fee at indicated rates along with the time of the lawyer's or law firm's other timekeepers (partners and associates). (*See* State Bar of California Standing Committee on Professional Responsibility and Conduct, Formal Opinion No. 2004-165; and The Professionalism and Ethics Committee of the Orange County Bar Association, Formal Opinion 2014-1). Absent such disclosure, the client should only be charged the out-of-pocket cost of the contract attorney.

---

[5] There are numerous other non-billing, ethical considerations that are triggered by the use of contract lawyers. As COPRAC concluded in its Opinion 2004-165: Contract attorney services, and individual lawyers providing contract legal services to lawyers, may provide cost-effective alternatives to consumers of legal services. In using these services, those lawyers hiring the contract attorneys must comply with the ethical rules concerning the disclosure to the client of significant developments in the representation. Both those lawyers doing the hiring and those lawyers who are hired must comply with the ethical rules concerning competence, confidentiality, advertising, and conflicts of interest that apply to their respective roles in any such arrangement.

For example, assume that a lawyer [a solo practitioner], charging her client $300/hour, is unable to attend a status conference. She engages a contract attorney to attend a status conference. The contract attorney then delivers an invoice to the lawyer indicating that it took him 1½ hours to attend the status conference and the cost to the lawyer is $100, which the lawyer pays. Generally, given the foregoing facts, the client should only be charged the $100 paid to the contract attorney. If the lawyer seeks to charge the client some other amount, more than $100 or $450 (1½ hours it took to attend the status conference multiplied by her $300/hour rate), it must be clearly disclosed in the written fee agreement. If it is not, then it may be evidence of bill padding.

However, there are circumstances where the facts are not so clear-cut. For example, some law firms [including large multi-national law firms], occasionally find it necessary to hire groups of contract attorneys to conduct special assignments, like document reviews in large cases involving hundreds of thousands, if not millions, of hard and digital documents. In addition to the hourly rate for the contract attorneys, such law firms also incur office and transportation [and other] costs associated with using the contract attorneys. For example, the law firm may have to allocate a portion of their office space, or rent some additional office space, for the contract attorneys to do their work. In such cases, assuming that the use and charge of the contract attorneys are properly disclosed in the written fee agreement, it may be appropriate for the law firm to charge a premium for the use of the contract attorneys. If there is no such disclosure, in addition to the contract attorney's actual hourly rate, the law firm may also be able to properly charge the client for the associated costs described above. Of course, in such circumstances, it is the law firm's obligation to bear the burden of proof to quantify the associated costs chargeable to the client.

The arbitrator should consider the terms of the written fee agreement and whether the client agreed to pay for contract attorneys at some rate other than the actual cost to the lawyer. In the vast majority of written fee agreements, the term "attorney" or "lawyer" is typically defined to mean only the lawyer and/or law firm hired by the client. While a reasonable extension of this definition may include the defined lawyer's employee associates and partners, it does not necessarily include non-employee contract attorneys to which the client has no relationship. Accordingly, the arbitrator should assess those facts regarding whether the client agreed or acknowledged the use and expense of contract attorneys.

## CONCLUSION

The vast majority of lawyers are honest and their bills are reliable statements of the work and time billed to the client. However, if a client claims to have been over-billed, the arbitrator should, at the very least, (1) evaluate the specificity of the time entries and the process by which the fee bill was prepared, (2) evaluate the staffing used on the matter, (3) evaluate the work performed against the time billed, and (4) look for certain patterns in the descriptions of the work performed, including the time entries, to assess the accuracy and propriety of the time charged to the client.